ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | S1 23 Cr. 151 (JPC) |
| DO HYEONG KWON, | |
| Defendant. | |

The Grand Jury charges:

**Overview**

1.      From at least in or about 2018, up to and including in or about 2022, DO HYEONG

KWON, the defendant, orchestrated schemes to defraud purchasers of cryptocurrencies created

and issued by a company that he co-founded called Terraform Labs PTE, Ltd. ("Terraform").

KWON claimed that Terraform had used blockchain technology to create a self-contained,

decentralized financial world with its own money, payment system, stock market, and savings

bank.    KWON presented Terraform as having developed functioning, reliable financial

technologies on the cutting edge of a movement towards "decentralized finance" (or "DeFi"), in

that Terraform's products purportedly operated largely through automated mechanisms and

economic incentives, and that Terraform's systems were governed by their users rather than by

KWON and his associates and subordinates.   In fact, KWON's constructed financial world was

built on lies and manipulative and deceptive techniques used to mislead investors, users, business

partners, and government regulators regarding Terraform's business.   Behind the scenes, core

Terraform products did not work as KWON advertised, and were manipulated to create the illusion

of a functioning and decentralized financial system in order to lure investors.  KWON engaged in

this deceptive conduct in order to pump up the value of Terraform's cryptocurrencies, which

KWON and entities he controlled (a) possessed in large amounts and (b) sold to investors in exchange for billions of dollars' worth of other assets.

2.     The misrepresentations that DO HYEONG KWON, the defendant, made in furtherance of his schemes to defraud included the following:

a.     **The Stablecoin Misrepresentations**: KWON lied about the effectiveness of the system that lay at the heart of Terraform's cryptocurrency empire, the "Terra Protocol," which purportedly used a computer algorithm to maintain the value of Terraform's so-called "stablecoin" pegged to the U.S. dollar, TerraUSD ("UST"), at a value of $1 for one UST. Beginning at least in or about 2020, KWON and his associates advertised the Terra Protocol, including the economic incentives it created in the market, as sufficient on its own to maintain parity between one UST and one U.S. dollar. In particular, KWON claimed that the Terra Protocol on its own had caused the successful restoration of UST's $1 value after it dropped below 92 cents in or about May 2021. That was a lie. In truth, after the Terra Protocol on its own failed to cause the restoration of UST's $1 peg in May 2021, KWON reached an agreement with executives at a high-frequency trading firm (the "Trading Firm") to have the Trading Firm purchase large amounts of UST to artificially support UST's $1 peg. UST's $1 peg was restored in May 2021 only after the Trading Firm strategically purchased millions of dollars of UST for the purpose of artificially propping up the peg.

b.     **The LFG Misrepresentations**: KWON lied about the governance of the Luna Foundation Guard Ltd. (the "LFG"), a purportedly independent body the creation of which KWON publicly announced in or about January 2022. KWON claimed that the LFG was managed by a governing body that operated independently of Terraform and was tasked with deploying billions of dollars' worth of financial reserves to defend UST's peg. In truth, KWON

simultaneously controlled both the LFG and Terraform at all relevant times following the creation

of the LFG; operated the LFG as an arm of Terraform rather than as an independent entity;

repeatedly made significant financial decisions for the LFG without the prior approval of its

governing body; and treated the LFG's funds as interchangeable with Terraform's funds when it

suited KWON's interests, resulting in KWON misappropriating hundreds of millions of dollars in

assets from the LFG.  KWON and others acting at his direction then sought to launder those

misappropriated funds using a variety of transactions designed to conceal and disguise the nature,

location, source, ownership and control of the funds.

        c.      **The Mirror Misrepresentations**: KWON lied about the control, operation,

and extent of user adoption of an investing application on the Terra blockchain called Mirror

Protocol ("Mirror"), that purportedly allowed for the creation, buying, and selling of synthetic

versions of stocks listed on United States securities exchanges.  KWON claimed that Mirror

operated in a decentralized manner and that he and Terraform played no role in Mirror's

governance.  In truth, KWON and Terraform secretly maintained control over Mirror, and used

automated trading bots to manipulate the prices of synthetic assets issued by Mirror.  KWON

funded those manipulative trading bots in part by using a supply of one billion stablecoins that he

created at the genesis of the Terra blockchain (the "Genesis Stablecoins").  KWON also caused

Terraform to inflate key user metrics to deceive investors about the extent of Mirror's adoption

and decentralization.

        d.      **The Chai Misrepresentations**: KWON falsely claimed that the Terra

blockchain was being used to process billions of dollars in financial transactions for the Korean

payment-processing application Chai.  KWON pointed to Chai's purported use of the Terra

blockchain as evidence that Terra had "real world" applications or uses, as distinct from competing

cryptocurrency platforms.  In truth, Chai processed transactions through traditional financial processing networks, not the Terra blockchain.  To create the illusion that Chai processed transactions through the Terra blockchain, KWON and his co-conspirators used an automated process that copied transactions onto the Terra blockchain.  KWON used the Genesis Stablecoins in part to fund these fraudulent efforts.

        e.    **The Genesis Coin Misrepresentations**: When the Terra blockchain was first established in or about 2019, KWON arranged for it to have a preexisting supply of approximately one billion Terra stablecoins (the Genesis Stablecoins).  KWON provided limited, shifting, and knowingly false disclosures to investors about the Genesis Stablecoins.  Rather than using the Genesis Stablecoins solely for the purposes set forth in his limited and shifting disclosures to investors, KWON used the Genesis Stablecoins for fraudulent purposes, such as funding (i) fake Chai blockchain transactions and (ii) trading bots to manipulate the prices of synthetic assets issued by Mirror.

        3.    Enticed, in part, by the fraudulent claims of DO HYEONG KWON, the defendant, both institutional and retail investors flocked to the Terra blockchain, such that, at its peak in the spring of 2022, the total market value of all UST and another Terraform cryptocurrency, LUNA, exceeded $50 billion.  Much of this growth followed KWON's brazen deceptions about Terraform and its technology, including efforts by KWON and his associates to paper over UST's vulnerabilities in May 2021 by secretly manipulating the market for UST.

        4.    By May 2022, UST's peg began to break again.  By this time, the UST market was (a) approximately nine times larger in terms of market capitalization and (b) more than eight times larger in terms of daily trading volume relative to one year prior, in May 2021, when the Trading Firm was able to assist DO HYEONG KWON, the defendant, in deceptively manipulating UST

to maintain its $1 value.  These significantly changed circumstances led Trading Firm personnel in May 2022 to refer to the secret prior peg defense as taking place in "simpler times," and to note that "[u]nfortunately it wasn't so simple this time" compared to when "about $100 M[illion] committed was enough to re-peg."  While KWON was able to cover up the weaknesses of the Terra Protocol in May 2021, he was not able to do so in May 2022 when the market had expanded substantially.  As a result, UST and LUNA crashed, resulting in over $40 billion worth in investor losses.

5.    After the crash of UST and LUNA in May 2022, and the initiation of government investigations in multiple jurisdictions into the crash, DO HYEONG KWON, the defendant, sought to continue Terraform's business operations and made public misrepresentations about being in "full cooperation" with law enforcement inquiries.  In truth, KWON fled to foreign jurisdictions in which he believed he could purchase political influence and evade legal accountability for his fraudulent conduct by using the substantial resources he had obtained through fraud.  In a recorded conversation with an associate in or about August 2022, KWON stated, in substance and in part, that his strategy with law enforcement investigating the crash of UST and LUNA was to "tell them to fuck off," and that he had been taking steps to obtain "political protection" from multiple countries and was "pretty comfortable" that he would not be extradited to face criminal charges.  On or about March 23, 2023, KWON was arrested in Europe for trying to use a fraudulent passport to travel to a country in the Middle East that does not have an extradition treaty with the United States.

**Background on Terraform and its Products**

6.    **Terraform**: Terraform was founded by DO HYEONG KWON, the defendant, and another individual (the "Co-Founder") in or about 2018, and incorporated under the laws of

Singapore. Terraform employed personnel around the world, including in the United States. Early in its existence, Terraform's operations were closely intertwined with the business that operated Chai (which operated through a variety of affiliated entities, such as Chai Pay Holding Company Pte. Ltd. and Chai Corporation, together referred to herein as "Chai Co"). During that early time period, Terraform and Chai Co. shared employees and office space. However, KWON and the Co-Founder separated the business operations of Terraform and Chai Co. in or about March 2020 because of regulatory restrictions that applied to Chai Co. due to its status as a licensed electronic payments business. Thereafter, KWON became the CEO of Terraform, and the Co-Founder became the CEO of Chai Co. KWON and the Co-Founder each remained a shareholder of Terraform as well as Chai Co., with KWON owning approximately 92% of the equity in Terraform.

7.    **The Terra blockchain**: Terraform's business centered on the Terra blockchain. A blockchain is a distributed electronic database or ledger that is shared among the nodes of a computer network. In theory, the distributed nature of electronic information ensures that accurate electronic records can be maintained even if one part of the system fails or if some of the nodes become corrupted. Terraform constructed the Terra blockchain using popular and publicly available software components and its basic design resembled that of many other blockchains. DO HYEONG KWON, the defendant, and other Terraform personnel frequently touted the fact that the Terra blockchain and its core products were purportedly decentralized, *i.e.*, that the broader community of users of the blockchain and its applications controlled their operation, as opposed to KWON and other Terraform personnel maintaining centralized control.

8.    **LUNA**: Terraform first began promoting the private sale of LUNA in or about 2018. DO HYEONG KWON, the defendant, along with others, created and promoted LUNA as

the Terra blockchain's native token that could be used both to earn financial rewards and to play a role in the governance of the system. Specifically, by "staking" LUNA within the Terra blockchain, i.e., agreeing to lock up LUNA tokens within the system in a particular manner, holders of LUNA received the right to earn fees from transactions on the Terra blockchain and to vote on certain decisions affecting the blockchain. An increase in the number of transactions on the Terra blockchain would lead to greater rewards for LUNA holders who staked their tokens. Terraform promoted LUNA to investors as providing "equity in Terra's decentralized economy."

9. **Do Kwon**: DO HYEONG KWON, the defendant, co-founded Terraform in or about 2018, and served as its CEO from in or about 2020 through in or about 2023. KWON initially led engineering and research at Terraform, and involved himself in the technical details of Terraform's projects. For example, KWON co-authored a white paper concerning the design of core aspects of Terraform's technologies and participated in the software development of the initial iterations of the Terra blockchain. KWON also represented Terraform to the public. KWON met with investors and potential investors, gave media interviews, and attended cryptocurrency industry conferences to promote Terraform and its products. KWON solicited and obtained investments from a number of investment firms in the United States and other locations, with the investments primarily consisting of agreements for the purchase or loan of Terraform's cryptocurrencies such as LUNA. KWON become one of the most prominent business leaders in the cryptocurrency industry due to his work at Terraform, which led Forbes Magazine to name him to its "30 Under 30" list for Finance & Venture Capital in Asia in 2019.

10. **The Terra Protocol**: Terraform distinguished the Terra blockchain from other competing blockchains by issuing so-called algorithmic stablecoins pursuant to what it called the "Terra Protocol." As described by DO HYEONG KWON, the defendant, and others, these

stablecoins maintained a steady value even under changing market conditions. This stable value was purportedly maintained through an automated algorithmic mechanism in which users could exchange a Terra stablecoin on the Terra blockchain for a certain amount's worth of LUNA at a guaranteed price, and *vice versa*, regardless of the market price of the stablecoin at the time. Users could also exchange one type of Terra stablecoin for another through the Terra Protocol. Terraform referred to this process of on-chain exchange of one Terraform token for another as "burning" an old token and "minting" a new token. While many competing stablecoins were backed largely or entirely by reserves of fiat currency or other monetary instruments, KWON touted the Terra stablecoins as backed principally by the promise that the stablecoin could be exchanged for LUNA at a certain price. The blockchain's "smart contracts" supposedly adjusted arbitrage incentives relating to the burning and minting process in order to regulate the supply of Terra stablecoins and LUNA to maintain a steady value for the stablecoins.

11.    **UST**: Terraform publicly announced the launch of UST in or about September 2020. Terraform promotional materials claimed that, under the Terra Protocol, one UST could always be exchanged for $1 worth of LUNA through the on-chain burning and minting process, and $1 worth of LUNA could always be exchanged for one UST. This relationship was supposed to maintain a $1 unit value for UST through an algorithmic maintenance of the supply of both coins that relied on arbitrage incentives. According to statements made by DO HYEONG KWON, the defendant, and others at Terraform, if the market price of UST dropped below $1, market participants would be incentivized to burn UST to mint $1 worth of LUNA for each burned UST. This would reduce the supply of UST, and thus cause its value to return to $1 under the economic law of supply and demand. Conversely, if the market price of UST exceeded $1, then market participants would be incentivized to burn LUNA to mint UST at a rate of $1 worth of LUNA for

UST worth more than $1. This would increase the supply of UST, and thus cause its value to return to $1 under the economic law of supply and demand. Thus, while LUNA was designed to fluctuate in value, UST was supposed to maintain a steady value of $1 through the arbitrage incentives created by the Terra Protocol. The existence of this mechanism was supposed to assure investors that UST's price would remain fixed at approximately $1, and to value UST accordingly.

