P188KWOC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4                  v.                         23 Cr. 151 (PAE)

 5    DO HYEONG KWON,

 6                  Defendant.                 Conference

 7    ------------------------------x
                                               New York, N.Y.
 8                                             January 8, 2025
                                               10:35 a.m.
 9
      Before:
10
                        HON. PAUL A. ENGELMAYER,
11
                                               District Judge
12
                             APPEARANCES
13
      EDWARD Y. KIM
14         Acting United States Attorney for the
           Southern District of New York
15    BY:  JARED LENOW
           KIMBERLY RAVENER
16         ANDREW THOMAS
           Assistant United States Attorneys
17
      HECKER FINK LLP
18         Attorneys for Defendant
      BY:  MICHAEL FERRARA
19         ANDREW L. CHESLEY
           CHRISTOPHER MOREL
20

21

22

23

24

25
```

P188KWOC

```
 1                 (In open court; case called)
 2                 THE DEPUTY CLERK:  Counsel, please state your
 3     appearance for the record.
 4                 MR. LENOW:  Good morning, your Honor.  Jared Lenow for
 5     the government.  I am joined at counsel table with my
 6     colleagues Kimberly Ravener and Andrew Thomas.
 7                 THE COURT:  Good morning, Mr. Lenow.
 8                 Good morning, Ms. Ravener.
 9                 And good morning, Mr. Thomas.
10                 MR. FERRARA:  Good morning, your Honor.  From Hecker
11     Fink, Michael Ferrara for Defendant Do Hyeong Kwon, who is
12     standing to my left.  I am joined by my colleagues Christopher
13     Morel to my right and Andrew Chesley.
14                 THE COURT:  Good morning, Mr. Ferrara.
15                 Good morning, Mr. Morel.
16                 And good morning, Mr. Chesley.
17                 And, of course, good morning to you, Mr. Kwon.
18                 THE DEFENDANT:  Good morning, sir.
19                 THE COURT:  Apart from counsel, good morning to court
20     staff and to members of the public and to the members of the
21     district's press room, who I understand are auditing via the
22     live feed from here to there.  I wish all of you a Happy New
23     Year.
24                 This is our initial conference in the case and there
25     is a lot of ground to cover and a lot of topics to cover, and
```

P188KWOC

1    in the interest of an orderly discussion, I want to set out for

2    you the sequence in which I would propose our discussion

3    follow.

4          At the outset, I have a few obligatory disclosures

5    about my prior interactions with counsel.  All or virtually all

6    of the counsel who have appeared in this case are known to me

7    having appeared before me.  So I can say from experience that

8    both parties are exceptionally well represented and it's an

9    honor for me to have such suburb lawyers appearing in my

10   courtroom.

11         Beyond that, first of all, as to the defense, although

12   he is not here, a word about Mr. Patton.  In my capacity as

13   chair of the Southern District's Criminal Law Committee, I met

14   or otherwise interacted fairly extensively with Mr. Patton when

15   he was the head of the Federal Defenders office, and we took up

16   issues of mutual interest.  He also came by for a social visit

17   with me and my law clerks when he was leaving that role a year

18   or two ago.

19         At the government table, for each of the past two

20   years I have been a guest speaker at one session of the

21   Columbia Law School class that Mr. Lenow teaches for students

22   who are fall term externs at the U.S. Attorney's Office.

23         Counsel, I noted that Danielle Sassoon had entered a

24   notice of appearance, but my deputy tells me that may have been

25   an error.  Is she on this case?

P188KWOC

1          MR. LENOW:  Judge, she was assigned in the past.  She

2     is no longer working on this case.

3          THE COURT:  So no disclosures needed there.

4          That, then, is the extent of my dealings with counsel.

5     I put all that on the record, as I always do, purely in the

6     interest of transparency.

7          With that, as to the sequence today, first of all, I

8     am going to be asking the government for a history of this

9     matter, including the sequence of indictments, the extradition

10    process, and so forth.  Some of this and some of the other

11    material I will be asking for is covered in the government's

12    helpful letter of last night, which is docketed at Docket 15,

13    but I think it's valuable to have a one-stop shop in the form

14    of a conversation in open court today.

15         Second, I am going to ask the government for a

16    narrative summary of the charges and, importantly, the conduct

17    underlying them.  I am just eager to get a better understanding

18    of the case.

19         Third, I will ask the government to summarize the Rule

20    16 evidence and the manner and timetable in which it will be

21    produced, not only to defense counsel, but how that discovery

22    as a practical matter will be made available to Mr. Kwon.

23         Fourth, I am going to ask the government to identify

24    any searches or seizures or other investigative steps that by

25    their nature may be fodder for a potential suppression motion,

P188KWOC

meaning not just searches and seizures, but identification

procedures, post-arrest statements, and the like.

         And, defense counsel, I do this because my practice at

the second conference in a criminal case is to ask the defense

to identify any suppression motions that it reserves the right

to make, and to do that, the defense has to be aware of the

searches and seizures, etc. that took place.  That doesn't mean

we would then proceed right to a suppression litigation,

depending on the trajectory of the case it may or may not make

sense to front-load that, but I want to at least have a defined

universe of the suppression litigation that has been reserved.

         Fifth, I will take up the government's motion with

respect to victim notification, which I understand to be

unopposed.

         Sixth, I will put on the record the obligatory Rule

5(f) disclosure, joining Judge Lehrburger who I understand did

one of his own a few days ago.

         Seventh, I have a substantial list of largely

substantive questions for counsel about the case that may or

may not have implications for the schedule through to trial.

This is sort of a grab bag of a variety of questions, some

drawing on the fact that there was a somewhat parallel civil

litigation last year.

         Eighth, and relatedly, I am going to ask counsel for

your assessment at this early stage of pretrial motions that I

P188KWOC

1    can anticipate beyond the usual motions *in limine* and 404(b)

2    and this sort.

3           Ninth, I want to take up with counsel the trial date.

4           Tenth, I want to set a next conference date, and I

5    will entertain a motion for the exclusion of time until then.

6           Last, in case somehow something has been left out, I

7    will open the floor to counsel to raise any issues of

8    importance to you.

9           So that's our sequence.

10          With that, Mr. Lenow, will you be taking the lead for

11   the government?

12          MR. LENOW:  Yes, for today at least, Judge.

13          THE COURT:  Very good.

14          So, with that, I welcome a history of the matter.

15          MR. LENOW:  So, Judge, I will start with the

16   procedural history, which I think your Honor asked for first.

17          Mr. Kwon, an unsealed indictment was returned against

18   him, an original indictment in this matter, on or about

19   March 23, 2023.  So almost two years ago now.  This past New

20   Year's Eve, on December 31, 2024, Mr. Kwon was extradited from

21   Montenegro.

22          I should note, just to back up a second, on that

23   March 23, 2023 date, Mr. Kwon was arrested on local passport

24   fraud charges in Montenegro, seeking to travel from Montenegro

25   to another country in the Middle East.  And the false documents

P188KWOC

1    were discovered, he was arrested, and there were local criminal

2    proceedings in Montenegro that ended up being resolved.  And

3    then in parallel with that, there were extradition proceedings

4    going on around the same time, stemming from an extradition

5    request that the U.S. government made shortly after the

6    March 23, 2023 indictment was returned.

7             THE COURT:  Let me see if I have this right.

8             So the indictment is returned on March 23, 2023.  The

9    initial developments in Montenegro involving the arrest don't

10   actually stem from an extradition request; it sounds like that

11   came a little bit later.

12            MR. LENOW:  At least not an extradition request from

13   the United States.

14            THE COURT:  So all of that drama is independent of

15   this case.

16            MR. LENOW:  Judge, in some ways it is and some ways it

17   isn't.  I think the evidence will show that the attempt to

18   leave Montenegro to go to this other country in the Middle

19   East, that does not have an extradition treaty with the United

20   States, we believe is relating to the fact that there were

21   ongoing investigations in multiple jurisdictions, including the

22   United States.  But in terms of that immediate date and that

23   immediate arrest, there is no close tie between those topics,

24   but I think more on a broader-based level, it's out contention

25   that the attempt to leave Montenegro was part of a broader

P188KWOC

1    effort to evade law enforcement.

2            THE COURT:  Was it publicly known or reported that

3    there had been a U.S. investigation into these matters as of

4    the time that Mr. Kwon attempted to leave Montenegro?

5            MR. LENOW:  Yes, Judge.  We had, in fact, engaged

6    directly with Mr. Kwon's criminal counsel at the time, prior

7    counsel separate from the Hecker Fink law firm.

8            THE COURT:  When was it, if you recall, that Mr. Kwon

9    or his counsel would have become aware of the extradition

10   request and the indictment that underlay it?

11           MR. LENOW:  Judge, the indictment followed from the

12   local arrest.  So, in other words, the local arrest occurred in

13   Montenegro and our indictment and the extradition request

14   followed in the days after that.

15           THE COURT:  In other words, on or about late

16   March 2023, Mr. Kwon would have been aware of the content of

17   the initial indictment in this case.

18           MR. LENOW:  Yes, Judge.  It was returned in an

19   unsealed format.  So on the same date of the local arrest in

20   Montenegro, an unsealed indictment was unsealed here, and then

21   we quickly followed up with an extradition request to

22   Montenegro.

23           THE COURT:  Very good.

24           The superseder was returned when?

25           MR. LENOW:  The superseder was unsealed on

P188KWOC

1    January 2nd.  It was returned a number of months before that

2    date, but it was unsealed on January 2nd of 2025.

3            THE COURT:  And he has been arraigned on the

4    superseder?

5            MR. LENOW:  Yes, Judge.  On the same date that the

6    superseder was unsealed, on January 2nd of this year, Mr. Kwon

7    was arraigned on both the original indictment and the

8    superseding indictment before Magistrate Judge Lehrburger in

9    this district.

10            THE COURT:  Has time been excluded up until today?

11            MR. LENOW:  It has, Judge.

12            THE COURT:  Defense, anything on the history of the

13    case?

14            MR. FERRARA:  Your Honor, it obviously will not

15    surprise your Honor that we contest some of the inferences

16    drawn, etc. in Mr. Lenow's account there.  I just don't want

17    the Court to leave with the idea that -- yes, this has been

18    going on since March of 2023.  There was an SEC civil trial,

19    maybe you will ask about that.

20            THE COURT:  I will.

21            MR. FERRARA:  Mr. Kwon has been detained in Montenegro

22    since March of 2023.  And I just don't want your Honor to leave

23    thinking that we have been, therefore, in regular contact with

24    him.  That would mislead the Court into thinking that we are

25    further along with him than maybe we are.  He had Montenegro

P188KWOC

```
 1    counsel.  We certainly visited him, and we had other means of

 2    communication, but as your Honor might imagine, it was

 3    intermittent, it was difficult to speak with him.

 4             So, if we are in a position to ask at the end of this

 5    for more time, etc., I just want your Honor to have the context

 6    that, yes, we have known and worked with Mr. Kwon for some time

 7    now, but we are just really with him in person for substantial

 8    periods of time to work on this.

 9             THE COURT:  That's helpful context.  Thank you.

10             If I may, when did you begin the representation?

11             MR. FERRARA:  March of 2023.

12             THE COURT:  Later on, I will have some questions,

13    really getting at I think what you're driving at, which is the

14    extent to which defense counsel has been able to engage with

15    the content of the charges and the discovery, including by

16    means of the civil litigation, but there will be a time for

17    that.  In any event, I appreciate the alert.

