## Hecker Fink LLP

NEW YORK | WASHINGTON, DC | LOS ANGELES

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

TEL (212) 763-0883 | FAX (212) 564-0883
WWW.HECKERFINK.COM

**dpatton@heckerfink.com**

November 26, 2025

**BY CM/ECF**

The Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
40 Foley Square, Room 2201
New York, New York 10007
EngelmayerNYSDChambers@nysd.uscourts.gov

> Re:    *United States v. Do Hyeong Kwon*, 23-cr-151

Dear Judge Engelmayer:

We respectfully submit this memorandum on behalf of Do Hyeong Kwon ahead of his sentencing on December 11, 2025.

Even considering its notoriety, this is an unusual prosecution. Do was the subject of dueling extradition requests from South Korea and the United States, a process that played out for nearly two years while he was incarcerated in a Montenegrin prison. Though he had no real connection to the United States—Terraform Labs ("Terraform" or "TFL") was based in Korea and Singapore, and the only time Do spent in the United States was in college before Terraform was founded—the United States ultimately succeeded in prosecuting him here. Do still faces trial in Korea for the same conduct charged in this Indictment, and for which Korean prosecutors have publicly stated they will seek a sentence of 40 years. ███████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

In that agreement, the government agreed to seek a sentence "not to exceed 12 years," and Do agreed to plead to two counts and neither admit nor contest other aspects of the Indictment (topics which remain subject to the Korean prosecution). For the many reasons discussed below, 12 years in prison would be far greater than necessary to achieve the goals of sentencing, and we ask the Court to impose a sentence not exceeding five years.

Hecker Fink LLP                                                                              2

As the Court well knows, fraud cases come in all varieties. Some are akin to outright theft. Some are Ponzi schemes or houses of cards from the outset. This case is fundamentally different. Do was a talented computer scientist with a Stanford degree and limitless opportunities to make plenty of money at places like Microsoft and Apple, where he spent time as a programmer. He did not leave that path to found a blockchain company with the goal of swindling people. On the contrary, he genuinely believed that blockchain technology could solve serious problems. And he spent years of painstaking work in his mid-20s developing what would become Terraform Labs. It succeeded and grew beyond his wildest dreams. He named his daughter, Luna, after Terraform's native cryptocurrency. He fostered a community of like-minded idealists who thought they were changing the world for the better. And then it all came crashing down.

In his letter to the Court, Do does not equivocate about his role in that crash and how his arrogance got the best of him. He made false statements, exaggerating Terraform's capabilities and misleading investors about the stability of its products. As he puts it, "I let my early success and fame go to my head. As Terra grew, so did that special deference people reserve for young tech founders running shiny companies with sky-high valuations. . . . Looking back, I cannot comprehend my own hubris."

Do has now spent nearly three years in prison, with more than half that time in brutal conditions in Montenegro. His family, including his parents, wife, and young daughter, all live in Korea and Singapore. He has not seen any of them since his extradition. Do's criminal conduct was not motivated by personal greed or enrichment, but rather flowed initially from his "hubris," and later from the desperation of a young founder who made serious mistakes while facing pressures he was ill-equipped to handle. ██████████████ Do has already suffered substantially for his crimes, and he will continue to experience the consequences of his misconduct well after serving whatever sentence the Court hands down.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    Do's Personal Background

Do wrote a substantial personal submission to the Court, attached as Exhibit A. Do's letter provides details about himself and his life before founding Terraform, his early work on the Terra idea, his accounting of the offense conduct, the May 2022 collapse of TFL's crypto assets, and how he has experienced the period after his arrest in March 2023. We therefore provide only a summary of Do's life and work, with an eye toward avoiding repetition of descriptions that are better read in Do's own words.

Do was born in 1991 in Seoul, South Korea. He was a gifted child and learned English at age eight when his father promised him a toy if Do would read *Harry Potter* to him. His mother was convinced he was destined for high achievement and fostered that path. He succeeded at a prestigious high school, the Daewon Foreign Language High School. For college, Do attended Stanford, beginning in 2010. During his first two years, Do interned at Apple and built software applications in his spare time to pay his tuition. Do had to leave Stanford in 2012 to complete his mandatory Korean military service, during which he was stationed in the demilitarized zone. He

completed his military service in 2014 and returned to Stanford to complete his degree in computer science, which he obtained in 2015.

After graduating from Stanford, Do completed a summer internship at Microsoft. Microsoft offered him an opportunity to return full time, but Do decided to set up his own company, ultimately moving back to Korea to obtain grant funding for a start-up called Anyfi in early 2016. Do remained in Korea working on that project before starting what would become TFL in 2017. In 2022, he moved from Korea to Singapore along with most of TFL's employees.

### B.    Terraform Labs, LUNA, and UST

While working for his first startup in Seoul, Do became "consumed" by the possibilities of cryptocurrency after reading the Bitcoin white paper. He saw decentralized finance as an exciting frontier that could solve serious economic problems like currency controls and price volatility— problems that had plagued South Korea. As he explains in his accompanying submission, Do saw a gap for a truly decentralized currency that could also serve as a stable unit of account for crypto-based transactions. Do wanted to create a crypto token with the price stability of a stablecoin, but without becoming centralized by virtue of having a single party backing the coin with other assets. To bring the project to life, he began working on what would become TFL with his co-founder, Daniel Shin, in late 2017.

In 2018, he and his colleagues at TFL developed a novel approach to dealing with volatility in decentralized stablecoins by creating the Terra Protocol, a decentralized and open-source application for algorithmic stablecoins, which operated on the Terra Blockchain. The Terra Blockchain was a "proof-of-stake" blockchain where transactions were recorded and verified by the consensus of validators who locked up or "staked" their holdings. To accomplish the Terra Blockchain's staking and governance, TFL created LUNA tokens in April 2019. LUNA also served as the stabilization token for the algorithmic stablecoins on the Terra Blockchain, of which UST was the most popular.

UST was launched in September 2020 and targeted a 1:1 exchange rate, or "peg," to the U.S. dollar through smart contracts operating on the Terra Blockchain that adjusted the money supply of UST in response to demand. The Terra Protocol, TFL's most important innovation, was designed to stabilize the price of UST through a "mint-burn" mechanism. When UST fell below one dollar, UST holders could burn UST and receive one dollar of minted LUNA, and when UST rose above one dollar, LUNA holders could mint UST by burning a dollar's worth of LUNA. This arbitrage mechanism created an incentive for users of the Terra Blockchain—whether individuals or trading firms—to interact with the Terra Protocol to decrease or increase the supplies of UST and LUNA to keep the price of UST close to one dollar.

Immediately after its launch in September 2020, UST was quickly and widely adopted by the market precisely because, as Do saw, there was market demand for a stablecoin governed by a decentralized blockchain instead of a centralized entity. Many of the letters accompanying this submission reflect that the public excitement for the Terra project came from Do's genuine passion for what he was building and why it was important. "Do stood out as that one daring person who was genuinely excited about the decentralized future he was building towards" and that he gave people inspiration and purpose in DeFi, wrote Jesse Chung, a former TFL employee. Exhibit B at

Hecker Fink LLP                                                                                    4

19. Jose Macedo, a Terra investor, said that "Do truly believed in Terra's mission of decentralised money and its importance to the world" and that it was Do's "vision and his fervent belief in it that drew so many to the Terra ecosystem." *Id.* at 38. Evan Schindler, who worked with Do at this time, described him as having "brought to life . . . thoughtfully designed financial tools that inspired genuine excitement in the community." *Id.* at 12. Jay Campbell, another investor, said that he still believes Do's ideas are "a truly inspirational, benevolent, and potentially world changing financial and technological venture." *Id.* at 13. Zack Guzman, a financial journalist, described how Do's "mission of 'decentralized money' . . . became more than just an investment. It became a community, which was all the more devastating to witness suffer in the fallout." *Id.* at 41. Chris Amani, who took over as TFL's CEO after Do, described Do's vision for Terra as "inspiring" and "audacious" and Do as "one of the most impressive" company founders he has ever seen in his career in the technology industry. *Id.* at 125.