12.    **Terraform's "DeFi" Applications and Entities**: Over time, Terraform and its affiliated entities developed and launched various purportedly decentralized finance applications and entities designed to increase the number of users and transactions on the Terra blockchain, including the following:

a.    **Chai**: Chai was a Korean payment platform that purportedly began using the Terra blockchain to process financial transactions in or about June 2019, creating both (i) a real-world application for the Terra blockchain; and (ii) a means of generating substantial fees for LUNA holders.

b.    **Mirror Protocol**: Mirror, a platform launched in or about December 2020 that allowed for the creation, buying, and selling of synthetic versions of financial assets, such as stocks listed on United States securities exchanges, using the Terra blockchain. These synthetic financial assets were called "mAssets."

c.    **Anchor Protocol**: Anchor, a platform launched in or about March 2021 that allowed for the borrowing and lending of UST, and that offered an approximately 20% annual return for UST deposited in Anchor.

d.    **The Luna Foundation Guard**: The LFG, an entity incorporated in Singapore in or about December 2021 and publicly launched in or about January 2022, eventually maintained billions of dollars' worth of financial reserves in the form of other cryptocurrencies such as bitcoin

(the "LFG Reserve") purportedly to support UST's peg to the dollar. The LFG was promoted as being governed by an independent body of industry experts (the "LFG Governing Council").

## The Stablecoin Misrepresentations

### *Kwon Sees Opportunity in Cryptocurrency Depending on One's "Moral Constitution"*

13.     DO HYEONG KWON, and the Co-Founder first began discussing the creation of a stablecoin in or about early January 2018. In an email exchange that month, the Co-Founder asked KWON's view on the many cryptocurrencies being launched around that time, observing that it "[a]lmost seems like a huge ginormous bubble that we should somehow partake in before it crashes?" KWON responded that there were "[g]ood returns to be had" on different kinds of cryptocurrency projects "depending on your risk appetite / moral constitution ;)." The Co-Founder observed to KWON that there were "frothy market conditions" in the cryptocurrency industry in which it "almost feels stupid not to take part," and that the requirements for a successful cryptocurrency launch had "nothing to do with the fundamentals of the business," but rather depended on a "convincing and lofty white paper" and a "deep network of big name partners," among other assets. Later in that email exchange, KWON offered his thoughts on the design of a potential algorithmic stablecoin, advocating for developing a stablecoin that used a "clever algorithm" and "curation" by a centralized foundation as a "[w]inning strategy." KWON also observed that for algorithmic stablecoins, "[s]tability has not been proven" and that a "catastrophic event (market-wide crash) could de-peg the coin."

### *Kwon Promotes the Terra Protocol*

14.     DO HYEONG KWON, the defendant, began promoting Terraform's cryptocurrencies to potential investors in or about 2018, and came to serve as the principal public face of Terraform through the crash of UST and LUNA in May 2022.

15.    In public presentations and conversations with potential investors and others, DO HYEONG KWON, the defendant, and others acting at his direction, promoted the Terra blockchain by emphasizing the design of its stablecoins, including UST, that operated through the purportedly automated and decentralized Terra Protocol.  For example, in a videorecorded interview that was published on a financial news website on or about October 25, 2021, KWON promoted the purportedly decentralized nature of Terraform's cryptocurrencies, including in the following statement:

> It is crucial that a decentralized economy and these decentralized apps depend on decentralized money.  And that is essentially sort of the core thesis behind what Terra is working on in the sense that we have these stablecoins that are pegged to various different fiat currencies such as the U.S. dollar, the Korean won, the SGD [Singapore dollar] and so on and so forth that are entirely decentralized and cannot be censored.

An image from that interview is reproduced below, including a graphic showing the significant increase in the value of LUNA:



As another example, in an interview on the cryptocurrency news program "Unconfirmed" that was distributed via YouTube and podcast on or about October 29, 2021 (the "October 2021

Unconfirmed Podcast"), KWON made the following statement:

> So the differentiator of TerraUSD versus some of the better known stablecoins in the industry such as Tether and USDC is that it's decentralized and algorithmic. Right? So while uh for something like Tether there is a dollar in bank deposits uh, supposedly, for every unit of stablecoin that's issued, Terra uses a set of on-chain incentives to make sure that the coin can maintain price parity with the dollar.

As discussed in greater detail below, KWON's representations to investors about how Terraform's stablecoins would maintain their stability shifted over time as KWON increasingly sought to portray the Terra blockchain and its products as decentralized and automated.

### Kwon's Early Statements About the Need for a Reserve to Support the Terra Protocol

16.    In or about the first year of Terraform's existence, DO HYEONG KWON, the defendant, made less ambitious statements about the strength of the Terra Protocol compared to the claims he would make later on. This early messaging coincided with Terraform's first two rounds of fundraising from investors, including a first seed round approximately between April and May 2018, and a second seed round approximately between August and October 2018. In that earlier time period, KWON represented to investors in promotional materials that his stablecoins would not rely solely on the Terra Protocol to maintain their consistent value, but also on substantial reserves of both fiat currency and LUNA to ensure the stability of Terraform's stablecoins. For example, in 2018, KWON distributed a document promoting the private sale of LUNA (the "2018 Private Offering Document") that made the following representations:

a.    Terraform would initially devote 80% of its funds to a centralized "temporary fiat reserve" and then "gradually transition from leaning on the fiat reserve to functioning as a fully decentralized system." The contemplated centralized reserve of fiat currency was to "act as a guarantor of last resort, ensuring the ability to buy up Terra during extreme market

downturns" and provide "an additional layer of safety to the Protocol" that "need[ed] to be put in place in the early days after network launch, when the ecosystem is most vulnerable."

        b.    Terraform would also establish a longer term, decentralized "Stability Reserve" of LUNA, consisting of 20% of the total supply of LUNA (*i.e.*, 200 million out of the one billion total LUNA tokens) "to protect the stability of the system" and supplement the Terra Protocol, with the balance of the total supply of LUNA allocated to Terraform employees (200 million LUNA) and investors and business partners (600 million LUNA). In the longer term, according to the 2018 Private Offering Document, Terraform would rely on both the Terra Protocol *and* the Stability Reserve of LUNA to maintain the stability of the company's stablecoins, and Terraform was "confident that the decentralized Stability Reserve and the Terra Protocol [would] be effective in guaranteeing solvency in the long run."

### *Kwon Begins Claiming that the Terra Protocol Alone Will Maintain the Peg*

        17.    Leading up to UST's launch in or about 2020, DO HYEONG KWON, the defendant, began making substantially different representations to many investors about how Terraform's stablecoins would maintain their stability. Specifically, KWON began promoting the Terra Protocol to investors as sufficient on its own to maintain the fixed value of UST, without the support of any sort of financial reserve. This shift in messaging coincided with Terraform seeking a new "growth" round of funding from investors beginning in or about the middle of 2019.

        18.    This shift was reflected in revisions to an investor presentation document distributed by DO HYEONG KWON, the defendant, and others at Terraform. An early version of that document, distributed in or about July 2018, included a slide referencing the establishment of a "stability reserve" (depicted below on the left, with relevant text highlighted); however, a

version of that document distributed approximately one year later, in or about July 2019, removed the reference to a "stability reserve" from a substantially similar slide (depicted below on the right).

 

The revised July 2019 version of the slide deck also portrayed the Terra Protocol as the exclusive mechanism through which Terraform's stablecoins would maintain their pegs, asserting that "[t]he system maintains Terra's price peg by standing ready to swap Terra and Luna at the peg," as reflected in the excerpt below.

**HOW LUNA IS USED TO STABILISE THE PRICE OF TERRA**

The system maintains Terra's price peg by standing ready to swap Terra and Luna at the peg

Illustrative example of stabilisation mechanism in contractionary cycle

If TerraUSD's price < $1 e.g. $0.99, users can send 1 TerraUSD to the system and receive $1 worth of Luna in return

Selling Luna on the open market therefore generates a riskless profit of $0.10

As users exploit the arbitrage opportunity, the circulating supply of TerraUSD decreases, bringing the price back to peg

Luna supply temporarily increases above equilibrium issuance, and to compensate validators, the protocol increases transaction fees accordingly

The protocol adjusts transaction fees and allocation of new money (seigniorage) to maintain stable demand for Luna in all economic conditions

Thus, by the time UST was launched in or about 2020, KWON represented to investors that the Terra Protocol, including the the economic incentives it created, was the sole mechanism that would be used to maintain the pegs of Terraform's cryptocurrencies.

19.     DO HYEONG KWON, the defendant, caused Terraform to repeatedly represent to investors between in or about 2019 and in or about 2021 that the Terra Protocol, including the economic incentives it created in the market, was sufficient on its own to maintain the fixed value of UST.  Indeed, Terraform's promotional materials began to advertise the Terra Protocol as the exclusive mechanism through which Terraform's stablecoins would maintain their pegs.  KWON and others at Terraform touted this as proof of the decentralized nature of the Terra blockchain and its core products.  For example:

a.     On or about February 22, 2019, Terraform's head of research published an article titled "Introducing the New Terra Protocol" explaining how the Terra Protocol maintained the price pegs of Terraform's stablecoins.  Later, on or about September 16, 2020, KWON sent a link to that article to a business partner and explained, "We have an algorithmic stability model where the protocol 'makes the price' of the stablecoins by allowing tokens to be swapped at par with luna."  The business partner asked in response, "so there is no reserve right?"  KWON replied, "no reserve."

b.     On or about October 21, 2020, KWON caused Terraform to publish a video on its YouTube channel titled "How Does Terra Work?"  The video explained, in substance and in part, that Terraform had "designed a machine that swaps one dollar worth of LUNA to one UST" (*i.e.*, the Terra Protocol algorithm) and this mechanism, combined with market incentives, would respond to any variation in UST's price by "bringing its price back to the $1 peg."  A portion

of that video with an animated depiction of Terraform's Terra Protocol "machine" is depicted below:



The video also stated that "much like the moon which stabilizes the earth's rotation, LUNA and its stakers are essential to Terra's stability. Join us on our mission to create a truly open and transparent monetary platform that no one controls, setting money free for billions worldwide."

      c.     In or about 2021, KWON and other Terraform employees distributed a fundraising document to multiple investors asserting that the Terra Protocol "keeps UST on peg."

20.     DO HYEONG KWON, the defendant, gave numerous interviews in which he promoted the Terra Protocol, including the economic incentives it created, as the sole mechanism that maintained UST's peg.  For example:

a.     In an interview on a podcast called "The MikoBits Show" that was distributed on or about January 28, 2021, KWON stated, "So Terra is different in the sense that it's an algorithmic stablecoin, so, which means there are no reserves that are backing the stablecoin."  An image from a video version of that interview posted to YouTube is reproduced below:



b.     In an interview on a podcast called Modern Finance that was distributed on or about June 22, 2021, KWON was asked by the host, "how do you maintain the peg?"  KWON responded, in substance and in part, "at any given time the protocol it basically acts as the price

maker for Terra, regardless of what its secondary market prices might be." KWON claimed that this was possible because there were "tons of different traders" who used automated trading "bots" to take advantage of the arbitrage opportunities provided by the Terra Protocol.

        c.      In an interview on a podcast called "This Week in Startups" that was distributed on or about July 22, 2021, KWON stated "so Terra USD is in sort of a burgeoning class of stablecoins called algorithmic stablecoins and the idea is there that while the currency remains itself pegged to a fiat currency like the dollar it's not backed explicitly by a dollar in the bank account instead it uses a set of game theoretic incentives that live on a blockchain uh to make sure that the currency retains its value against the dollar . . . ."

21.      With respect to Terraform's early investors who had once been told by DO HYEONG KWON, the defendant, that the Terra Protocol needed a stability reserve as a backstop, KWON claimed that such a support system was no longer necessary. On or about January 6, 2021, KWON sent messages to multiple early LUNA investors asserting that "[m]any of the use cases for tokens that we had designed when we first launched the network don't make sense anymore" such as "a stability reserve."