18             MR. FERRARA:  Thank you, your Honor.

19             THE COURT:  Next, the nature of the charges.

20             Mr. Lenow.

21             MR. LENOW:  Yes, Judge.

22             So, on a very big-picture level, our allegation is

23    that this case is about a massive and highly sophisticated

24    fraud that resulted ultimately in over $40 billion in losses to

25    investors and users of Mr. Kwon's products.
```

P188KWOC

1          I want to step back and just talk about the

2     representations that were made by Mr. Kwon and then speak to

3     why those were not true, why they were false.

4          So, Mr. Kwon, between the time frame around 2018 and

5     2022, was a senior executive at a company called Terraform

6     Labs, which he cofounded.  And Mr. Kwon promoted himself, and

7     was promoted by many others in the blockchain and

8     cryptocurrency world, as a visionary.  There were many products

9     in blockchain technology and cryptocurrency that would involve

10    just a coin or a token, in other words, a unit of exchange or

11    value that didn't have any other purpose apart from having

12    value.  And the novel and unique thing that Mr. Kwon promoted

13    about his product was, he wasn't just promoting a Bitcoin or

14    something like that, he was promoting this entire constructed

15    financial universe.  Terraform, that had its own Terra

16    blockchain, would have its own bank, it would have its own

17    money payment system, its own currency, its own stock market,

18    its own savings bank, and dozens of other applications that sat

19    atop a Terra blockchain, and made this not just a token or a

20    coin, that might have some value, it might not, depending upon

21    people's perception of it, but it was part of a giant

22    ecosystem.  And this set Mr. Kwon apart from many other

23    entrepreneurs in the space.

24          And, in particular, Mr. Kwon promoted his company as

25    being at the cutting edge of what is known as the DeFi

P188KWOC

1    movement, decentralized finance movement.  And the motivating

2    philosophy here is that, rather than having some centralized

3    player, a central bank, a federal reserve, large banks, a

4    government control the system, this would be a sort of utopian

5    vision in which economic incentives in the free market and a

6    decentralized base of users controlled the products and systems

7    in this world that he envisioned.  And this was a very

8    appealing prospect.  A lot of investors and users had been

9    looking I think for some time for a broader vision of how

10   blockchain and cryptocurrency could have value, could have a

11   real future, as opposed to just being Bitcoin or something like

12   that.  And so this was an enticing vision and billions of

13   dollars flowed in from investors and users.

14          THE COURT:  Pause on that.

15          Mechanically, how would an investor invest?

16          MR. LENOW:  Sure.

17          So, principally, through purchasing the

18   cryptocurrencies that were created and issued by Terraform.

19          So, this wasn't a scenario in which equity in

20   Terraform was sold to investors.  Mr. Kwon and his cofounder,

21   in large part, controlled all of the equity in this company,

22   substantially for all of the time period we are talking about.

23   So this wasn't a company like Apple where people were buying

24   stock in a company.  You would invest in this broader system by

25   purchasing the tokens or coins at issue.  And the principal

P188KWOC

1    token that you would invest in was called LUNA.

2            There were a bunch of other tokens that were created

3    alongside LUNA, but LUNA was the core of it.  And the idea was,

4    if you invested in LUNA, because of the connections that LUNA

5    had in the system, and how it could be exchanged for other

6    assets, as the system grew and gained in value, the value of

7    LUNA would grow.  Alongside LUNA, which was designed to change

8    in value depending on market conditions, go up if things became

9    more valuable, Mr. Kwon and his colleagues traded a number of

10   things called stablecoins.  These other coins were designed to

11   remain stable in value, in contrast to LUNA which the hope by

12   everyone was it would be go up and up and up, which it did for

13   a period of time.

14           So, to invest in the system, you would principally

15   invest by purchasing LUNA tokens, which you could get directly

16   from Terraform Labs or one could purchase on the open market.

17   And there are other ways one could invest in the system, but

18   that was really the principal way.

19           So, that is the vision that Mr. Kwon promoted.  Now

20   let's talk about the reality, as we allege at least.

21           Behind the scenes, we allege in the indictment, a

22   number of core systems in this Terra universe did not function

23   as advertised; they were Potemkin villages.  And it wasn't just

24   one system or one product or another, it was a number of core

25   facets or systems or products, and we allege at least five core

P188KWOC

1    categories in our indictment.  They are often variations on the

2    same theme, though, which is Mr. Kwon advertised, as we allege,

3    a product that operated, according to his utopian vision, a

4    decentralized finance, incentives created this robust stable

5    functional product, but behind the scenes it didn't work and he

6    had to tinker with it and manipulate functions behind the

7    scenes to create the illusion of a functioning system.

8         This, as I mentioned earlier, this was a very

9    successful course of conduct.  Billions of dollars flowed in

10   from institutional investors as well as retail investors around

11   the world, in the U.S. and South Korea and a number of other

12   countries.  And I will just give several examples of kind of

13   the variations of the theme I mentioned earlier.

14        One core deception we allege is that Mr. Kwon's

15   stablecoins did not remain stable by virtue of the advertised

16   system.  In other words, the stablecoins were not backed by

17   dollars or Treasury Bills or some other asset, which is true of

18   many cryptocurrency stablecoins; there was this sort of

19   algorithmic stream of elements.  Their value was to be

20   maintained by a combination of essentially computer code and

21   economic incentives.  And we allege that there is one incident

22   in which the stablecoin UST, pegged to the U.S. dollar, dropped

23   below, down to around 92 cents or so, and there was a danger of

24   a death spiral.  And Mr. Kwon worked with an outside firm, a

25   high-frequency trading firm, that pushed the coin back to a

P188KWOC

1      dollar, and then afterwards claimed to the world that this had

2      been an example of the successful operation of his

3      decentralized vision; the computer code and economic incentives

4      had successfully restored the stablecoin.

5            And one other variation on this theme, I mentioned

6      there was a stock market that existed in Mr. Kwon's constructed

7      financial universe called Mirror.  And Mirror, similar to

8      stablecoin, the assets were supposed to track the stock price.

9      There was a version of Apple stock, a version of Tesla stock,

10     and they were supposed to closely mirror, track those stock

11     prices through decentralized means.  This did not work.  The

12     prices would not have stayed in line with the prices of real

13     stock prices but for the fact that there was behind-the-scenes

14     monkeying around with the value and the prices and the trading

15     in those markets.

16           So those are just two examples.

17           And ultimately, about a year after that incident I

18     mentioned, where a trading firm intervened and the market

19     helped prop up the stablecoin UST, there was another incident

20     where UST began to depeg.  This time, though, the market had

21     expanded dramatically.  The trading volume was many times what

22     it had been in May of '21 when this earlier incident occurred.

23     The market cap of the core tokens here were billions of dollars

24     more than earlier.  It was a much different animal and the

25     system collapsed.

P188KWOC

1          So those are some of the core aspects of the fraud.

2          I will note also that we allege that after this

3    collapse of these cryptocurrencies in May of 2022, we allege

4    that Mr. Kwon's misconduct and illegal activity continued.

5    Among other things, he engaged in a public relations campaign

6    that was deceptive and misleading, including lies to investors,

7    as part of an effort to cover up his crimes, as well as to

8    restart his company and kind of get a fresh start and get more

9    investor capital; he engaged in money laundering, and caused

10   others to engage in that activity as well; and he used illicit

11   means to try to evade being held accountable for his crimes.

12   Among other things, he was arrested with a fake passport in

13   Montenegro trying to flee to a country that doesn't have an

14   extradition treaty with the United States, and this is after

15   his counsel had engaged in discussions with us and was clearly

16   aware of the U.S. charges.  Again, these are all allegations

17   that we make in the indictment in this case.

18          I will pause there in case the Court has any questions

19   there.

20          THE COURT:  Big picture, how do the factual

21   allegations you have set out track the nine counts in the

22   indictment?

23          MR. LENOW:  So, the first four -- I mentioned five

24   categories of misrepresentations.  The misrepresentations

25   relating to the stablecoin UST, including the misstatements

P188KWOC

<div style="margin-left: 3em;">

 1    after the May of 2021 event, those are covered by Counts Five,

 2    Six, Seven, and Eight.  And the balance of misrepresentations

 3    are covered by Counts One through Four.

 4         There is a ninth count in the -- let me just pause and

 5    back up.  The original indictment in this case, from May of

 6    2023, included eight counts.  Those same eight counts are

 7    re-alleged in the superseding indictment; they are the same

 8    charges.

 9         THE COURT:  Any changes?

10         MR. LENOW:  There are changes in the factual

11    allegations.  So the statutes, the counts are the same.  There

12    are changes in terms of there is more factual detail.

13         THE COURT:  There's about 62 pages before you get to

14    Count One.

15         MR. LENOW:  That's one change.

16         THE COURT:  How much of that preface is new?

17         MR. LENOW:  Judge, the original indictment was a

18    really bare-bones indictment.  It didn't include that level of

19    factual detail.  It had no significant preliminary narrative.

20    So all of that is new.

21         THE COURT:  But the content of Counts One through

22    Eight you're saying is effectively reproduced from the original

23    indictment?

24         MR. LENOW:  Yes.  Same charges and the conduct we

25    allege is overlapping.

</div>

P188KWOC

```
 1          THE COURT:  And Count Nine is the one that is added by
 2     the superseder.
 3          MR. LENOW:  Yes.  Count Nine, that is the new count in
 4     the superseding indictment, that's in addition to the eight
 5     original counts.  As we note in our letter to the Court,
 6     Mr. Kwon was not extradited on that ninth count.  He was
 7     extradited on the first eight counts:  Two counts of
 8     commodities fraud, two counts of securities fraud, two counts
 9     of wire fraud, and two counts of conspiracy.  And we do intend
10     to seek a waiver of the rule of specialty from Montenegro.
11          THE COURT:  I will be asking you about that.  But
12     thank you.  That is very helpful.
13          Mr. Ferrara, I am assuming you're taking the lead for
14     today.  Obviously, no need for you to rebut, it's early days
15     yet and that may not be in anyone's interest, but at the same
16     time, I want to give you the floor if there is something you
17     want to say.
18          MR. FERRARA:  Your Honor, I appreciate that.  I am
19     certainly not going to rebut everything Mr. Lenow said.  I
20     think it's obvious to the Court we dispute a vast majority of
21     what he just described.  I worry, though, that, in terms of
22     making a first impression, the government is making it sound as
23     if this was all a big fraud, there was nothing to this, and
24     that is just not the case.  There was an algorithmic
25     stablecoin.  Mr. Kwon put thousands of hours into programming
```

P188KWOC

1    this.  It was quite a feat of ingenuity.  There was a program.

2    There was an algorithm.

3            What the government wants to suggest is that it was a

4    facade, the idea that human beings and businesses had to invest

5    in these products for them to have value was somehow unknown.

6    That's not the way the world works.  It was obvious.  There was

7    literature put out.  If no one wants something, it's valueless.

8    It doesn't matter what you have coded it; if know one wants to

9    buy it, it's valueless.

10           So the idea was, yes, these coins were not necessarily

11   backed by fiat, dollar for dollar, but that as long as people

12   wanted to use this product and invest in this product, the

13   algorithm would generally keep things stable.

14           So, it's just so important to us that the Court at

15   least understand that there was a real product here.  And, yes,

16   at some point people got scared and they fled the product and

17   prices crashed, etc.  But that doesn't mean that there wasn't a

18   very real algorithm, a very real code, that everyone understood

19   needed human and business dollars to give value to it.

20           THE COURT:  But to the extent that Mr. Lenow has

21   previewed the government's case as turning on false statements

22   or misrepresentations thereafter, not at the inception but, for

23   example, as to the events that propped up the peg, if that's

24   the right way to look at it, anything you want to say about

25   that at this stage?

P188KWOC