There are many other similar sentiments expressed in other letters in Exhibit B. The sheer volume of letters we received from members of the Terrra community is itself indicative of the level of excitement that Do's work engendered. UST became the third-largest stablecoin in the world less than two years after its launch, exceeding the value of stablecoins launched by established centralized players in the crypto space such as Binance's BUSD. UST was used by many decentralized finance protocols across a number of blockchain ecosystems, and was a price-quoting currency on several popular, centralized cryptocurrency exchanges.

UST's popularity also drove broader use of the Terra Blockchain. At its peak, the Terra Blockchain was the second-largest smart-contract platform, trailing only Ethereum. The millions of active Terra community members were able to interact with hundreds of applications that ran on the Terra Blockchain. Popular applications like Astroport, Terraswap, and White Whale allowed Terra users to trade assets with one another. Non-fungible tokens ("NFTs") were traded using the application Knowhere. The applications Mars and Edge facilitated lending on the Terra Blockchain, while more complicated financial products like interest-rate-swap derivatives were made available through the application Prism. The Terra Blockchain also powered NFT games like Derby Stars and Zepeto.

Developers chose to build on the Terra Blockchain because they shared Do's vision of a peer-to-peer electronic currency that was truly decentralized, and they wanted to contribute to a community of like-minded individuals. And Do and TFL employees provided important support to these developers, both through financial capital and their personal efforts. That support is described in a letter submitted by Jason Arnold, who served as TFL's Head of Grants and "worked with [Do] to fund more than 100 startups and community initiatives, ranging from micro-lending apps in Southeast Asia to NFT marketplaces, distributing millions of dollars to empower builders." *See* Exhibit B at 30. Another former Terra developer and TFL employee, Michael Merz, wrote that Do's "thoughtful support and guidance" and "genuine interest in what builders were creating and his willingness to provide feedback left a lasting impression." *See* Exhibit B at 121.

While Do believed that the Terra Protocol solved many of the problems of algorithmic stablecoins, there were always risks, as there are with any new financial project. In particular, as an algorithmic stablecoin, UST was at risk of a potential collapse caused by a "death spiral," a scenario in which the UST's value drops below one dollar and that price drop causes traders to become nervous and unwilling to use the arbitrage mechanism. Similar to a run on a bank, as more

and more users fear losing funds—and therefore withdraw them or stop trading—the mechanism could collapse even if it was otherwise functioning perfectly.

Indeed, Do and TFL on a number of occasions disclosed the risks of UST depegging (UST becoming destabilized from its peg to one dollar). As the indictment alleges, Do noted the need to develop a centralized reserve of currency to defend the peg in early presentations about the Terra Protocol. Indictment ¶ 16. While the Terra Protocol and UST launched without a reserve, the Luna Foundation Guard ("LFG") was later created to provide that reserve. *Id.* ¶ 36. Do also appeared on a popular crypto podcast, The Pomp Podcast, and explained that algorithmic stablecoins like UST are "more brittle" than asset-backed stablecoins, because they are quicker to adjust in response to changes in user demand. As Do put it on the podcast, "If you have too many people divesting out of the stablecoin [here, UST] all at once, you can lead to a situation where too much of the paired asset [here, LUNA] gets printed and therefore there's a death spiral in the overall economy." The $10 Billion Stablecoin Bet on the Bitcoin Standard w/ Do Kwon, The Pomp Podcast (Mar. 24, 2022), at 7:30, https://podcasts.apple.com/us/podcast/880-the-%2410-billion-stablecoin-bet-on-the/id1434060078?i=1000555093692.

The possibility of a "death spiral" was described in the original whitepaper setting out the Terra Protocol, and as the Court will read in many of the enclosed letters, the most committed members of the Terra community understood that it could collapse and today do not hold those risks against Do, despite many of them losing millions of dollars on Terra's collapse. Jose Macedo (formerly a member of the LFG Governing Council), for example, described this risk as a "fundamental design flaw in Terra's underlying stability mechanism" that was "never concealed, but rather was clearly disclosed in the original Luna whitepaper, auditable in the open-source code, and discussed ad nauseum [sic] by various commentators over the years." Exhibit B at 36. Macedo wrote that this explained why many of "Terra's largest supporters, many of whom suffered catastrophic losses as a result of the collapse, still do not blame Do." *Id.*; *see also e.g. id.* at 6 (Kyle Davies and Su Zhu describing Terra as a "bold experiment that failed catastrophically in the harsh reality of market dynamics and leverage" in which "all of us in the crypto space" "knew the risks when we invested"); *id.* at 30 (Jason Arnold stating that "UST's algorithmic design . . . was transparent about its mechanics and risks, explicitly stating that stability depended on LUNA's value and market incentives").

In sum, the Terra ecosystem was a vibrant community of individuals and entities building products and features on top of a base built by Do and his team at TFL. But as TFL grew in size and popularity, so too did Do's confidence. As he now admits, he disregarded criticisms and warnings that he should have heeded, and he made false statements that exaggerated the stability and functionality of various protocols. Those false and misleading statements are discussed in greater detail further below in the Offense Conduct section and in Do's letter to the Court.

**C.     Terra Ecosystem Crash**

Today, Do understands that the fact that many members of the Terra community knew of the risks that ultimately led to its collapse does not excuse or justify his misrepresentations and false statements about certain aspects of the Terra Protocol and products TFL created.

Hecker Fink LLP                                                                                    6

Terra's collapse in May 2022 was a dark hour for Do. He of course understood that a collapse was possible. Indeed, that risk almost materialized in May 2021, when UST briefly depegged because of market volatility. As alluded to above, LFG was formed in the wake of the May 2021 depeg and public discussion around the risk that UST could lose its price peg again. The purpose behind LFG was to build a reserve fund that could be used to purchase UST and support the peg. Unfortunately, the risk of another depeg materialized in May 2022.

On or about May 7, 2022, significant market players began withdrawing and selling large amounts of UST, destabilizing its peg and causing panic in the market. TFL and LFG, at Do's direction, spent significant resources trying to restore the peg, to no avail. By May 12, 2022, LUNA had become essentially worthless.

Third-party trading firms plainly played a significant role in depegging UST and causing the collapse of the Terra ecosystem. They accomplished this through a coordinated pattern of trading that exploited weaknesses in the Terra Protocol and its stability mechanisms for UST's peg and coincided with a brief change in TFL's UST position that temporarily made UST's peg more vulnerable. That conclusion is supported both by contemporaneous accounts from shortly after the collapse of the Terra ecosystem, as well as more recent academic literature examining the crash in detail. Most recently, in August four academics published a paper providing the most in-depth analysis of the immediate precipitating causes of UST's collapse yet, focusing on the network-effects of destabilizing trades targeted at bringing down Terra. Their paper identified "anomalous selling activity on two specific days," roughly a month and two weeks prior to the crash, with coordinated trading activity that leaves "little doubt that the individuals (or single individuals or organization) controlling these wallets [were] deliberately participating in an attempt to destabilise Luna/Terra." *See* Exhibit C (Cheick Tidiane et al., *Investigating the Luna-Terra Collapse*, 19 ACM Transactions on Web 3 (August 2025)).