22.      As DO HYEONG KWON, the defendant, promoted UST and the strength of the Terra Protocol, the market capitalization of Terraform's cryptocurrencies increased dramatically,

from under $200 million in or about the end of 2019 to over $40 billion by the end of 2021, as depicted in the chart below:



*The Trading Firm's Agreements With Terraform*

23.    In or about November 2019, Terraform entered into a formal written investment agreement with the Trading Firm.  Under that agreement, and an amendment to the agreement signed in September 2020, the Trading Firm had the right to obtain up to 65 million LUNA at specified prices under $1.  However, the agreement contained certain restrictions on the Trading Firm's rights to obtain the LUNA.  Specifically, the agreement divided the 65 million LUNA into different tranches, with each tranche including separate threshold requirements for the Trading Firm to receive a certain amount of LUNA.  The threshold requirements consisted of the Trading Firm minting a certain number of UST, and cryptocurrency exchanges experiencing certain volumes of UST trading.

24.    Separate from those formal agreements, in or about August 2020, the Trading Firm and Terraform entered into a "gentleman's agreement" for the Trading Firm to help maintain UST's $1 peg.  That agreement was reflected in an August 25, 2020 email between an executive

at the Trading Firm ("Trading Firm Executive-1") and DO HYEONG KWON, the defendant, and was not publicly disclosed. In the email, Trading Firm Executive-1 proposed financial incentives "that align us in the most direct fashion," and referenced the "gentleman's agreement" that, among other things, the Trading Firm would "support trading on terra stable coin pairs on all exchanges we're connected to and help maintain the peg." In a subsequent internal email, Trading Firm Executive-1 sent an email stating that he viewed the Trading Firm's investment with Terraform as potentially resulting in a "multi-billion dollar enterprise" and "a pile of profits and money printing machine that spits out a continuous stream of widely adopted stablecoins."

### *The May 2021 Depegging of UST*

25.    In or about May 2021, approximately one year before the crash of UST and LUNA, UST's $1 peg began to break and UST traded substantially below $1 on cryptocurrency exchanges. By on or about May 23, 2021, the market price for both UST and LUNA had fallen significantly, with UST dropping below 92 cents and LUNA losing approximately 75% of its peak value over a period of days, as depicted in the chart below.



20

As UST's market price remained below $1, the market price of LUNA declined to the point that the total market capitalization of LUNA (which purportedly supported the value of UST through the Terra Protocol) fell below the total market capitalization of UST, as depicted in the chart below.



Under those circumstances, the Terra Protocol could not even in theory have operated as promised and provide UST holders with $1 worth of LUNA for every UST token because the aggregate amount of LUNA in existence did not have sufficient value to be redeemed for the aggregate face value of all UST in existence, *i.e.*, the market cap of UST exceeded the market cap of LUNA.  As a result, the decline in the prices of both UST and LUNA in May 2021 posed systemic risks to the viability of UST.

26.     The substantial drop in the price of UST in or about May 2021 resulted in the "burning" of large amounts of UST in order to "mint" LUNA, a dynamic that DO HYEONG KWON, the defendant, had advertised as the means by which the Terra Protocol would restore UST's $1 peg.  However, one aspect of the Terra Protocol design significantly limited its effectiveness when the protocol experienced a high volume of "burn" requests going in only one

direction: KWON designed the Terra Protocol to impose increasingly large transaction fees under those circumstances. Thus, when the Terra Protocol experienced many more requests to burn UST than to burn LUNA, burning UST resulted in receiving less than $1 worth of LUNA due to the higher transaction fees, reducing the incentive to actually use the Terra Protocol. In May 2021, the Terra Protocol was configured to effectively handle only approximately $20 million in redemptions of UST for LUNA before fees grew to a level that it became unprofitable to use the Terra Protocol as an arbitrage mechanism. This fee structure acted as a throttle on the Terra Protocol's effectiveness in the face of significant selling or buying pressure for UST, and was not disclosed in many of Terraform's promotional materials.

### The Trading Firm's Secret Role in Restoring the UST Peg in May 2021

27.     After UST began to lose its $1 peg in May 2021, DO HYEONG KWON, the defendant, negotiated a secret oral agreement with the Trading Firm pursuant to which the Trading Firm agreed to purchase tens of millions of dollars of UST and LUNA for the purpose of artificially propping up UST's $1 peg. In exchange, KWON agreed to accelerate the delivery of LUNA to the Trading Firm under the parties' investment agreements. This *quid pro quo* agreement between Terraform and the Trading Firm was never memorialized in writing, and the accelerated LUNA delivery schedule was not included in a written contract between the parties until in or about July 2021.

28.     As a result of the May 2021 secret agreement between DO HYEONG KWON, the defendant, and the Trading Firm, the Trading Firm authorized its traders to spend tens of millions of dollars to artificially prop up UST. The Trading Firm suspended certain automated trading strategies relating to UST and LUNA that had long been in place, and began placing manual trades to support UST's peg. An internal Trading Firm document noted that as of May 23, 2021, "LUNA

[was] down 40%" and this gave rise to a "fear of a run on the bank given that UST is 'backed' by LUNA and LUNA market cap dipped below UST market cap . . . ." The document noted that under these circumstances, the Trading Firm "[n]eeded to support UST directly" on a particular cryptocurrency exchange (rather than using the "on chain" Terra Protocol), and that the Trading Firm had put in place a trading strategy to sell up to $50 million worth of another cryptocurrency (Tether) for UST. Ultimately, the Trading Firm authorized its traders to spend up to $100 million worth of assets to defend UST's $1 peg should it prove necessary.

29.    The Trading Firm's purchases of UST after the coin lost its $1 peg in May 2021 made up a substantial portion of purchases in a key market for UST at critical times. For example, during an approximately thirty-minute period on May 23, 2021, the Trading Firm made over 90 percent of the UST purchases in one major UST trading marketplace. Specifically, on the morning of May 23, 2021, the Trading Firm manually purchased millions of dollars' worth of UST using the stablecoin Tether on the cryptocurrency exchange KuCoin, contributing to an increase in the market price of UST, as depicted in the chart below.



30.    The Trading Firm's purchases of UST on May 23, 2021 and May 24, 2021 were principally aimed at artificially propping up the market price of UST, as opposed to obtaining UST at the best available price in the market. For example, the Trading Firm placed orders on a cryptocurrency exchange to purchase UST at prices that were higher than the prevailing market

price on that exchange. In other words, the Trading Firm agreed to pay more than market price for UST as part of an effort to artificially inflate the value of UST towards its advertised $1 price.

31.     Following the Trading Firm's purchases of substantial amounts of UST and LUNA in May 2021, UST returned to an approximate market price of $1.

32.     DO HYEONG KWON, the defendant, and others within Terraform believed that but for the Trading Firm's artificial support for UST's $1 peg in May 2021, the token would have collapsed at that time, and expressed that view to other Terraform personnel. For example, KWON stated to a Terraform employee that if the Trading Firm had not propped up UST, Terraform might have been "fucked." Also, an internal Terraform employee resource manual from 2021 explained that the Trading Firm was "quietly one of the biggest players in crypto" and "the biggest on-chain market maker of UST and saved our ass in May this year."

33.     The Trading Firm earned substantial profits as a result of the restoration of UST's $1 market price in May 2021. In total, the Trading Firm made over $1 billion in profits from its investment in Terraform's cryptocurrencies, principally by exercising its options to purchase LUNA at or around 40 cents per token under its agreements with Terraform, and selling significant quantities of that LUNA prior to the May 2022 crash, when LUNA's market price peaked at over $115 per token. Over 90% of the Trading Firm's profits on LUNA were made between May 2021 and May 2022, and thus would not have been obtained had LUNA and UST crashed in May 2021 rather than May 2022.

### Misrepresentations About the Means Used to Restore UST's Peg in May 2021

34.     After the May 2021 temporary depegging event, DO HYEONG KWON, the defendant, and others acting at his direction, misrepresented the means that had been used to restore UST's $1 peg, concealing that KWON had reached a secret agreement for the Trading Firm

to deploy its funds for the purpose of artificially restoring UST's peg. KWON, and others acting at his direction, falsely claimed that Terra Protocol's algorithmic mechanism by itself restored the peg without financial support. For example:

    a.  On or about May 24, 2021, KWON caused Terraform to state the following on Twitter: "The peg is gradually normalizing again and will continue to do so as volatility subsidies. Remember, volatility at this scale is ephemeral, not permanent. On-chain swap spreads are healing . . . . The drawdown in the price of LUNA, UST peg deviation, and collateral effects across the ecosystem in such extreme market volatility is about as intense of a stress test in live conditions as can ever be expected. We just experienced a black swan. Despite sharp dislocations the on-chain swap spread is mending. UST peg is normalizing, and UST's role as a centerpiece of demand for the Terra ecosystem has not changed – buttressing the growth of the Terra economy as the system bounces back from distress."

    b.  In a podcast called Terra Bites that was distributed on or about May 29, 2021, an interviewer asked KWON about the success of the Terra Protocol during the temporary depegging of UST earlier that month, stating "there was no particular special action taken that I'm aware of by the Terra team, or even the community, in order to bring things back in line and it just took a while for UST to recover its peg. Do you think that's accurate? How, I mean I think it did pretty well. I mean it didn't come collapsing." KWON responded as follows, in substance and in part:

> Yeah . . . So, I think one of the good things about this is that, you know, even though we've studied and been working on the Terra protocol for a really long time now, we've never had a stress test of this magnitude. And I think what we've proved is that the Terra Protocol indeed does need a lot of, what has been up to now, purely theoretical assumptions. And that it can survive black swan events, and then sort of, sort of, you know, total death spiral of all of these different assets and economies all at once. So I think that that's been good. . . .

c. On or about June 9, 2021, Terraform's head of communications (the "Terra PR Executive") published an article titled "Stablecoins — Defining the Terra Algorithmic Design," that discussed the May 2021 temporary depeg of UST. In the article, the Terra PR Executive described the Terra Protocol as the exclusive mechanism for maintaining the pegs of Terraform's stablecoins, stating that Terraform defended those pegs "indirectly via arbitrage incentives," and that the Terra Protocol "valiantly" handled market volatility in May 2021. The following year, on or about April 18, 2022, the Terra PR Executive directed a reporter for a national newspaper to that article, and stated about the May 2021 depegging event: "Terra absorbed what many critics call a 'Death Spiral' or 'Black Swan' in a 75% drawdown in the LUNA price, with the UST peg recovering naturally via the protocol's mechanics and free market dynamics. . . . It's hard to imagine a more significant volatility event than what occurred during that period in such a young stage of the Terra protocol, and Terra passed the test."

d. In an October 4, 2021 videorecorded interview of KWON broadcast on the YouTube channel of a cryptocurrency entrepreneur, the interviewer stated that with respect to the May 2021 depegging of UST that they were "actually was quite impressed with UST dropping I think only 10 cents or so, which was interesting to see and I think built confidence in the project," and asked whether "Terraform Labs participates at all in market making to keep UST at peg?" KWON responded that "we don't really do much of that anymore," and stated that "there's like a number of large market makers that participate in stabilizing the peg of UST. Most of them—I don't think any of them have a contractual relationship with us. It's just something that they do because they feel like they can make money out of it . . . ." KWON's statement was knowingly false and misleading. As KWON well knew, the Trading Firm had a "gentleman's agreement" with Terraform to support UST's $1 peg, and the Trading Firm purchased large amounts of UST

in May 2021 in exchange for an oral promise by KWON to accelerate the delivery of LUNA to the Trading Firm under the parties' investment agreements.

      e.  In another interview with the cryptocurrency research and investment firm Delphi Digital, specifically a podcast distributed on about October 5, 2021, KWON remarked about the May 2021 depegging of UST, in part, "We handled our prices pretty well.  So as swaps were happening we saw the price peg of Terra USD slip 6 and 7 percent for a period of few days, but then it recovered as redemptions started to sort of smooth out in the open market.  I think the reason that I would have to give as to why Terra is more resilient than other types of algorithmic stablecoins is because there's a vibrant economy that is built, that is being built, on the Terra blockchain."

      f.  During a March 1, 2022 episode of an audio talk show called the Ship Show that was publicly distributed on Twitter, and that was hosted by personnel from the Trading Firm, KWON spoke about the May 2021 depegging event, stating, in part, "it took a few days for the slippage cost to naturally heal back to spot . . . the protocol automatically self-heals the exchange rate back to whatever the spot price is being quoted by the oracle.  So that's why it took several days for the peg to recover."

35.    After UST's $1 peg was restored in May 2021, investors continued to  purchase UST and LUNA, including based on false representations by DO HYEONG KWON, the defendant, and others that the Terra Protocol was the sole mechanism that KWON and Terraform had deployed to restore UST's $1 peg in May 2021.