```
 1              MR. FERRARA:  And a lot of this came out at the SEC
 2    trial as well.  We just don't think a lot of those were false.
 3    We think that, in order to make them false, you have to import
 4    this idea that people would not understand the comments through
 5    the lens of, if no one wants to put money into something, it
 6    has no value.  In other words, investing 101.  I am not even
 7    sure it's 101.  The idea that, if people don't want to pay for
 8    something, it's valueless.  All of the statements I think, in
 9    context with everything else that was put out, about how it
10    worked and that there were investors, in context, our position
11    is that it was not false.
12              THE COURT:  Thank you.
13              Look, I appreciate it's early days and the last thing
14    I want to do is make you feel compelled to defend the case when
15    it's your first conference.
16              MR. FERRARA:  I appreciate it.
17              THE COURT:  I also wanted you to have the floor given
18    the depth of the government's statement.
19              MR. FERRARA:  As your Honor may imagine, this is a
20    public proceeding, and we wouldn't want to leave the wrong
21    impression with the Court that we sort of stand idly by and
22    don't contest.
23              THE COURT:  So moving on, then, to the Rule 16
24    evidence.
25              Mr. Lenow, your letter of yesterday was very helpful.
```

P188KWOC

 1    I do want to get into a little more detail.

 2             Let's begin just by a summary of what it is and when

 3    you expect to produce it.

 4             MR. LENOW:  Of course, Judge.

 5             So, let me just start with a few initial points.  One

 6    is, in terms of timing, we have circulated a protective order

 7    with the defense, and we are working towards getting that

 8    finalized.  Hopefully, we can do so in the next several days,

 9    and once that occurs our plan is to start producing discovery

10    promptly.

11             THE COURT:  Is there anything out of the ordinary

12    about it?

13             MR. LENOW:  No.  There's one or two clarification

14    points that we are just working through, but I think that it

15    should be straightforward and it shouldn't be a problem.

16             THE COURT:  As soon as I get it, I will sign it.

17             MR. LENOW:  Judge, in terms of the categories, there's

18    over six terabytes of materials that we intend to produce,

19    putting aside electronic devices.  So the amount of content

20    here is massive, it's very significant.

21             Around six terabytes or so that is productions from

22    various parties——Terraform itself, its business partners,

23    current or former employees.  That makes up a large amount of

24    the data, electronic communications, e-mail, Slack, things of

25    that nature.  Voluminous trading data, I referred earlier to

P188KWOC

```
 1    various market activities, including in Terraform
 2    cryptocurrencies.  So there are significant amounts of trading
 3    data from both business partners and directly from
 4    cryptocurrency exchanges.  And then a number of the categories
 5    include, we have productions from other government entities,
 6    the SEC, the CFTC being two examples.  There are the sorts of
 7    third-party service provider discovery that we see in many
 8    cases——phone companies, social media companies, things of that
 9    nature.  And there is also publicly available material that we
10    have collected——blog posts, video statements from Mr. Kwon,
11    things of that nature.
12            And I do note that there are recordings of Mr. Kwon
13    that are not public, that were provided by various entities or
14    individuals that had dealings with him.  There were some
15    recordings, our understanding is, where others recorded
16    Mr. Kwon unbeknownst to him, but at the behest of the making of
17    that recording.  These were not at the direction of the
18    government, but those recordings are part of the discovery as
19    well.
20            I will pause there.
21            I will say one more thing, actually, Judge.  Your
22    Honor flagged the issue of search warrants so I will deal with
23    that here as well.  There are search warrants of electronic
24    accounts, such as social media accounts, one of which belonged
25    to the defendant, a Twitter account, a number of e-mail
```

P188KWOC

1   accounts on which we obtained search warrants, several that we

2   believe were used by the defendant, and there is also code

3   repository databases upon which we executed search warrants.

4   That's one bucket.

5           We have obtained four cell phones that were in

6   Mr. Kwon's possession.  We obtained those in connection with

7   our dealings with Montenegro.  These were devices that were

8   either taken from Mr. Kwon at the time of his initial arrest or

9   were obtained later on.  For example, when Mr. Kwon was

10  extradited, he had a cell phone in his possession as part of

11  his personal property, we have obtained that.  We have obtained

12  search warrants on those four devices.

13          So we have the electronic account search warrants.

14  Then we have the cell phone search warrant as well.  So that's

15  the universe of warrants that we are talking about here.

16          In terms of the cell phones, these were warrants that

17  were just obtained, so they have to go through the process of

18  being extracted, reviewed.  And just in terms of a timeline, we

19  anticipate there will be privilege issues, there may be

20  foreign-language issues, there may be encryption issues.

21          THE COURT:  Is that limited to the phones or is that a

22  broader point?

23          MR. LENOW:  That is certainly the case as to the

24  phones.  There are a very large amount of foreign-language

25  materials in this case, a lot of materials that are in Korean.

P188KWOC

```
1    And there were also privilege issues that we encountered and
2    used a filter team to address with respect to our search
3    warrants and some other investigative avenues.  So those issues
4    certainly are popping up in terms of the devices.  They have
5    also popped up more broadly.
6            So, that's a summary of the discovery.  In terms of
7    timing, we are working quickly to assemble this material.  I
8    think we are going to be in a position to produce the vast
9    majority of it in the next six to eight weeks.  That timing is
10   dictated in part by the fact that, because of the volume, there
11   are vendor processing times that are associated with
12   productions that are out of our control, but we believe in that
13   timeline we will produce the vast majority of it.  And I think
14   in the next several weeks we are looking to produce a
15   substantial amount of discovery.  We have talked to defense
16   counsel about producing the warrant affidavits, for example, as
17   early as today once we kind of have the protective order nailed
18   down.
19           So, the bottom line is, in light of some of these
20   issues, including the foreign-language issues, the privilege
21   issues, the recently obtained search warrants, I think our
22   proposal would be -- we are going to move quickly on this, but
23   we don't want to provide a timeline that is not realistic.  So
24   I think what we would propose is in the next 45 to 60 days
25   providing the Court with an update.  I think within that amount
```

P188KWOC

```
 1   of time we will have a very substantial body of production, and

 2   at that point we can identify for the Court any existing work

 3   streams that have proven tricky or ongoing that may take some

 4   more time.

 5              THE COURT:  Thank you.  A lot to take in there.

 6              Let me throw out a handful of questions bearing on

 7   this.

 8              One question is, I am mindful that there was a civil

 9   case in which Mr. Kwon was a party, albeit in absentia.  To

10   what degree is the discovery that you are going to be producing

11   to the defense coterminous to that and to what degree does it

12   go beyond that?

13              MR. LENOW:  Judge, the government doesn't have

14   excellent visibility into what exactly the discovery was in

15   that case.  There was a lot that occurred in the SEC case that

16   we have no awareness of, that we don't have those materials.

17   So it's kind of difficult for me to opine on that.  I can say,

18   we did a broad review of our file, just to get a sense for how

19   much material came from the SEC, and it's less than a terabyte.