This recent academic work confirms what members of the Terra community and outside crypto observers have understood since shortly after the collapse in 2022. As a report by the independent crypto analysis company Chainalysis described, the trades by a small number of individuals or groups that initiated the depeg were timed to coincide with TFL's withdrawal of "150 million UST from 3pool, a decentralized stablecoin exchange, as part of a planned, public effort to move these funds to another pool." *The Trades That Triggered TerraUSD's Collapse*, Chainalysis (June 9, 2022), https://www.chainalysis.com/blog/how-terrausd-collapsed/. That public transition of some of TFL's UST made UST briefly more "prone to volatility" and, in the very short window of that transfer, "one trader—perhaps taking advantage of this vulnerability—swapped 85 million UST for USDC" and "another trader then swapped a total of 100 million UST for USDC." *Id.* The resulting peg destabilization panicked the Terra community and caused a cascading failure.[1]

While, as discussed above, this type of risk was generally understood for algorithmic stablecoins like UST, Do deeply regrets his failure to disclose to the public Jump Trading's longstanding agreement with TFL to defend UST's peg during market panics, like the ones in May

---

[1] Many of the enclosed letters reflect the widespread understanding in the Terra community that an outside attack destabilized UST's peg. *See, e.g.*, Exhibit B at 44 (Jacob Gadikian describing and attaching papers, including Exhibit C, on the collapse of UST).

Hecker Fink LLP                                                                    7

2021 and May 2022. In his letter, Do states that his failure to disclose Jump's role in restoring the peg in May 2021 "misled investors into believing UST was a lot less experimental than it was, and made them unwitting participants in the ultimate failure of UST in May 2022." Exhibit A at 8.

### D.    Detention in and Extradition from Montenegro

After the UST and LUNA crash in May 2022, Do spent several months in Singapore working to rebuild TFL and the Terra ecosystem. After Singaporean authorities froze TFL's bank accounts, Do, on the advice of TFL's outside counsel, traveled to Serbia, hoping to redomicile TFL in that country. Shortly after leaving for Serbia, South Korea issued a red notice for Do's arrest, leaving him unable to leave Serbia without facing immediate detention in Korea. Do made the decision not to turn himself in. Do knows that avoiding arrest was wrong.

After spending several months in Serbia and then Montenegro, Do was arrested on March 23, 2023 while attempting to leave Montenegro and travel to Dubai using a fake passport. Korea requested Do's extradition from Montenegro on March 29, 2023; the United States requested his extradition days later, on April 3, 2023.

As set out in the accompanying declaration from Do's Montenegrin attorneys, Goran Rodić and Marija Radulović, the process of Do's extradition from Montenegro was highly unusual and appears to have been contrary to Montenegrin law. The extended duration of Do's time in Montenegro was caused by "numerous unanticipated mistakes made by" Montenegrin courts. Exhibit D ¶ 38 (Declaration of Goran Rodić).

Under Montenegrin law, an extradition proceeds under either the "summary" process or the "ordinary" process. *Id.* ¶ 4. As relevant here, the "summary" process applies when the requested individual consents to extradition. *Id.* ¶ 5. An investigating judge and the High Court (a three-judge panel) are tasked with overseeing the "summary" process and ensuring that any extradition complies with Montenegrin law and the relevant international extradition treaty. *Id.* ¶ 20. Where, as was true for Do, there are competing extradition requests, the High Court must select which extradition request to grant. In doing so, the High Court considers the seriousness of the criminal offenses, the place of commission, the respective dates of the requests for extradition, the nationality of the person claimed, and the possibility of subsequent extradition to another state. *Id.* ¶ 7.

Here, neutrally applying these factors should have led to Do being extradited to South Korea. The U.S. and Korean allegations were largely the same, Do never worked on Terraform while in the United States, and Korea was first to request his extradition on March 29, 2023 (the United States requested his extradition on April 3, 2023). *Id.* ¶ 8. And of course, Do is a Korean national. Extradition to South Korea would have also been consistent with the fact that there are many Korean victims in this case, given Terra's high degree of popularity in South Korea. While Do consented to both extradition requests, he should have, and would preferred to have been, extradited to Korea, where he would have been close to his family and would not have faced subsequent extradition to the United States.

Do's extradition process from Montenegro took as long as it did because of repeated legal errors requiring six decisions from the court of first instance (Montenegro's High Court), seven

Hecker Fink LLP                                                                      8

decisions from the intermediate Montenegrin Court of Appeal, two decisions on extraordinary appeals from the Montenegrin Supreme State Prosecutor's Office to the Supreme Court of Montenegro, and two decisions of the Constitutional Court of Montenegro. *Id.* ¶¶ 10-36. Do's efforts to be extradited to Korea, consistent with Montenegrin law, should have been successful after Montenegro's Court of Appeal affirmed a lower court decision granting Do's extradition to Korea, making the decision final and initiating extradition procedures to Korea. *Id.* ¶ 22. Instead, Montenegro's Supreme State Prosecutor's Office, presumably at the urging of the United States, took several "extraordinary steps" to file and pursue unusual appeals in contravention of standard Montenegrin criminal procedure, ultimately obtaining a decision from the Montenegro Supreme Court that took the decision out of the hands of Montenegro's court system and into those of its Minister of Justice. *Id.* ¶ 33. The Minister of Justice ultimately ordered Do's extradition to the United States. *Id.* ¶ 37.

Had it not been for egregious misconduct by the Montenegrin Minister of Justice, Andrej Milović, Do would have almost certainly been extradited to South Korea years ago to face his charges there. Milović apparently misrepresented the sequence of extradition requests that were made by the United States and South Korea to suggest to Montenegrin courts that the U.S. request came first, when in reality the South Korea request preceded it several days.[2]

Do served a total of nearly two years in a Montenegrin prison: four months for his conviction related to the false passport and 17 months and eight days awaiting his extradition to the United States. PSR ¶ 99. That time was extremely difficult. As he describes in his letter, he was kept in solitary confinement for the duration of his detention and frequently spent weeks entirely alone. He had only one permitted visit from any family member, his wife, during his entire period of incarceration and was rarely allowed to make phone calls. His wife describes the one 15-minute visit she was allowed with him and how her heart dropped at the sight of him, gaunt and shivering. When he was first detained, Do did not realize that he was expected to bribe guards for the most basic essentials, including food, resulting in his loss of an unhealthy amount of weight. *See* Exhibit A at 11.

### E.     Detention in the United States

Do was finally extradited to the United States on December 31, 2024 and has been detained during the pendency of these proceedings. ████████████████████████████████

---

[2] *See* Mihailo Jovovic, *Milović and the High Court left him in the lurch*, Vijesti Online (March 8, 2024), https://en.vijesti.me/news-b/politika/697303/milovica-and-the-higher-court-left-in-the-lurch.

Marko Kovač, who was the Minister of Justice at the time both extradition requests were received, confirmed the correct sequencing and "called into question" Milović's credibility for providing "incorrect information" to the Montenegrin High Court. *See Kovac on the Do Kwon affair*, Vijesti Online (March 16, 2024), https://en.vijesti.me/news-b/politika/698430/Kovac-about-the-affair-until-the-quon-credibility-of-Milovic-and-the-department-on-whose-end-it-was-called-into-question.

Owing in part to his involvement in forcing Do's extradition to the United States, Milović was removed as Minister of Justice in July 2024.

Hecker Fink LLP



### F.    Assistance to TFL Plan Administrator

TFL filed for Chapter 11 bankruptcy protection on January 21, 2024 and a plan for TFL's liquidation became effective on October 1, 2024. Notice of Entry of Order Confirming Second Amended Chapter 11 Plan at 2, *In re Terraform Labs PTE Ltd.*, No. 23-10070 (BLS), ECF No. 765 (Del. Bankr. Oct. 1, 2024). Since the approval of the liquidation plan, TFL's interests have been represented by the Plan Administrator, Todd Snyder, who is responsible for maximizing the recovery of assets for the benefit of TFL's creditors.