### The Establishment of the LFG Following UST's Undisclosed Vulnerability

36.    DO HYEONG KWON, the defendant, subsequently worked to create a new financial reserve—the LFG Reserve—to defend UST's $1 peg, without disclosing the Trading

Firm's secret deployment of its own funds in May 2021 to artificially prop up UST's $1 peg. The LFG Reserve eventually held almost $3 billion worth of bitcoin, among other cryptocurrency assets. Rather than being promoted as a critical attempted fix for a demonstrated vulnerability in the stablecoin mechanism, the LFG Reserve was touted in a February 22, 2022 LFG press release as merely providing "a further layer of support." Trading Firm Executive-1, who was a member of the LFG Governing Council, provided the following statement for that press release: "[The LFG Reserve] further strengthens confidence in the peg of the market's leading decentralized stablecoin UST. . . . It can be used to help protect the peg of the UST stablecoin in stressful conditions. This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions." The press release omitted any reference to the depegging of UST in May 2021, and the fact that KWON negotiated an agreement for the Trading Firm to deploy its funds for the purpose of artificially restoring UST's peg at that time.

### The Explosive Growth of UST and LUNA After May 2021

37.    By in or about May 2022, one year after the May 2021 temporary depegging of UST, the total market value and trading volume for UST and LUNA had increased substantially. UST's total market value increased from approximately $2 billion to approximately $18 billion, and LUNA's total market value increased from approximately $5 billion to approximately $29 billion. The average daily trading volume of both coins also increased significantly over that one-year time period: UST's average daily trading volume increased from under $100 million to over $800 million, and LUNA's average daily trading volume increased from approximately $500 million to approximately $2.5 billion. Thus, when UST's peg began to break again in May 2022, DO HYEONG KWON,    the defendant, was confronted with a UST market that was (a) approximately nine times larger in terms of market capitalization and (b) more than eight times

larger in terms of daily trading volume relative to May 2021.

38.    A significant amount of this growth was driven by the approximately 20% interest rate offered on UST deposits by Anchor. Shortly before the crash of UST and LUNA in early May 2022, approximately 70% of all UST was deposited in Anchor (approximately $12.9 billion out of a total circulating supply of approximately $18.5 billion). Anchor paid out far more in interest to its depositors than it earned from its borrowers, and Anchor was able to pay its approximately 20% interest rate only because DO HYEONG KWON, the defendant, caused the diversion of funds from the LFG Reserve and Terraform to Anchor. For example, in or about February 2022, KWON caused the LFG to divert approximately $450 million from the LFG Reserve to Anchor. KWON himself deposited funds in Anchor, and personally benefitted from these subsidies in light of his status as an Anchor depositor.

39.    DO HYEONG KWON, the defendant, was repeatedly warned that the approximately 20% Anchor interest rate enabled by substantial subsidies was unsustainable, and would contribute to destabilizing the entire Terra blockchain system by artificially inflating demand for UST. KWON nonetheless maintained the approximately 20% Anchor interest rate.

### *The May 2022 Crash of UST and LUNA*

40.    In or about May 2022, approximately one year after the temporary depegging of UST in May 2021, the market price of UST dropped below $1 and failed to recover despite the deployment of large amounts of capital from Terraform and the LFG to support UST's $1 peg. As a result, the value of UST and LUNA crashed. While DO HYEONG KWON, the defendant, was able to cover up the weaknesses of the Terra Protocol in May 2021, he was not able to do so in May 2022 when the market had expanded substantially. In the midst of the May 2022 crash, one Trading Firm trader remarked to his colleagues that the Trading Firm's defense of UST's peg in

May 2021 took place in "simpler times," and noted that "[u]nfortunately it wasn't so simple this time" compared to when "about $100 M[illion] committed was enough to re-peg." The May 2022 crash of UST and LUNA resulted in over $40 billion in investor losses.

### The Luna Foundation Guard Misrepresentations

#### *False Statements About the LFG's Independence and Governing Council*

41.     DO HYEONG KWON, the defendant, issued, and caused others to issue, public statements asserting that the LFG operated as an independent entity governed by the LFG Governing Council. For example:

a.     KWON caused Terraform to issue a tweet on or about January 19, 2022 asserting that "[t]he LFG is governed independently by an international Council of industry leaders and experts . . . ."

b.     Also on or about January 19, 2022, KWON tweeted that the "LFG is governed by top builders in the @terra_money ecosystem," that the LFG Governing Council would serve as "a counterweight to TFL [Terraform] in the @terra_money ecosystem," and that "[d]ecentralization wins."

c.     On February 8, 2022, KWON stated in a public forum on the internet that "[t]he reason we've set up LFG is to decentralize decision making processes in the Terra ecosystem, and having multiple directors (all building on the Terra ecosystem) make the decision instead of one person is an important step in that direction."

d.     Several months later, in a podcast titled "Unchained" that was distributed on or about March 29, 2022, KWON stated that the approximately $3 billion worth of bitcoin held in the LFG Reserve at the time was held by the LFG Governing Council in secure "multisig" (short for "multi-signature") wallets, *i.e.*, cryptocurrency wallets that require multiple private keys to

approve a transaction. Specifically, KWON stated about the LFG Reserve, "so the Luna Foundation Guard has a, you know, has a council of about seven people, so its secured in a multisig held by the council members."

        e.    KWON asserted, and caused others to assert, that the LFG spent approximately $2.8 billion worth of its own funds in the form of the LFG Reserve (largely consisting of approximately 80,000 bitcoin) in a failed effort to defend UST's peg in May 2022, and that the LFG used two other purportedly independent parties to make those trades, specifically the Trading Firm and Terraform.

        f.    KWON portrayed the LFG Governing Council as an independent gatekeeper for the use of funds in the LFG Reserve, including during the time period when UST and LUNA crashed in May 2022. For example, on or about May 9, 2022, KWON tweeted, "The LFG Council just voted to deploy 1.5B in capital (0.75B in BTC, 0.75B in UST) to allay market concerns around UST," and that "we made this decision via an unanimous vote of the council."

### Fundraising for the LFG Reserve

42.    DO HYEONG KWON, the defendant, raised billions of dollars' worth of assets from investors to fund the LFG Reserve. In the course of soliciting those funds, KWON repeatedly represented to investors that the LFG Reserve would be used to defend UST's peg, and that neither the LFG nor Terraform stood to profit from the LFG Reserve. For example, on or about November 16, 2021, KWON emailed an investor that Terraform was looking to raise $1 billion worth of bitcoin assets "to put into a decentralized reserve smart contract to buttress UST's stability mechanism (users can redeem UST against Bitcoin)," and that "[w]e believe this will assuage lingering worries about the stability of UST's core stability mechanism . . . ." KWON's email attached an investor pitch deck asserting that the fundraising for the LFG Reserve "will be a novel

philanthropic raise where the funds added are controlled by the community, transparent on-chain."
Approximately two months later, on or about January 24, 2022, that investor entered into an
agreement with the LFG to provide approximately $50 million worth of assets for the LFG Reserve
in exchange for LUNA tokens, with the agreement stating that it was made "in furtherance of the
establishment [of] a decentralized asset reserve" that was "a non-profit initiative of the [LFG] to
provide a further layer [of] support to maintain the UST's peg to the USD," that the LFG Reserve
was "intended to remain as a decentralised asset reserve in perpetuity to the extent UST remains
in circulation and is used by members of the community," and that "[n]either the [LFG] nor any
of its Affiliates stand to profit from the proceeds of [the agreement] and/or [the LFG Reserve]."
KWON signed the fundraising agreement on behalf of the LFG.

### *Kwon's Control of the LFG and Use of Retroactive Accounting Tricks to Benefit Himself*

43.     In truth, DO HYEONG KWON, the defendant, simultaneously controlled both the
LFG and Terraform at all relevant times following the creation of the LFG; operated the LFG as
an arm of Terraform rather than as an independent entity; repeatedly made significant financial
decisions for the LFG without the prior approval of the LFG Governing Council; and treated the
LFG's funds as interchangeable with Terraform's funds when it suited KWON's interests.  For
example:

a.     Internal corporate records for the LFG show that KWON established the
LFG Governing Council on or about January 10, 2022 only as a "non-director subcommittee"
whose powers were limited to "advis[ing] and giv[ing] recommendations" and performing acts
"deemed necessary or advisable by the Directors . . . ."  The LFG was legally governed by a two-
person Board of Directors consisting of KWON and a Singaporean business consultant, the latter
of whom was appointed a Director of the LFG solely to satisfy local Singapore regulations and

exercised no independent discretion or authority. Functionally, KWON exercised total control over the affairs of the LFG, a reality that was contrary to his representations to investors about the LFG's independence, decentralized governance, and status as a "counterweight" to Terraform.

b.    The LFG Reserve was not maintained in a "multisig" wallet controlled by the LFG Governing Council, as KWON had publicly claimed. In a May 8, 2022 message exchange between KWON and Trading Firm Executive-1 relating to the use of the LFG Reserve to protect UST's peg, Trading Firm Executive-1 asked "will we need lfg multisig for settlement?" KWON responded, "no we will not we havent moved funds there yet." Rather, the LFG Reserve was actually held in wallets controlled by KWON and not the LFG Governing Council.

c.    Of the approximately 80,000 bitcoin from the LFG Reserve that was purportedly spent to defend UST's peg in May 2022, the LFG Governing Council did not hold a vote on the expenditure of at least 28,000 of those bitcoin (worth over $800 million). In other words, at least 28,000 bitcoin worth of LFG assets were spent in violation of KWON's promises to investors about the LFG's independence and governance, a result made possible by KWON's secret control of the LFG and its finances. After one council member learned of this unauthorized spending and told KWON that "I think it's important to highlight that most of these [LFG Reserve] transactions were executed without a vote," KWON responded that "with the community and every media outlet out with pitchforks not sure if its the best time to throw me under the bus."

d.    KWON commingled the assets of the LFG and Terraform, which allowed KWON to engage in after-the-fact accounting tricks to benefit himself at the expense of investors in the wake of the May 2022 crash. Specifically, after Terraform had already used a substantial amount of its own assets in one of its cryptocurrency trading accounts in an attempt to defend UST's peg in early May 2022, KWON caused the transfer of hundreds of millions of dollars' worth

of the LFG Reserve into that same trading account (the "Commingled Account") without the authorization of the LFG Governing Council. Later on, KWON attributed hundreds of millions of dollars' worth of prior spending on ultimately worthless assets (UST and LUNA) by Terraform—spending using Terraform's own assets in Terraform's own trading account—to the LFG. In an attempt to justify this retroactive accounting, KWON claimed that Terraform had spent hundreds of millions of dollars' worth of its own assets "on behalf of" the LFG, with KWON reverse-engineering the amount of this purported spending "on behalf of" the LFG to justify Terraform keeping almost all of the LFG's remaining bitcoin assets. KWON orchestrated this deception to maximize the amount of net trading losses in the Commingled Account attributed to the LFG (approximately $1 billion), and minimize the amount of net trading losses in the Commingled Account attributed to Terraform (approximately $600 million). KWON engaged in this retroactive accounting without the approval of the LFG Governing Council, and was able to do so only because he secretly maintained the power to unilaterally control the LFG and its finances, in violation of his promises to investors about the LFG's independence and governance.

e. . After the crash of UST and LUNA, KWON used these retroactive accounting tricks as a cover to send a significant portion of the LFG Reserve's remaining valuable assets (approximately 12,000 bitcoin worth over $300 million) to Terraform as purported "reimbursement" for earlier spending "on behalf of" the LFG. KWON took these actions as part of an effort to shield his spending of much of the LFG Reserve's remaining approximately 12,000 bitcoin (the "Misappropriated LFG Funds") from public scrutiny. Indeed, after the crash, KWON made a commitment in the face of public pressure to distribute only the LFG's remaining funds to investors, but not Terraform's remaining funds, which KWON subsequently used in substantial

part for purposes that benefitted himself. After the May 2022 crash, the Misappropriated LFG Funds made up most of Terraform's assets.