20              So, there is around six terabytes of material we

21   intend produce that we obtained independently of the SEC.  And

22   that may be overlapping because some of the topics were

23   overlapping.  For example, I mentioned there was a

24   high-frequency trading firm that was involved in some of this

25   conduct.  That discovery, sent directly from the trading firm,
```

P188KWOC

1    is very voluminous, in part because there is a lot of data.  So

2    I think there is probably going to be some overlap, and perhaps

3    overlap of a lot of material, but there is also going to be a

4    lot of material that is new.

5            THE COURT:  That's what I am trying to focus on,

6    because I am trying to approach this from the perspective of

7    defense counsel and how much new material they need to absorb.

8    So let me be a little more focused.

9            MR. LENOW:  Sure.

10           THE COURT:  The phones, for example, from Mr. Kwon's

11   possession, to your knowledge, were the contents of that

12   available to the parties in the SEC case?

13           MR. LENOW:  No.

14           THE COURT:  The surreptitious, if that's the right

15   word, recordings of Mr. Kwon, was that part of the SEC case?

16           MR. LENOW:  Some, but not all.

17           THE COURT:  The various search warrants that you have

18   cited, other than as responsive to the questions I have just

19   asked, to what degree, to your knowledge, was that material

20   part of the SEC discovery?

21           MR. LENOW:  I believe some of it, but a minority

22   amount.  For example, I mentioned code repositories.  That is

23   one area where I think the SEC did have those materials, so I

24   assume they were produced in discovery, and they would have

25   been accessible to the defense.  And I should caveat that only

P188KWOC

by saying, the electronic devices were unavailable to the SEC,
these were Mr. Kwon's phones.  So I can't speak to whether he
or Terraform had access to them.  But on the government's side,
to my knowledge at least, the SEC side did not have access to
those electronic devices, nor did they receive from us the vast
majority of the search warrant materials.

THE COURT:  A lot of what you're saying is to suggest
the answer to what I am about to ask you, but it sounds as if
you are treating the SEC as not, if you will, part of the
prosecution team from a, for example, *Brady* or Rule 16
perspective.  Am I reading you right?

MR. LENOW:  Yes, Judge.

THE COURT:  So, by what means did you obtain material
from the SEC?

MR. LENOW:  Judge, we submitted access requests to the
SEC, at various points in time, and received materials in
response.  Our overlap with the SEC, though, Judge -- let me
answer your question at least at a high level, and I am happy
to answer any follow-ups, of course.

To the extent this is part of motion practice, I will
say, broadly, our overlap with the SEC was a relatively small
slice of time.  As I understand it, the SEC had an
investigation into Mirror Protocol that predated the crash of
UST and LUNA where we were not working in parallel with them.
We did do a number of joint interviews -- not joint, but

P188KWOC

interviews where there was both SEC and SDNY personnel in the room for a period of time, but that ceased after the charging of the SEC case. So there were many, many interviews, for example, in this case that were done by our office where SEC personnel were not present.

So, there was some period of time where we were in communication, working in parallel with the SEC, but there were vast amounts of time where that was not the case.

THE COURT: But your representation is that there wasn't a systematic working with the SEC so much as jointly appearing at, for example, some interviews?

MR. LENOW: If I understand your Honor's question, let me just respond with a little bit more -- I want to be precise here.

Our office, and we followed this practice in this case, when we work in parallel with another agency, we oftentimes do interviews where everyone is present at once so as not to subject someone to the same interview two or three times. So we followed this procedure for a period of time and were working in parallel with the SEC.

I guess my broader point is, there was substantial amounts of time when the SEC was doing interviews without us being present, or perhaps even knowing about the interview occurring, and vice versa. So there was a slice of time sort of in the middle, I will refer to it as, where there were

1    interviews occurring where we were doing them in the same room.

2           My point is, your Honor has seen a number of cases

3    where there have been parallel proceedings, where there was

4    kind of an overlap of both entities or both agencies were open

5    around the same time or being in the same room for interviews.

6    My point is that this is not that case.  It was different than

7    many cases and there was unusually a lack of doing many things

8    in parallel.  So there was parallel proceedings for a defined

9    and short amount of time.

10           THE COURT:  Do you have the record of the SEC trial,

11   not just what happened publicly but, for example, depositions

12   or discovery that was exchanged there?

13           MR. LENOW:  Judge, we made requests to Terraform and

14   the SEC at various points in time.  I believe we do have

15   deposition transcripts.  I think a majority of all the ones we

16   have are from Terraform as opposed to the SEC.  There could be

17   some we received from the SEC.  I want to check my records

18   before I make a representation on that point.  But we do have a

19   number of those records, but I believe most or all of them were

20   obtained from the company as opposed to the SEC.

21           THE COURT:  Was Mr. Kwon deposed in that case?

22           MR. LENOW:  I believe he was not deposed, Judge.  I

23   think there was a fair amount of litigation back and forth on

24   this.  I want to make sure --

25           THE COURT:  I think we are about to get a

P188KWOC

1    clarification.

2         MR. FERRARA:  I can help with that one.  He was not

3    formally deposed, but he was subject to a Q and A by the SEC.

4    I think they call it investigative testimony.  So, for all

5    intents and purposes, he sat down with the SEC and answered

6    questions.

7         THE COURT:  Was it the standard SEC investigative

8    testimony that you're saying your client sat for?

9         MR. FERRARA:  I want to say yes, your Honor, but for

10   whatever reason I remember it being maybe a different word

11   people were using.  In any event, he sat down and answered a

12   lengthy set of questions from the SEC.  It smacks as a

13   deposition in every other way.

14        MR. LENOW:  I should clarify.  I mentioned that there

15   was an SEC investigation into the Mirror Protocol that predated

16   the crash of UST and LUNA.  My recollection is that there was

17   either an interview or a deposition or something like that from

18   that time frame.  In connection with the post-crash matter and

19   trial, my understanding is that there were attempts made by the

20   SEC to depose Mr. Kwon in Montenegro, and I don't believe that

21   ever occurred.

22        So, I think there are these different buckets where

23   there is -- again, obviously, Mr. Kwon's counsel will know this

24   better than I would, but there is some kind of record of an

25   interview with the SEC, but the attempts to have Mr. Kwon

P188KWOC

1    deposed in connection with the trial were unsuccessful.

2              THE COURT:  Okay.  I think you have alluded to other

3    investigations by other foreign authorities.  What are they and

4    to what degree do you have the fruits of those?

5              MR. LENOW:  Judge, I think it is public that South

6    Korea has an investigation in this matter.  I can't, at least

7    sitting here today, think of any substantive materials that we

8    have from those authorities.  I don't believe we have

9    investigative fruits from foreign authorities.  I did mention

10   that we have these four cell phones that were provided in

11   connection with the extradition from Montenegro.  So we do have

12   some materials from Montenegro in that respect.

13             THE COURT:  Are there any materials that you as of yet

14   have been unable to access, as we have sometimes have in

15   foreign seizure cases?

16             MR. LENOW:  I don't have an answer yet on whether the

17   phones have encryption that we cannot bypass.  I will say that

18   there are concerns, as there always are.  We just got these

19   warrants, I believe it was yesterday.

20             THE COURT:  I misunderstood.  I thought you had the

21   phones for some time.

22             MR. LENOW:  No, Judge.  There was one phone we just

23   obtained in connection with the extradition, and there were

24   three phones we obtained a matter of weeks before that.  So

25   these are four phones we have only come into possession of in

P188KWOC

1    the last month or two.

2              THE COURT:  So, at this point, you really have no

3    visibility into even the volume, let alone the value of what is

4    in the four phones.

5              MR. LENOW:  That's correct.

6              THE COURT:  I see.  Okay.

7              MR. LENOW:  We have come across some encryption issues

8    non-device related in our investigation.  There are keys to

9    wallets that seem to have been lost, for example.  There are

10   electronic accounts, as we understand from the company, they

11   say they have not been able to access.  So these issues have

12   popped up in some other ways.  But the big issue here, and I

13   assume your Honor is asking this with respect to discovery, the

14   four phones are the big question mark, but I think we hope to

15   have a handle on that in the next several weeks.

16             THE COURT:  I have had this repeatedly in cases before

17   me, which is the problem of the government coming into

18   possession of a phone and, in effect, requiring a very

19   different type of algorithm to be used to try to find the

20   passcode, and there are cases where it's cracked early and

21   there are cases where it has taken a long time, and that can be

22   a challenge in terms of case management, for obvious reasons.

23             I assume, though, that the process of running those

24   traps will get going forthwith.

25             MR. LENOW:  Yes, Judge.

P188KWOC

1          THE COURT:  Without holding you to it, given the sheer

2     volume of material here, and excluding the phones where you

3     don't have any visibility into whether it is going to prove

4     useful or not, what are the most important parts of this

5     discovery, just thinking objectively as to what is likely to

6     move the needle at a trial?

7          MR. LENOW:  I think what I can say is that——and I will

8     tie this to the indictment because I think that maybe is the

9     most productive way to do this——substantial amounts of what is

10    in the indictment are based on materials that came from

11    Terraform Labs or its employees and business associates, and

12    trading records from Terraform and its business associates and

13    cryptocurrency exchanges.  There are other categories of

14    information, but I think that this is a case where those

15    productions make up a substantial amount of what we cite in the

16    indictment.

17         THE COURT:  How significant are the recordings of Mr.

18    Kwon?

19         MR. LENOW:  Judge, there are multiple recordings.

20    There is at least three or four.  I don't want to give a number

21    that is wrong.  I can think of at least three or four sitting

22    here today.

23         THE COURT:  What you have described to me, and very

24    ably, is a daunting amount of discovery.  I want to hear in a

25    moment from Mr. Ferrara.  I am happy to set a soft deadline,

P188KWOC

1  broadly consistent with what you are proposing, to get

2  discovery done, with the understanding that something may slip

3  and you are going to do your best. But, beyond that, I would

4  like your commitment that you are going to try and front-load

5  the stuff that matters most, based on your assessment of the

6  case. And beyond that, just as a matter of collegiality, that

7  you will give a heads-up to able defense counsel as to what you

8  regard as wheat and what you regard as chaff.

9          And I say that in every case. In this case, there is

10  more parity, in terms of an ability to understand the meaning

11  of the discovery, than there usually is, both because of the

12  ability of defense counsel and because they tried the SEC case

13  so they get the narrative better. Still in all, the progress

14  of the case will be immeasurably assisted if you could tick and

15  tie and tag material as being consequential as opposed to

16  something that you are obliged to produce but doesn't appear to

17  be important.

18          MR. LENOW: Absolutely, Judge. I think the

19  superseding indictment also provides -- it's obviously not all

20  of our case, but it does provide a bit of a road map to a

21  number of our core theories and views of what we believe at

22  least matters. But of course we will do what your Honor

23  suggested.

24          I was going to say something about the SEC case, but I

25  will pause in case there are other issues to address.

P188KWOC

1          THE COURT:  No.  In a moment I want to turn to Mr.

2     Ferrara.  I don't have any other questions about discovery.  I

3     had questions about the extent of things like foreign-language

4     discovery and the extent of un-retrieved electronics, but you

5     have covered all of that.

6          MR. LENOW:  I think one other thing, you had asked

7     about the SEC case, I think it's also relevant for discovery.

8     I think we mentioned this in our letter but, as I understand

9     it, the SEC case centered on, at least in terms of the alleged

10    fraud in that case, kind of two out of the five categories of

11    representations that we set out in the indictment in paragraph

12    2.

13          THE COURT:  The peg and Chai?

14          MR. LENOW:  That's right.

15          So, three out of the five kind of categories of

16    misrepresentations, and it doesn't include money laundering and

17    other post-arrest conduct that we have alleged, were not, as I

18    understand it, at issue in the SEC case.  So that's relevant

19    both because there are communications, various individuals and

20    players that may not overlap precisely, but, also, there is

21    substantial amounts of data.

22          So, the operation of the Mirror Protocol, just to give

23    you one example, is one of the five categories of

24    misrepresentations, and we have conducted and will produce data

25    on this point, but those markets and how the markets work and

P188KWOC

1    the role of Terraform in behind-the-scenes meddling with them,

2    that data is part of our allegations.  And so it's not just a

3    few more communications, it's also technical analysis and

4    market data that the defense will be dealing with.  And so

5    that's one point.

6        THE COURT:  Your point as to that is that's a

7    narrative that the defense would not be familiar with at least

8    by defending the SEC case?

9        MR. LENOW:  That's my understanding, Judge.

10       And I mentioned there was an SEC investigation in the

11   Mirror Protocol.  My understanding, at least, of that

12   investigation was the issue of whether -- it was something that

13   had to do with whether this was a failure to register a

14   security as opposed to being a deliberate deception or fraud.

15   To my knowledge, the SEC never formally lodged any allegations

16   about fraud in connection with Mirror.  It was about whether

17   this was a security that should have been registered.  So I

18   think it does appear to be a fundamentally different

19   allegation.

20       THE COURT:  It looks to me as if the SEC case broadly

21   is a subset of this case.

22       MR. LENOW:  That's right.  Two out of the five

23   categories of misrepresentations in our case were at issue in

24   the SEC case.  And even as to those two out of five that were

25   at issue, we have substantial additional evidence beyond what

P188KWOC

1    was at issue in the SEC case.

2            THE COURT:  Let me ask you one more question and then

3    I want to hear from Mr. Ferrara about discovery.

4            Mr. Kwon is in custody.  Do you know where he is being

5    held?

6            MR. LENOW:  I do, Judge.

7            THE COURT:  He is being held at one of the usual

8    places.

9            MR. LENOW:  Yes.

10            THE COURT:  Is there going to be any challenge, given

11    the nature of the discovery here, getting him practical access

12    to the Rule 16 discovery?

13            MR. LENOW:  We have raised with the defense the issue

14    that we are happy to troubleshoot on the front any issues that

15    do arise.  We hope there is not, and we intend to do everything

16    we can to make sure that isn't an issue.  So we would propose

17    having our update to the Court address any issues that pop up.

18    All I will say is we are going to do everything we can to make

19    sure it's a smooth process.

20            THE COURT:  Is there any discovery that by its nature

21    is problematic to have it accessible to a defendant outside the

22    presence of his lawyers?

23            MR. LENOW:  So, Judge, with respect to the vast

24    majority of the discovery, the answer is no.  There may be some

25    disclosures that we make that we will have to give some thought

P188KWOC

1    to that, but the short answer is no for the vast majority,

2    perhaps all the discovery.  However, a lot of the discovery in

3    this case, in terms of size, is going to be trading data and

4    things that, you or I looking at an Excel spreadsheet, might

5    not have a tremendous amount of meaning.

6              THE COURT:  Your part about me is absolutely correct.

7              MR. LENOW:  I think we will work with the defense on

8    this, and I am sure there is a way that Mr. Kwon can

9    meaningfully participate in his defense.

10             I would note one other quick point.  It is our

11   intention to produce as much as we can in a format that is

12   easily digestible, searchable by the defense.  We may make

13   productions at the front end that get to them quickly that is

14   not fully digested by all these programs, but we are going to

15   give them this in a format that's usable, electronically

16   formated, loadable, for the most part.  There may be some

17   exceptions to this, just because of the format of the material,

18   but we are going to produce this in what we believe is a very

19   usable and searchable format.

20             THE COURT:  Good to hear.

21             I know that I am preaching to the choir here, but I

22   count on the U.S. Attorney's Office these days more than ever

23   to be a force for good in assuring the practical access of an

24   incarcerated defendant to discovery material.  It has been a

25   challenge, in particular, with one of the facilities at which

P188KWOC