Over the last year, as part of a settlement with the U.S. Securities and Exchange Commission,[3] Do has worked with the Plan Administrator to deliver considerable value to the TFL bankruptcy estate and its creditors. As described in a recent update to the Bankruptcy Court, Do facilitated the contribution of 500 million PYTH tokens to the Plan Administrator, which were worth roughly $200m at the time of Do's settlement with the SEC. *See* Plan Administrator's Second Status Update ¶¶ 14-15, *In re Terraform Labs PTE Ltd.*, No. 23-10070-BLS, ECF No. 1086 (Del. Bankr. Sept. 21, 2025).

---

[3] Do's settlement with the SEC requires that he facilitate the transfer of $204,320,196 worth of assets to the TFL Plan Administrator through four specified transfers. *See* Final Judgment, *SEC v. Terraform Labs* at 8, No. 23-cv-1346 (ECF No. 273). We respectfully submit that the Court need not order restitution due to the substantial forfeiture order in this case, Do's settlement agreement with the U.S. Securities and Exchange Commission, ████████████████
████████████████████████████████████████████████████



### G.    South Korean Charges

As noted above, Do faced competing extradition requests from the United States and his home country, South Korea. Nothing about his extradition, plea, and sentencing here has any effect on the Korean charges against him, which remain pending. Specifically, Do faces charges of commodities fraud and capital markets fraud substantially similar to the charges here. The Korean prosecutor leading Do's case when it was filed in 2023 told *The Wall Street Journal* that he expected Do's sentence in South Korea could exceed 40 years. *See* Jiyoung Sohn, *South Korean Prosecutor Calls for Crypto Entrepreneur Do Kwon to Face Charges in Home Country*, Wall St. J. (May 5, 2023), https://www.wsj.com/world/south-korean-prosecutor-calls-for-crypto-entrepreneur-do-kwon-to-face-charges-in-home-country-639f5515?reflink=desktopwebshare_permalink ("If convicted, Mr. Kwon would likely face the longest jail term for a financial crime in South Korean history, Mr. Dan [the head of the prosecutor team bringing the charges against Do] said, adding that he expected it could top the sentence of 40 years handed out last year for a fraud case involving Seoul-based hedge fund Optimus Asset Management.").

As noted above, Do has no legal immigration status in the United States and has never lived here outside of his time at Stanford and the handful of months after graduation and before he moved back to Korea. Do has no desire to remain in the United States and would not be here at all except for his extradition. As an alien, Do is consenting to the entry of a judicial removal order under 8 U.S.C. § 1228(c). Accordingly, after serving the sentence imposed by this Court, Do will be promptly deported to Korea, where he will face the charges described above.

### H.    Plea Agreement

In light of many of the foregoing unique aspects of this case, and to the government's credit for recognizing them, Do's plea agreement correspondingly includes some unique elements. Reflecting his prompt acceptance of responsibility ███████████████, the government agreed not to seek a sentence greater than 12 years' incarceration, notwithstanding the higher Guidelines range. As a condition of the 12-year offer, the government required that Do agree not to contest any factual allegations in the Indictment in connection with sentencing, though it also did not require admission of anything beyond his plea allocution. Further, and consistent with Do's interest in returning to South Korea as quickly as possible to reunite with his family and face these same charges in the ongoing proceedings there, the government agreed to support a prisoner transfer application should Do make one, but not until he has served half of the sentence

Hecker Fink LLP                                                                                    11

entered by the Court.[4] While the government's offer to seek no more than a 12-year sentence accounts for these factors, it does not consider the totality of circumstances that support a sentence not greater than five years' incarceration.

## II.    OFFENSE CONDUCT

The personal and professional importance of the Terra project and its community to Do makes him all the more ashamed of the mistakes he made that led him to where he is today: unable to help his wife raise their daughter, publicly disgraced worldwide, incarcerated for almost three years and facing much more, both here and in Korea. Sitting where he is now, having lost everything, Do has already been punished severely.

Do knows that his own mistakes led him here, and through his separate letter and this submission hopes to make clear to the Court that he accepts responsibility for his crimes and hopes only that the Court will impose a sentence that allows him to return to South Korea as quickly as possible.

As mentioned above, consistent with his acceptance of responsibility, Do has agreed not to contest the factual allegations in the Indictment in connection with sentencing. This section provides additional context on the five fraud theories set out in the Indictment and the money laundering allegations that form the basis of Count Nine, which was not covered by Do's guilty plea.

### A.    Jump Misrepresentations

As described in the Indictment, TFL had a longstanding relationship with Jump Trading. Jump had agreed to provide liquidity for TFL's cryptocurrencies on centralized and decentralized crypto exchanges, and defend UST's peg to one dollar in the form of exchange trading activity and use of the mint-burn mechanism. Jump's role was to help grow adoption of UST and LUNA by making the currencies easier to trade across a variety of platforms, provide liquidity for UST and LUNA on centralized and decentralized exchanges, and help defend UST's peg.

The relationship between Jump and TFL began in November 2019 with an agreement that TFL signed to loan substantial amounts of LUNA to Jump. It expanded with a new loan agreement signed in September 2020. Under the second agreement, Jump was ultimately entitled to receive nine percent of the total circulating supply of LUNA in existence at the time, subject to certain vesting conditions related to the size of the Terra ecosystem, consistent with Jump's role in helping grow its popularity, primarily by providing liquidity. These vesting conditions were originally added at Jump's request and were not intended to be onerous for Jump to meet.

At Jump's direction, TFL's relationship with Jump was not publicly disclosed at the time of the November 2019 or September 2020 loan agreements. TFL and Do wanted to announce Jump's role in helping grow the ecosystem and defend UST's peg because it would have increased investor interest in the Terra Protocol and Terra Blockchain. While Jump implied publicly—by frequently posting about UST and LUNA, and the ecosystem more generally—that it was working

---

[4] The government agreed to support Do's prisoner transfer application after he serves half of the additional time he faces after sentencing, not including the time he has served to date in Montenegro and here.

Hecker Fink LLP                                                                    12

with Terra, there was no explicit announcement of the relationship between TFL and Jump until well after the May 2021 depeg event.

Do first learned about that May 2021 depeg from Kanav Kariya, the head of Jump Crypto, who called him early in the morning in Singapore on the first day that UST's peg began to slip. Mr. Kariya informed Do that almost all $100 million worth of another stablecoin that Jump had available in the market for conversion to UST as part of Jump's role defending UST's peg had been sold, suggesting that another firm or group of traders was aggressively trading to destabilize UST's peg.

Over the course of the first day of the May 2021 depeg, Do spoke with Mr. Kariya several times about possible structures of an expanded role for Jump in TFL's peg defense so that Jump could provide further support in real time. Among other suggestions, Mr. Kariya, on behalf of Jump, asked TFL for a sizeable loan or grant of UST so that Jump could use that UST to defend its peg. Mr. Kariya also asked that TFL remove the vesting conditions on the existing September 2020 LUNA loan. At the time, Do did not agree to these proposals, but told Mr. Kariya that Mr. Kariya should do what he thought necessary to defend the peg, and that Do would check back in on changing the terms of the existing loan at a later time. Do did not oppose lifting Jump's vesting conditions, which were originally included at Jump's request.

After UST's peg was restored, Do asked Mr. Kariya if TFL could publicly thank Jump for its efforts to defend the peg. After checking with Jump's lawyers, Mr. Kariya informed Do that Jump did not want its defense of the peg to become public.

In July 2021, Mr. Kariya again raised with Do the vesting conditions for the September 2020 LUNA loan. Mr. Kariya told Do that, as he understood it, the two had, during the May 2021 depeg, reached an agreement to allow for earlier vesting of Jump's LUNA. In other words, when Do had told Mr. Kariya during UST's May 2021 depeg to do what he thought necessary to defend the peg, Mr. Kariya had understood Do to be agreeing, on behalf of Terraform, to amend Jump's vesting conditions in exchange for Jump's continued efforts to defend the peg. This was the "secret oral agreement" described in the Indictment. Indictment ¶ 27.