### *Money Laundering of Misappropriated LFG Funds*

44.     DO HYEONG KWON, the defendant, and others acting at his direction, engaged in financial transactions and other conduct designed to conceal and disguise the nature, location, source, ownership and control of the Misappropriated LFG Funds. For example:

a.     KWON caused the transfer of Misappropriated LFG Funds through multiple cryptocurrency addresses and accounts, engaging in "layering" transactions designed to conceal, among other things, the source of those funds.

b.     KWON caused the transfer of portions of the Misappropriated LFG Funds between blockchains, *i.e.*, "bridged" the funds, in order to conceal their nature, location, source, ownership and control.

c.     Shortly after South Korean authorities publicly announced criminal charges against KWON on or about September 14, 2022, KWON caused the transfer of Misappropriated LFG Funds into and out of centralized cryptocurrency exchanges within short periods of time, thus concealing the path of those funds on public blockchains. For example, between on or about September 15, 2022 and on or about September 18, 2022, KWON caused the transfer of

approximately $39 million worth of bitcoin into and out of an account at the cryptocurrency exchange OKX that had been opened in 2018 (the "OKX Account"), as depicted below:



As another example, during the same time period, KWON caused the transfer of approximately $27 million worth of bitcoin into and out of an account at the cryptocurrency exchange KuCoin that was opened in 2019 (the "KuCoin Account"), as depicted below:



Both the OKX and the KuCoin Accounts were held in Terraform's name, and a copy of KWON's passport, among other materials, was submitted to both exchanges in connection with those

accounts as part of "Know Your Customer" ("KYC") procedures. After Misappropriated LFG Funds were transferred into and then out of the OKX and KuCoin Accounts within a period of days, they were transferred to a Swiss bank account held by Terraform (the "Terraform Swiss Bank Account"). Several days later, on or about September 21, 2022, Terraform transferred approximately $57 million from the Terraform Swiss Bank Account to a professional services firm retained by KWON and Terraform.

   d. Following public reporting about the transfer of Misappropriated LFG Funds to KuCoin and OKX, KWON made a number of false and misleading public statements disclaiming his use of OKX or KuCoin, including the following:

    i. KWON issued a September 28, 2022 social media post stating, in part, "i havent used kucoin or okex in at least the last year . . . ."

    ii. KWON issued an October 5, 2022 social media post stating, in part, "I don't even use Kucoin and OkEx . . . ."

    iii. KWON made a statement during the course of an interview on the cryptocurrency program Unchained, distributed on or about October 18, 2022, that "I really have not used, you know, KuCoin or OKX or done any trading on those platforms, at least as far as I can remember, and I definitely don't have any funds there, and if they froze, I don't remember the amount, but if it's like 67 million, I think I definitely would have noticed." When asked by the interviewer about analysis showing that approximately 65 million dollars' worth of the Misappropriated LFG Funds were sent to KuCoin and OKX, KWON responded, in part, "Like, over video call I wouldn't be able to identify, like, an on-chain audit trail or something to that effect, but what would be helpful is we've hired a sort of on-chain analysis company and we've worked with them to provide all the trading data at LFG, so they should be publishing a report

shortly, which I think is going to provide a lot more clarity. So there isn't any embezzlement, or you know, theft of funds or anything to that effect that seems to be cycling through the media." An image from that interview is reproduced below.



45.     Rather than being used solely to defend UST's peg, or to reimburse investors for losses from the May 2022 crash, tens of millions of dollars' worth of the Misappropriated LFG Funds were used to pay professional services fees and expenses for DO HYEONG KWON, the defendant, and Terraform.

46.     In order to facilitate the transfer of Misappropriated LFG Funds to financial accounts that could be used to pay professional services fees and expenses, DO HYEONG KWON, the defendant, caused his agents to make representations to a financial services firm about the source of those funds that were not factually accurate, including representations that the funds were from software development fees and investment activities. In truth, the source of the Misappropriated LFG Funds was the LFG Reserve. Further, in response to inquiries relating to

anti-money laundering due diligence on the source of the transfers, KWON also caused his agents

to provide a financial services firm with a fake Costa Rican passport for KWON, among other

materials.

### *Kwon's Distribution of a False and Misleading Audit Report to Cover Up His Crimes*

47.    DO HYEONG KWON, the defendant, sought to cover up his lies and misconduct

by, among other means, causing the distribution of a false and misleading "third party audit" report

(the "Audit Report") by a consulting firm (the "Audit Firm") advertised by the LFG as providing

"full transparency into the trading, blockchain records, and efforts" of the LFG and Terraform to

defend UST's peg.  An image of a social media post by KWON promoting the Audit Report is

reproduced below:



48.    DO HYEONG KWON, the defendant, sought to cover up his lies and misconduct

with the Audit Report not only to evade any sort of sanction for his crimes, but also to enable him

to solicit funds from investors to launch a new Terra blockchain under false pretenses.

49.    DO HYEONG KWON, the defendant, caused the public distribution of the Audit

Report, as well as the distribution of the Audit Report to specific business partners. For example, on or about November 14, 2022, before the Audit Report had been publicly released, KWON caused the distribution of the Audit Report to the Swiss bank at which the Terraform Swiss Bank Account (containing laundered Misappropriated LFG Funds) was maintained, along with a message describing the Report as "the results of an independent 3rd party audit into the LFG peg defense showing that all funds were used appropriately in defense of the peg." In fact, the Audit Report was not conducted independently of KWON and Terraform, as they claimed. Among other things, KWON and his representatives sought to directly dictate certain portions of the report. For example, in an October 18, 2022 Audit Firm internal email, a senior employee of the Audit Firm noted with respect to certain passages in a draft version of the report that one of KWON's agents had "dictated those paragraphs to us."

50.    On or about November 16, 2022, the day that the Audit Report was publicly released, DO HYEONG KWON,  the defendant, tweeted that it "shows that all LFG funds were spent to defend $UST's peg parity with the Dollar as declared" and that "we fought to the last to protect UST and its users." In truth, as discussed above, all LFG funds were *not* spent to defend UST's peg.  Rather, over $300 million in Misappropriated LFG Funds remained in the Commingled Account after the crash of UST and LUNA, and were not used to defend the peg. Nor were those funds returned to the LFG. Rather, KWON directed after-the-fact that Terraform internally account for the Misappropriated LFG Funds as belonging to Terraform as "reimbursement" for Terraform's own spending in defense of UST's peg, and transfer those funds to Terraform wallets. In an effort to generate some "loose math" supporting this fraudulent, post-hoc accounting, Terraform selected a period of time in the past during which Terraform spent approximately $1 billion in assets defending UST's peg, and attributed all Terraform trading

during that time period to the LFG. That period of time was selected to result in an amount approximating the LFG Reserve funds transferred to the Commingled Account. In other words, KWON directed Terraform to reverse-engineer the company's accounting to provide an excuse for Terraform to keep the Misappropriated LFG Funds.

51.     The Audit Report misleadingly omitted (1) that DO HYEONG KWON, the defendant, transferred over 28,000 bitcoin (worth approximately $800 million) from the LFG Reserve to Terraform without approval from the LFG Governing Council, in violation of KWON's promises to investors about the independence and governance of the LFG; (2) that KWON retroactively attributed Terraform spending on UST to the LFG based on an after-the-fact, "loose math" accounting fiction; and (3) that this was done not to enable the purchase of additional UST or LUNA but rather to shift financial losses from Terraform to the LFG after the fact for KWON's benefit. In other words, KWON used the Audit Report to obscure and hide the fact that he had lied to investors about the LFG's independence and governance, and engaged in accounting tricks to provide an excuse for Terraform to keep substantial amounts of the LFG's assets.

## The Mirror Misrepresentations

52.    As discussed above, Mirror was a Terraform product that purportedly operated as a decentralized system for creating, buying, and selling synthetic securities called "mAssets" using the Terra blockchain.  Users could access Mirror through a web browser, as depicted in the image below of Mirror's user interface.



DO HYEONG KWON, the defendant, lied to investors about the decentralized nature of Mirror, including falsely claiming that neither he nor Terraform controlled the protocol's governance or operation, and that Mirror's growth was driven by its users.  In truth, KWON maintained significant influence over the governance of Mirror, manipulated Mirror asset prices, and inflated key metrics concerning Mirror's growth.

### Misrepresentations About the Control of Mirror

53.    Terraform issued the cryptocurrency MIR as a "governance token" for Mirror, that

is, a type of cryptocurrency that allows holders to vote on decisions relating to the product, and thus can decentralize decision-making about how the product operates.

54.     DO HYEONG KWON, the defendant, claimed that neither he nor Terraform held any MIR tokens or otherwise controlled Mirror.  For example:

a.     On or about December 3, 2020, KWON posted the following public statement on Twitter: "In order to maintain censorship resistance, Mirror is entirely decentralized from day 1 - the protocol is governed by the MIR token, setting economic parameters, controlling the on-chain community fund, and recommending code changes. TFL has no special owner / operator keys."

b.     Also on or about December 3, 2020, KWON caused Terraform to issue a press release asserting, among other things, that Mirror "is decentralized from day 1, with the on-chain treasury and code changes governed by holders of the native token, MIR, of which Terraform Labs holds none. There are also no admin keys or special access privileges granted."

c.     In a podcast titled "The Delphi Podcast" that was publicly distributed on or about January 11, 2021, KWON made the following statements when asked about a potential "crackdown" on Mirror from U.S. authorities, in substance and in part:

> [A]s we were designing the protocol, we set aside no tokens for the team, no tokens for the investors.  I received some Mirror tokens as a function of having my LUNA stakes.  But at the end of last year, I committed to give all that away to people that actually built the protocol.  So I have nothing, Terra has nothing.  And we have no governance rights as a consequence of that.  So this is something that we do not control, right?  So even now, there's 30 different proposals that are up on governance.  I think it just passed yesterday.  None of those proposals were from us, it was entirely from the community, and the engagement as a consequence of being decentralized is huge. . . .  The way that I think about it is, at this point, we don't control or own any portions of the Mirror protocol.  All we did was write code.  And you cannot be prosecuted for what you do not control and nor do you profit from.

d.    In a podcast titled "Crypto 101" that was publicly distributed on or about March 11, 2021, KWON made the following statements, in substance and in part:

> What we did when we launched Mirror is that we created a governance token called MIR which most  project teams would either choose to retain for themselves or sell to investors or you know sell to the community in the open market.  But we kept zero pre-mine for the team and then we gave all the tokens away to various people in the community . . . .  Even if Mirror does well, like, nothing really happens to me, like, I don't benefit from it financially in any direct sense. . . . . So basically no control, no profit incentive, and then uh no owner keys . . . .

55.    In truth, DO HYEONG KWON, the defendant, and Terraform secretly maintained a large number of MIR tokens and exercised substantial control over Mirror, including by voting their MIR tokens and maintaining operator keys for Mirror.  KWON, and others at Terraform acting at KWON's direction, lied to investors about these facts to further the illusion of Mirror as a decentralized system (which was one of KWON's principal marketing points for Mirror and Terraform's products more broadly).  For example, in internal Terraform messages sent on or about July 8, 2021, two Terraform employees discussed how they had lied to the public about the decentralized nature of Mirror.  Among other things, one of the employees ("Terraform Employee-1") stated that he "[n]eed[ed] to pray for forgiveness and repent" because he had just "spent an hour talking live" on a cryptocurrency livestream "[a]nd saying mirror is decentralized."  In the same message exchange, another Terraform employee ("Terraform Employee-2") stated "mirror isn't decentralized," that it was a "fake it till u make it thing" to "provide the initial illusion to make em [investors] believers."  Terraform Employee-2 also stated that he "can't belirve [sic] do just goes out and tweets TFL holds no MIR," to which Terraform Employee-1 responded "LOL."

56.    DO HYEONG KWON, the defendant, and others at Terraform sought to use the company's MIR tokens and blockchain operator keys to undermine community proposals and

governance votes.  For example, on July 20, 2021, a group of Terraform employees discussed using over three million MIR tokens controlled by Terraform to vote "no" on a Mirror community proposal.  A few weeks later, on or about July 26, 2021, KWON stated in a message to another Terraform employee ("Terraform Employee-3") that "we need to forfeit operator key to governance" of Mirror, a reference to the fact that Terraform held a privileged operator key for controlling Mirror even though KWON had publicly disclaimed that fact.  Terraform Employee-3 later told KWON that Terraform should limit the number of times it made use of its power to control the governance of Mirror and vote down community proposals, noting that "if this happens enough, most people will realize it's the same whale suddenly shooting down the proposals."

### Misrepresentations About the Operation of Mirror

57.    DO HYEONG KWON, the defendant, and others acting at his direction, claimed the prices of mAssets were set principally by decentralized processes, and not controlled by Terraform.  Specifically, the price of an mAsset at the time of its creation was supposed to be determined by a "pricing oracle" that used data from a decentralized pricing service.  After the creation of an mAsset, its price was purportedly determined by a decentralized market of buyers and sellers.  Mirror's rules relating to the posting and redemption of collateral for mAssets supposedly created an economic incentive structure that would cause the price of mAssets to track the price of the traditional assets that they "mirrored" without any centralized control by Terraform.  In other words, the Mirror pricing oracle did not automatically determine the price of an mAsset following that asset's creation; rather, built-in economic incentives for mAsset traders relating to the value of posted collateral (specifically the opportunity for arbitrage) were supposed to keep mAsset prices pegged to their corresponding traditional asset prices without the need for any centralized control or intervention by Terraform.  KWON explained this purportedly

decentralized process during an interview on the podcast titled "The Defiant" that was distributed on or about April 16, 2021, during which KWON represented that the prices of mAssets remained pegged to their underlying assets with "no centralized counterparties."