```
 1   defendants are held these days.  I will ask you, the moment you
 2   hear from defense counsel that there is a challenge of that
 3   nature, to take ownership of the process, working with the
 4   facility and figuring out a way to practically solve those
 5   problems.  At the end of the day, I am available to issue
 6   orders and do what I can to break logjams, but my experience
 7   has been that the U.S. Attorney's Office intercession with the
 8   facilities tends to work.
 9            MR. LENOW:  Yes, Judge.  That's our intent.
10            THE COURT:  Mr. Ferrara, just focusing on Rule 16
11   evidence, anything you want to add?
12            MR. FERRARA:  No, not a lot.  I do want to just
13   correct one thing for clarity.  Whether you call it one
14   interview over two days or two interviews, I think there were
15   two days worth of interviews by the SEC of Mr. Kwon, and I
16   think Mr. Lenow was right that the first day was primarily
17   focused on Mirror stuff.  I think the second day was more
18   wide-ranging.  There was also an interview by Singapore
19   authorities at the SEC's request.  So I will just flag that as
20   well.
21            THE COURT:  Is that material, to your knowledge, part
22   of the discovery you expect in this case?  You may already have
23   it.
24            MR. FERRARA:  I think we do.  But I think it should be
25   part of the discovery, nonetheless.  Obviously, we are happy to
```

P188KWOC

1    work with the government so they don't have to waste their
2    time, but we want to make sure we have a good record.
3            THE COURT:  I am going to be very receptive to
4    everyone in terms of thinking about the implications of this
5    massive discovery for the schedule, but to what degree is the
6    foreign-language dimension of the discovery here, based on your
7    familiarity with the case, likely to slow us down?
8            MR. FERRARA:  It certainly will.  And I appreciate Mr.
9    Lenow flagging for the Court.  We have had the superseder for
10   less than a week.
11           THE COURT:  I gather you had the first eight counts
12   for well over a year and a half.
13           MR. FERRARA:  We have always been focused on the Chai
14   and the depeg allegations.  Some of these are new allegations.
15           THE COURT:  Did you not know before the last week or
16   ten days of the gist of the government's allegations?
17           MR. FERRARA:  I am not putting that on these folks.
18   We worked with the SEC, against the SEC, for quite some time,
19   and no one suggested that LFG was improperly --
20           THE COURT:  No.  But per Mr. Lenow, you had the
21   charging language, in essence, Counts One through Eight, even
22   if not the lengthy narrative that preceded it.
23           MR. FERRARA:  We had One through Eight, but I don't
24   know that we understood -- look, maybe I am just speaking for
25   myself, if Mr. Lenow wants to correct me.  I thought about that

P188KWOC

1    through the lens of it's a Chai and depeg.  It's not a speaking

2    indictment.

3            THE COURT:  I see.  So the to-wit clause and whatnot

4    you took really as focused on the theories of fraud that were

5    litigated before the SEC.

6            Let me circle back a sentence or two.  You understood

7    the to-wit clauses, if you will, to capture the two theories of

8    fraud that were litigated against the SEC?

9            MR. FERRARA:  That is how I understood it.  I can flip

10   through it.

11           THE COURT:  The point is, from your preparation

12   perspective, you are starting close to ground zero with respect

13   to the other three theories of fraud, is what you're saying to

14   me.

15           MR. FERRARA:  Yes.

16           THE COURT:  Anything else you want to add with respect

17   to the discovery process here?

18           MR. FERRARA:  No, your Honor.  I am conscious of the

19   fact that your Honor is going to ask about motions.  But given

20   the unusual nature of this case, where we had a civil trial

21   before this, I think the government should take a hard look at

22   witness statements.  I don't think this is the normal problems

23   of witness safety or tailoring the defense, which I candidly

24   have never understood why that's a problem, that's the whole

25   idea.  But I think those sort of go out the window, and I think

P188KWOC

1    in the spirit of moving things along --

2            THE COURT:  I'm sorry.  You're making a comment about

3    the Jencks Act material?

4            MR. FERRARA:  Correct.  It would help us understand

5    the Rule 16 material better if we understood what some of the

6    witnesses told the government.

7            THE COURT:  Later in this conference we are going to

8    be setting a schedule, and I will be happy to tee up for

9    initial consideration the government's view on that issue.  But

10   it seems to me at this point the Rule 16, it sounds like we are

11   going to be backing up a U-Haul to the Southern District and

12   delivering it to you.  In the first instance, I just want to

13   make sure we have an orderly process for that.

14           Let me just take up the issue of suppression topics

15   and then we will take a comfort break.

16           Mr. Lenow, listening to you, it sounds as if, with

17   respect to searches undertaken by U.S. authorities, just

18   bracket it that way, it doesn't sound like there are any

19   searches or seizures by U.S. authorities that were done without

20   a warrant; is that correct?

21           MR. LENOW:  Judge, I believe that's correct.

22           THE COURT:  And you have summarized it here, but you

23   can set out by letter a list of all the warrants for the

24   defense so that they will be on notice as to what warranted

25   searches or seizures they might want to move against?

P188KWOC

1          MR. LENOW:  Yes, Judge, of course.

2          THE COURT:  Turning to identification procedures, it

3     doesn't feel like that type of case.  I take it nothing like

4     that was used here?

5          MR. LENOW:  That's correct, your Honor.

6          THE COURT:  What about searches or seizures by foreign

7     authorities?  You have mentioned, for example, the receipt of

8     phones in Montenegro.  Are there searches or seizures -- I

9     don't even know if warrant is the right question to ask.  Were

10    there warrantless searches or seizures abroad?

11         MR. LENOW:  I think what we can say is, we don't have

12    the fruits of any search that I am aware of that was done by

13    foreign authorities.

14         THE COURT:  I thought the phone was taken in the

15    context of the extradition.  Wasn't that a seizure?

16         MR. LENOW:  Our understanding and my understanding, at

17    least, is three phones, and perhaps other devices, were seized

18    from Mr. Kwon and one his compatriots when they were seeking to

19    leave Montenegro.  In the last several months, three of those

20    cell phones were provided to us, and we obtained a search

21    warrant on them.  I can't speak to whether Montenegro was able

22    to obtain anything from those phones.  But what I can say to

23    you is --

24         THE COURT:  Sorry.  It sounds like the physical

25    contraption that is the phone was seized incident to arrest,

P188KWOC

```
1   and you thereafter got a U.S. search warrant permitting you to

2   get at the contents.  But I am getting at the actual seizure of

3   the thing.  It sounds like, as a formal matter, there may have

4   been a warrantless seizure of the phone.

5          Look, I am not commenting on what the legal

6   consequence of any of this is.

7          MR. LENOW:  You're absolutely right.  You're correct.

8          THE COURT:  Is there anything else that foreign

9   authorities got here?

10         MR. LENOW:  Judge, I don't actually have a complete

11  and perfect picture into what was seized by Montenegro.  I

12  think it is possible that there were other papers or items

13  seized incident to arrest.  I think there were also electronic

14  devices that we do not have that were seized by Montenegro.