After the May 2021 depeg, Do made false and misleading statements and omissions regarding Jump's role in defending the peg, including several of the statements set out in the Indictment. Specifically, when making public statements about the restoration of the peg, Do should have stated that Jump played an important role in those efforts. Failing to do so was deliberately misleading and contributed to a false narrative that UST's peg was restored solely through the arbitrage incentive created by the mint-burn mechanism. Many of Do's statements, which are set out in the Indictment, were false or misleading, including the following:

- In response to a question from an interviewer on a podcast, Do falsely confirmed that there was "no particular special action taken . . . by the Terra team, or even the community, in order to bring things back in line and it just took a while for UST to recover its peg." *Id.* ¶ 34(b).

- On another podcast, Do was asked whether TFL participated in market-making to defend UST's peg. In response, he falsely stated that there were a "large number of

Hecker Fink LLP                                                                                    13

market makers that participate in stabilizing the peg of UST" but that "I don't think any of them have a contractual relationship with us." *Id.* ¶ 34(d).

- Do acknowledges that public statements about the launch of LFG, intended to provide support for peg defense by Jump and others in light of the May 2021 depeg, should have highlighted the extent to which that event revealed weaknesses in the peg's stability. *Id.* ¶ 36.

Do acknowledges and regrets that his failure to disclose Jump's role misled investors he cared about deeply: "The Terra community was owed the truth and full picture from me, not Jump, and it is I who failed to deliver." Exhibit A at 9.

While Do forthrightly acknowledges his failure to disclose TFL's relationship with Jump and Jump's role in restoring UST's peg in May 2021, three points are worth raising as relevant context:

First, TFL would have benefited from disclosing its relationship with Jump, and failed to do so only at Jump's request. Do had every incentive to make Jump's role with TFL public, because doing so would have given the community more confidence about the stability of UST's peg. The involvement of a significant market maker with substantial capital in the Terra ecosystem was intended to provide a deterrent effect against third-party attacks on the stability of UST's peg; the effect of that deterrent was significantly reduced by the lack of broad public disclosure of Jump's role. Certainly some members of the Terra community would not have purchased UST or LUNA had appropriate disclosures been made about Jump's role, but on the whole it is impossible to know what the net effect of a complete disclosure of Jump's role would have been. While this does not excuse Do's failure to make truthful representations to the investing public, it is relevant to the appropriate sentence.

Second, while Jump's particular role in the May 2021 depeg was not disclosed, the use of market makers like Jump was commonly understood by many crypto investors, particularly for a project at the scale of UST and LUNA. Specific to UST and LUNA, many members of the Terra community knew that Jump played a role in providing liquidity for the ecosystem. While Do made false statements that omitted Jump's specific role in restoring the peg during the May 2021 depeg, Jump's involvement in the Terra community was not a secret. *See* Exhibit B at 6 (Kyle Davies and Su Zhu describing the relationship with Jump as "standard industry procedure in 2020 and 2021"); *id.* at 11 (M. Ten Klei: "[P]artnerships like these were common knowledge and often considered a responsible measure to protect users and maintain confidence in the system."); *id.* at 12 (Evan Schindler: "[I]t was common knowledge that institutional partners like Jump Trading played an important role alongside public arbitragers."); *id.* at 31 (Jason Arnold: "Collaborating with market makers like Jump crypto . . . was a standard practice in the industry to ensure liquidity and stability."); *id.* at 37 (Jose Macedo: "Every crypto project works with market makers to establish liquidity for their coins, secure exchange listing, and, in the case of nascent stablecoin projects, ensure peg stability" and "Jump's involvement was a core part of many people's thesis around Terra.").

Finally, Jump was not the sole or even the largest contributor to the restoration of UST's peg during the May 2021 depegging event. To be sure, Jump played an important and necessary

role stabilizing UST's peg, and accordingly Do has admitted that it was wrong and fraudulent not to tell the Terra community the full story of Jump's involvement. But Do would not have continued to promote and build TFL if he thought that the Terra Protocol and its stability mechanism were entirely ineffective at maintaining UST's peg. The volume of trading that Jump was internally authorized to conduct to defend the peg in May 2021, as set out in the Indictment, was up to $100 million worth of Jump's assets. Indictment ¶ 28. Other public sources suggest that Jump traded only a part of its total $100 million authorization during the May 2021 depeg. *See* Order Instituting Cease-and-Desist Proceedings, *In re Tai Mo Shan Ltd.*, File No. 3-22382 (S.E.C. Dec. 20, 2024), available at https://www.sec.gov/files/litigation/admin/2024/33-11349.pdf (finding that Jump Trading engaged in trading that "diverged from its historic trading pattern for UST" during the May 2021 depeg and "accumulating more than $20 million worth of UST"). Whether Jump's total peg-defense efforts in May 2021 reached its $100 million cap or fell somewhere below that, the amount of Jump's involvement was a fraction of the total volume of transactions that the stability mechanism handled during the May 2021 depeg.

### B.    Chai, Mirror, and Genesis Coin Misrepresentations

While the Chai, Mirror, and Genesis Coin misrepresentations are set out as separate fraud schemes in the Indictment, they are closely related. The Genesis Coin misrepresentations concern the use of those coins in furtherance of the Chai and Mirror schemes. While Do wants to take responsibility for his mistakes and has done so in connection with the Jump fraud theory, he is substantially constrained by the fact that Chai is the core subject of the Korean charges that Do will face after he serves his sentence here.

Chai was a Korean payments company that allowed users to make purchases in stores and online in South Korea through their phones. Chai users would add funds into their Chai wallets by either transferring a Terra Blockchain stablecoin called KRT (similar to UST, but pegged to the value of 1 Korean won) or wiring money through their linked bank accounts. When users would fund their Chai wallets with their linked bank accounts, TFL would exchange equivalent amounts of Korean won to KRT in what was effectively an over-the-counter (OTC) service. When Chai would settle its payments to merchants, the opposite OTC transaction would occur between TFL and Chai. Chai users could see their in-store and online Chai transactions on the Terra Blockchain and were encouraged to do so by competitions that Do promoted on Twitter. *See* Exhibit E. Chai and Terra users were able to engage in this competition and see their transactions on the Terra Blockchain because Do supported the development of tools like ChaiScan, which exposed the blockchain-side of Chai transactions to the public.

The Indictment describes a conversation between Do and his TFL co-founder that concerned "an interim scheme to fake Terra blockchain transactions while [Do and the Co-Founder were] preparing to launch Chai." Indictment ¶ 68. This conversation did not concern an effort to generate *fake Chai transactions* (as the Indictment impliedly acknowledges), but instead an unrelated effort to provide financial support to early backers of the Terra Blockchain who staked their LUNA to provide validator services while transaction volumes were low. The fake-transaction project discussed in that conversation was not implemented and was replaced with a different system for incentivizing those early backers.

Hecker Fink LLP                                                                                          15

While the Indictment rightly notes that TFL possessed MIR governance tokens for the Mirror protocol, TFL obtained those tokens only as rewards for participating in transactions to support the liquidity of Mirror's mAssets. TFL did not possess Mirror tokens at launch, and the Mirror protocol was not set up to provide an immediate windfall to TFL at launch. In addition, while Do acknowledges that statements about the decentralized nature of Mirror omitted TFL's retention of operator keys, TFL never used those keys for its own benefit, and the Indictment contains no such allegation. TFL maintained operator keys so that it could provide updates to the Mirror protocol, for example, to fix security vulnerabilities or bugs that could imperil users' access to their funds. While the Indictment is correct that TFL voted its earned Mirror tokens on Mirror governance proposals, it did so to protect Mirror users, including by voting to help block proposals that would create entirely fictitious assets to trade on Mirror (in what amounted to efforts to defraud Mirror users).