58.    However, in truth, DO HYEONG KWON, the defendant, caused Terraform itself to supply certain price data used by Mirror, rather than relying on a third-party decentralized data feed for all of Mirror's price oracles. Additionally, KWON caused Terraform to secretly fund and operate trading bots on Mirror (which Terraform referred to internally as "MM bots") to keep mAsset prices in line with the prices of the traditional assets they purportedly "mirrored," as opposed to relying on decentralized market processes. In other words, Mirror's decentralized mechanism for keeping the price of mAssets pegged to their underlying traditional assets did not work, and so KWON used robotic accounts masquerading as users to manipulate mAsset prices for the entire time Mirror operated. An internal Terraform document explicitly outlined this process, explaining, among other things, how "MM bot is managing to bring the mAsset price within a set range by placing a counter order when the price is out of the range in Oracle," and that if the secret Terraform MM bots were not used then "the mAsset may be highly unlikely to track its underlying asset accurately."

59.    DO HYEONG KWON, the defendant, was never able to get Mirror to function in the decentralized fashion that he advertised. On or about August 9, 2021, approximately nine months after Mirror launched, KWON acknowledged to Terraform Employee-3 that he was still seeking a "solution to arb[itrage] MAssets to oracle prices to minimize our need to have to conduct operations to the peg," *i.e.*, to find a way to keep mAsset prices pegged to their "mirrored" traditional assets without Terraform secretly funding and operating MM bots. KWON further stated to Terraform Employee-3 that "we need to be hands off on all terra side mirror operations

in a couple months." However, because of the ineffectiveness of Mirror's design, KWON continued secretly deploying the MM Bots and substantial capital to manipulate mAssets through the crash of UST and LUNA in May 2022.

60.    DO HYEONG KWON, the defendant, used the Genesis Stablecoins to fund the MM bots and their manipulation of the mAsset market. In total, KWON used over $85 million worth of the Genesis Stablecoins in this manner to deceive investors about the decentralized operation of Mirror.

### Misrepresentations About the Extent of Mirror Usage

61.    DO HYEONG KWON,  the defendant, caused Terraform to promote Mirror (and the Terra blockchain more broadly) based on metrics purporting to show Mirror's widespread adoption by users, including (a) the total amount of collateral posted to mint mAssets; (b) the total amount of "liquidity" on Mirror, *i.e.*, mAssets and UST available on Mirror exchanges; (c) the total amount of staked MIR tokens; and (d) "Total Value Locked" (or "TVL") on Mirror, *i.e.*, the total combined amount of collateral, liquidity, and staked MIR tokens. For example:

a.    On or about December 15, 2020, less than two weeks after Mirror launched, KWON sent an email to investors stating that "Mirror launch went very well - there is now 100M USD in total value locked on mirror . . . ."

b.    On or about January 23, 2021, KWON tweeted about Mirror, in substance and in part, "11M daily trading volume / 230M tvl in stock synthetics @mirror_protocol in 6 weeks."

c.    On or about February 12, 2021, KWON tweeted about various Mirror metrics, including that Mirror had "TVL: 400M UST" and "mAsset Liquidity: 200M," and KWON concluded his tweet by writing "(Pats self on the back)."

d.      On or about March 9, 2021, KWON tweeted, "Welcome @mirror_protocol to the 1B TVL club."

e.      On or about April 11, 2021, KWON tweeted about Mirror having $1.8 billion in TVL, stating, "1.8B TVL is offensive," *i.e.*, that this amount was a very substantial quantity of TVL.

f.      On or about June 25, 2021, KWON caused the publication of an article on an online platform touting Mirror's widespread adoption by users, including claiming that in its first six months "Mirror crossed 2 billion in TVL and 1 billion in liquidity . . . making Mirror a top 15 DeFi protocol and leading cross-chain protocol." The article included an image from Mirror's website illustrating these metrics, including the chart depicted below showing that Mirror at the time had nearly $2 billion in TVL, nearly $1 billion in liquidity, and over $800 million in collateral.



62.      However, in truth, DO HYEONG KWON, the defendant, caused Terraform to inflate key Mirror metrics to deceive investors about the extent of Mirror's adoption and decentralization. Specifically, KWON caused Terraform to engage in a significant amount of transactions on Mirror using its own accounts in order to inflate collateral, liquidity, MIR staking, and TVL metrics. For example, Terraform's own accounts were responsible for almost all of the

collateral posted on Mirror in its first six months, and a substantial majority thereafter, as depicted in the chart below.



Terraform's own accounts also accounted for up to approximately 40% of liquidity and up to approximately 60% of TVL on Mirror, as depicted in the charts below.



When KWON caused Terraform to promote Mirror as achieving the milestone of having $1 billion in liquidity and $2 billion in TVL, Terraform's accounts were actually generating over $400 million of that claimed liquidity and approximately $1 billion of that claimed TVL.

**The Chai Misrepresentations**

*Kwon Claimed Chai Used the Terra Blockchain to Process Payments*

63.     One of the principal ways that DO HYEONG KWON, the defendant, promoted the Terra blockchain to investors was touting its "real-world" usage by the Korean payment application Chai beginning in or about June 2019.  KWON claimed that Chai used a Terraform stablecoin pegged to the Korean Won called TerraKRW ("KRT"), which operated on the Terra blockchain using the same algorithmic mechanism as UST, to process transactions for millions of users and billions of dollars in transactions.  This purportedly demonstrated the potential for widespread adoption of the Terra blockchain and the generation of significant transaction fees for investors who "staked" their LUNA tokens, *i.e.*, locked up their LUNA tokens within the system.  As discussed above, an increase in the number of transactions on the Terra blockchain would lead to greater rewards for LUNA investors who staked their tokens.

64.     DO HYEONG KWON, the defendant, used emails and public articles, among other means, to promote Chai to investors as a purported real-world application of the Terra blockchain. For example:

a.     On or about December 10, 2018, KWON caused a promotional email to be sent to investors stating that there was a need in the cryptocurrency industry for "projects that achieve real world adoption beyond whitepapers and fluffy concepts."  The email claimed that when Chai was launched, it would be "a product that is easy to integrate for e-commerce partners and seamless to use for consumers" because it would not require customers "to sign up for exchanges, manage wallets and store private keys," and that Terraform would "separate the branding for the payment service with that of the underlying blockchain technology."

b.    On about June 21, 2019, KWON published an article touting how "75k unique shoppers" in Korea used Chai to make purchases worth a total of 1.5 billion Korean won, and proclaiming that "Chai's launch is not only a victory for Terra but also for the blockchain industry as a whole." In the article, KWON stated "[w]eve been getting a lot of questions regarding how Chai uses Terra's blockchain," and the answer was that "[q]uite simply, Chai runs, records transactions, and manages account balances on Terra's Columbus mainnet."

c.    Later, on or about July 26, 2019, KWON published a "Terra Community Update" referring to Chai as "Terra's blockchain-powered payments app" that would allow "anyone to easily buy their morning coffee with Terra," claiming that in the "40 days since Chai launched using the Terra Protocol" it was "already . . . one of the most heavily used blockchain applications in existence."

65.    DO HYEONG KWON, the defendant, publicly attributed Chai's commercial success at least in part to the Terra blockchain allowing Chai to operate at lower costs and higher speeds than Chai's competitors. For example:

a.    On or about October 14, 2019, KWON represented in a CNBC presentation that "Chai's unique value proposition is enabled by Terra's cutting-edge blockchain technology,"

as depicted in the image below:



      b.     KWON caused Terraform to publish an article on or about October 24, 2019 claiming that "CHAI utilizes Terra's blockchain and stablecoin economy to offer lower transaction fees and fund ongoing discounts." The article asserted that "[w]hile most merchants pay about 2.5% ~ 3% as transaction fees we replace the complicated value chain with a single blockchain layer to offer rates as low as 0.5%. Assuming that we've saved at least 1.5% on transaction fees for our partners, we can estimate our current savings to be $810,000."

      c.     On or about November 22, 2019, KWON sent an email to a U.S. investor attaching a Chai promotional document stating that "CHAI's unique value proposition is enabled

by Terra's cutting-edge blockchain technology," and that "CHAI's transactions are facilitated by a fully collateralized stablecoin that maintains price stability via a protocol that dynamically adjusts money supply." The promotional document included the following graphic demonstrating how Chai purportedly used the Terra blockchain to settle transactions rather than traditional payment processing mechanisms:



*Kwon Falsified Data to Fraudulently Claim that Chai*
*Processed Transactions on the Terra Blockchain*

66.     In truth, Chai processed transactions through traditional payment rails operated by established financial institutions, not the Terra blockchain. DO HYEONG KWON, the defendant, configured Chai to use traditional bank rails rather than the Terra blockchain due to regulations concerning electronic-payment businesses in South Korea. At the time of Chai's launch, KWON understood that South Korean financial regulators were not prepared to issue electronic-payment licenses to companies that used cryptocurrency or other blockchain technology to process payments. In order to obtain such licenses, KWON arranged for Chai to use traditional bank rails

to process payments, and not cryptocurrency or other blockchain technology.

67.    Despite knowing that Chai used traditional bank rails to process its transactions, DO HYEONG KWON, the defendant, nonetheless fraudulently promoted Chai to investors in the United States and other locations as using blockchain technology to process payments. KWON sought to deceive investors in this manner because being truthful with investors about Chai's use of traditional bank rails would have undermined one of the principal talking points that KWON used to distinguish his business from competitors and raise capital. As discussed above, KWON touted Chai's purported use of the Terra blockchain to process transactions as a key vehicle for increasing the number of stablecoin transactions on the Terra blockchain, and thus generating higher rewards for investors who staked LUNA tokens. Especially in Terraform's early years, KWON viewed Chai's generation of transaction fees for LUNA stakers as critical to the success of Terraform's business. KWON worried that a low volume of blockchain transactions (and thus low staking rewards) would result in investors selling rather than staking their LUNA tokens, creating a glut of LUNA in the market and driving down its price.

68.    Indeed, in the month before Chai launched, DO HYEONG KWON, the defendant, was so concerned about the need to generate transaction fees for LUNA stakers at that time that he contemplated an interim scheme to fake Terra blockchain transactions while he was preparing to launch Chai. KWON discussed this interim scheme with the Co-Founder on an electronic communication platform on or about May 9, 2019. In that discussion, KWON wrote a message to the Co-Founder asking whether he should "do fake transactions" on the Terra blockchain "to generate staking returns" that could be funded by the Genesis Stablecoins. The Co-Founder expressed that "we probably need a story" as to the source of the fake blockchain transactions. KWON later wrote to the Co-Founder that "i can just create fake transactions that look real . . .

54

which will generate fees . . . and we can wind that down as chai grows." When the Co-Founder
responded by expressing concern that users and investors would "find out it's fake," KWON
replied, "[a]ll the power to those that can prove its fake . . . because i will try my best to make it
indiscernable . . . i wont tell if you wont 😊 " The Co-Founder then stated, "Haha . . . Well let's
test in small scale and see what happens 😊 "

69.    Once Chai launched in or about June 2019, DO HYEONG KWON,  the defendant,
and his co-conspirators "mirrored" Chai transactions on the Terra blockchain through an
automated process to create the illusion for investors in the United States and other locations that
Chai processed transactions through the Terra blockchain. KWON initially engineered these fake
blockchain transactions by transferring small amounts of stablecoins between wallets that he
controlled. Over time, he caused the implementation of more sophisticated methods of fabricating
Chai transaction data on the Terra blockchain, such as faking patterns of transactions designed to
make some wallets appear to belong to sellers and others appear to belong to buyers. KWON used
over $60 million worth of the Genesis Stablecoins to fund these fraudulent efforts.

70.    DO HYEONG KWON, the defendant, and others acting at his direction, sought to
suppress public reporting about Chai's use of traditional bank rails to process payments. For
example, after a Korean-language news website published an article on or about June 16, 2019
reporting that Chai did not use stablecoins due to South Korea financial laws and regulations, a
Terraform employee ("Terraform Employee-4"), acting at the direction of KWON, sought to have
an editor at the news website revise portions of the article. On or about June 18, 2019, Terraform
Employee-4 informed KWON that the editor stood behind the accuracy of the article since Chai
did not have "a direct connection to stablecoins." Terraform Employee-4 further informed KWON
that the editor "understands that we wish to soften the language at the very least, but she is not

willing to," and "[g]iven that [the editor] even hinted that she knows we chose this path due to reg risks, I think we should let it be."