15         THE COURT:  My concern is just bracketed by what you

16  have in your possession, custody and control, what you're

17  producing.  And what I would like you to do is set out in a

18  letter for the defense, and file it on the docket of the case,

19  any evidence that essentially was the product of investigative

20  techniques by foreign law enforcement.  Again, there are a

21  variety of issues here, including the application or not of the

22  Fourth Amendment to events like that.  I am not prejudging the

23  outcome of it.  I just want to make sure that there is a common

24  understanding among the two tables as to what of your evidence

25  came from investigative techniques like that, just so that Mr.
```

P188KWOC

1    Ferrara and his team can make a knowledgeable determination of

2    whether there is any value to a suppression motion.

3            Mr. Ferrara.

4            MR. LENOW:  Can that include witness statements, your

5    Honor?

6            THE COURT:  Let me ask you this, Mr. Lenow.  To the

7    extent that you may have witness statements taken by foreign

8    authorities, would you be treating that as Rule 16 or as

9    *Jencks*?

10           MR. LENOW:  Judge, I believe we would treat that as

11   *Jencks*, although I want to give that some more thought.  I

12   understand your Honor is considering this with an eye towards

13   suppression material.

14           THE COURT:  That's the spirit of the question.

15           MR. LENOW:  So, to the extent we have any statements

16   of the defendant, we would turn those over as *Jencks*.  In terms

17   of other --

18           THE COURT:  I'm sorry.  You would turn those over --

19           MR. LENOW:  As Rule 16.  I'm sorry.  We would turn

20   that over as Rule 16.

21           To the extent that there are witness statements from

22   other individuals that foreign authorities obtained, I can't

23   conceive of a suppression issue there.

24           So, in terms of this bucket of making sure that the

25   defense is aware of any possible facts that they could use to

P188KWOC

1    suppress materials, I don't think it would apply beyond

2    Mr. Kwon's own statements, but I could be missing something.

3            THE COURT:  Here's the thought.  I am not resolving

4    anything today.  I just want to make sure the defense is on

5    notice at a macro level of what you have.

6            So, it's enough for you to alert the defense that

7    you're in possession of witness interview statements taken by

8    the following authorities, and the defense will do what it is

9    going to do if it wants to tee that up to be litigated.  I just

10   don't want to have a situation where late in the day in this

11   case the defense pops up and says, wait a minute, we are now

12   getting, perhaps at the *Jencks* Act stage, material that we

13   think was susceptible to a plausible motion to suppress.  It

14   may be that there's no viable legal doctrine that the defense

15   could invoke, and it may be that this can be litigated without

16   their having the content of what the statement is, but I want

17   to make sure they are on notice just so that, if there is a

18   motion like this to be made, we get it identified early.

19           MR. LENOW:  Understood, Judge.  We will do that.

20           MR. FERRARA:  Your Honor, I want to say, I appreciate

21   the Court's intention there.  I guess what I am trying to get

22   at is, there is going to have to be discovery into the

23   discovery.  We can't know if a witness statement is

24   suppressible unless we understand the circumstances.  There is

25   definitely law about involuntary witness statements being

P188KWOC

1    impermissible in various contexts.

2            THE COURT:  But if the statement isn't being offered

3    at trial, and if it is part of discovery, what is the value of

4    the motion?

5            MR. FERRARA:  That's fair, your Honor.

6            THE COURT:  At the end of the day, I appreciate that

7    you're seeking by any means possible to gain access to the

8    content of the statement.  I would be if I were where you are

9    too.  But at the end of the day, as it relates to suppression,

10   if ultimately we have a hearsay interview statement that is not

11   going to be capable of being offered at trial, unless there is

12   some fruit-like theory here, and there is a major standing

13   problem at the jump, I am not sure this is going to be fit into

14   a suppression box.

15           MR. FERRARA:  How about the circumstances of the

16   seizure of the phones and how the phones were maintained over

17   the course of -- I am flagging, your Honor, I think that's

18   discovery into discovery, and I think it's permissible and

19   appropriate here.

20           THE COURT:  We will reserve on that.  For the time

21   being, I am just trying to issue spot categories so that you

22   are well armed to do what you are anticipating doing, which is

23   litigating these.  All I want to do is make sure you know what

24   the universe is out there, and you will do with it what a

25   skilled lawyer does with it.

P188KWOC

1          MR. FERRARA:  Thank you, your Honor.

2          MR. LENOW:  I will just say more broadly we intend to

3     engage in a dialogue with the defense on these topics.  And

4     even if there are things that are not covered by Rule 16, we

5     very well may be willing to provide them voluntarily or out of

6     an abundance of caution.  So I think the benefit of providing

7     the Court with an update in 45 or 60 days is not only that you

8     will see our progress, which I hope will be substantial, but I

9     think we are going to work productively and we will be able to

10    narrow down areas of disagreement.

11         THE COURT:  Great.  I agree.

12         Look, I do hope you will approach the conversations

13    with the defense in that spirit, notwithstanding the defense's

14    unusual familiarity with the case relative to most initial

15    conferences.  There is a lot of material that's about to fall

16    in on them, and we will talk a little bit later after the break

17    about a trial schedule, but anything that can be done to

18    expedite the defense's digestion of the material here is all

19    for the good.

20         All right.  The final topic as part of the suppression

21    topic just involves statements of the defendant.  Other than

22    the investigative deposition from the SEC, are you aware of any

23    statements by the defendant to law enforcement?

24         MR. LENOW:  Judge, Mr. Ferrara's mention of the

25    statements to the SEC, and also, I think there are foreign

P188KWOC

1    authorities that took some information at the request of the

2    SEC.  Those are the two that I am aware of.  And there are, of

3    course, Mr. Kwon's public statements.  Those are the statements

4    I am familiar with sitting here today.

5            THE COURT:  If you become familiar with anything else,

6    put it in writing to the defense and the Court just so that we

7    are all aware.

8            We are going to take a five-minute comfort break.  I

9    will ask the people in the audience to let counsel go first, if

10   you're using the restroom, because we have got some more ground

11   to cover and I have got a hard stop a few minutes before 1.

12           When we resume, we will pick up the sequence as I

13   advertised it.

14           (Recess)

15           THE COURT:  We will turn now to an easy subject, the

16   government's motion with respect to notice to victims.

17           Defense, I take it you don't oppose by signing the

18   proposed order?

19           MR. FERRARA:  No objection.

20           THE COURT:  Government, I will be signing that order

21   today.

22           Next, I know Judge Lehrburger covered this, but I

23   think by statute the district judge is required to do the same

24   too.

25           So, just very briefly, I am notifying the government

P188KWOC

1    pursuant to the Due Process Protections Act and Rule 5(f) of

2    the following:

3         I direct the prosecution to comply with its obligation

4    under *Brady v. Maryland* and its progeny to disclose to the

5    defense all information, whether admissible or not, that is

6    favorable to the defendant, material either to guilt or to

7    punishment, and known to the prosecution.  Possible

8    consequences for noncompliance may include dismissal of

9    individual charges or the entire case, the exclusion of

10   evidence, and professional discipline or court sanctions on the

11   attorneys responsible.  I believe Judge Lehrburger has already

12   entered a written order more fully describing this obligation

13   and the possible consequences of failing to meet it.  I direct

14   the prosecution to review and comply with this order.

15        I know the answer to this question is yes, but does

16   the government confirm that it understands its obligations and

17   will fulfill them?

18        MR. LENOW:  Yes, Judge.

19        THE COURT:  Next, I have a handful of questions that

20   are to some degree prompted by the helpful discussion we have

21   already had.

22        There is the issue that has come up about the scope of

23   the extradition and the rule of specialty.

24        Mr. Lenow, how is that going to work with respect to

25   Count Nine?  What is the process from here?  I have not had

P188KWOC

1    that in a case.

2           MR. LENOW:  So, Judge——and I may have mentioned this

3    earlier, apologies if this is repetitive——Mr. Kwon was

4    extradited on the first eight counts in the original

5    indictment, the same eight counts as in the superseder.  He was

6    not extradited on the ninth count.  The U.S. intends to seek a

7    waiver from Montenegro.  And the process we would propose to

8    follow is we will keep the Court updated on the status of that.

9    I think that was the approach that was followed in the *Sam*

10    *Bankman-Fried* trial, where a waiver was sought with respect to

11    additional charges from the Bahamas, and I think Judge Kaplan

12    ordered in that case that the government apprise the court of

13    the status of that waiver.  So I think we would propose the

14    same thing here.  We will keep the Court updated and we can

15    take it as we see it.

16           THE COURT:  I am happy to be updated.  My

17    understanding is in that case there was not ultimately a

18    positive answer in time for trial, and therefore the government

19    proceeded on those counts on which the defendant had been

20    extradited.

21           MR. LENOW:  I believe that's the case.

22           THE COURT:  Mr. Ferrara, anything to add on this

23    front?

24           MR. FERRARA:  No.  We think it is a violation of the

25    rule of specialty.

P188KWOC

1          THE COURT:  Count Nine is.

2          MR. FERRARA:  Yes.  And it is one of the things we

3     plan to move on.  I would also say, if the government does seek

4     a waiver, then we would like an opportunity to respond to

5     Montenegro about that.

6          THE COURT:  Well, given that the government is seeking

7     a waiver from Montenegro, it doesn't feel like it's ripe to

8     litigate before me because events may overtake any such motion.

9          MR. FERRARA:  Your Honor, that's totally fair, and I

10    am familiar with the idea of specialty being the other

11    sovereign's right and not the defendant's.  But that being

12    said, I am not prepared to stand here and say that there's no

13    cases that suggest that the defendant might have some rights

14    around this.  And for what it's worth, your Honor, we might

15    want to do a broader motion on the irregularities of the

16    extradition procedure in this particular case.  I am not saying

17    we will, but just in terms of fronting with the Court, it was a

18    whiplash kind of back-and-forth situation and it may be that

19    there is a broader motion.

20         THE COURT:  I am on notice that that's under

21    consideration.

22         Next issue, are there any foreign prosecutions of

23    Mr. Kwon that have been initiated or just investigations

24    bearing on the issues here, not bearing on the use of a bogus

25    trial document?

P188KWOC

1          MR. LENOW:  Judge, I think it is public that there is

2    an investigation and prosecution in South Korea.

3          THE COURT:  Prosecution, not just investigation?

4          MR. LENOW:  I don't have deep familiarity with the

5    Korean legal system.  My understanding is there are legal

6    proceedings in that country that are criminal in nature.

7    Whether you want to call it investigation or prosecution, I

8    don't know which is the right term, but there are proceedings

9    in which Mr. Kwon is --

10          THE COURT:  A defendant.

11          Are there any implications for us to the fact that

12    there is an open investigation or other proceeding abroad?

13          MR. LENOW:  I don't know.

14          Judge, I should clarify, there were dueling

15    extradition requests to Montenegro for Mr. Kwon from the United

16    States and from South Korea.  So I can infer from that that

17    there was the equivalent of an arrest warrant or indictment in

18    South Korea that formed the basis for that extradition request.

19          THE COURT:  Can you see any way in which the presence

20    of an unconsummated extradition request or other proceedings

21    in, for example, South Korea has any implication for this case?

22          MR. LENOW:  Judge, I personally don't see one.  I am

23    not an expert in this area so I don't want to get ahead of my

24    skis.

25          THE COURT:  Mr. Ferrara, any issue to spot there?

P188KWOC

1            MR. FERRARA:  Your Honor, I can see potential

2     discovery issues.  I simply don't know if the government has

3     worked at all hand in glove with South Korea.  I will also say

4     we are going to propose some language for the protective order

5     where I think, unfortunately, we are going to have to at times

6     think about how Mr. Kwon's defense here will affect things for

7     him in Korea, should he arrive there.  So we are going to need

8     to share some things with counsel there.

9            THE COURT:  There may be some issue about what, if

10    any, limits are put on the use of Rule 16 discovery in terms of

11    other proceedings.  There is nothing ripe for me to review, but

12    that is an issue within this space.  Thank you for catching

13    that.

14            Next issue involves the SEC case.  I am just eager to

15    get counsel's initial take on this.

16            Mr. Lenow, in your letter you noted that, among the

17    rulings that Judge Rakoff rendered in the SEC case, in which

18    Mr. Kwon was a party, were, for example, rulings that four of

19    Terraform's crypto assets were investment contracts, and hence

20    securities.  There were also coconspirator statements within

21    the scope of the hearsay exclusion.  To what degree, if you

22    have given thought to this, is Mr. Kwon bound by rulings by

23    Judge Rakoff where it is truly the same issue in this

24    litigation?

25            MR. LENOW:  Judge, I would like to give more thought

P188KWOC

1    to that, but we at least wanted to flag it for the Court.

2    Certainly, Judge Rakoff's rulings are, at the very least,

3    persuasive authority to your Honor, and as you noted, we could

4    conceive of situations where they were binding.  There was a

5    trial in that case so there were many, many rulings, including

6    evidentiary rulings on various particular pieces of evidence.

7    So I think one thing I want to be careful of is, I did not sit

8    through that entire trial.  I am familiar with some portions of

9    it.  What I propose is, if we could give some more thought to

10   that, and the next time we are before your Honor we will be

11   prepared to discuss it then.

12           THE COURT:  It's way premature to brief that, but it's

13   sitting right out there as an issue that I have no doubt we are

14   going to be engaging with.  So I would welcome counsel trying

15   to get ahead of that and give some thought to how to think

16   about those questions and whether the legal analysis differs,

17   depending on the issue, and certain rulings are -- well, let me

18   leave it at that.  There may be a variety of different species

19   of problems presented in this space.  It's a new one on me

20   because it's rare to have a criminal case where the defendant

21   was a civil defendant in what amounts to a somewhat overlapping

22   case.  So new issue for me, spotting it for you, please think

23   about it.

24           Mr. Ferrara, anything on that?

25           MR. FERRARA:  No.

P188KWOC

1          THE COURT:  I am mindful that there is a lot of

2    ferment in this district and elsewhere about, in the crypto

3    world, what qualifies as a security.  And just yesterday Judge

4    Failla certified an interlocutory appeal in the *Coinbase* case

5    to the Second Circuit on that very question.

6          To what degree is that developing body of law going to

7    be a thing here?

8          MR. LENOW:  Judge, I think there are a number of

9    judges who have weighed in on this, and it's a complex question

10   in some cases.  But I would say, in this case, this is a

11   scenario in which Mr. Kwon's company directly sold LUNA to

12   investors on certain occasions.  There are also exchanges in

13   which people bought and sold the securities.  But in order for

14   our securities fraud claim to have validity, we would have to

15   show that every transaction was a securities transaction.

16         I know a lot of the current litigation stems from

17   various fact patterns, whether it's a primary seller, a

18   secondary seller, a secondary market.  I guess my point is,

19   however you come out on that, our case is not going to rise or

20   fall on those kind of complex legal issues that splice up the

21   market.  As long as there was a purchase or sale of a security,

22   in connection with our fraud count, for example, a direct sale

23   to a buyer, that is sufficient under the law.  So I think a lot

24   of the complexity won't be terribly complicated.

25         THE COURT:  You see this as an easier case than some

P188KWOC

1    of those others?

2              MR. LENOW:  Yes, Judge.

3              THE COURT:  I guess there is an issue conceptually in

4    defining what the security is, to the extent that there is a

5    securities fraud count in question, because there is a variety

6    of tokens here and a variety of other vehicles, and it may be

7    that, however it gets done, there needs to be clarity going

8    into a trial as to what is alleged to be the security.

9              MR. LENOW:  That does make sense.  I don't think there

10   is going to be a lack of clarity on that point going into this

11   trial.  And as your Honor noted, we need to look into the issue

12   of whether there is a preclusive effect from Judge Rakoff's

13   case.  So that may kind of clear away some underbrush here.

14   Certainly, it's an issue we are looking at, but I don't think

15   it's going to be something that this case is going to rise or

16   fall based upon the *Coinbase* appeal.

17             THE COURT:  Mr. Ferrara, anything?

18             MR. FERRARA:  I don't know if it will rise or fall on

19   it, but I think we are going to have to figure out whether some

20   of these are securities and understand exactly what the

21   government is alleging about it.

22             THE COURT:  And there will be a question of whether