Do acknowledges that the SDT Genesis Coins were used to fund Chai wallet balances (as he explained in the disclosures set out in subparagraphs 83(b) and (c) of the Indictment) and support trading to provide liquidity for mAssets. These activities were a kind of liquidity provision, consistent with the disclosures Do made about the use of the Genesis Coins.

## C.     LFG Misrepresentations and Money Laundering

As described above, LFG was a separate entity intended to operate as an independent stability reserve for TFL, to protect UST's peg. Do acknowledges that the statements referenced in the Indictment about the independence of LFG's governance were not accurate at the time they were made. Do's statements about LFG were intended to describe the plan for LFG, which was for the members of the LFG Governing Council to also serve as Directors of the Singaporean nonprofit entity that was LFG's legal form. But due to various delays, that plan had not been completed by May 2022. At that time, most members of the LFG Governing Council were in various stages of completing onboarding paperwork required by Singapore regulators for them to join the nonprofit entity. Accordingly, Do's statements about the independence of LFG were false when he made them. But as context, members of the LFG Governing Council played an important role in supervising LFG's peg-defense activities, including around the May 2022 depeg. The Indictment acknowledges that the LFG Governing Council voted on the deployment of at least 52,000 of the 80,000 LFG bitcoin (roughly $2.8 billion worth of bitcoin) that were spent in an effort to defend UST's peg in May 2022. Indictment ¶ 43(c).[5] Indeed, the LFG Governing Council was in constant communication during the May 2022 depeg, both through their chat channel and an always-on Zoom call that members joined and left throughout the crash.

The related money laundering allegations comprise two sets of allegations: first a series of transactions that the Indictment states ultimately led to the transfer of "approximately $57 million from the Terraform Swiss Bank Account to a professional services firm retained by KWON and Terraform," and second the drafting and distribution of the "false and misleading" Audit Report to cover up Do's misconduct. *Id.* ¶¶ 44(c), 47-51.

---

[5] The LFG bitcoin that was sold to defend UST's peg was the largest asset deployed to defend the peg, but billions of dollars of other funds were deployed as well, from both LFG and TFL.

Hecker Fink LLP                                                                          16

The Indictment does not state that Do personally benefited from the described fund transfers or that Do surreptitiously stole or embezzled them and that is because he did not. The $57 million transferred at the end of the chain of transactions that form the basis of the money laundering theory satisfied a Mareva asset freeze injunction in litigation brought against TFL by its investors in Singapore. That transfer is supported by contemporaneous records, attached here as exhibits. *See* Exhibit F (█████████████████████████████████████████████████████); Exhibit G ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

The funds in question are to this day in the same escrow account controlled through the Singapore litigation. They will either be released to the claimants in that action, should they prove successful, or returned to the TFL bankruptcy Plan Administrator and used to compensate claimants in the bankruptcy. The Plan Administrator is actively seeking to reduce the size of the escrow account so that the bulk of the funds can be transferred back to the Plan Administrator for distribution to bankruptcy claimants more broadly. *See* Plan Administrator's Second Status Update ¶¶ 16-21, *In re Terraform Labs PTE Ltd.*, No. 23-10070-BLS, ECF No. 1086 (Del. Bankr. Sept. 21, 2025).

Finally, the drafting of the report by the Audit Firm was managed by TFL's outside counsel without Do's involvement beyond TFL's counsel interviewing him to support the Audit Firm's efforts. Though Do himself does not know if statements in the Audit Report were accurate, he of course acknowledges that he was ultimately responsible for TFL's communications.

### III.   ARGUMENT

We ask the Court to impose a custodial sentence of no longer than five years, which would be "sufficient, but not greater than necessary" to reflect the statutory purposes of sentencing. 18 U.S.C. § 3553(a).

#### A.   Do's History and Characteristics

##### 1.   *Do's Relationship with the Terra Community*

Do is a still-young man who built an extraordinarily successful community around a core innovation that he thought would ultimately be his life's work, only to see that work collapse spectacularly. That collapse caused enormous financial and personal consequences to members of the community whom he held dear. Do pled guilty because he wanted to accept responsibility for his false and misleading statements. He did so because he alone feels "responsible for everyone's pain." Exhibit A at 1. Do acknowledges that the Terra community looked up to him and his "hubris led them astray." *Id.* Do knows that the Terra community's belief in him gave him a "once-in-a-lifetime opportunity to build a better financial infrastructure for the future, and [he] repaid that gift with a failure of historic proportions that wreaked havoc on their savings and reputations." *Id.*

We think it is relevant to the Court's consideration of the appropriate sentence to understand why so many members of the Terra community were eager to support TFL and Terra, and why so many are still supporting Do today. The Court will read in the letters that Terra

community members saw that "Do truly believed in Terra's mission of decentralised money and its importance to the world," and Do's "fervent belief" was what "drew so many to the Terra ecosystem." Exhibit B at 38 (Jose Macedo); *see also id.* at 84 (Hanju Kim: "I was consistently impressed by his enthusiasm, intellectual curiosity, and unwavering commitment to innovation. His passion for the project never weakened since we first met."); *id.* at 86 (Yunsuk Yeo: "Throughout the years I worked for Terra Project and interacted with Do Kwon, I came to see him as someone wholly absorbed in his work, not for personal gain but out of genuine passion for building. Whenever I met him, he was intensely focused, pouring all of his time and energy into the project. Because of this, I do not believe, nor have I ever seen any indication, that Terra was conceived as a scheme to deceive people."); *id.* at 88 (CJ Han: "Having observed Mr. Kwon over several years, I came to recognize him as a leader who demonstrated unparalleled passion and dedication to the Terra project.").

Just as importantly, Do cared about the people in the Terra community as much as, or more than, the actual project of the community. This is clear from the letter submitted by William Chen, a former TFL employee. Do hired Mr. Chen in 2019, ████████████████████████████ ████████████████████████████████ Not only did Do employ Mr. Chen, he also "opened his home to [him] for three months, taking personal responsibility for [his] wellbeing during the darkest period of [his] life." *Id.* at 8. Mr. Chen wrote that Do "possessed an unusual ability to sense when something was wrong" and that "[h]e understood that leadership meant caring for his team members as whole people' their physical and emotional wellbeing, not merely their professional output." *Id.* Mr. Chen's close relationship with Do allowed him to see Do for who he really is, not the person portrayed on social media. Mr. Chen observed that "Do became intoxicated by his crypto persona's adulation online." *Id.* at 9. But that "wasn't Do; it was a character born from a toxic culture that rewards hubris over empathy. Watching him lose himself to this manufactured facade was painful. The callous figure portrayed in the media isn't the person I knew, but an inauthentic caricature manufactured for an audience, which ended up consuming him." *Id.* The Do whom Mr. Chen knew was "[t]he person who opened his home to someone struggling ██████████████, who intuitively recognized when his team members needed support, who invested personally in their wellbeing beyond any professional obligation—that person was real." *Id.*

Other TFL employees expressed similar sentiments. Maslin Edwin, a former communications associate at TFL, observed how Do gave his employees a sense of meaning and purpose in their work: "We celebrated those wins like family. Nobody forced me to work long hours, nobody demanded weekends. I worked my ass off for the company because I believed it mattered." *Id.* at 21. Mr. Edwin further notes that Do "dared us to dream bigger than our small tasks, always inspiring us to push further." *Id.* at 22. Woojin Lim noted that "Do had a particular willingness to mentor student founders, including many others beyond myself, and to invest in young talent." *Id.* at 26. Mr. Lim recounts how "Do acqui-hired a young team that had taken on debt for their former project and helped them pay that off via employment with a generous offer; and in another, helped other former employees secure second jobs or prestigious fellowships." *Id.* Mark Chan, a former TFL employee ████████████████████████████, wrote that Do "opened his home to staff and community members" during the May 2022 depeg, where the community "gathered, spoke honestly and tried to process events together." *Id.* at 80.