71.    Terraform and Chai Co. employees discussed the fabrication of Terra blockchain data to mirror Chai transactions with DO HYEONG KWON, the defendant.  For example, in one email in or about May 2020, a Chai Co. employee emailed with KWON and others about how to implement transaction processing for another payment application that purportedly used the Terra blockchain (a payment service in Mongolia called memePay), asking whether they should "follow the same structure as Chai to process transaction outside blockchain . . . But write a record on Terra blockchain in parallel."  A Terraform employee responded, "I thinking copying Chai structure would be the best choice for now."

### Lies to South Korean Regulators

72.    DO HYEONG KWON,  the defendant, worried that South Korean financial regulators would learn about the steps he had taken to deceive investors about Chai's use of the Terra blockchain, including the creation of financial and technological connections between Chai and Terraform (such as the mirroring of Chai transactions on the Terra blockchain) to create the illusion that Chai was a blockchain-based payments system.  As a result KWON and his subordinates at Terraform took steps to hide those deceptive acts from regulators.  For example, on or about March 28, 2019, KWON instructed Terraform employees working on blockchain projects not to come into Terraform's office when South Korean financial regulators conducted an in-person inspection relating to Chai's application for financial licenses, and Terraform's Chief Information Security Officer directed employees that "when you leave the office later today, please remove any items and interior decorations related to Terra so that they are not visible" when

regulators were present.[1]

73.    At the same time that DO HYEONG KWON, the defendant, sought to hide any business connections between Chai and Terraform from South Korean regulators, KWON touted such connections to investors to promote the lie that Chai used the Terra blockchain to process payments.  For example, on or about April 10, 2019, KWON caused an email to be sent to investors touting how South Korean regulators had granted electronic payment licenses to Chai, that "[t]hese licenses are necessary for any payment gateway facilitating the settlement of users' funds," and that Chai was the "1st crypto firm . . . to be granted these licenses" which "demonstrates Chai's unique ability to navigate difficult regulatory waters."   Shortly after that promotional email to investors was sent, Terraform employees expressed concern through an internal Terraform messaging platform that South Korean regulators would learn about the email, with Terraform Employee-4 noting, "Ugh a foreign investor said they will promote this on their [social media] channel," and other employees responding "No! That cannot happen!!!!!!  Oh my god!!!!!" and "I pray I pray for that to please not happen," among other things.  Terraform Employee-4 then expressed hope that the substance of the promotional email would not ultimately reach South Korean regulators because the foreign investor who planned to publicize the promotional email was not in South Korea, stating, "[t]here shouldn't be any big issues since the investor is an Italian, sigh...."

74.    In sum, DO HYEONG KWON, the defendant, advanced conflicting narratives about Chai depending on his audience, and in the process told different lies to investors, business partners, and regulators.  Terraform employees repeatedly expressed concerns within the company about these false and conflicting statements.  For example, Terraform Employee-4 raised concerns

---

[1] These quotations, and those in Paragraph 73 of this Indictment, are translations of the original Korean language communications.

with the Co-Founder about publicizing financial connections between Terraform and Chai with reporters, sending a message to the Co-Founder on or about June 13, 2019 that "my dilemma is that [at the moment], as Do pointed out, we are not being honest with the media," and that if Terraform disclosed certain financial payments to Chai, "we'd be put in an awkward situation where we have lied to the banks, to whom we promised both verbally and in writing that CHAI has nothing to do with Terra/cryptocurrency."

### *The Separation of Terraform and Chai and the "Look the Other Way" Agreement*

75.     In or about March 2020, DO HYEONG KWON, the defendant, and the Co-Founder separated the business operations of Terraform and Chai Co.  KWON sent an email to Terraform employees on or about March 2, 2020 explaining that the split was the product of "the tension between Terra's mandate to challenge the boundaries of traditional finance, and Chai's need to be fully compliant with existing regulations as a licensed entity."  KWON further explained that "[p]ost split, Chai will double down on growing as a successful payments company within the bounds of regulatory tolerance," and that "[m]uch of that will have nothing to do with Terra" with the exception of Chai "facilitate[ing] direct Terra topups," *i.e.*, loading tokens to a cryptocurrency wallet.  In other words, KWON acknowledged in an internal Terraform email that, at least as of March 2020, Chai's only relationship to the Terra blockchain would be serving as a means of funding cryptocurrency wallets, and that Chai would not process transactions through the Terra blockchain.

76.     But after Terraform and Chai Co. separated, DO HYEONG KWON, the defendant, sought to ensure that he could continue to fraudulently represent Chai transactions as taking place on the Terra blockchain.  KWON initially sent a written proposal to the Co-Founder stating "I ask that Terra be able to continue public representation of Chai transaction volumes as its own over

the next two years, and that Chai continue to support that narrative unless materially unfavorable to do so." KWON eventually secured a written agreement from the Co-Founder on or about October 27, 2020 that Terraform would have the right for three years to "represent Chai Wallet as a DApp [decentralized application] on Terra's blockchain," and that Chai Co. would "not contradict, or make any independent representations which would otherwise contradict, such representations made by Terra in respect thereof." After the agreement was signed, KWON continued to make public misrepresentations about Chai's use of the Terra blockchain, and the Co-Founder subsequently explained to another Chai Co. executive that he had a "look the other way" agreement concerning KWON's misrepresentations about Chai using the Terra blockchain.

77.     After Terraform and Chai Co. separated, and a Chai Co. executive expressed concern to the Co-Founder during a recorded conversation about the "fraudulent" narrative that Chai used the Terra blockchain to process transactions, the Co-Founder responded by stating, in substance and in part, "it does bother me somewhat morally that the narrative is off. But that's not – I don't think [it's] your problem, and I think it's not necessarily my problem either. I think it's Do [Kwon]'s problem." When the other Chai Co. executive reiterated that "there is no involvement of actual Terra stable coins in Chai," the Co-Founder responded, "Yeah, but why does that matter?"

78.     DO HYEONG KWON, continued making misrepresentations about Chai's use of the Terra blockchain in in 2021 and 2022. For example, in a podcast titled "Exponential View" that was distributed on or about January 12, 2022, KWON stated about Chai, "the value proposition as you said is pretty simple, the idea is that instead of having to wait multiple days and have to pay egregious fees in order to get your settlement through . . . merchants can get settled very quickly so instead of multiple days it could be say 6 seconds which is the average block time of the terra

blockchain, and then the fees are also structurally much lower, I think about 50 to 60% what merchants are forced to pay on net using traditional payment gateways."

## The Genesis Coin Misrepresentations

### *Background on the Genesis Stablecoins*

79.    DO HYEONG KWON, the defendant, publicly raised questions about whether it was fair and appropriate for cryptocurrency developers to "pre-mine" their tokens for their own benefit, *i.e.*, creating or "mining" a quantity of tokens for their own benefit before offering tokens to the public. In the October 2021 Unconfirmed Podcast, KWON spoke about potential regulations for cryptocurrencies, such as "things like having no pre-mine of the asset, so fairly distributing the asset at launch." KWON also suggested that a cryptocurrency pre-mine was an "unfair advantage" over investors that could result in a token being considered a security, stating: "I feel like if there's no pre-mine to the asset in the sense that the developer doesn't have an unfair advantage when the asset is issued, then it cannot be a security. . . . It seems like a pretty good reason you shouldn't have any financial responsibility if you didn't have any unfair financial gains."

80.    However, as discussed above, DO HYEONG KWON, the defendant, programmed the Terra blockchain at its creation in or about 2018 to include pre-mined tokens which he used for his own purposes and benefit. Specifically, KWON programmed the Terra blockchain to include one billion stablecoins (the Genesis Stablecoins) and one billion LUNA. The Genesis Stablecoins consisted of a Terraform stablecoin called TerraSDR (abbreviated as SDT), which was pegged to a financial unit used by the International Monetary Fund called Special Drawing Rights or "SDR," that is based on a basket of five currencies (the U.S. dollar, the Euro, the Chinese Remminbi, the Japanese Yen, and the British Pound Sterling). SDT was not a widely used or traded stablecoin on public cryptocurrency exchanges. KWON programmed the Terra blockchain

to make 10% of the Genesis Stablecoins available to Terraform each year, *i.e.*, to "unlock" 100 million SDT on an annual basis. Terraform ultimately received a total of 300 million of the Genesis Stablecoins before a Terra blockchain governance vote was held in or about late 2021 to "burn" the remainder of the Genesis Stablecoins.

### *Kwon Provides Limited, Shifting, and Knowingly False Disclosures*

81.     DO HYEONG KWON, the defendant, provided limited, shifting, and knowingly false disclosures about the Genesis Stablecoins to his investors.

82.     Early Terraform promotional materials such as the 2018 Private Offering Document represented that the "primary" use of the Genesis Stablecoins would be to fund ecommerce discounts for business partners, distribute free tokens to existing users to promote Terraform's business (known as "airdrops"), and grow the Terra "ecosystem" (a term used by KWON to refer to the universe of products and systems that operated on the Terra blockchain).

83.     After Terraform conducted its initial seed rounds of investor fundraising in 2018, DO HYEONG KWON, the defendant, generally did not include disclosures about the Genesis Stablecoins in Terraform's promotional materials. Still, between 2019 and 2021, KWON made, and caused to be made, occasional statements on social media platforms and internet message boards about the Genesis Stablecoins, including in response to questions from users who discovered the Genesis Stablecoins on the Terra blockchain and inquired about their purpose. In these statements, KWON repeatedly changed his explanation for the purpose and use of the Genesis Stablecoins. For example:

a.     In June 2019, after a user observed on social media that that they had located a wallet on the Terra blockchain holding the Genesis Stablecoins and asked about their purpose, KWON responded that the Genesis Stablecoins would be used "to engage in Luna <> Terra swaps

to stabilize pegs."

       b.     In January 2020, KWON provided another explanation: the Genesis Stablecoins were being used to supply stablecoins to Chai "whenever they run out of Terra tokens to provide to new users."

       c.     In November 2021, KWON posted on a public message board that he had used the Genesis Stablecoins to mint other Terra stablecoins "when the cost of minting have been prohibitively high to do Luna<–>stablecoin swaps." KWON represented in the post that, out of the 300 million of the Genesis Stablecoins had been released to Terraform through the annual "unlocking" process, approximately 100 million had been used to mint KRT "mainly used to facilitate transactions for Chai" and that approximately 180 million had been used to mint UST "to provide liquidity" in various decentralized cryptocurrency exchanges.

      84.     In truth, DO HYEONG KWON, the defendant, did not use the Genesis Stablecoins solely for the purposes set forth in even his limited and shifting disclosures to investors. Instead, as discussed above, KWON used at least $145 million worth of the Genesis Stablecoins for fraudulent purposes. The Genesis Stablecoins were not "mainly used to facilitate transactions for Chai," but rather, as discussed above, to fake Chai transactions on the Terra blockchain. The Genesis Stablecoins were also not used simply to "provide liquidity" on decentralized exchanges, but rather, as discussed above, to fund trading bots that manipulated the price of mAssets because Mirror did not function as advertised.

      85.     In sum, DO HYEONG KWON, the defendant, used substantial amounts of the Genesis Stablecoins as a slush fund to finance fraudulent activities designed to create the false appearance of widespread adoption of the Terra blockchain and the decentralization of Terraform products.

## COUNT ONE
### (Conspiracy to Defraud)

86.    From at least in or about 2018, up to and including in or about 2022, in the Southern District of New York, and elsewhere, DO HYEONG KWON, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, (a) commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5) and Title 17, Code of Federal Regulations, Section 180.1; (b) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; and (c) wire fraud, in violation of Title 18, United States Code, Section 1343, to wit, KWON agreed with others to defraud individuals selling digital commodities in exchange for cryptocurrencies issued by Terraform, including LUNA and UST, by deceiving those individuals about products, systems, and entities that operated (or purported to operate) on or in connection with the Terra blockchain, including Chai, Mirror, the Genesis Stablecoins, and the LFG.

87.    It was a part and object of the conspiracy that DO HYEONG KWON, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate and foreign commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and attempting to make, untrue and misleading statements of material fact and omitting to state material facts necessary in order to make the statements made not untrue or misleading; and (3) engaging, and attempting to engage in acts, practices, and courses of business which operated

and would operate as a fraud and deceit upon other persons, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5).