23   these are rulings that I can make pretrial.

24             MR. FERRARA:  Agreed.

25             One of the tokens that we are talking about, the whole

P188KWOC

1    idea was it would stay at one dollar.  I think there will be

2    things that we are going to have to talk about.

3            THE COURT:  Again, something to focus on.

4            Next question is for the government.  In looking at

5    the indictment, it looked to me as if there are two different

6    sets of substantive counts here, if you will.  Counts Two,

7    Three and Four deal with Chai, Mirror, Genesis, LFG, and they

8    are, respectively, Count Two commodities, Count Three

9    securities, and Count Four wire fraud.  And then,

10   symmetrically, Counts Six, Seven and Eight all involve the

11   stablecoin peg issue, with Count Six being commodities fraud,

12   Count Seven being securities fraud, and Count Eight being wire

13   fraud.

14           Just to simplify the conversation, let's focus on the

15   first set, Two, Three and Four.  Do those essentially allege

16   the same pattern of behavior and charge them just under

17   different legal theories, or are those counts really addressed

18   to different behavior?

19           MR. LENOW:  There are a number of common themes.  One

20   is there were representations made to purchasers of LUNA and

21   other Terraform cryptocurrencies that -- let me back up.

22           A common pitch was to point out various systems on the

23   Terra blockchain; for example, e-mail, pictures and literature

24   would say, we have Chai for payments, Mirror for investing, and

25   so forth, and LFG adding this layer of stability.  These are

P188KWOC

1    all misrepresentations put out to investors in order to obtain,

2    under false pretenses, investors' funds.

3         So, that is a broader version kind of theme.  And as I

4    mentioned earlier, there are variations of a theme.  Both Chai

5    and Mirror, for example, we allege that these behind-the-scene

6    machinations that keep these systems afloat operating as false

7    advertisement was to use the Genesis coins to fund them.

8         THE COURT:  I understand that there are different

9    theories of fraud that underlie Counts Two, Three and Four.  I

10   guess where I am going is, unless a particular, say, token can

11   be both a security and a commodity, if these accounts are

12   essentially aimed at the same bucket of behavior, I am trying

13   to understand whether they are mutually exclusive or not.

14        MR. LENOW:  Sorry, Judge.  I misunderstood the

15   question.

16        LUNA, for example, we allege to be a security.  Judge

17   Rakoff also found it was a security.  It was a common way of

18   doing business for investors to provide Bitcoin or another

19   cryptocurrency.  Bitcoin I think is widely acknowledged as

20   being a commodity.  Investors gave Bitcoin over in exchange for

21   LUNA as one example.  That was both, as we allege, commodities

22   and securities fraud because individuals were defrauded of

23   their commodity Bitcoin in exchange for a security LUNA.  So

24   the same transaction.  There was a commodity being exchanged

25   for a security and that transaction is simultaneously both.

P188KWOC

| | |
|---|---|
| 1 | THE COURT:  That answers my question.  Obviously, this |
| 2 | may or may not be ground for litigation, but it certainly at a |
| 3 | minimum suggests, when we get to this point way down the road, |
| 4 | a need for extreme clarity with a jury as to what |
| 5 | differentiates the two counts beyond just the legal charge. |
| 6 | What is alleged to be the commodity?  What is alleged to be the |
| 7 | security? |
| 8 | That's helpful.  And I take it you would give a |
| 9 | similar answer to Count Six, Seven and Eight? |
| 10 | MR. LENOW:  I think a broader point to make is, a |
| 11 | number of these SEC cases, some of the stand-alone allegations |
| 12 | are that X is a security, Y is a security.  That's not this |
| 13 | case.  Unlike a lot of these civil litigations involving the |
| 14 | SEC, all of our active counts, for the money laundering count, |
| 15 | are fraud counts.  And it doesn't have to be for LUNA or UST, |
| 16 | either one would satisfy in our view the security requirement. |
| 17 | It can be a transaction where LUNA is directly sold to an |
| 18 | investor; it can be a transaction of a secondary exchange. |
| 19 | My point is we anticipate, when we ask for a jury |
| 20 | verdict in this case, it's going to be guilty or not guilty, |
| 21 | and there will be multiple potential ways in which  -- |
| 22 | THE COURT:  It's multidimensional. |
| 23 | MR. LENOW:  We don't need a finding that both UST and |
| 24 | LUNA are securities, or that Tether and Bitcoin are |
| 25 | commodities.  This distinguishes this case from a lot of civil |

P188KWOC

1    litigations where there is a request for a finding of liability

2    on an unregistered security and they list out each security.

3    That is not the nature of this litigation.

4              THE COURT:  And a related question.  Putting aside the

5    possibility of somebody who might be an expert in the sense of

6    just giving guidance to the jury about a world of commerce that

7    they are unfamiliar with, is this a case in which you expect

8    the government's case to involve expertise?

9              MR. LENOW:  Yes.

10             THE COURT:  What would be the nature?

11             MR. LENOW:  There are a number of potential bodies of

12   expert testimony.  One is market analysis, in other words,

13   analysis of markets and opinions on how certain trading

14   affected the market and prices in the market.  That's one.

15   Another potential area for expert testimony would bear on the

16   technical operation of the blockchain, Terra blockchain,

17   blockchain technology, in some of these programs.  I think it

18   can potentially be covered by just a fact witness, like an

19   investor who could explain the technology.  But it's possible

20   we would also seek to call an expert, just to opine as an

21   expert.

22             So those are two areas that I foresee.  There may be

23   others, but I think -- certainly at the SEC case, both sides

24   did seek to introduce expert testimony and ultimately Judge

25   Rakoff did allow some expert testimony, including on market

P188KWOC

1    operation.

2            THE COURT:  I am just putting this out there.  I

3    expect that I am going today to set a trial date, hearing both

4    of you as to your views.  But one of the things I will want you

5    to be thinking about afterwards so that we can put something in

6    place, presumably at the second conference, is

7    reverse-engineering the schedule from there, including giving

8    due time for expert disclosures.

9            Mr. Ferrara, any thoughts on this space?

10           MR. FERRARA:  Not on experts.  But your Honor also

11   covered the counts in the indictment.  I just want to flag

12   again motion practice.  We would call it multiplicitous.

13           THE COURT:  Multiplicity meaning one count that embeds

14   multiple legal theories.

15           MR. FERRARA:  Multiple counts that embed one.

16           So, Mr. Kwon, we are ratcheting up his sentencing

17   exposure based on the exact same conduct.  And I understand the

18   same course of conduct can be charged multiple ways.  But here,

19   if it's a security, then we don't need the commodities fraud

20   count.  It's not fair to say that, as to Chai, there's three

21   different ways, because it's a security, a commodity, and it's

22   also a wire fraud, and we therefore are going to ratchet up

23   that punishment.  That would be inappropriate.

24           THE COURT:  So the motion you're anticipating is not

25   that a particular count embeds multiple crimes, that would be

P188KWOC

 1    duplicity, but that multiple counts effectively replicate each

 2    other, which would be multiplicity.

 3           MR. FERRARA:  I don't want to cut myself off on

 4    duplicity.  But what I am flagging for your Honor is, yes, we

 5    essentially have three counts that charge the exact same thing,

 6    and that is inappropriately ratcheting up.

 7           THE COURT:  You heard Mr. Lenow's assessment that a

 8    course of conduct can check both boxes because it, for example,

 9    implicates both a security and a commodity.

10           MR. FERRARA:  I understand his point.  I think the

11    government probably charged it this way because they didn't

12    know which way the Court was going to come out on whether it's

13    a security or not.  We may have to argue it.

14           THE COURT:  Point taken.

15           Next issue is just pretrial motions that I can expect

16    other than the garden variety coconspirator exclusion under

17    hearsay, standard motions *in limine*.  I am hearing issues

18    potentially sounding in multiplicity.  I am hearing a potential

19    issue with respect to Count Nine and extradition and perhaps

20    something broader on that.

21           Mr. Ferrara.

22           MR. FERRARA:  Suppression maybe based on overseas

23    conduct.  I think, your Honor, that we may have other motions

24    regarding the way this indictment is put together.  I think

25    there might be surplusage here, potential motions to strike

P188KWOC

1    portions of this indictment.  There might be issues around the

2    jury pool.

3            THE COURT:  What is the issue with respect to the jury

4    pool?

5            MR. FERRARA:  I think the government has put into this

6    indictment certain allegations that it is trying to help itself

7    get in -- by putting it in this indictment, it wants to get

8    into trial and in front of the public.  Some of the stuff in

9    here about what Mr. Kwon did after he maybe understood -- the

10   idea that he was in flight, he was on the lam, he had fake

11   passports, all of that.

12           THE COURT:  That sounds like a motion *in limine*.

13           MR. FERRARA:  It might be, your Honor, but I don't

14   think it should be in this indictment.  Judge Rakoff kept it

15   out of our trial in front of the SEC on 403 grounds.

16           THE COURT:  That sounds like a motion *in limine* that

17   he may have granted.  Perhaps it was consented to.

18           The issue is whether, independent of the usual vehicle

19   in which we would litigate that, which would be under the rules

20   of evidence, whether there is a value in flyspecking the

21   indictment for this purpose.  There is a separate issue about

22   whether speaking indictments go into a jury room.  That's a

23   distinct issue from whether there is some value in having

24   litigation about whether to redact or excise a sentence, a

25   paragraph from the indictment.  There's a real question in my

P188KWOC

1    mind about what practical value is served by that exercise,

2    except as a precursor to a motion *in limine*.

3    MR. FERRARA:  Understood, your Honor.  I would like to

4    look at it more closely.  I do think some of the allegations

5    here really are sort of obvious 403 stuff that is publicly

6    prejudicial to Mr. Kwon.

7    THE COURT:  Look, this is early days, it's the first

8    conference.  I am merely putting a note out there that, to my

9    mind, something of that nature, the real issue is making sure

10    that the jury doesn't hear evidence that isn't admissible.  But

11    litigating it before me feels a little bit like the situation

12    we have of somebody who chooses to litigate a defamation case.

13    You may be drawing much more attention to an allegation by the

14    litigation than the value you're getting by prevailing.  In

15    this case you're not going to get any damages and so what the

16    value would be of excising that is lost to me.

17    MR. FERRARA:  Fair enough, your Honor.  I am not going

18    to waste the Court's time.  It's important to us that your

19    Honor has what we think is the right set of information in

20    front of you.  The government writes a letter and it has its

21    allegations in the indictment, and we think it's important that

22    your Honor understands our perspective.

23    THE COURT:  I appreciate that.  I am always delighted

24    to review an interesting motion, but I also would like the

25    motions practice here to be about things that are real.

P188KWOC

1          MR. FERRARA:  I am just trying to give my best sense,

2     sort of a week into reviewing this indictment, of where we

3     might even go.  Obviously, your Honor, I am sure you are not

4     going to see half of the things I am talking about.

5          THE COURT:  That's great.

6          MR. FERRARA:  There might be some discovery motions

7     that we want to make here given the number of

8     different -- there are different foreign entities that went

9     into this.  I already talked about witness statements a little

10    bit.  The joint versus parallel nature.  I understand everyone

11    is using the word parallel.  We might see it differently.

12         THE COURT:  You might be trying to develop an argument

13    that the government is working in conjunction with some foreign

14    sovereignty and the SEC in the way that they did not.

15         MR. FERRARA:  Something along those lines.

16         THE COURT:  Very helpful.  Premature to set any dates

17    for any of that.

18         We are now at the point in my sequence of setting a

19    trial date.

20         Mr. Ferrara, let me turn to you because a lot of this

21    is going to be dictated by your capacity to make sense of the

22    discovery here and to work with your client.  What is your

23    view?

24         MR. FERRARA:  On the timeline?

25         THE COURT:  We will worry about the intermediate

P188KWOC

1    dates.  From your perspective, when should we have this trial?

2            MR. FERRARA:  I don't think we should have this trial

3    any sooner than winter of 2026.

4            THE COURT:  Meaning December-January.

5            MR. FERRARA:  December is fall timeline.  December

6    21st usually is where we click over.

7            THE COURT:  You're not proposing that as the trial

8    date.

9            MR. FERRARA:  No.  We would ask for at least a year on

10   this, your Honor.

11           THE COURT:  I want to set a date now that we can all

12   commit to, because this is a big-deal case, we have got a lot

13   of lawyers, it's likely to be a long trial.  My experience is

14   that, in cases where I am dealing with heavy-duty scheduling

15   challenges, there is a huge value in locking everybody in early

16   to the date.  But I also don't want to choose a date that is

17   unrealistic.  So I want to listen to you.

18           You are proposing to me that we schedule this

19   effectively in January of 2026.

20           MR. FERRARA:  Given what your Honor just said, I would

21   ask for maybe early spring.  I see your Honor's body language.

22   The challenges here, your Honor, in addition to everything you

23   heard about what the discovery is, we have to work in

24   connection with foreign counsel; we might be making motions

25   about trying to get discovery from foreign entities; we are

P188KWOC

|   |   |
|---|---|
| 1 | also in the middle of a bankruptcy proceeding and trying to |
| 2 | resolve Judge Rakoff's settlement order imposed in the SEC |
| 3 | case. |
| 4 | THE COURT:  There is no appeal of his case; you |
| 5 | settled at the end of the day on damages after his liability |
| 6 | determination. |
| 7 | MR. FERRARA:  There is no appeal, but we are still |
| 8 | trying to sort out getting that settlement taken care of.  And |
| 9 | all of these things require us to be saying to ourselves, how |
| 10 | does each piece fit together -- if we do this or say this, |
| 11 | counsel in Korea, how does that affect what is happening there? |
| 12 | Bankruptcy counsel, is this something that is going to be a |
| 13 | problem in terms of resolving a settlement? |
| 14 | THE COURT:  What was the window of time between the |
| 15 | first conference and the trial in *Bankman-Fried*?  I think it |
| 16 | was a good deal shorter than that. |
| 17 | Mr. Lenow, how long is the trial apt to be? |
| 18 | MR. LENOW:  Our estimate would be four to six weeks. |
| 19 | Obviously, we don't have a window into a possible defense case, |
| 20 | but that's our best estimate. |
| 21 | THE COURT:  That is making an assumption about the |
| 22 | defense case or that's independent of the defense case but |
| 23 | including everything else? |
| 24 | MR. LENOW:  We would try to have our case in in four |
| 25 | weeks.  So I think six weeks would provide a week for a |

P188KWOC

defense, a week for deliberations.  So I think we would say six

weeks.  It might be good to block eight weeks at the outside.

THE COURT:  What is your view on the trial date?

MR. LENOW:  We are prepared to go to trial on whatever

timeline your Honor requests.  A year does not seem

unreasonable to me in light of the complexity of the volume of

discovery here.  Whether that's January or March, I am not sure

that we have a significant opinion on that, that one or the

other is more appropriate.  I think our bottom line is we don't

see the defense request as unreasonable.  Anytime within that

January to spring time frame would seem reasonable to us.

THE COURT:  Counsel, I can't remember a time in which

I have set a trial a year out, but I can't imagine a better

candidate for a trial a year out than this one given everything

I have heard.  And I am acutely aware that I have seasoned

counsel who are internalizing, no doubt, Mr. Ferrara, your

client's liberty interest here.  Your client has been in

custody for 22 months, and barring a change of events, he is

going to be in custody through the end of this trial.  And so,

I take it, when you're asking that I put this off a year,

you're doing so mindful that you are presumptively dictating

your client's being in custody for that period of time plus the

length of the trial.  Without prejudice to your making some

motion, you have to be operating on the assumption that his

detention remains.

P188KWOC

1          MR. FERRARA:  Without prejudice, yes, your Honor, we

2     understand.  And, unfortunately, Mr. Kwon has some other

3     problems that are happening overseas, and I think it would be

4     more prejudicial to him to rush this than it would be for him

5     to unfortunately have to spend more time in custody here.

6          THE COURT:  Is this a conversation you have had with

7     him?  I don't want you to tell me about the content of it, but

8     in asking me to set a trial a year from now, or your request is

9     even more than that, but around that, are you doing so with

10     your client's informed consent?

11          MR. FERRARA:  Mr. Kwon and I certainly have discussed

12     things like the timeline here.  But, candidly, we are just

13     hearing about a lot of the discovery.  We are all digesting

14     everything we just heard, and when your Honor then says to me,

15     what's your view on a trial date, it's based on everything I

16     have just heard here, and obviously Mr. Kwon is hearing it at

17     the same time.  So, no, we have not discussed everything we

18     have heard.

19          THE COURT:  I came here with a range of menu options

20     on my schedule, which included one significantly earlier than

21     this, and I was certainly prepared to try this right after

22     Labor Day if I had been asked to do that.  But I am inclined to

23     defer to your judgment within reason and to set this down for

24     late January next year, which is essentially consistent with

25     your request, albeit somewhat on the earlier end of the window

P188KWOC