Hecker Fink LLP                                                                              18

Jason Arnold wrote that Do worked closely with startups and community initiatives for Terra, spending "weekends mentoring a team building a charitable giving platform on Terra." *Id.* at 30. Personally, Mr. Arnold described Do as "a leader who inspired and uplifted those around him." *Id.* Do provided support and mentorship to other founders, like Taemin Park, who wrote that Do's gestures "carried profound significance. Do was not obligated to maintain this relationship but he did, consistently and warmly. His actions showed that he valued people beyond their immediate utility or achievements. He cared about others as human beings, offering kindness and support without expecting anything in return." *Id.* at 75. Joowon Ryoo, who worked with Do at the startup Do founded before TFL, described Do as a leader who "shared generously" and "opened doors for young builders." *Id.* at 35. Jun Kim, a founder who was working on a project that was struggling to launch, wrote that "Do quietly connected us with engineers, designers, and even investors who could help—asking for nothing in return. He spent a great deal of his personal time mentoring us and seemed genuinely motivated by a belief that young builders could use crypto to create something meaningful." *Id.* at 183. Do's eagerness to help others learn and grow has extended to his time in pre-trial detention. One of his fellow inmates submitted a letter describing programming lessons Do has given him over the last few months. *Id.* at 194.

Across the board, the letters submitted from those who knew Do personally and professionally reveal a young man who still has much to contribute to society, after serving his sentence here and his later sentence in Korea. *See, e.g.*, *id.* at 35 (Joowon Ryoo: "I believe that if given the chance, Do can again contribute positively, not only to technology but also to the people and communities he has always sought to empower."); *id.* at 45 (Jacob Gadikian: "While he has certainly made and admitted mistakes, I hope that he can resume his life and his work because he has so much to offer. I'm sure that this experience has tempered him, and that he wouldn't repeat the same mistakes again."); *id.* at 79 (Javier Su: "I learned a great deal from working with [Do], and it would be a loss if he were unable to continue making a positive impact in the future."); *id.* at 80 (Mark Chan: "The qualities I describe above are why I believe he will continue to be a constructive, diligent and positive contributor to society."); *id.* at 82 (Terence Lim: "I believe someone with his intellect, creativity, and fundamental decency still has an enormous amount to contribute to society."); *id.* at 157 (JP Thor, founder of a decentralized trading platform: "I believe Do is a force for good.").

### 2.    *Do's Family*

Most important to Do, more than any professional contributions he can make after serving his sentences, is the continued support of his family. Do's wife, Daeun Lee, has known Do for almost half of Do's life. The Court will read Daeun's own words about Do's magnetism and willingness to help others. Daeun also wrote about how the collapse of the Terra ecosystem hurt Do personally and how hard Do's time in detention in Montenegro was on both her and Do. Exhibit B at 2-5.

Do and Daeun have a four-year old daughter, Luna, named at the time Do was proudest of the community he had built. Do has not seen Luna since she was just a few months old, and today she knows her father only as a voice on the phone, where he is a "gentle pony who lives alone in a forest of wolves, and eats hay." *Id.* at 3. Despite their physical distance, Luna is the most important person in Do's life, and he desperately wants to return to Korea to see her, even if he is still incarcerated when he does. Both Do and Daeun acknowledged the challenges this process has

Hecker Fink LLP                                                                    19

had on their ability to raise Luna, whom Do said he hopes "will read [his] letter" to the Court "and think better of her father for having owned up to his responsibilities." Exhibit A at 11. Daeun similarly wrote that she and Do "want to raise our daughter with honesty, dignity, and a sense of purpose. She deserves to have her father present as she grows, learns, and discovers her place in the world." Exhibit B at 5.

## B.    The Offense and Comparable Sentences

Do's crimes are serious. He misled the community of Terra investors, developers, and users about the role that Jump played in restoring UST's peg in May 2021. The stability of UST's peg was the cornerstone of the Terra ecosystem and the most prominent example of the success of the Terra Protocol that Do had helped build. He failed to provide important information to the Terra community about its cornerstone, and deceived investors. As Do says in his separate submission about the victims of the Terra collapse, "Not a day goes by when I don't think about the damage I've caused to their lives."

Do's acknowledged failures, while significant and deserving of just punishment, were not motivated by his desire to make a quick buck. As described in detail above and in Do's separate letter, the Terra community matters deeply to him, as the letters from that community attest. Do was led astray by a misguided relationship with Jump Trading and his own arrogance. As discussed above, Jump insisted that Do wrongfully keep their relationship secret from the Terra community, and he agreed. Do could not regret this decision more.

Consistent with Do's motivations in building TFL and supporting the Terra community, and the fact that this is not a fraud case built on a theory that Do was swindling people out of their money, there is an appreciable gap between the losses that are described in the Indictment (roughly $40 billion) and whatever gains Do accrued from his conduct, even as described in the forfeiture allegations (roughly $20 million and certain specified property, most of which now belongs to the TFL Plan Administrator).

Reflecting the serious nature of Do's crimes, and the heavy loss amount resulting from the collapse of the Terra ecosystem, the Sentencing Guidelines offense level is 43, or life in prison. *See* PSR at 42. That sentence exceeds the statutory maximum sentence of 25 years, so the Guidelines range is 300 months' incarceration. As the Court well knows, it is widely recognized that in many fraud cases, the Guidelines drastically "overstate[] the seriousness of [the] offense." *United States v. Rivernider*, 828 F.3d 91, 111, 114 (2d Cir. 2016). Courts in this Circuit have repeatedly noted that the Guidelines are "just mindlessly accelerated once you have numbers of any size added in the loss or gain table." *United States v. Faibish*, No. 12 Cr. 265 (ENV), ECF No. 271 at 23 (E.D.N.Y. Mar. 10, 2016) ("[A] whole host of judges . . . have said so publicly and scores of others . . . have . . . grumbled about it privately."); *see also United States v. Caspersen*, No. 16 Cr. 414 (JSR), ECF No. 37 at 80 (S.D.N.Y. Nov 4, 2016) (noting many "problems with the guidelines," including "their irrationality"; "their draconian [and] far too punitive approach to all crimes," including "white collar crimes"; "their very real responsibility for . . . mass incarceration"; and "the fact that they regard sentencing as an exercise in bean counting, as opposed to one of the most difficult tasks that . . . judges have to undertake"). This Court has recently acknowledged that in cases in which "the guidelines' recommendation is largely driven by quantity[,] . . . the ultimate guidelines recommendation tends to give excessive weight to that quantifiable factor" and "give

Hecker Fink LLP                                                                                            20

short shrift to important qualitative factors." Sentencing Transcript at 62, *United States v. Sadleir*, No. 20-cr-320, ECF No. 90 (S.D.N.Y. Sept. 9, 2022) (Exhibit I).

It appears the Sentencing Commission is poised to respond to these pleas for consistency and common sense. In August 2025, after significant public comment on the issue, the Commission identified its policy priorities for the upcoming amendment cycle, including the examination of § 2B1.1 and the loss table "to ensure the Guidelines appropriately reflect the culpability of the individual and the harm to the victim," including "reassessing the role of actual loss, intended loss, and gain."[6]

Although the government may seek a sentence higher than the five years we are requesting, its agreement to seek a sentence of no more than 12 years' incarceration reflects the parties' shared view on the Guidelines range: It is excessive, and a sentence well below the range is appropriate.