88.     It was a further part and object of the conspiracy that DO HYEONG KWON, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

89.     It was a further part and object of the conspiracy that DO HYEONG KWON, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

Overt Acts

90.     In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and

elsewhere:

      a.     DO HYEONG KWON, the defendant, distributed the 2018 Private Offering Document representing that the "primary" use of the Genesis Stablecoins would be to fund ecommerce discounts for business partners, distribute free tokens to existing users to promote Terraform's business, and grow the Terra "ecosystem."

      b.     Between in or about 2019 and in or about 2022, KWON used millions of dollars' worth of Genesis Stablecoins to fund fake Chai transactions on the Terra blockchain.

      c.     On or about October 12, 2020, KWON sent an email to a representative of an investment firm based in New York containing a Terraform promotional document falsely claiming that Chai used the Terra blockchain to settle transactions rather than traditional payment processing mechanisms.

      d.     On or about October 14, 2019, KWON made a false and misleading statement during a CNBC presentation transmitted to, among other places, the Southern District of New York, about Chai's usage of the Terra blockchain.

      e.     On or about November 22, 2019, KWON sent an email to a U.S. investor attaching a Chai promotional document that included a false and misleading statement about Chai using the Terra blockchain to process transactions, including the statement that "CHAI's unique value proposition is enabled by Terra's cutting-edge blockchain technology," and that "CHAI's transactions are facilitated by a fully collateralized stablecoin that maintains price stability via a protocol that dynamically adjusts money supply."

      f.     On or about December 3, 2020, KWON posted false and misleading public statements on Twitter about Mirror, including that "Mirror is entirely decentralized from day 1" and "TFL has no special owner / operator keys."

g.      On or about December 3, 2020, KWON caused Terraform to issue a false and misleading press release claiming that Mirror "is decentralized from day 1," that Terraform held no MIR tokens, and that "[t]here are also no admin keys or special access privileges granted."

h.      Between in or about 2020 and in or about 2022, KWON used Genesis Stablecoins to fund trading bots that manipulated the price of mAssets.

i.      On or about January 11, 2021, KWON made false and misleading statements on a podcast about Mirror that were transmitted to, among other places, the Southern District of New York, including assertions that neither he nor Terraform possessed any MIR tokens "[a]nd we have no governance rights as a consequence of that . . . . The way that I think about it is, at this point, we don't control or own any portions of the Mirror protocol."

j.      On or about August 9, 2021, KWON sent a message to Terraform Employee-3 about trying to find a "solution to arb[itrage] MAssets to oracle prices to minimize our need to have to conduct operations to the peg."

k.      On or about January 19, 2022, KWON caused Terraform to issue a false and misleading tweet asserting that "[t]he LFG is governed independently by an international Council of industry leaders and experts . . . ."

l.      On or about January 19, 2022, KWON issued a false and misleading tweet that the LFG would serve as "a counterweight to TFL [Terraform] in the @terra_money ecosystem" and that "[d]ecentralization wins."

m.      In a podcast interview that was distributed on or about March 29, 2022, KWON falsely stated that the approximately $3 billion worth of bitcoin held in the LFG Reserve at the time was held by the LFG Governing Council in secure multisig wallets.

n.     On or about November 16, 2022, KWON caused the distribution of an audit report that sought to obscure and hide the fact that KWON had retroactively shifted hundreds of millions of dollars in trading losses from Terraform to the LFG to provide an excuse for Terraform to keep substantial amounts of the LFG's assets, used funds from the LFG Reserve in ways that substantially benefited himself, and lied to investors about the LFG's independence and governance.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Commodities Fraud)

The Grand Jury further charges:

91.     The allegations contained in Paragraphs 1 through 85 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

92.     From at least in or about 2018, up to and including in or about 2022, in the Southern District of New York and elsewhere, DO HYEONG KWON, the defendant, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and attempting to make, an untrue and misleading statement of material fact and omitting to state a material fact necessary in order to make the statements made not untrue and misleading; and (3) engaging, and attempting to engage in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWON engaged in a scheme to defraud individuals selling digital commodities in exchange for cryptocurrencies

issued by Terraform, including LUNA and UST, by deceiving those individuals about products, systems, and entities that operated (or purported to operate) on or in connection with the Terra blockchain, including Chai, Mirror, the Genesis Stablecoins, and the LFG.

(Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

## COUNT THREE
### (Securities Fraud)

The Grand Jury further charges:

93.    The allegations contained in Paragraphs 1 through 85 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

94.    From at least in or about 2018, up to and including in or about 2022, in the Southern District of New York, and elsewhere, DO HYEONG KWON, the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWON engaged in a scheme to defraud individuals purchasing digital securities issued by Terraform, including LUNA, by deceiving those individuals about products, systems, and entities that

operated (or purported to operate) on or in connection with the Terra blockchain, including Chai, Mirror, the Genesis Stablecoins, and the LFG.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Wire Fraud)

The Grand Jury further charges:

95.    The allegations contained in Paragraphs 1 through 85 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

96.    From at least in or about 2018, up to and including in or about 2022, in the Southern District of New York and elsewhere, DO HYEONG KWON, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, KWON, along with others, engaged in a scheme to defraud purchasers of cryptocurrencies issued by Terraform, including LUNA and UST, by deceiving those individuals about products, systems, and entities that operated (or purported to operate) on or in connection with the Terra blockchain, including Chai, Mirror, the Genesis Stablecoins, and the LFG, and transmitted electronic communications to the Southern District of New York in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

**COUNT FIVE**
**(Conspiracy to Defraud and Engage In Market Manipulation)**

The Grand Jury further charges:

97.     The allegations contained in Paragraphs 1 through 85 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

98.     From at least in or about 2021, up to and including in or about 2022, in the Southern District of New York, and elsewhere, DO HYEONG KWON, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, (a) commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5) and Title 17, Code of Federal Regulations, Section 180.1; (b) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; (c) wire fraud, in violation of Title 18, United States Code, Section 1343; and (d) securities manipulation, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff, to wit, KWON agreed with others to defraud purchasers of cryptocurrencies issued by Terraform, by deceiving those purchasers about the means by which Terraform sought to maintain UST's $1 peg, and the effectiveness of the Terra Protocol, through false statements and market manipulation.

99.     It was a part and object of the conspiracy that DO HYEONG KWON, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate and foreign commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and

attempting to make, untrue and misleading statements of material fact and omitting to state material facts necessary in order to make the statements made not untrue or misleading; and (3) engaging, and attempting to engage in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5).

100.    It was a further part and object of the conspiracy that DO HYEONG KWON, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

101.    It was a further part and object of the conspiracy that DO HYEONG KWON, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

102.    It was a further part and object of the conspiracy that DO HYEONG KWON, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the mails and means and instrumentalities of interstate commerce, and of the facilities of national securities exchanges, and being a member of national securities exchanges, effected, alone and with one and more other persons, a series of transactions in securities registered on national securities exchanges, securities not so registered, and in connection with security-based swaps and security-based swap agreements with respect to such securities creating actual and apparent active trading in such securities, and raising and depressing the price of such securities, for the purpose of inducing the purchase and sale of such securities by others, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff.

Overt Acts

103.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about May 2021, DO HYEONG KWON, the defendant, and Trading Firm Executive-1 communicated by electronic means about altering the market price of UST.

b.    In or about May 2021, the Trading Firm deployed trading strategies designed to alter the market price of UST.

c.    On or about May 23, 2021, KWON agreed with the Trading Firm to modify an existing loan between Terraform and the Trading Firm to compensate the Trading Firm for its assistance in seeking to alter the market price of UST.

d.    On or about May 24, 2021, KWON caused a Terraform social media account to issue a false and misleading statement concerning the effectiveness and sustainability

of the Terra Protocol.

      e.    On or about October 4, 2021, KWON made a false and misleading statement in an interview transmitted to, among other places, the Southern District of New York, that "there's like a number of large market makers that participate in stabilizing the peg of UST" but that "[m]ost of them — I don't think any of them have a contractual relationship with [Terraform].  It's just something that they do because they feel like they can make money out of it . . . ."

      f.    On or about March 1, 2022, in the course of an interview on an audio talk show, KWON made a false and misleading statement concerning the effectiveness and sustainability of the Terra Protocol.

(Title 18, United States Code, Section 371.)

## COUNT SIX
### (Commodities Fraud)

The Grand Jury further charges:

104.    The allegations contained in Paragraphs 1 through 85 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

105.    From at least in or about 2021, up to and including in or about 2022, in the Southern District of New York and elsewhere, DO HYEONG KWON, the defendant, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and attempting to make, an untrue and misleading statement of material fact

and omitting to state a material fact necessary in order to make the statements made not untrue and misleading; and (3) engaging, and attempting to engage in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWON engaged in a scheme to defraud individuals selling digital commodities for cryptocurrencies issued by Terraform, including LUNA and UST, by using market manipulation and false statements to deceive those individuals about the means by which Terraform maintained, and sought to maintain, UST's $1 peg, and the effectiveness of the Terra Protocol.

(Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

## COUNT SEVEN
### (Securities Fraud)

The Grand Jury further charges:

106.    The allegations contained in Paragraphs 1 through 85 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

107.    From at least in or about 2021, up to and including in or about 2022, in the Southern District of New York, and elsewhere, DO HYEONG KWON, the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWON

74

engaged in a scheme to defraud individuals purchasing digital securities issued by Terraform, including LUNA, by using market manipulation and false statements to deceive those individuals about the means by which Terraform maintained, and sought to maintain, UST's $1 peg, and the effectiveness of the Terra Protocol.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT EIGHT
### (Wire Fraud)

The Grand Jury further charges:

108.    The allegations contained in Paragraphs 1 through 85 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

109.    From at least in or about 2021, up to and including in or about 2022, in the Southern District of New York and elsewhere, DO HYEONG KWON, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, KWON, along with others, engaged in a scheme to defraud purchasers of cryptocurrencies issued by Terraform, including LUNA and UST, by deceiving those individuals about the means by which Terraform maintained, and sought to maintain, UST's $1 peg, and the effectiveness of the Terra Protocol, and transmitted electronic communications to the Southern District of New York in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT NINE
### (Money Laundering Conspiracy)

The Grand Jury further charges:

110.    The allegations contained in Paragraphs 1 through 85 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

111.    From at least in or about 2022, up to and including in or about April 2024, in the Southern District of New York and elsewhere, DO HYEONG KWON, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957(a).

112.    It was a part and an object of the conspiracy that DO HYEONG KWON, the defendant, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which transactions affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, and securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

113.    It was a further part and an object of the conspiracy that DO HYEONG KWON, the defendant, and others known and unknown, within the United States, knowingly engaged and

attempted to engage in monetary transactions, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, KWON and others, known and unknown sent wires and cryptocurrency transfers worth over $10,000 consisting of proceeds from wire fraud and securities fraud, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h).)

## FORFEITURE ALLEGATIONS

114.    As a result of committing the offenses alleged in Counts One, Three, Four, Five, Seven, and Eight of this Indictment, DO HYEONG KWON, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the following specific property:

a.    The entity Terraform Labs PTE, Ltd.;

b.    Any and all assets, funds, and property of Terraform Labs PTE, Ltd.;

c.    The entity the Luna Foundation Guard Ltd.;

d.    Any and all assets, funds, and property of the Luna Foundation Guard Ltd.;

e.    Any and all accounts held in the name of Terraform Labs PTE, Ltd. at Sygnum Bank AG, including but not limited to accounts with account numbers ending in -3674 and -1793;

f.    Any and all accounts held in the name of Terraform Labs PTE, Ltd. at CIMB Bank, including but not limited to an account with account number ending in - 5203;

g.    Any and all accounts held in the name of Terraform Labs PTE, Ltd. at DBS Bank;

h.    Any and all assets, funds, and property held at the cryptocurrency exchange KuCoin under user number ending in -5668;

i.    Any and all assets, funds, and property held at the cryptocurrency exchange OKX under user number ending in -9526;

j.    Any and all assets, funds, and property held at the cryptocurrency exchange Kraken under user number ending in -SCDI;

k.    Any and all assets, funds, and property held at the cryptocurrency exchange Binance under user numbers ending in -1760, -2128, and -9329; and

l.    Cryptocurrency wallets with the following wallet addresses (and all assets, funds, and property contained within those wallets):

| |
|---|
| Address 1: an address ending in -qexu |
| Address 2: an address ending in -tv4q |
| Address 3: an address ending in -06dz |

A list of this specific property that includes full account and user numbers is attached hereto as Attachment 1.

115.    As a result of committing the offense alleged in Count Nine of this Superseding Indictment, DO HYEONG KWON, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and the specific property set forth above in paragraphs 116(a)-(l).

78

116.    If any of the above-described forfeitable property, as a result of any act or omission

of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred

or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the

Court; (d) has been substantially diminished in value; or (e) has been commingled with other

property which cannot be subdivided without difficulty; it is the intent of the United States,

pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section

2461(c), to seek forfeiture of any other property of the defendant up to the value of the above

forfeitable property.

> (Title 18, United States Code, Section 981;
> Title 18, United States Code, Section 982;
> Title 21, United States Code, Section 853; and
> Title 28, United States Code, Section 2461.)

FOREPERSON

_Damian Williams_
DAMIAN WILLIAMS
United States Attorney