```
 1    you have given me.  But I want to set that down as a firm date.

 2    I also want you to speak to Mr. Kwon because if, after speaking

 3    with him, he wants the trial earlier and you're persuaded to

 4    back off your suggestion, I want to know that now so that we

 5    can move this to October or something like that.

 6              So, let us do this.  Let us put this down for January

 7    the 26th.  It's not going to move any later.  You understand

 8    that?

 9              MR. FERRARA:  I do.

10              THE COURT:  That is a firm outside trial date.  The

11    only possibility is that it would move earlier, and that would

12    be based on your having an opportunity to take some time with

13    your client and internalize his views on the point.  But I

14    don't want to deny you that opportunity.  I am mindful the one

15    thing you haven't had an opportunity to do is to confer in a

16    serene way with your client, taking in everything you have

17    heard today.

18              MR. FERRARA:  Yes.  Thank you, your Honor.

19              THE COURT:  Before we move off this, does anybody have

20    a problem if I set this down for a trial of approximately the

21    length estimated, it could go eight weeks, I'm told, but four

22    to six sounds pretty likely, beginning on January 26.

23              Government.

24              MR. LENOW:  No objection.

25              MR. FERRARA:  No objection.
```

P188KWOC

1          THE COURT:  Ms. Ravener, the same?

2          MS. RAVENER:  Yes, your Honor.

3          THE COURT:  Mr. Ferrara, same?

4          MR. FERRARA:  Yes.

5          THE COURT:  Within one week, if Mr. Kwon has persuaded

6    you to push for an earlier date, I want a letter to that

7    effect.  If that happens, I will likely bring you all in here

8    for the limited purpose of changing the trial date.  But if I

9    don't hear from you within one week from today, the ship has

10   sailed and we are down for January 26.

11         MR. FERRARA:  Understood.

12         THE COURT:  With that, let me set a next conference

13   date.  Here is what I propose we do.  I would like to set a

14   conference date about eight weeks from now, and I would like to

15   have a discovery update from the government about a week

16   before.  That way I will be savvy to the state of play with

17   respect to discovery when we gather about eight weeks from now.

18         I would also, though, welcome seasoned counsel, now

19   that we have had this conference ventilating all these issues,

20   to speak candidly together about the way this story is going to

21   unfold.  There are a lot of potential motions out there.  There

22   are a lot that have an obvious capability of being withdrawn or

23   mooted.  And there is a sequencing issue that you all in the

24   first instance may be better to tackle than I.  So rather than

25   my dictating a bunch of dates, I'd rather, now that we have a

P188KWOC

1    framework of the trial date in hand, leave it to thoughtful

2    counsel to build an edifice around that.

3         What I propose, therefore, is that also a week before

4    the trial date I get a letter from counsel setting out

5    hopefully an agreement, but if not, your alternative views,

6    about the sequencing of all the various things we have got

7    going here.  My hope, counsel, as well is that you will do your

8    best to moot some of these issues.  There may be issues that,

9    in effect, involve arguable Jencks Act material that the

10   government may draw the conclusion, it's just not worth

11   litigating, let's get that produced.  I will leave it to all of

12   your judgment.  But to the extent you're able to moot some of

13   these issues, you are not going to meet with unhappiness from

14   me.

15        With that, how about if we meet at Thursday, March 6,

16   at 11:00?

17        MR. LENOW:  That works for the government, Judge.

18        THE COURT:  Defense, does that work for you?

19        MR. FERRARA:  I am sure that among the team we will be

20   able to make that work, your Honor.

21        THE COURT:  Let's then meet Thursday, March 6, at

22   11:00.  And a week before then, on February 27, I would like

23   either one letter or two, but essentially dealing with two

24   topics.  One is the state of discovery and the other is the

25   parties' hopefully joint, but if not, partially joint and

P188KWOC

 1    partially discordant views as to the schedule.  But please

 2    think about all of the issues we have covered today and try to

 3    think about a rational mousetrap here.  Again, when I have

 4    great lawyers in front of me, and I don't use the word

 5    ill-advisedly, this process works best because you're able to

 6    think, with all the benefit of your experience, as to what the

 7    journey is going to be like from here and what the rational

 8    sequencing is, for example, of issues.  So I am tasking you to

 9    do a little bit of my job for me and think about the rational

10    sequence.

11         With that, is there an application to exclude time

12    until March the 6th?

13         MR. LENOW:  Yes, Judge.  In order to allow the

14    government to produce discovery, the defense to review

15    discovery, and for the parties to have productive discussions

16    about the various logistical issues flagged by the Court.

17         MR. FERRARA:  Without objection.

18         THE COURT:  I will exclude time between today and

19    March the 6th pursuant to Title 18, United States Code, Section

20    3161(h)(7)(A).  I find that the interests of justice outweigh

21    the interests of the defense and the public in a speedy trial.

22    It should be obvious why that is so.  The volume of discovery

23    here, if not unprecedented, is unprecedented in any case before

24    me.  It's challenging in its scale and its variety and its

25    multiple languages.  The presence of foreign sovereigns is out

P188KWOC

1   there as an issue.  The interplay with a prior civil case in

2   which the defendant was a party presents issues.  There are a

3   host of legal issues to be hashed about.  And the last thing I

4   want is for Mr. Kwon and his counsel's ability to engage with

5   all these issues and make sense of the discovery to be

6   pressured by an expiring speedy trial clock.  So, for all those

7   reasons, I will exclude the time between now and March 6.

8           I will also make a point that I would make in any

9   case.  This is not key to Mr. Kwon's case.  While the case

10  certainly presents as one that is destined to go to trial, in

11  every case, counsel are well advised to discuss whether there

12  is an off-ramp and whether there is a basis for a disposition.

13  I strongly encourage defense counsel and the government to have

14  those conversations and to do them early.  Particularly,

15  insofar as counsel have been informed by at least the

16  experience of the case before Judge Rakoff, there may well be a

17  basis for counsel to reach some form of an agreement.  In any

18  event, the excluded time is there as well to give you the

19  breathing space to have those discussions.

20          Anything further from the government?

21          MR. LENOW:  No, Judge.  Thank you.

22          THE COURT:  Anything further from the defense?

23          MR. FERRARA:  No, thank you, your Honor.

24          THE COURT:  Thank you for an incredibly informative

25  and well-prepared conference.  It's my pleasure to have you all

P188KWOC

1    before me, and I look forward to seeing you on March 6.

2         We stand adjourned.

3         (Adjourned)