The need to avoid unwarranted sentencing disparities similarly counsels in favor of a sentence well below the Guidelines (and well below 12 years). There is no case with the same unique combination of circumstances as are present here. Do will serve substantial prison time in Korea for the same conduct, ████████████████████████████████████████████████████████
████████████ The circumstances of Do's extradition from Montenegro to the United States instead of his native South Korea, the harsh detention conditions in Montenegro, and the already extended separation from his family only add to this case's uniqueness.

Notwithstanding all of the features that make this case difficult to compare to others, one recent sentence imposed by this Court, as well as other sentencings in cryptocurrency-related cases in this District, strongly support a sentence of no more than five years' imprisonment.

First, in 2022, the Court sentenced William Sadleir to six years' incarceration in a case the Court described as "the most brazen and cynical and persistent and . . . disappointing fraud schemes I have seen." Exhibit I at 71. The factors that the Court noted there as supporting significant punishment are absent here. Where Mr. Sadleir pleaded guilty on the eve of trial, Do pleaded guilty early, "in time to spare the parties and the Court substantial resources." *Id.* at 76. As discussed above, Do took "responsibility from the start," ████████████████████████████████████████
████████████ *Id.* Like Mr. Sadleir, Do's sentencing submission is accompanied by scores of letters from family, friends, and former colleagues testifying to Do's many admirable qualities. Finally, while Mr. Sadleir was substantially older than Do is today, he had not served considerable and harsh time in a foreign jail, and did not face the substantial additional prison time that Do faces in Korea.[7]

---

[6] U.S. Sentencing Comm'n, Final Priorities for Amendment Cycle (Aug. 6, 2025), https://www.ussc.gov/sites/default/files/pdf/amendment-process/federal-register-notices/20250806_fr_final-priorities.pdf.

[7] As the Court will recall, Mr. Sadleir faced charges in another case in the Central District of California, and the parties in Mr. Sadleir's case "agreed that the government will recommend that whatever sentence [the Court] impose[d], the Central District of California sentence run concurrent to it." Exhibit I at 9. While we worked with the government to explore whether there was any way to resolve both this case and Do's case in Korea at the same time, we learned from the government that such a resolution was not possible. There is no way for this proceeding to restrict the sentence that Do will later receive in South Korea.

Second, the Court should consider the 12-year sentence Judge Koeltl imposed on Alex Mashinsky, the cofounder of Celsius Network, another cryptocurrency company that went bankrupt in 2022. Mr. Mashinsky is the most similarly situated defendant to Do, given the timing of Mr. Mashinksy's prosecution in the same industry as Do. That said, the § 3553(a) factors overwhelmingly favor a far shorter sentence for Do than the one Mr. Mashinsky received. Mr. Mashinksy did not face the prospect of further prosecution abroad, as Do does here. Nor was Mr. Mashinsky detained before trial, let alone detained in Montenegro under terrible conditions. Moreover, as the government argued at sentencing in that case, Mr. Mashinsky and his company engaged in a pattern of manipulative and deceptive trading for Mr. Mashinsky's own profit, propping up the price of the CEL tokens that Celsius was paying Mr. Mashinsky, while Mr. Mashinsky sold his tokens back to the company. *See* Sentencing Transcript at 60-67, *United States v. Mashinsky*, No. 23-cr-347 (S.D.N.Y. May 8, 2025) (Exhibit J). And Mr. Mashinsky's wife withdrew millions from her Celsius account during its collapse. *Id.* at 67. There are no similar allegations of manipulative trading intended to personally enrich Do in this case.

Finally, the government argued that Mr. Mashinsky, through his sentencing submissions, failed to adequately accept responsibility for his crimes: "[T]hroughout this sentencing proceeding, [Mr. Mashinsky] has acknowledged with specificity very few mistakes." *Id.* at 74. In sharp contrast, since arriving in the United States, Do has done everything possible to accept responsibility for his crimes ███████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████ That positions Do quite differently than Mr. Mashinsky, and further counsels in favor of a shorter sentence.

### C.    Deterrence

Neither specific nor general deterrence would be served by imposing a sentence over five years. Indeed, the consequences that have already befallen Do, including his terrible experience in Montenegrin detention is all the deterrence he—or anyone—needs to refrain from criminal conduct.

As he wrote in his letter, Do spent nearly two years in what amounted to solitary confinement, without regular access to his family. Weeks went by without Do speaking to anyone at all, and he spent hours looking out the small window in his cell. Do lost considerable weight because of the food and the need to bribe prison guards with cigarettes to receive any. Exhibit A at 11. Daeun wrote that the first and only time she was able to visit Do in Montenegro, "he looked like he had lost half his weight." Exhibit B at 4. "He was shivering, likely from the weight he had lost and the lack of food." *Id.* Though Do is of course still detained here in the United States, he is at least able to speak with Daeun and Luna by phone. *Id.* He has so far remained physically separated from his family while in detention here.

As for general deterrence, Do's detention to date and certain future detention in Korea have already sent a substantial deterrent effect to the crypto community. It is worth noting that Do's position here is somewhat unusual. As described above, under a straightforward application of Montenegrin law, Do should have been extradited to South Korea to face charges there, rather than coming here first. The lengths to which the government went to obtain Do's extradition were no

Hecker Fink LLP                                                                    22

doubt extensive, and the very fact that he was extradited here as a Korean citizen whose Singaporean and Korean business failed while he was abroad is a powerful statement about the "long arm" of U.S. law and its government's efforts to police worldwide markets.

### D.    Kinds of Sentences Available

As a foreign national, Do is ineligible under Bureau of Prisons regulations for designation to a minimum-security prison camp. Whatever sentence the Court imposes on Do he will serve in, at best, a low-security prison environment. *See* Inmate Security Designation and Custody Classification (Sept. 4, 2019) (explaining that a non-citizen of the United States "shall be housed in at least a Low security level institution").

While Do has consented to the entry of a judicial removal order, he would still have to spend some time after completing his term of imprisonment in immigration detention to await the process of being physically removed from the United States, which can take several months. He would not be able to walk out of jail in the United States as a free man for any amount of time: He will be taken from whatever facility in which he serves his sentence directly to an immigration detention center to await a deportation flight to Seoul, where he will immediately reenter pretrial detention pending his criminal charges in South Korea.

Moreover, as a non-citizen he is not eligible for Earned Time Credits under the First Step Act to reduce the length of his detention here.

In sum, the lack of any camp designation options for him, the unavailability of First Step Act credits, and the certainty that he will face charges in Korea after serving his sentence here are further support for a sentence of not more than five years.

### IV.    CONCLUSION

Do began working on the idea that would become Terra when he was 26 years old. By 28, he had written most of the foundational code. By 30, he was one of the richest men in the world, worth billions on paper. That meteoric rise landed him in a role for which, in his own words, he was "woefully unqualified." As he writes to the Court, at the height of Terra's success, he had lost his "intellectual humility" and instead of listening to critics, his "insane arrogance" got the better of him, leading him to deceive the investing public about the vulnerabilities and flaws in Terra's protocols.

Today, Do sits in a prison half a world away from his family. He has done all that he can to make amends for his wrongdoing. He spends much of his time in a loop of regret, replaying what might have been, still jotting code by hand in his jail cell when he wakes in the night.

Do has already suffered enormously from his conduct. Regardless of the sentence Your Honor imposes, more lies ahead. We ask for a sentence of no greater than five years so that he may return to his home country to face the charges awaiting him there and serve whatever prison time he must closer to his family.

Hecker Fink LLP

Respectfully submitted,

_____
David Patton
Michael Ferrara
Sean Hecker
Andrew L. Chesley
Christopher Morel
Hecker Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
shecker@heckerfink.com
mferrara@heckerfink.com
dpatton@heckerfink.com
achesley@heckerfink.com
cmorel@heckerfink.com

Counsel for Defendant Do Hyeong
Kwon

Encl