# EXHIBIT H

M99WsadS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          20 Cr. 320 (PAE)

5   WILLIAM SADLEIR,

6              Defendant.
                                          Sentence
7   ------------------------------x

8                                         New York, N.Y.
                                          September 9, 2022
9                                         11:00 a.m.

10  Before:

11
                   HON. PAUL A. ENGELMAYER,
12
                                          District Judge
13
                         APPEARANCES
14
    DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16  BY:   JARED P. LENOW
          ELIZABETH A. HANFT
17        Assistant United States Attorneys

18  BOIES SCHILLER FLEXNER LLP
          Attorneys for Defendant
19  BY:   VALECIA BATTLE
          MATTHEW L. SCHWARTZ
20

21  Also Present:  Special Agent Daniel Mardakhayev, FBI

22

23

24

25

1    (Case called; appearances noted)

2              MR. LENOW:  Good morning, your Honor.  Jared Lenow for

3    the government, and with me at counsel table is my colleague

4    AUSA Elizabeth Hanft and FBI Special Agent Daniel Mardakhayev.

5              THE COURT:  Good morning, Mr. Lenow.

6              Good morning, Ms. Hanft.

7              And good morning, Agent Mardakhayev.

8              Very good.  You may all be seated.

9              And for the defense.

10             MS. BATTLE:  Good morning, your Honor.  My name is

11   Valecia Battle.  I'm here with my colleague Matthew Schwartz

12   from the firm Boies Schiller Flexner.  We're also here with our

13   client.

14             THE COURT:  Very good.

15             Good morning, Ms. Battle.

16             Good morning, Mr. Schwartz.

17             Good morning to you, Mr. Sadleir.

18             And good morning as well to the members of the public

19   who are here.

20             Ms. Battle, I assume some of the people who are here

21   are friends or family of your client.

22             MS. BATTLE:  Yes.  We are joined by Hannah, his wife,

23   and their two young sons as well as their other son Tyson

24   Sadleir, who is studying for a Ph.D. at Columbia, and then

25   Mr. Faris.

M99WsadS

1        THE COURT:  All right.

2        Welcome.  Thank you for being here.

3        We're here today to impose sentence in the case of

4   United States v. William Sadleir.  On January 19 of this year,

5   Mr. Sadleir pled guilty to Counts One and Two of the indictment

6   in this case, each of which charged the substantive offense of

7   wire fraud.  In preparation for today's proceeding, I've

8   reviewed the plea agreement and the transcript of the plea

9   proceedings.  I've also reviewed the proposed consent order

10  that I issued on January 21 with respect to the interlocutory

11  sale of real property in Beverly Hills and immediately before

12  this proceeding, I was handed by my deputy a proposed order of

13  restitution and a preliminary order of forfeiture.

14        I've also reviewed the presentence report, dated April

15  the 12th, including its recommendation and addendum.  I've also

16  reviewed the defense sentencing submission, dated June the 1st,

17  plus various attachments; and the government's sentencing

18  submission, dated June 7, also with various attachments.

19        Have the parties received each of these submissions,

20  and has anything else been submitted in connection with the

21  sentence?

22        MR. LENOW:  We have reviewed the submissions, Judge,

23  and I don't know of any other relevant documents for

24  sentencing.

25        THE COURT:  Same for you, Ms. Battle.

M99WsadS

```
 1              MS. BATTLE:  Yes, your Honor.

 2              THE COURT:  Very good.  Ms. Battle, have you read the

 3    presentence report.

 4              MS. BATTLE:  Yes, your Honor.

 5              THE COURT:  Have you discussed it with your client.

 6              MS. BATTLE:  Yes, your Honor.

 7              THE COURT:  Mr. Sadleir, have you read and reviewed

 8    the presentence report.

 9    A.  Yes, your Honor, I have.

10    Q.  Have you discussed it with your lawyers?

11    A.  I have, your Honor.

12    Q.  Have you had the opportunity to go over with them any

13    errors in the report or anything else that should be taken up

14    with the Court?

15    A.  Yes, I have.

16              THE COURT:  Government, have you reviewed the

17    presentence report?

18              MR. LENOW:  Yes, Judge.

19              THE COURT:  Putting aside, just the factual accuracy,

20    starting with the government, are there any objections to the

21    report regarding its factual accuracy?

22              MR. LENOW:  No, your Honor.

23              THE COURT:  Defense.

24              MS. BATTLE:  No, your Honor.

25              THE COURT:  Then hearing no objections, I will adopt
```

1   the factual recitations set forth in the presentence report.

2   The report will be made a part of the record in this matter.

3   It will be placed under seal.  In the event an appeal is taken,

4   counsel on appeal may have access to the sealed report without

5   further application to the Court.

6              It appears to me that both parties' sentencing

7   submissions have been publicly filed.  Is that correct?

8              MR. LENOW:  Yes, Judge.

9              MS. BATTLE:  Yes.

10             THE COURT:  Very good.

11             All right. turning to the sentencing guidelines, the

12  Court is no longer required to follow the sentencing

13  guidelines, but I am required to consider the applicable

14  guidelines in imposing sentence.  To do so, it's necessary that

15  the Court accurately calculate the guidelines sentencing range.

16             In this case, there was a plea agreement in which the

17  parties stipulated to a particular calculation of the

18  sentencing guidelines.

19             Counsel, am I correct that the calculation in the

20  presentence report is in accord with your agreement?

21             MR. LENOW:  Yes.

22             MS. BATTLE:  Yes, your Honor.

23             THE COURT:  All right.

24             Then based on the parties' agreement, in the absence

25  of objection, and my independent evaluation of how the

1  guidelines apply here, I accept the guideline calculation in

2  the presentence report.  Accordingly, I find that the offense

3  level is 31, the criminal history category is I, and the

4  guideline range is between 108 and 135 months' imprisonment.

5        Turning to the issue of departures, which is to say

6  within the sentencing guidelines framework, in the plea

7  agreement both parties agree that neither an upward nor a

8  downward departure -- again, within the guidelines framework --

9  is necessary.  Having reviewed the presentence report and

10  parties' submissions, I share that conclusion.  I find that no

11  departure is available as a matter of law.  Of course, that

12  does not preclude either party from seeking a variance.

13        All right.  Having taken care of those necessary

14  preliminaries, does the government wish to be heard with

15  respect to sentencing?

16        MR. LENOW:  Yes, your Honor.

17        I just want to emphasize the five points in our

18  submission that we think are the most significant for the Court

19  to consider, and just before I do that, I would note we have

20  been in contact and notified the victims of the charged

21  offenses.

22        THE COURT:  I'm going to ask you, Mr. Lenow, for

23  whatever reason, your voice isn't picking up well.  If you'd

24  like to sit down and speak more closely to the mike, that's

25  fine.  I just need you to project better.

 1              Thank you.

 2              MR. LENOW:  Thank you, Judge.  I appreciate that.

 3              As a preliminary matter, I wanted to note that we have

 4    been in touch with the victims of the statutory offenses that

 5    are charged here, which include the New York investment fund,

 6    and arguably additional victims would include some of the

 7    employees of the fund who were directly lied to or had their

 8    identities stolen, and we have not received any submission for

 9    the Court on behalf of those victims.

10              THE COURT:  Let me pause on that.  That's on my list

11    of matters to take up, but since you're starting with that,

12    let's tie the loop there.

13              My understanding is that BlackRock is essentially,

14    from the perspective of the charged offenses here, formally the

15    only victim.

16              MR. LENOW:  That's correct, Judge.

17              THE COURT:  Put aside for a moment the PPP fraud,

18    which I want to pick up as to that in a moment, my chambers has

19    received calls -- I haven't been on any of them -- from

20    individuals -- I think there is one who went by the first name

21    Anne -- identifying herself as a victim.

22              Have you been in touch with such a person?

23              MR. LENOW:  So, that individual -- and I'm not sure if

24    they're in the courtroom right now; I think they may be -- did

25    submit a letter to our office that we forwarded to the Court.

1  The letter observes that they're not, this individual's not a

2  victim of these charged offenses and they say that in the

3  letter that we forwarded.  But they report having one or more

4  other unpleasant experiences when they felt they were

5  mistreated by Mr. Sadleir.

6          There's a footnote in our submission where we note

7  this, and we are not in a position -- the government is not in

8  a position to opine one way or the other on the facts reported.

9  Since it's not someone who is a victim of the charged offenses

10 here, we are not asking the Court to rely on their submission.

11 And we don't mean to take a position one way or the other about

12 the nature of that individual's interactions with Mr. Sadleir

13 or not.  We just are not in a position to opine, and we're not

14 asking the Court to rely on it.

15         THE COURT:  And I'm not treating that conduct as

16 within the scope of the charged conduct here, and therefore,

17 without making any fact finding about it, I'm also not

18 considering it in connection with sentencing.

19         With respect to BlackRock, was BlackRock given an

20 opportunity to participate in the sentencing, including through

21 a written submission?

22         MR. LENOW:  Yes, Judge.  We were in contact with

23 counsel for BlackRock, and they declined to make a submission.

24         THE COURT:  Any idea why?

25         MR. LENOW:  Judge, I could speculate, but I think that

our factual submission here is very detailed and addresses the

nature of the conduct and what occurred with respect to

BlackRock.  So I could only speculate, but I do hope the Court

believes it has a full set of facts before it, though.

        THE COURT:  Oh, I didn't feel like anything was

lacking from my perspective, but victims often want to be

heard, and I was curious why they didn't.  And it may well be

that they feel that the government's recapitulation captures

everything.

        A curiosity of the case is that there is a separate

prosecution in Los Angeles in connection with the so-called PPP

fraud.  I understand the parties have agreed that the

government will recommend that whatever sentence I impose here,

the Central District of California sentence run concurrent to

it.  Therefore, it seems to me that I need to factor in the PPP

fraud in my assessment of the 3553(a) factors.  Otherwise, and

it's a matter in practice, unless the Court in California was

to disregard that recommendation, it goes unaccounted for.

        Are there any victims of the PPP fraud who have

indicated they wish to be heard?

        I recognize they don't have a formal right to be heard

in this proceeding, but as a practical matter, given that

you're effectively asking me to sentence Mr. Sadleir in toto

considering the California as well as New York charges, I'm

eager to know whether any of them expressed an interest in

M99WsadS

1  participating.

2         MR. LENOW:  Judge, could I just have a moment to

3  confer with my colleague?

4         THE COURT:  Yes.

5         MR. LENOW:  So, Judge, let me give the best answer to

6  your question that I can with the facts that we have.

7         The short answer is we have not directly made victim

8  inquiries in that case.  I think that, generally speaking, my

9  understanding is that the PPP fraud conduct in this case and in

10  others, the principal victim is generally the U.S. government.

11  It is possible that there are some financial institutions who

12  might have had some -- been victimized along the way

13  potentially, but I just don't want to speak to that not knowing

14  the detail there.  So I just would make two observations.

15         One is I think for the purposes of sentencing here at

16  least -- and I realize that this is a different issue from the

17  victim issue, which is an important one, from our perspective,

18  in terms of the relevance of that conduct at sentencing -- and

19  I will state this shortly in more detail -- there is a kind of

20  repeated nature of the fraudulent conduct that is particularly

21  salient here.  And so, we know of no specific victims as of now

22  that were particularly vulnerable or anything of that nature.

23  My understanding generally would be the U.S. government and

24  potentially some financial institutions, but again, that's not

25  based on a detailed knowledge of the case.

M99WsadS

1          THE COURT:  Look, as the PPP fraud has been reported

2     to the Court here, it is really directed at the U.S.

3     government.  I'm unaware of any private victim, and I wasn't

4     prepared to consider a private victim as germane here.

5          MR. LENOW:  Right.

6          THE COURT:  So I'm really thinking of it as the U.S.

7     government.  I'm mindful that, for present purposes, you are

8     the U.S. government and you are in that respect before me.  So

9     it's not as if the government's voice is going unheard.

10          MR. LENOW:  Right, Judge.

11          THE COURT:  But nonetheless, because in function, if

12     not in form, I'm being asked to consider holistically all of

13     the conduct, if there was somebody involved at the

14     administration of the program or somebody who had facts to

15     bring to bear, I would have been receptive to it had it been

16     provided.  It's certainly not statutorily required, since

17     that's not within the scope of the charged conduct here.

18          MR. LENOW:  Judge, understood.  And I would say -- and

19     I'm obviously not an individual who administers the program, so

20     I can't speak with that level of detail; I would say I think

21     that it is fair to say that this program was obviously

22     initiated for a very specific and important purpose during a

23     national emergency.  And so obviously, the fact that those

24     funds were misused, I think, goes to a number of relevant

25     sentencing factors, one of which is the fact that it's taking

M99WsadS

1    advantage of, frankly, a national emergency and taking

2    advantage of a U.S. program that was designed to help those who

3    really did need it.

4         And I also think it's fair to say that when these

5    sorts of things happen, there is a fair bit of reporting on

6    fraud in these programs, and it is an inherent problem to make

7    sure things like this happen when they need to happen when

8    there is significant fraud because it sometimes gives people

9    pause about whether it is wise to enact this legislation in

10   light of the large fraudulent activity that occurred.  So

11   there's not just been an issue with taking advantage, this

12   fraudulent conduct here, but when Mr. Sadleir and others who

13   have engaged in PPP fraud engage in this sort of conduct, it

14   certainly affects the public policy discussions going forward.

15   So there are kind of systemic effects.  So I think that --

16   again, I don't want to get into too much detail about it,

17   because we're not the prosecutors on that case, but I think

18   there are very significant factors there that bear on

19   sentencing here that the Court should consider, and I'm happy

20   to address then in a little more detail.

21        THE COURT:  OK.  I took you off your sequence just to

22   tie up the discussion of victims, and I think we've fully

23   covered that.

24        MR. SCHWARTZ:  Can I interrupt for one second on the

25   victim point before they get into their main presentation just

M99WsadS

1   so I don't lose the thread?

2          THE COURT:  Briefly, but there will be a chance for

3   the defendant --

4          MR. SCHWARTZ:  Yeah.  Just two technical points:

5          One, with respect to BlackRock's participation here,

6   and I meant to say this earlier but didn't find exactly the

7   right time, the one place of departure that I think both we and

8   the government have with the PSR is in respect to the

9   restitution amount --

10         THE COURT:  Well --

11         MR. SCHWARTZ:  The PSR, BlackRock made some sort of

12  submission to probation.  I don't think -- we have not seen

13  that; I don't think the government has either.  That's

14  reflected at paragraph 99 of the PSR.

15         THE COURT:  YES.  One of the questions I'll be asking,

16  but I want to do this in sequence, I'll be asking each party

17  about restitution, including the obvious question of why the

18  PSR's figure is different from what appears to be the joint

19  recommendation of the parties.  But I will get there.  At this

20  point, I'm really asking about the rights of victims to

21  participate.

22         MR. SCHWARTZ:  But --

23         THE COURT:  I don't think you've got anything to offer

24  on that.

25         MR. SCHWARTZ:  I don't.  And with respect to the PPP,

1    just to confirm, my understanding of the position in California

2    is that while those loans are processed through private

3    financial institutions, the government is the only victim.

4                   THE COURT:  Very good.  Thank you.

5                   Go ahead, Mr. Lenow.

6                   MR. LENOW:  Thank you, Judge.

7                   As I mentioned, and as we said in our submission,

8    there are five points that I think are front of mind for us to

9    this sentencing that we would ask the Court to strongly

10   consider.

11                  The first is the brazen and calculated nature of the

12   conduct.  As we say, this was not a case that involved fudging

13   a few numbers or on one occasion changing some decimal point,

14   or something like that.  This was conduct that was -- involved

15   masquerading as a female advertising executive on maternity

16   leave as part of an effort to deflect from the conduct.  It

17   involved creating fake entities.  It involved, and we included

18   one of these emails in our submission, long Kafkaesque

19   explanations to try to have, throw the lawyers and others off

20   the trail of the crime.  So it's one of these -- it is a crime

21   that is extremely brazen.  I think that is a significant

22   factor.

23                  Second, as I alluded to, this was something that

24   occurred over the course of years.  It wasn't a single lapse on

25   a stressful day.  This is a course of criminal conduct that

1   occurred, took place over three years and involved multiple

2   data points.  And with each year, the extent of the scheme and

3   the brazenness of it increased, and that's especially true in

4   the later part of the scheme, in 2019, when Mr. Sadleir

5   fictitious persona and engaged in a number of deceptive acts

6   using that persona.

7            The third point is the extravagant nature of the

8   personal benefit that was obtained here.  There are some cases

9   in financial frauds where, this Court, I'm sure, has seen,

10   where someone doesn't personally enrich themselves; it's more

11   about digging out of a hole or avoiding personal embarrassment,

12   you know, that might occur in the heat of a very stressful

13   situation on one occasion.

14            Here, though, the motivation seems to have been true

15   just to get extravagant gifts and extravagant personal

16   benefits, such as a Beverly Hills mansion to the tune of $14

17   million, a luxury Tesla, and to hire a very extravagant

18   decorating company that billed tens of thousands of dollars to

19   kind of revamp the house.  So this is not the sort of case

20   where it is a someone digging themselves out of a hole

21   situation.  It's really a truly calculated act of greed.

22            The fourth point is the prolific and diverse array of

23   the fraudulent conduct here, and we point here not only to the

24   two charged offenses but also the two other offenses, one of

25   which being the PPP fraud, which postdated the conduct here,

1    but also the defrauding of Cairn Capital, which predated the

2    UCC fraud, one of the two frauds charged in this case, and was

3    part of the motive for the UCC fraud.

4            Just to recap briefly, Mr. Sadleir faked some

5    performance metrics that resulted in him getting a payment he

6    was not entitled to, and when he was caught, that was the

7    motive to engage in the UCC fraud, to generate the $3 million

8    to pay off the prior victim to avoid getting caught.  And I

9    raise these really to respond to the defense point about this

10   being a bit of an aberration in Mr. Sadleir's life.  There

11   really is -- I'm not aware of every single fraud case that your

12   Honor has seen or that this courthouse has seen, but I do think

13   this case is one in which there really is a striking array in

14   diversity of conduct that occurs over a period of years and

15   just kind of undermines the notion that this is an aberration.

16           I do think the conduct shows that Mr. Sadleir was

17   willing to lie whenever it suited his interest in a truly

18   brazen fashion.  Here, the Cairn fraud also involved

19   fabricating complex business documents.  So it's not the sort

20   of thing, again, that's done accidentally -- not accidentally,

21   of course; that would not have been a criminal case.  But it's

22   the sort of thing that's done in the heat of a decision that's,

23   you know, one night there's a filing deadline and he made an

24   error of judgment.  It's something that occurs again and again

25   and again with a degree of sophistication that's significant.

M99WsadS

1          The fifth point that we would make is that Mr. Sadleir

2     is a person who's lived a very privileged life, and it's, I

3     think, very sad that we end up here for multiple reasons.

4          One, the government obviously acknowledges that

5     Mr. Sadleir has a family with young kids, and it's deeply,

6     deeply tragic that he is facing a significant jail term --

7     tragic for his family more probably than anyone else.  And we

8     acknowledge that, and I think it's a truly sad place we're at

9     today for the Sadleir family.

10          But Mr. Sadleir's background also is a significant

11     aggravating factor here.  He is someone who has literally had

12     every advantage that one can have in terms of his education,

13     his professional life, his family support.  He is someone who

14     went to Harvard Business School.  He's someone who has held

15     multiple executive positions at various companies in a variety

16     of fields.  He's someone who served in the White House as a

17     personal aid to a sitting U.S. president in the 1980s.  And

18     with somebody who clearly had such talent and such ability, it

19     makes the crime all the more baffling and unnecessary.  And I

20     guess if Mr. Sadleir had been satisfied with a more modest

21     house, perhaps a more modest career, this conduct was totally

22     unnecessary.  This isn't a situation where he found himself in

23     a hole and had to dig himself out, as I mentioned earlier.

24          So I think that those five factors are very

25     significant here, and I think there's some -- the defense

1    mentions in their submission some of the critiques of the fraud

2    guidelines and how the loss amount oftentimes drives the

3    guidelines, and it's true there have been a number of critiques

4    that the loss amount on its own is not the best proxy for how

5    egregious conduct is.  I think in this case, though, there are

6    a lot of factors that the guidelines do not account for, and

7    the five factors I went through, I think, go to that.  So if

8    there were a more -- if there were additional factors mentioned

9    in the guidelines that attributed to a lot of other conduct,

10   you could take the loss amount away and what I just went

11   through, the five factors, each of them, I think, would --

12   perhaps in a newer version of the guidelines in the future

13   would trigger any number of additional offense increases -- the

14   fact that there's a repeated array of conduct; the fact that

15   the crimes occurred over a period of years, things like that.

16          So the point that I'm trying to make here is while the

17   loss amount does drive the guidelines here, there are so many

18   factors that are not accounted for that, ultimately, we do

19   believe that the 108-month recommendation of the government is

20   appropriate.  And we did give that great weight.  We are not in

21   this case -- the weight of the facts here, the specific facts,

22   give great weight to our recommendation.  This is not a case

23   where we just said, Judge, give a guidelines sentence.  We gave

24   thought to whether an above-guidelines sentence was appropriate

25   or a below-guidelines sentence was appropriate.  And we gave it

1    quite a bit of thought.  And in light of the factors I've

2    articulated, we do think 108 months would be an appropriate

3    sentence.

4            THE COURT:  Apropos of that, let's just discuss the

5    PPP fraud.  I just want to make sure that all agree that the

6    recommendation in California will be for a concurrent sentence

7    with whatever I impose here, and therefore, it's appropriate

8    for me to consider the PPP fraud, in effect, as part of, if not

9    literally the offense conduct, under 3553(a).

10           MR. LENOW:  We think that's correct, Judge.

11           THE COURT:  Had the PPP fraud been charged here, would

12   it have changed the overall guideline calculation?

13           MR. LENOW:  Judge, I don't -- let me just confirm, I

14   don't believe that's the case.

15           THE COURT:  I think it keeps you in the same band of

16   loss, for whatever value that has; it increases the loss amount

17   but it keeps you, from a strictly guidelines perspective, in

18   the same place, I think.

19           MR. LENOW:  Yes, Judge.  If I could just have a second

20   to confer with my colleague?

21           THE COURT:  By all means.

22           Specifically, the cutoff under 2B1.1 is between 25 and

23   $65 million.

24           MR. LENOW:  Right.

25           THE COURT:  So from a loss perspective, you'd have to

 1    go quite a long ways up, I guess, to get --

 2                MR. LENOW:  Right, Judge.  I think in terms of loss

 3    amount, it certainly would not affect the guidelines.  What

 4    we're just checking for is if there is a separate enhancement

 5    that might apply for defrauding a government program, or

 6    something that of that nature.  There are a number of --

 7                MR. SCHWARTZ:  I don't think it would matter because

 8    of the difference.

 9                THE COURT:  Yes.

10                In any event, fundamentally, subject to the

11    possibility that there is some nicety triggered by that

12    offense, fundamentally, it would be within the same guideline

13    range.

14                MR. LENOW:  I think that's right, Judge, and that's

15    our understanding.

16                THE COURT:  OK.

17                Next question: restitution.  The parties, I think, are

18    jointly recommending a restitution figure of $31,597,000, and

19    that is what's consistent with the restitution order that

20    identifies the one victim in the sealed proceeding, although I

21    don't think it's very mysterious who that is.

22                Any idea how the probation department came up with

23    such a radically different figure?

24                MR. LENOW:  Judge, my understanding is that, I think

25    that figure was based on loss -- this is my rough

1    understanding, Judge.  I don't mean to let go of my skis here,

2    but my understanding is that the BlackRock fund at issue in

3    this case was a much larger fund and the investment in Aviron

4    was much more than the 28 or $31 million at issue.  It was, I

5    believe, over a hundred thousand dollars -- hundred million

6    dollars -- my apologies.  And so I think that the loss amount

7    that the probation department included included loss amounts

8    the fund suffered from the Aviron investment that were not

9    directly traceable to the specific lies in our case.  In other

10   words --

11             THE COURT:  It may have just been a bum investment for

12   other reasons.

13             MR. LENOW:  Well -- so, I think the argument that I

14   think the probation office, maybe, had in mind was perhaps if

15   the fund knew of some of this conduct earlier they would not

16   have gotten in deeper.  And so even if the loss amount, even

17   if -- there are loss amounts directly attributable to the fraud

18   but unattributable to the Aviron investment.  And so the theory

19   would be that had there been any knowledge of misconduct, the

20   fund would not have continued investing.  And so even if the

21   additional losses beyond the $31 million are not attributable

22   directly to the fraud, they're arguably attributable in the

23   sense that they would never have been suffered because the

24   investment would never have been made because any amount of

25   fraud that would cause the fund to withdraw its funds and not

M99WsadS

1  make further loans to --

2          THE COURT:  But that's certainly not a theory that the

3  government is embracing, and you and the defense have jointly

4  agreed on the order of restitution that has the $31 million --

5          MR. LENOW:  Right.  We're basing the number on the

6  losses that are directly attributable, directly traceable to

7  the lies that we allege in the indictment.

8          THE COURT:  OK.

9          Putting aside the much larger amount, do you have any,

10  take issue in any way with any of the mechanics of restitution

11  as proposed in the presentence report?

12          MR. LENOW:  Sorry, Judge.  In terms of how --

13          THE COURT:  Mechanics of the installment payment, that

14  sort of thing.

15          MR. LENOW:  Oh.

16          THE COURT:  In other words, the restitution order you

17  have given me is of the more bare bones sort, which really just

18  identifies the figure and the victim.

19          MR. LENOW:  Yes, Judge.

20          THE COURT:  But there are mechanics which often attend

21  a restitution order.  I would have in mind, putting aside the

22  different figures that are used, adopting the methodology,

23  including, for example, the installment payment metrics that

24  are on page 42 of the PSR.

25          MR. LENOW:  Yes, Judge.  We have no objection to that.

1          I think my understanding is that oftentimes those

2     agreements are sometimes worked out once an order's in place,

3     but we have no objection to the Court formally including those

4     mechanisms in any sort of order.

5          THE COURT:  OK.

6          With respect to restitution, shortly after sentencing,

7     I issued the order that essentially allowed for presentencing

8     the -- I guess it was the real estate in California to be

9     liquidated.  There hasn't been, I think, though, even a

10    preliminary order of forfeiture, and what you've handed up is

11    listed as a preliminary order.  Is that right?  Is it really

12    preliminary at this point, or is it what I would be executing

13    at the time of sentencing the order of forfeiture?

14         MR. LENOW:  Right, Judge.  So I think, and two points:

15         One, just factually, so the Court is aware, our

16    understanding is that the Beverly Hills, the mansion that the

17    Court has issued an order with respect to, has been sold

18    according to the approved procedures that we all agreed on and

19    the Court has embraced, endorsed.  And the funds from that sale

20    do not -- there is no leftovers for the government, in other

21    words.  The house was sold and another party had priority as a

22    bona fide purchaser, a bona fide holder of a lien on that

23    house, that was unaware of the fraud.  And so the house was

24    sold, and our understanding is all those proceeds went to that

25    third party, so there's no -- the property has now been sold

1    and the proceeds are not there for us to forfeit or seek

2    restitution on.  So the house is now kind of no longer a

3    factor.  So the forfeiture order we're proposing -- and I don't

4    mean to entangle restitution and forfeiture, but the bottom

5    line is there is a Tesla vehicle we are seeking to forfeit that

6    was purchased with proceeds from the crime, and then the

7    remainder of the money that the government will seek in this

8    case is just substitute assets.  There's no other, specific

9    property.

10          THE COURT:  I see.  The Tesla is the only

11   nonsubstitute asset.

12          MR. LENOW:  That's right.

13          THE COURT:  All right.

14          And is this properly denoted as a preliminary order of

15   forfeiture?

16          MR. LENOW:  Judge, the short answer is yes, and I

17   understand from our forfeiture unit, it's simply always denoted

18   as a preliminary order of forfeiture.  I had the same question.

19   I think if your Honor signs it, my understanding is that once

20   the sentence is made final, it becomes a final order in some

21   manner.  But my understanding is they always denote these

22   orders as preliminary orders of forfeiture.  I don't know the

23   answer why.

24          MR. SCHWARTZ:  I can help.

25          THE COURT:  OK.  On this one, I'll welcome the early

M99WsadS

     1    intercession.  Why is it a preliminary order?

     2              MR. SCHWARTZ:  So, it's preliminary as to all parties,

     3    final as to the defendant.  It's preliminary because there is

     4    specific property in the form of the Tesla, and it won't be a

     5    final order until notice of the potential forfeiture is

     6    published by the marshals service and third parties who may

     7    have an interest in the property have a right to assert

     8    potential claims.

     9              THE COURT:  I see.

    10              MR. SCHWARTZ:  Once those claims are adjudicated and

    11    the time period elapsed, it becomes final for all --

    12              THE COURT:  There we go.  That makes good sense.  And

    13    Mr. Schwartz, while I've got you on it, I take it the proposed

    14    preliminary order of forfeiture and restitution order have been

    15    negotiated between the government and the defense.

    16              MR. SCHWARTZ:  No.  Actually, we just received them

    17    moments ago.

    18              THE COURT:  All right.  Then I will call on you when

    19    it's your turn just to get your take on them, whether there's

    20    any issue with either of them.

    21              MR. SCHWARTZ:  OK.  I can give you the short answer

    22    now --

    23              THE COURT:  Go ahead.

    24              MR. SCHWARTZ:  -- which is on a quick read, I had the

    25    same reaction to the restitution order that your Honor did.

M99WsadS

 1    And frankly, with a single-defendant, single-victim case, I

 2    don't even know why we need a separate restitution order

 3    because it can be done in the judgment itself, but as long as

 4    the Court adopts the restitution mechanics that are set forth

 5    in the PSR, there's no objection.

 6            THE COURT:  Fine.  So to be clear, the restitution

 7    order, which is bare bones, is unobjectionable, but you are in

 8    support of my adopting essentially the procedures, including

 9    the installment payment one, that are set out in the PSR;

10    you're good with that.

11            MR. SCHWARTZ:  Yes.

12            THE COURT:  OK.

13            And as to forfeiture.

14            MR. SCHWARTZ:  I think we probably are going to need a

15    little time with that, so what I would suggest is that your

16    Honor orally impose judgment, forfeiture in the amount, and I

17    think we can come back to you early next week with any issues

18    with respect to the form of document.  There's one issue

19    already that I discussed very briefly with Mr. Lenow, but it

20    should be easy to work out.

21            THE COURT:  Mr. Lenow, any problem with that?

22            MR. LENOW:  We have no objection, Judge.

23            THE COURT:  OK.  So what I will do is I will orally

24    impose forfeiture and the amount and give you until, let us

25    say, a week from now to submit an agreed-upon preliminary order

M99WsadS

1    of forfeiture.

2              All right.  Very good.

3              Time served, just so I have the understanding that

4    there's a common vocabulary here, the defense is seeking such a

5    sentence, what is the government's view as to what that amounts

6    to; how many days?

7              MR. LENOW:  Judge, my recollection is that -- well,

8    Judge, if I could just have a moment, please?

9              THE COURT:  Yes, of course.

10             MR. LENOW:  Judge, we've conferred, and both sides'

11   understanding is that Mr. Sadleir never spent a night in jail.

12   He was in jail -- he was in custody for some period of hours on

13   the day of his arrest in California, but he was bailed that day

14   to home confinement in California on the day of his arrest.  So

15   I mean I guess -- I don't know how the Bureau of Prisons --

16             (Indiscernible overlap)

17             THE COURT:  -- formality of the one day on which he

18   was subject to a postarrest restraint.

19             MR. LENOW:  Yes.

20             THE COURT:  OK.

21             I think I can safely address this publicly, but

22   evidently there was some effort by Mr. Sadleir to quote/unquote

23   cooperate which did not result in anything apparently close to

24   a cooperation agreement.  It may be that there's something that

25   you're unable to say in terms of the specifics, but I

M99WsadS

1    understand at the get-go that there was no discussion by

2    Mr. Sadleir of the offense conduct either underlying this case

3    or the PPP fraud.  Is that correct?

4            MR. LENOW:  That's correct, Judge.

5            THE COURT:  Is there anything you can elaborate upon

6    independent of that as to why the government found no basis to

7    sign Mr. Sadleir up for an agreement?

8            MR. LENOW:  Sure.

9            And I think Mr. Sadleir provided some information

10   about conduct that he thought may have been unlawful that's

11   unrelated to this conduct in this case and unrelated to the

12   Cairn Capital case, unrelated to the PPP fraud, and it was not

13   firsthand knowledge that unlawful conduct occurred but, based

14   on a business transaction, a suspicion that something might not

15   have been aboveboard.  We investigated that, those facts, and

16   we determined that it did not appear to be a crime.

17           It was not an issue with us believing Mr. Sadleir's

18   information was not credible.  It was more an issue of when we

19   followed up on his suspicions, the suspicion of illegal conduct

20   was not borne out at least based upon the facts that we were

21   able to ascertain.

22           THE COURT:  OK.  It wasn't that there was a falsehood

23   made; it just didn't rise to the level of interesting the

24   government or in making out a free-standing crime.

25           MR. LENOW:  That's correct.

M99WsadS

```
1              THE COURT:  OK.

2              The defendant pled guilty close to the time of trial.

3     As you know, under the guidelines, for what it's worth, the

4     third point for acceptance of responsibility presupposes a plea

5     sufficiently beforehand -- usually the metric is two weeks or

6     more -- to avoid inconvenience to the parties.  Briefly, to

7     what degree did the government devote more resources to this

8     matter in the time period between -- well, to what degree did

9     the timing of the plea here, if one assumes that a plea

10    otherwise would have been two to three weeks, let's say, before

11    the trial, how much more additional work was done on the

12    account of the timing?

13             MR. LENOW:  Sure, Judge.

14             I would say a substantial amount of work, and

15    especially in a case like this that is a sophisticated white

16    collar offense, we, as your Honor may suspect, began preparing

17    far in advance of two weeks for trial.  So I would say the

18    month or two before trial we expended very substantial amount

19    of resources.  An additional AUSA was assigned to the case to

20    prepare for trial, and we spent many, many hours preparing

21    witnesses, collecting and stamping Jencks Act material, which

22    was produced, and briefing various issues association.  I would

23    say that there was a significant amount of time where, I think,

24    several AUSAs were spending virtually all of their time in the

25    several months preceding trial on this case.
```

M99Wsads

```
1              THE COURT:  All right.  Thank you.
2              Anything further from the government?
3              MR. LENOW:  No, Judge.
4              THE COURT:  OK.
5              Ms. Battle, the floor is yours.
6              MS. BATTLE:  Yes, your Honor.
7              As you just heard from the government and as you
8    already know, that you know the nature and circumstances
9    surrounding this case, and what we're here to do is just
10   provide you some context of those circumstances, some context
11   around the history and characteristics of Mr. Sadleir.
12             In doing so, we have no intention of taking away from
13   his guilty plea.  He takes full responsibility for his actions,
14   and in just a moment you will be able to hear from him and just
15   how emotional he is.  But by all accounts, from his family,
16   from the people who know him and from the people who have
17   worked for him, he is a good person.  He was -- he's a very
18   good husband.  He's a good father, and he tried very hard to be
19   a good boss.  And trying to be a good boss is partially why
20   we're here today.
21             It is true that Mr. Sadleir lied.  It is true that
22   when he got caught up in those lies, he created more lies but
23   he did so not to protect himself, not to protect his ego, but
24   to protect his family, his very young family here, who's
25   sitting here, under the age of six -- they are four and five
```

1    years old -- and he tried to protect his business.  He tried to

2    protect the third-party interests and then the investments that

3    were already made by BlackRock and others, and he tried to

4    protect those jobs, those more than three dozen jobs that he

5    had created for those that worked for him.

6              And if we look at the 3553 factors, they weigh in

7    favor of a nonguidelines, noncustodial sentence.

8              Mr. Sadleir has already been severely punished here,

9    not only by his family.  He is very shameful.  What has

10   occurred here, because of the public nature of the crime and of

11   the public nature that surrounded the case here, he has not

12   only caused himself reputational harm but that of his

13   colleagues, that of those who invested in him previously and

14   believed in him and had worked with him previously.  And that

15   has made him a bit of a pariah, and he will no longer able to

16   work in that same capacity in his field.

17             He's lost his job.  He's lost his business.  He's

18   embarrassed his family, and unfortunately, he also caused the

19   loss of those jobs right before Covid.  So those individuals,

20   those 36 individuals, three dozen individuals who worked for

21   him, who he tried so hard to keep those jobs, he lost them

22   right before Covid, and some of them are still unemployed.  He

23   will likely never be able to work in the industry again,

24   because of the coverage and nature of --

25             THE COURT:  Wait.  When he put in for the PPP fraud,

1   that was really to benefit him, not them, right?  In other

2   words, I appreciate he's not responsible for Covid, but he then

3   actually exploits Covid, and the money that he gets from that

4   fraud, it's not like he's actually using it for, for example,

5   his own employees.  He's using it for himself.  Is that

6   factually correct?

7           MR. SCHWARTZ:  No.  No, that's not a real fact.  As

8   with the government, we're not counsel of record in that case,

9   and I appreciate that there's the recommendation in

10  California -- here will be a recommendation that that sentence

11  run concurrently with this one, I'm also mindful of the fact

12  that that judge is going to go through an entire sentencing

13  process.

14          THE COURT:  Look, I've got a factual question.

15          MR. SCHWARTZ:  But, but --

16          THE COURT:  Here's the factual question, Mr. Schwartz.

17  Did the money from the PPP fraud go exclusively for the benefit

18  of employees to fill voids in their income created by the

19  pandemic?  My understanding is he has pled guilty to the

20  contrary.

21          (Defendant conferred with counsel)

22          MR. SCHWARTZ:  Yeah, right.

23          So, my understanding, which I was just confirming, was

24  that the money did, in fact, go to benefit Aviron and its

25  employees either directly in the form of benefits to them or

1    reimbursement to Mr. Sadleir for money that he had laid out for

2    the business.

3          THE COURT:  Sorry.  That doesn't count.  I'm asking

4    you, the PPP program, he's pled guilty to defrauding them.

5    What was the basis for that guilty plea?  I understood it was

6    that because he was putting in on false pretenses, like the

7    number of employees.  Isn't that correct?

8          MR. SCHWARTZ:  I think that the narrow -- and I

9    haven't reread the allocution recently, but I believe the

10    narrow basis for the allocution was that there were

11    misrepresentations in those applications in large part because

12    there were multiple applications that were overlapping with one

13    another, including with respect to use of proceeds.  I'm not

14    disagreeing with that, but I believe it's our position -- and I

15    can certainly supplement the record if this is of interest --

16    that an accounting for those funds would show that they either

17    went directly to Aviron employees or went to reimburse

18    Mr. Sadleir for money that he had laid out personally that

19    benefitted Aviron or its employees.

20          THE COURT:  Let me just pause on that.

21          Mr. Lenow, factually, what was the factual basis for

22    the plea to the PPP fraud?

23          MR. LENOW:  Judge, if I could just have a moment?

24          THE COURT:  Yes, please.

25          Let me just pause.

1          Mr. Schwartz, this is what is represented in the

2    government's sentencing submission -- I'm directing everyone to

3    page 7, the second-to-the-last paragraph:

4          "After Sadleir was forced out of Aviron due to the

5    discovery of the UCC fraud, he fraudulently obtained $1.7

6    million in loans under the Paycheck Protection Program for

7    Aviron entities.  Sadleir obtained the loans for three Aviron

8    entities by falsely representing that the funds would be used

9    to support payroll expenses for 33 employees at each company."

10         Pause there.  Is there anything factually inaccurate

11   about what I've just read?

12         MR. SCHWARTZ:  Right.  I think the emphasis is, as I

13   said, there were three applications that were essentially

14   redundant of one another.  And so if one looked at those as

15   three separate applications for three different companies that

16   had 33 employees, such that that money in the aggregate was

17   going to support 99 employees, that would be false.

18         THE COURT:  Right.  And I take it that was a problem,

19   that there was not -- these employees weren't each getting

20   three sets of paychecks.

21         MR. SCHWARTZ:  Well --

22         THE COURT:  The implication was that there are three

23   sets of 33 employees, not each employee is getting put in for

24   three times.

25         MR. SCHWARTZ:  Perhaps that's the implication.  We're

1    now getting into complexities with that case, which is why this

2    case went to the last moment.

3        THE COURT:  Well, the reality is, look, you're asking

4    that the sentence here be concurrent.  You can't have it both

5    ways.

6        MR. SCHWARTZ:  I'm not asking for anything today.  I'm

7    asking simply for you to impose sentence in this case today.

8    In California, several weeks from now, the judge will impose

9    sentence in that case, and the government, it is anticipated,

10   in that case will make a recommendation, which the Court may or

11   may not accept, to impose concurrent sentences.

12       THE COURT:  Right, but when you entered into the plea

13   agreement here, it was explicitly with the idea that there was

14   an interrelationship between the two cases, which ultimately

15   was presented to me, as my going first, and the government,

16   which is the only party that would potentially be asking for

17   anything other than a concurrent sentence, agreeing to

18   recommend concurrency.

19       MR. SCHWARTZ:  Actually, we approached this case in

20   exactly the opposite way because we anticipated that sentencing

21   would go forward in California first.  And so the carve-out in

22   the plea agreement in this case is if sentencing goes forward

23   in California first, the government had agreed to a downward

24   departure to carve that out.  So --

25       THE COURT:  And but the sentencing is going forward

M99WsadS

1    here first.

2              MR. SCHWARTZ:  Right.

3              THE COURT:  It's going forward today, and my

4    understanding is that the parties here are in agreement that I

5    should consider the California conduct but that the price of

6    that is that in the California case the government will bind

7    itself to a recommendation that the sentence there be

8    concurrent, *i.e.*, nothing incremental there.

9              MR. SCHWARTZ:  I mean I --

10             THE COURT:  We can't have a situation where you get to

11   say don't really consider the PPP in full here, but government,

12   bind yourself to concurrency there.  That's obviously not

13   workable.

14             MR. SCHWARTZ:  Well --

15             THE COURT:  You've got a guilty smile on your face.

16             MR. SCHWARTZ:  This is what, for a very long time, we

17   tried to do -- one agreement that encompassed all of this, and

18   that ended up being unworkable for various reasons of

19   governmental administration.  And so we're in the position of

20   being a little bit whipsawed.

21             I don't disagree that it's appropriate for your Honor

22   to consider any facts that you find to be relevant and that are

23   statutorily relevant to sentencing, and I don't disagree with

24   you that it's significant that there's going to be a

25   recommendation of concurrence.  At the same time, I think we

M99WsadS

1    can all agree we don't intend to make the sentencing in

2    California a dead letter.  Right?  The judge there has a

3    function of imposing sentence.

4           THE COURT:  The judge there also has to impose

5    restitution there, which is not something I have the authority

6    to do.

7           MR. SCHWARTZ:  True.

8           THE COURT:  But when it comes to the central

9    ingredient of what the term of imprisonment is, the government

10    here is doing something very important, which is the Justice

11    Department as a whole is saying, Judge Engelmayer, you impose

12    sentence here and we will recommend that the imprisonment

13    component of the California sentence be concurrent.  What

14    follows from that is that I need to consider the PPP fraud

15    here, and what I'm trying to get at is, the government says

16    that Mr. Sadleir put in for three separate PPP loans, each for

17    33 employees.  He didn't have 99 employees, and he didn't say,

18    in effect, each of these people is being put in for three

19    times.

20           Factually, is there anything wrong with what I've just

21    said?

22           MR. SCHWARTZ:  All right.  So let me say one other

23    structural point, and then I promise I'll answer the question.

24           The structural point is that you could interpret what

25    the government has done here as saying that your Honor should

1    sentence Mr. Sadleir for everything today.  You could also

2    interpret what the government has done as recognition that the

3    PPP case is immaterial in the context of this case.

4              THE COURT:  OK.

5              MR. SCHWARTZ:  And therefore, you should sentence for

6    this case without regard to --

7              THE COURT:  The way I'm understanding it is something

8    in the middle.  I'm imposing sentence for this case, but the

9    PPP fraud is exceptionally relevant, for essentially the

10   reasons Mr. Lenow said, to a number of 3553(a) factors.  So the

11   sentence, as a formal matter, is strictly about the two wire

12   frauds here, but the subsequent and more or less almost

13   immediately subsequent conduct of the PPP fraud does speak to,

14   for reasons we can all understand, various 3553(a) factors.

15             MR. SCHWARTZ:  So here's where I'm at.

16             THE COURT:  I'm now going to ask you my question

17   finally about the facts here.

18             MR. SCHWARTZ:  Yes.

19             THE COURT:  Yes or no, did he put in for three

20   separate PPP loans, each of 33 people, without there being 99

21   employees to benefit?

22             MR. SCHWARTZ:  Yes.  Here's what happened.

23             The PPP loans were all processed through the same

24   bank, Chase.  The Chase representative instructed Mr. Sadleir

25   to file redundant applications.  So each of them, yes, listed

1   33 employees, but they listed the same 33 employees.  There's

2   transparency around that and with Chase.

3        When those funds were funded, Chase retained the

4   proceeds of two of the loans, and only one of them was ever

5   made actually available to Mr. Sadleir.  That was the 1.7, or

6   whatever it was.  So 1.7 is not three loans.  It's one loan,

7   and that 1.7, as I said before, went either to benefit directly

8   Aviron employees or to reimburse Mr. Sadleir for money that he

9   had personally outlaid to Aviron employees.

10        So it is correct that he put in three applications,

11  asked for three different loans, each one of which said they

12  would support 33 employees, such that if you read that as 99

13  employees, that was false.  And he pled guilty to that and he

14  accepts responsibility for that.  But as to the ultimate point,

15  whether he benefitted personally and personally enriched

16  himself as a result of that, which I think is the bigger point,

17  the answer is no.

18            THE COURT:  Wait a minute.  The government said in its

19  sentencing letter:  "Sadleir expended a substantial amount of

20  these fraudulent loan proceeds on utility bills, mortgage

21  expenses, and his personal attorney, among other things."

22            MR. SCHWARTZ:  Right.

23            THE COURT:  Pause there.

24            MR. SCHWARTZ:  Right.

25            THE COURT:  Correct or not?

M99WsadS

1          MR. SCHWARTZ:  Again, it depends on how you do the

2     accounting.  So if Mr. Sadleir had fronted money that he was

3     not obliged to pay personally to the business and then

4     reimbursed himself from the PPP funds, that's then his money,

5     and if he uses it to pay for his own expenses --

6          THE COURT:  Did he disclose in applying for the loans

7     that he was going to use the money to pay himself for money he

8     claimed he had previously paid his employees?  Did he disclose

9     that?

10         MR. SCHWARTZ:  I can tell you from personal experience

11    that is not the way the PPP program works.

12         THE COURT:  Sorry.

13         MR. SCHWARTZ:  The answer is no.

14         THE COURT:  OK.

15         MR. SCHWARTZ:  I mean --

16         THE COURT:  But how the loan program works, if he's

17    putting in for money for the employees, not money for himself

18    because he previously paid people --

19         MR. SCHWARTZ:  But that is -- if he effectively gave

20    Aviron a bridge loan, which is what happened, and then the PPP

21    funds were used to effectively refinance that bridge loan, that

22    still would make it accurate to say that all of that money went

23    to benefit Aviron employees.

24         THE COURT:  Well, I mean the money had already

25    benefitted the Aviron employees before the PPP loan came to

M99WsadS

Mr. Sadleir.  And what you're not saying, the dog that isn't
barking here, is he told the people who were making the loan
that the money was going to be -- he didn't tell them the money
is going to reimburse me for money I've previously paid to my
employees.  That is not disputed, is it?

MR. SCHWARTZ:  He did not explicitly say that,
correct.

THE COURT:  Did he implicitly say that?  I mean we can
fence all day long here.  I'm happy to do it, but it sounds
like there was no disclosure that he came close to saying that.

MR. SCHWARTZ:  Again, I think it depends on how you
think things, and I can see the way that your Honor's thinking
about things, so I don't want to go in circles.

THE COURT:  I'm trying to get the facts, but when
there are qualifications he didn't explicitly say it, it leaves
open the possibility that you're saying that in some way he
implicitly told the lender that this is money that's actually
going, for instance, going to Mr. Sadleir.

MR. SCHWARTZ:  But I think if you are, for example,
keeping people on payroll that you otherwise would lay off in
expectation of getting the PPP money, and as a timing issue,
because that money is not yet in the door, you pinch your own
top pocket to pay for those people's payrolls so they don't get
fired, and then when the PPP money comes in, you pay yourself
back, I think that, at the very least, is implicitly correctly

1    saying that that money goes to benefit Aviron employees.

2              THE COURT:  Yes or no.  Is there anything in the loan

3    application that indicated to the bank that the money that was

4    being paid would go to either Mr. Sadleir or to pay personal

5    liabilities of his that were not to the employees but to

6    utilities or mortgage?

7              MR. SCHWARTZ:  I would have to double-check it to be

8    sure, but no.

9              THE COURT:  All right.

10             Go ahead, Ms. Battle.  Back to you.

11             MS. BATTLE:  Thank you, your Honor.

12             Even with that factor of the PPP loan, and that does

13   go to the 3553(a) factors, those factors still weigh in favor

14   of a nonguideline and a noncustodial sentence.  Again, because

15   he has been severely punished, because he has already received

16   a suspended SEC bar that effectively bars him from

17   participating in this industry, and because of the forfeiture

18   and the restitution that far exceed any assets that he has,

19   there has been severe punishment here.

20             Additionally, when it goes to the deterrence, those

21   purposes have already been served.  Again, he is a felon.  He

22   is barred from the industry, and the job loss and his business

23   being destroyed and collaterally destroying the -- having the

24   effect of destroying the lives of those dozens of employees and

25   as well as the humiliation and the $31 million of restitution,

M99WsadS

1    that's significant deterrences that will not allow him to,

2    would not allow him to commit any crime of this nature or a

3    crime again.

4           Additionally, there is no need to protect the

5    government or the public from Mr. Sadleir.  He has no -- no

6    likelihood of recidivism.  Again, he is barred from

7    fund-raising and has embarrassed his colleagues who have

8    decided they will no longer likely work with Mr. Sadleir in

9    this instance or in the industry.

10          Additionally, even though there are no requirements

11   for vocational training, Mr. Sadleir does have medical needs

12   that go beyond just the hypertension and the high cholesterol.

13   There is also his heart disease, which required him to have an

14   angioplasty and three medical scans.

15          In addition to that, Mr. Sadleir has spent his time,

16   actually, providing back to society in a way that he will not

17   be able to do from incarceration, from prison.  There is no

18   vocational training that would give what he is giving now, and

19   what he is doing, where he's working with NASA and with other

20   rocket scientists is actually way more beneficial for society

21   than he would, than would be for him to be in prison.

22          Indeed, there is the other sentencing ability of home

23   confinement and community service, and we believe that those

24   are appropriate nonguideline, noncustodial sentences available

25   to him, especially with the state of our prison system at this

moment as a result of Covid.

Additionally, your Honor, as a result of the overstated loss amount that we are not arguing, a guidelines sentence would actually result in sentencing disparities instead of avoiding them. As we pointed out in *Casper*, which is very much very similar to this case, where Casper, there, fraudulently obtained $43.3 million in loans, and he went on to attempt to induce nine other financial institutions to lend his company between 46 and $52 million each to refinance their loans. Then he went on to make up fake third parties, as is similar to what happened here. But even worse, Mr. Casper lied, said his daughter was dying of cancer, and even after postarrest, he continued to pursue and act in fraud.

And the adviser, the guidelines there were between 121 months and 151 months of incarceration, but instead of giving that sentence, the judge sentenced Casper to 18 months of imprisonment, pointing out that he was 50 years old, he had medical issues, he had family responsibilities, and that his children and his parents and other family members would suffer as a result of his term of incarceration.

That's exactly the case here. Mr. Sadleir is closely approaching 70 years old. His family depends heavily on him, seeing that they are five and four. I was corrected earlier when I said that someone was three, three years old. But because of this case and because of his actions, he will be the

1   one that will be the primary caretaker because his wife will

2   have to enter the workforce and take care of the family and be

3   the main breadwinner for the first time in their relationship.

4   So as a result, there will be significant havoc on this family

5   if there is a significant sentencing or if there is the, if

6   your Honor were to take the guidelines at their face.

7           Lastly, I would like to address that the victim here

8   in this situation who did not decide to speak, again,

9   Mr. Sadleir takes full responsibility and acknowledges what he

10  has done to the victims here, and you will be able to hear from

11  him.  But BlackRock itself has issued press releases why it did

12  not lose any money and BlackRock is not an average investor.

13  It is not a mom and pop.  It is not you or any other individual

14  who is an investor.  It is a large conglomerate worth billions

15  of dollars and then bragged to its investors and others and

16  shareholders that it did not lose any money in this situation.

17          The government here says that --

18          THE COURT:  How is it that BlackRock was made whole if

19  you're saying they didn't lose any money?  Are you saying that

20  somebody else paid restitution or there is insurance?  How can

21  that be accurate?

22          MS. BATTLE:  So, initially BlackRock announced a

23  write-down as a result of these actions, but then they

24  installed a restructuring officer at Aviron to assist in

25  maximizing value for the IC.  These are in BlackRock's own

1   words.  And then they also worked with the insurers.  So

2   BlackRock recovered $40 million through its own contributions

3   from BlackRock, and it also received $32 million.

4           THE COURT:  Let me see if I understand that.  At the

5   end of the day, what is defrauded in the first instance is a

6   fund for the benefit of the investors in the fund, right?

7           MS. BATTLE:  Yes.

8           THE COURT:  And if Mr. Sadleir defrauds the fund for

9   millions of dollars, either the investors in the fund stand to

10  lose or BlackRock can make the fund whole, which means,

11  ultimately, it gets left holding the bag, so to speak, as

12  opposed to the investor.  It sounded from what you've just said

13  that something like the latter is true -- that BlackRock

14  stepped up and protected the investors.

15           Is that your understanding?

16           MS. BATTLE:  That is not exactly the understanding.

17           The understanding is that in addition to the funds

18  provided by insurance, that BlackRock, with the restructuring

19  officer and the actions that it took made money off of the

20  those actions.  So it restructured the system.  It restructured

21  the fund and it restructured -- they didn't just give the money

22  to BIT; it actually made funds and made a better rate of return

23  on other assets.

24           MR. SCHWARTZ:  So, we don't have a complete accounting

25  of this, but between what BlackRock tells probation, as

M99WsadS

        1    reflected in the PSR, and BlackRock's own press releases, it

        2    looks like they recovered $72 million on account of this debt,

        3    which reflects payment in full plus a return equivalent to the

        4    average of the other investments in that particular fund.  That

        5    72 million, as best as I can tell, is comprised of 32 million

        6    in insurance recoveries and $40 million in what is described as

        7    "contributions by BlackRock and transactions relating to the

        8    defaulted loans."

        9            Now, I take that 40 million, and I look at what

       10    probation has said in paragraph 100, where they say that

       11    BlackRock paid 25 million to BIT, and I read that to say that

       12    by virtue of receivership over Aviron and liquidation of assets

       13    they recovered at least $15 million and contributed

       14    approximately $25 million in fresh capital to true up the

       15    investors to where they would otherwise be.

       16            THE COURT:  OK, but in other words, the investors are,

       17    in effect, being made whole through a combination of factors.

       18            MR. SCHWARTZ:  The investors are being more than made

       19    whole.  They're being made as if that was a performing

       20    investment.

       21            THE COURT:  Right, but it comes from somewhere.

       22    There's an insurance company in this chain of events that

       23    that's out a lot of money, right?

       24            MR. SCHWARTZ:  Yes.  So there's insurance --

       25            THE COURT:  Sorry.  Your client's saying no.  He's

shaking his head vigorously.  You're saying yes, which you had

pretty much, which follows from what you just told me.  There

was an insurance payment, right?  Money doesn't grow on trees.

Somebody lost money putting money back into this venture, and

it sounds like at least part of is an insurance situation.

            MR. SCHWARTZ:  Let me consult for a second.

            THE COURT:  Please do.

            MR. SCHWARTZ:  It appears there is a degree of

complexity to this, which is not surprising, but I think the

upshot, for these purposes, is the 32 million came from outside

sources, perhaps not as simple as simply the payoff of an

insurance policy but a more complicated reinsurance/business

transaction involving separate insurance that BlackRock was

providing itself but still outside money -- 32 -- and then the

other 40 was some combination, which we don't have total

transparency into, of liquidation of Aviron assets, which

should, by the way, mitigate restitution dollar for dollar,

and -- and fresh BlackRock money.

            THE COURT:  The 30-some-odd million dollars that's

reflected in the restitution order, $31,597,000, what does that

reflect?

            MR. SCHWARTZ:  The face amount.  So prior to whatever

mitigation there may be.

            THE COURT:  In other words, are you representing to me

that as we sit here today, Mr. Sadleir has already paid money

1      towards the $31,597,000?

2             MR. SCHWARTZ:  Mr. Sadleir has not paid anything, no.

3      So in that respect --

4             THE COURT:  In effect, if I wind up signing that

5      order, which you've indicated isn't a correct number, that is

6      an amount that remains in effect due from Mr. Sadleir to make

7      somebody whole.  The victim's identified.  The name keeps

8      coming up here.  I don't know why it needs to be sealed.  It's

9      BlackRock -- sorry -- just for fruitful conversation.  You're

10     not disputing that the restitution that's due BlackRock is over

11     $31 million.  What does that represent.

12            MR. SCHWARTZ:  I'm not disagreeing with that as the

13     correct calculation of restitution in the first instance, and

14     the methodology is laid out in the government's paper, but it

15     comes from two buckets.  It's roughly 3 million from what they

16     call the UCC fraud and 28 million from the main fraud, for lack

17     of a better word.  I think that some interrogation has to be

18     done after the fact, does not affect the order that you enter,

19     as to whether because BlackRock's loans were, in part, secured

20     and they have gotten recourse to Aviron's assets, liquidated

21     those assets, whether any of that recovery is mitigation.

22            THE COURT:  Understood.  That's what I was --

23            MR. SCHWARTZ:  And by the way, that would not affect

24     the forfeiture amount.  It wouldn't be a credit to the

25     forfeiture amount.

M99WsadS

1          THE COURT:  Understood.  OK.  That's clarifying.

2     Thank you.

3          Ms. Battle, let me just ask you, stepping back here,

4     you're asking for a time-served sentence, which I think we've

5     elicited amounts to a day and not even a night in prison.  From

6     the perspective of the message that is sent, can you articulate

7     how imposing a sentence of that, what message would that send

8     in terms of respect for the law?  What message comes from the

9     sentence you're urging?

10          MS. BATTLE:  I think, your Honor, that it sends the

11     message that forfeiture, through restitution, and through

12     community service and through -- through the continued

13     ramifications of one's actions, there can be respect for the

14     law.

15          I think, in addition, it also shows that we are not

16     only looking at the crime and we are also making the punishment

17     fit the offender.  And in doing so, we're following the United

18     States Supreme Court in *Pepper*, but we're also considering the

19     effects that incarceration has on families and on children.

20     And I think that respect and the respect of families and the

21     respect for what could possibly happen to those children as a

22     result could also (indiscernible) society and shows that we

23     have that respect for the laws as well.

24          THE COURT:  There's a letter in the sentencing packet

25     submitted by the defense from Matthew Acevedo, who -- usually

1    these letters are testimonials to the defendant.  The letter

2    more or less is a machine-gunning of BlackRock, ending with

3    calling BlackRock the white collar financial Mafia and going

4    through a whole account of how BlackRock essentially, and not

5    Mr. Sadleir, is responsible for this situation.

6            Is that the defense's position?

7            MS. BATTLE:  That is not the defense's position.

8            THE COURT:  Why is that letter in the sentencing

9    packet?  It doesn't say word one about why Mr. Sadleir is even

10   a nice guy?  It just basically trashes the victim.  What's the

11   point of that?

12           MS. BATTLE:  I think Mr. Sadleir has shown to his

13   friends and his family that he is a good man and they were

14   extremely passionate about this and wanted to be heard,

15   especially those who had feelings regarding BlackRock.

16           THE COURT:  I appreciate that, but at the end of the

17   day, the defense is the gatekeeper of what you're choosing to

18   submit.  It sure looks as if somebody on the defense team

19   wanted to throw a big mud ball at BlackRock without taking

20   responsibility for it.  This is not a testimonial to

21   Mr. Sadleir.  It acknowledges factually that he's known

22   Mr. Sadleir for four years and then proceeds to trash

23   BlackRock.  I just don't understand what that's doing here.

24           It doesn't help Mr. Sadleir in terms of any 3553(a)

25   factor.  It doesn't speak to his history and characteristics.

1    It just, for all intents and purposes, is overwhelmingly about

2    why BlackRock is a bad actor.

3           Does Mr. Sadlier embrace what is said in that letter?

4           MS. BATTLE:  Mr. Sadleir embraces BlackRock as a

5    victim, and later, you'll be able to hear from his own words --

6    (indiscernible)

7           THE COURT:  All right.  Look, just for future

8    reference, I expect some curation of the letters I get.  This

9    one really looked like it was aimed at trashing the victim, not

10   at really enhancing any 3553(a) factor.  It is what it is.

11          MS. BATTLE:  Yes, your Honor.

12          THE COURT:  Go ahead.

13          MS. BATTLE:  Thank you.

14          And by the way, the government says that Mr. Sadleir

15   has such a talent and has such ability, and as seen by the

16   submissions, we have seen that he's a good man, he's a good

17   husband and a good father.  And again, as the United States

18   Supreme Court said, in *Pepper v. United States*, in crafting a

19   sentence, the punishment should fit the offender and not merely

20   the crime.  Mr. Sadleir should not be locked away but made

21   available to benefit the public, as he has in his work since he

22   has been arrested as well as at home with his children as his

23   wife seeks work.

24          Thank you, your Honor.

25          THE COURT:  All right.  Thank you.

1          MR. SCHWARTZ:  May I?  Sorry.  I just want to correct

2   something --

3          THE COURT:  Yes.

4          MR. SCHWARTZ:  I said before when we were discussing

5   the PPP loan.

6          I think I said before that 1.7 million reflected not

7   all three loans but each one and that he only kept or had

8   access to the proceeds of one of the three.  1.7 was the value

9   of all three in the aggregate, not each one.  It is still true,

10  however, that two of the loans never left the bank and he only

11  had access to one.

12         The best, I think, for these purposes, recitation of

13  facts is set out in the plea agreement itself.  So if you look

14  at the plea agreement in the California case, which is attached

15  as exhibit F to our sentencing submission, there is a

16  factual-basis section that's set out at pages 10 to 14.

17  Obviously, that is a stipulation between the parties, and I

18  would suggest if your Honor believes it is appropriate to look

19  at the facts of that case, that that's the best source rather

20  than the counsel here, who are not involved in that case.

21         THE COURT:  All right.  Looking at page 12, it says

22  that in April 2020, in Los Angeles County, the defendant

23  submitted plural fraudulent PPP loan applications on behalf of

24  Aviron Group, Aviron Leasing and Aviron Licensing, through

25  which the defendant falsely represented to the SBA and the

1    SBA's administering financial institution that each company

2    was operational, had 33 employees, and was incurring

3    substantial quarterly payroll costs and that defendant would

4    spend the PPP loan proceeds on business operational expenses.

5    And then it goes on to elaborate on those, including that upon

6    receipt of the approved -- upon approval of the three and the

7    receipt of the funds, it adds that the defendant spent $409,103

8    at least on personal bank transfers and expenditures.  For

9    instance, defendant transferred $185,000 to the personal

10   account of his wife; transferred $98 000 to a personal account

11   in defendant's name; used more than 85,000 to pay down credit

12   cards held in the names of the defendant and his wife and

13   expended a substantial amount of the fraudulent loan proceeds

14   on utility bills, mortgage expenses, and his personal attorney,

15   among other things.

16          I think that's more or less the question that I asked

17   you, and you're asking me to credit the factual representations

18   in the California plea agreement.

19          MR. SCHWARTZ:  Those are factual representations that

20   have been stipulated by the parties.

21          I'd just point to the very last sentence of that

22   section, which emphasizes that the actual loss here was

23   282,000, so of that 409 that we were just looking at, some of

24   that is just accounting internal bank transfers, but that money

25   was recovered.

M99WsadS

| | |
|---|---|
| 1 | THE COURT:  All right.  Thank you.  That's helpful. |
| 2 | All right.  Government counsel has asked that we alert |
| 3 | a judge before whom Mr. Lenow has an upcoming proceeding that |
| 4 | Mr. Lenow is needed here. |
| 5 | You are indeed, and Mr. Smallman will let my colleague |
| 6 | know.  Thank you for the heads-up. |
| 7 | MR. LENOW:  Thank you, Judge. |
| 8 | THE COURT:  All right. |
| 9 | With that, anything else from defense counsel before I |
| 10 | turn to Mr. Sadleir? |
| 11 | No? |
| 12 | MR. SCHWARTZ:  No, your Honor. |
| 13 | THE COURT:  Mr. Sadleir, do you wish to make a |
| 14 | statement? |
| 15 | THE DEFENDANT:  I do, your Honor. |
| 16 | THE COURT:  Just kindly move the microphone closer. |
| 17 | Thank you. |
| 18 | THE DEFENDANT:  Your Honor, for the past nine months |
| 19 | following my guilty plea and over the last two and a half years |
| 20 | since my arrest, I've been able to reflect and evaluate what |
| 21 | compelled me to resort to criminal conduct. |
| 22 | There is no excuse or justification for my actions. |
| 23 | But I now have clarity and understanding of my motivation and |
| 24 | the flawed reasoning that caused me to harm and betray so many |
| 25 | people that trusted me. |

M99WsadS

1          I apologize to my wife Hannah, who, in spite of vowing

2     to take me for better or worse, didn't sign up for this

3     excessive burden.  I apologize to my six children, and

4     particularly to my two youngest boys, William and Remington,

5     for not providing the example of honesty and integrity that

6     they expected from their father.

7          I apologize to all of the executives and employees at

8     Aviron and to their families for the demise of their company,

9     the resulting financial strain, and the associated

10    embarrassment.  I'm also deeply sorry to all of Aviron's

11    vendors and service providers who trusted me and relied on my

12    perseverance and determination, many of whom were left being

13    owed substantial amounts and who were ultimately forsaken when

14    BlackRock took over the company.

15         And I apologize to my country, particularly to the

16    Department of Justice.  Dealing with my criminal conduct is

17    congesting an already immense workload and a court docket.  I

18    appreciate the professionalism, kindness, and respect shown to

19    me by my pretrial service officer in Los Angeles.  I also

20    respect the work required by the prosecutors and defense

21    counsel.  The DOJ is one area of the federal government that

22    attracts the best and the brightest.  I apologize for the time

23    invested in this because of my conduct and for the distraction

24    that it has caused the Court.  I respect and honor the work

25    that you do.

1           I also apologize to BlackRock and to its

2    representatives, particularly the two primary representatives

3    that I worked with that lost their jobs or were fired over

4    this.  I know it's caused trauma in their families as well, and

5    I apologize.

6           THE COURT:  Just move a little bit back from the mike.

7           THE DEFENDANT:  OK.

8           THE COURT:  You're echoing.

9           Thank you.

10           THE DEFENDANT:  All right.  Thank you.

11           Your Honor, I acknowledge that sentencing is likely

12    the most difficult aspect of your job.  Balancing mercy with

13    the demands of justice, while also finding humanity, not

14    succumbing to institutional inertia, and dealing with the

15    lamentations of grappling with the federal sentencing

16    guidelines in what some feel has become routine and clerical,

17    is undoubtedly challenging.  Today's hearing is certainly not

18    unusual.  While it may be routine for the government, it is

19    life altering for me and my young family.

20           I apologize again, your Honor.  I take full

21    responsibility for my actions.  I am mildly relieved that

22    through the assets and collateral I put in place, including a

23    surety bond, that BlackRock was made whole, that they were able

24    to sell the Aviron assets and recover from an insurance bond

25    that I put in place.  It was not the insurance company that

1    paid that, but rather -- rather a beneficiary that was sitting

2    behind BlackRock who decided that it would be better to pay

3    BlackRock 32 million and free up their senior position so they

4    could in turn collect $240 million from the insurance company

5    in New Zealand.  It was through that process of a company

6    called Aviron Re, not CBL Insurance, that BlackRock was able to

7    be made whole.  In fact, BlackRock, said, in a press release,

8    "BIT fully recovered the amounts loaned to Aviron and realized

9    a rate of return that is the same or better than the rate of

10   return of the other assets in BIT's investment portfolio during

11   the relevant investment periods."  And BIT's share price

12   rebounded immediately.

13          While I'm not in any way defending my actions, I am

14   pleased that my intention all along was to make sure that

15   BlackRock never lost any money, and in fact, the assets that I

16   and my team put in place helped protect BlackRock from ever

17   having or suffering a loss.

18          Notwithstanding, again, I take full responsibility.

19   There's no justification for my actions.  In my mind, I thought

20   the ends justified the means.  That's an important lesson that

21   I've learned.  There is no circumstance or situation where the

22   ends justify the means.  I betrayed my family, my upbringing,

23   my education, and many people who trusted me, and in particular

24   BlackRock.  The two individuals at BlackRock really trusted me.

25   They went out on a limb for the company and although there are

1    things that I wish had been done differently between me and

2    them, ultimately, I'm the one that took actions that result in

3    this criminal conduct.  Your Honor, I ask for their

4    forgiveness, the forgiveness of my family, and again, I am

5    deeply saddened and ashamed of my conduct.

6            THE COURT:  All right.  Thank you, Mr. Sadleir.

7            We've been proceeding for a while.  I want to give

8    everybody a comfort break.  We'll take a ten-minute recess, and

9    then I'll come back and impose sentence.

10           (Recess)

11           THE COURT:  You may be seated.

12           Is there any reason why sentence should not now be

13   imposed?

14           MR. SCHWARTZ:  No, your Honor.

15           MS. BATTLE:  No, your Honor.

16           THE COURT:  All right.

17           As I have stated, the guideline range that applies to

18   this case is between 108 and 135 months' imprisonment.

19           Under the Supreme Court's decision in Booker and the

20   cases that have followed it, the guidelines range is only one

21   factor that a court must consider in deciding the appropriate

22   sentence.  The Court is also required to consider the other

23   factors set forth in the sentencing statute, Title 18, United

24   States Code, Section 3553(a).  These factors include:

25           The nature and circumstances of the offense and the

1    history and characteristics of the defendant; the need for the

2    sentence imposed to reflect the seriousness of the offense, to

3    promote respect for the law, and to provide just punishment for

4    the offense; the need for the sentence imposed to afford

5    adequate deterrence to criminal conduct; the need for the

6    sentence imposed to protect and the need for the sentence

7    imposed to provide the defendant with needed education or

8    vocational training, medical care, or other correctional

9    treatment in the most effective manner.  The Court must also

10   impose a sentence that is aimed at avoiding unwarranted

11   sentence disparities among defendants with similar records who

12   have been found guilty of similar conduct.

13           The Court, above all, is required to impose a sentence

14   that is sufficient but no greater than necessary to comply with

15   the purposes I've just summarized, all considered.

16           Mr. Sadleir, I find that the sentence I'm about to

17   pronounce here is sufficient but not greater than necessary to

18   satisfy, all in, the purposes of sentencing reflected in the

19   sentencing statute.

20           I have spent a lot of time, Mr. Sadleir, reflecting on

21   the just and proper sentence for you.  I've been focused on

22   that -- frankly, I was focused on that well before the original

23   June 14 sentencing date.  It had to be adjourned twice for

24   reasons unrelated to this case.  Since then I've continued to

25   turn over in my mind how the 3553(a) factors and the

1    appropriate purposes of sentencing apply in this unusual,

2    complex, challenging, and disturbing case, and these are my

3    thoughts.  And forgive me, but this is going to take a few

4    minutes.

5         The parties are very far apart in the prison sentences

6    they recommend.  The government recommends a sentence of 108

7    months -- that is to say, nine years at the bottom of the

8    guidelines range, which spans nine years to 11-1/4 years.  The

9    probation department makes the same recommendation -- 108

10   months.  The defense seeks a sentence of time served, and I

11   understand from what I've learned today that translates into

12   essentially one day.

13        I'm going to be really blunt with you, Mr. Sadleir, at

14   the outset.  The idea of a time-served sentence in your case is

15   a complete nonstarter.  Mostly that's because of the

16   seriousness of your offenses, meaning the multiple fraud

17   offenses that you committed between 2016 and 2020.  That

18   Section 3553(a) factor and the related factors of the need for

19   just punishment and the need for the sentence imposed to

20   promote respect for the law would not be satisfied by a

21   noncustodial sentence.  In my considered judgment, the interest

22   in just punishment, in fact, would be very badly offended by

23   such a sentence.  My judgment is that a substantial prison

24   sentence is necessary here to respect those factors, and by

25   that I mean a sentence measured in years, a sentence that will

1    keep you in prison well into your 70s.

2          I know that is hard to hear.  I'm saying it right up

3    front, and I'm saying it at the outset to condition your

4    expectations as you listen to these remarks.

5          In reaching the conclusion that a substantial prison

6    sentence is necessary here, I have considered the sentencing

7    guidelines' recommendation as to your sentence, but I'm giving

8    it limited weight.  I find the guidelines approach to the

9    sentence in this case problematic for two reasons:  First, in

10   general, the guidelines are empirically out of date.  They're

11   based on the pattern of sentences imposed by judges years,

12   sometimes even decades, ago.  And they have not been refreshed

13   since.

14         And second, in cases like this one, where the

15   guidelines' recommendation is largely driven by quantity, and

16   here of the monetary amount of the fraud loss, the ultimate

17   guidelines recommendation tends to give excessive weight to

18   that quantifiable factor.  The recommendation tends to give

19   short shrift to important qualitative factors, such as the

20   circumstances under which the offense or offenses came about.

21   And that has led me and other judges, in fraud cases involving

22   astronomical loss amounts, often to impose below-guidelines

23   sentences.  The defense, quite rightly, cites some of those

24   cases in its memorandum.

25         Here, I regard the guideline recommendation as useful

M99WsadS

       1    but only in a broad directional sentence.  The inputs that lead

       2    the guidelines to recommend a nine to 11 year sentence captures

       3    some important insights.  The guidelines capture that your

       4    fraud offenses were carried out on a very large scale and

       5    deprived your victims of a lot of money -- hence, the 22-level

       6    increase for a loss of over $25 million.  The guidelines

       7    capture that your offenses were calculated and plotted --

       8    hence, the two-level increase for sophisticated means.  And

       9    they capture that your conduct stood anyway to injure a

      10    financial institution -- hence, the two-level increase for

      11    having derived more than $1 million from a financial

      12    institution.  And the guidelines also capture that before

      13    committing these offenses, you had no prior criminal history.

      14    Hence, you fit within criminal history category I.

      15            But beyond those, the guidelines are really blind to

      16    factors that are important to your sentence.  They don't

      17    capture important aspects of the crimes, including aspects that

      18    make your conduct, frankly, more serious than the guidelines

      19    presuppose.  At the same time the guidelines miss out on

      20    important facts about you personally and your journey that I

      21    find genuinely impressive and mitigating.  So please know that

      22    while you're going to be disappointed with the sentence I

      23    impose today if you thought that the time-served recommendation

      24    was plausible, please understand that the sentence is not based

      25    on the guidelines except in the very broad directional sense

1    that the guidelines reinforce the need, which I find obvious

2    here, for a substantial prison sentence.  It's based on a

3    considered assessment of the facts in your case and what they

4    say about a just and meaningful sentence in light of all of the

5    3553(a) factors.

6         Turning to that, your offenses are serious for a

7    number of reasons.  For one, you committed three distinct

8    serious frauds.

9         First, there was the advertising scheme.  In that one

10   you lied to investors, specifically a BlackRock fund, that

11   invested $75 million in Aviron, the company that you ran.  You

12   told them that their money had been invested in prepaid media

13   credits that stood to benefit their investment.  That was a

14   lie.  Instead you diverted more than $25 million of that money

15   into a sham company you created called Group M Media Services

16   LLC.  You used that money for a variety of unauthorized

17   purposes.  Some were personal to you -- most obviously the $14

18   million Beverly Hills residence.  Those diversions occurred in

19   2016 and 2017 and the cover-up, including your fabrication of a

20   persona named Amanda Stevens, whom you used to throw BlackRock

21   off your trail -- that occurred in 2019 and 2020.

22        Second, there was the UCC fraud.  It ultimately

23   victimized BlackRock too.  In it, because you were unsatisfied,

24   apparently, with stealing BlackRock's money, you arranged to

25   appropriate assets that had secured BlackRock's loans to

Aviron.  You did that by forging the signature of a BlackRock

portfolio manager, Randy Robertson, a real live human being, to

make it appear that he had authorized the release of UCC liens

on those assets, which he most certainly did not.  You then

sold those assets.

And third, there was the PPP fraud.  Although your

guilty plea to that offense was in a California federal court,

the parties have agreed to recommend that the sentence there be

concurrent to the sentence I impose here.  As a result,

assuming that the judge in your California case will heed that

recommendation, it's essential that the sentence here at least

take into account the fact of the PPP fraud, lest it

effectively go unpunished or underpunished.  That fraud began

after the pandemic started in 2020, and it began after your

frauds on BlackRock had been detected, after a criminal

investigation into those frauds was underway and known to you,

and after BlackRock, in fact, had taken civil action against

you.

Rather than learning a lesson from all of that, soon

after the Paycheck Protection Program had begun to help

businesses continue to pay employees during the pandemic, you

exploited it, and although there was some equivocation from the

back table, I am relying today on the account of that offense

that is contained in the plea agreement that you entered into

in federal court in California that is attached to the

1    defense's plea submission in this case.  According to that you

2    made false statements to the PPP program and its administrators

3    about your payroll expenses, number of employees, and

4    operational status.  The $1.7 million that was obtained based

5    on those false statements you used, in meaningful part, for

6    personal use and other unauthorized uses without, again,

7    telling the lenders that you intended to do that with their

8    money.

9          These scams are gravely serious for obvious reasons.

10   They spanned a four-year period.  They deprived victims,

11   private and public, of millions of dollars.  And the money you

12   stole from your victims was real hard cash.  In some fraud

13   cases, the loss is measured by the drop in a company's market

14   capitalization or the valuation of an asset.  This crime

15   involved taking cold hard cash, whether from BlackRock in the

16   case of the advertising scheme or the federal government and,

17   therefore, indirectly its taxpayers in the PPP scheme.

18         Your sentencing submission portrays your crimes here

19   as aberrational.  I'm completely unpersuaded by that portrait.

20   It is refuted by the fact that you carried off a series of

21   crimes over a period of years.  Twice you found a new unlawful

22   means to obtain money when an old one ran dry or as the

23   authorities were closing in on an old one -- once when you

24   pivoted from the advertising scheme to the UCC scheme, and

25   later, when you pivoted in 2020 to the PPP scheme.

1          A defendant with an otherwise clean record who commits

2     a brief one-time offense can fairly call the crime

3     aberrational.  I've had cases like that -- defendants, for

4     example, who help themselves to someone else's money

5     opportunistically during a short period, with little

6     forethought or planning, or defendants who briefly fell in with

7     a bad element and briefly joined in criminal conduct that

8     others initiated.  That is not the portrait I see here.

9          It is true that you had a clean record and record

10     indeed of good works before starting in on the advertising

11     scheme in 2016.  And had you stopped looting BlackRock soon

12     after you started, then the crime perhaps could be considered

13     aberrational.  But you let the advertising scheme persist for a

14     couple of years with the price tag rising to more than $25

15     million, and as reflected in the PSR, you took lots of steps

16     along the way to deceive others and cover up the fraud.  And

17     from then on, you went on to other fraud schemes -- the UCC

18     scheme and the PPP scheme -- with no evidence of hesitation or

19     remorse.

20          In all these schemes, you were the leader.  You

21     carried these off, and by all accounts, you acted alone.  And

22     the schemes arguably got more exploitative over time.  You were

23     an accomplished CEO who had credentials and skills and

24     relationships and advantages and life and work experience that

25     others would dream of and which you could have put to lawful

M99WsadS

1   use to make money as you had earlier in your life.  But your

2   final scheme, the PPP scheme, entailed defrauding the

3   government during a once-in-a-century pandemic of money it had

4   set aside for vulnerable workers who otherwise would have been

5   unable to be paid.  That is very, very low.

6            So I find it profoundly wrong to view your crime as a

7   one-time aberrational blip.  Yours is not a case of a fleeting,

8   one time, immediately regretted mistake for which a substantial

9   punishment would be disproportionate.  And I say this

10  advisedly -- your case is a case of a person "Breaking Bad."

11  Late in your career, you dipped your toe in crime, but rather

12  than being repelled, you found that it paid, and you gradually

13  plunged deeper and deeper and deeper in.

14           Put a little differently, for the first four decades

15  of your working life, your career was that of an executive.

16  For the last four years of your life before your arrest, in

17  substantial part, your career was that of a criminal.

18           Your crimes are also serious, as the government points

19  out, because of the diverse and sophisticated and audacious

20  means you used to pull them off.  You invented a company, Group

21  M LLC, whose name was nearly identical to a legitimate company

22  in the advertising space, so as to fake out BlackRock about

23  where its millions were going.  You created a website for the

24  fake company.  You invented a person, Amanda Stevens, and

25  corresponded using her name to parry BlackRock's refund

1    requests.  You even made up a story about Amanda's being on

2    maternity leave and attending a baby shower.  You developed a

3    ruse to shed a UCC lien, which required you to forge the

4    signature of a BlackRock executive.

5         And in the PPP scam, in the spring of 2020, when the

6    U.S. and its economy seemed at times to be teetering, you chose

7    to make up a false narrative about three companies and their

8    phantom employees -- *i.e.*, three times 33 rather than one time

9    33 -- to enable you to feed at government trough.  Although

10   there is no evidence that it, in fact, did so, at the time you

11   carried out the PPP fraud, your conduct in that fraud at least

12   had the potential to crowd out deserving applicants for PPP

13   funds.  That makes it all the more serious.

14        Your crimes were also serious because they were

15   motivated in part by greed.  I've seen frauds where a defendant

16   gets into debt and fraudulently secures loans to enable him to

17   pay back his creditors.  In those cases, although the victim

18   experiences the same monetary loss, the defendant at least put

19   the money entirely to repay earlier creditors.  There appears

20   to be a degree of that here in that Aviron was struggling and

21   you used some of the fruits of the advertising scheme to pay

22   its expenses, no doubt about that.  But there was also a

23   significant personal greed dimension to this offense.

24        You bought a $14 million residence in Beverly Hills,

25   and to call that purchase, as your sentencing submission does,

M99WsadS

1    an investment in valuable Los Angeles real estate really

2    obfuscates the facts.  You weren't investing in it for someone

3    else living in it with the rent being payable, say, to

4    BlackRock.  The Beverly Hills residence wasn't being held in

5    trust for BlackRock.  The investors weren't going to live

6    there.  This was a personal residence for you and your family

7    to use, and the emails between you and your interior decorator

8    and the decorator's final bill -- these are Government Exhibits

9    339 and 337 attached to the sentencing submission of the

10   government -- prove the point.  They put the lie to the idea

11   that this was some sort of abstract quote/unquote investment

12   disconnected from your family's personal enjoyment.

13          Those expenditures described there were overtly for

14   the benefit of you and your wife and your young children.

15   There are repeated expenses on Government Exhibit 337 for

16   nursery items and window treatments for your boys' bedroom and

17   for custom-curved sofas and for a resin coffee table and for

18   family room throw pillows, and for a crib and nursery carpet.

19   Your email to the designer at Government Exhibit 339 from

20   October 2017, deep into the advertising fraud, is a wish list

21   of your likes, not those of the future buyer, for your home.

22   You set out what you wanted as to your "man cave" and rec room

23   and dining room and wallpaper in the children's room, and so

24   forth.

25          The record leaves no indication that you could have

M99WsadS

```
 1    afforded this on your own.  The inference is inescapable that a
 2    motive for the fraud on BlackRock was to use BlackRock's money
 3    to live a life of luxury in Beverly Hills with your wife and
 4    children.  And the same is true of the PPP fraud.  Within days
 5    of the PPP loans being funded by the United States, you
 6    transferred -- and this is right out of the plea agreement --
 7    $966,000, nearly a million dollars, to your personal checking
 8    account.  You then used those funds to pay for utility bills,
 9    mortgage expenses, and your personal attorney.
10            I'm going to sum up the first set of 3553(a) factors
11    this way:  I have been on the bench, effective a couple weeks
12    from now, for 11 years.  Yours was one of the most brazen and
13    cynical and persistent and, frankly, given all the advantages
14    you had and all the lawful means of accumulating wealth at your
15    disposal, disappointing fraud schemes I have seen.  As a matter
16    of just punishment, a substantial prison term is unavoidably
17    necessary.
18            Turning to other 3553(a) factors, the Court must also
19    consider the interest in general deterrence here.  It refers to
20    the need for the sentence imposed to send a message to other
21    people that is sufficient to deter them from engaging in
22    similar crime.  There is such an interest here.  White collar
23    frauds on investors and lenders and crimes by corporate
24    executives can be hard to detect.  They can be time-consuming
25    to investigate.  They can be difficult to prove.  It's
```

M99WsadS

important that a message go out to other people who rip off

lenders and investors and operate in a host of ways as if the

law doesn't apply to them.  The message is if you commit such a

crime and if you get caught, you'll do real time.  It's not a

defense that you have a title and assets and that you wear a

suit and a tie.

General deterrence particularly matters here because

when crimes like this are successfully prosecuted, as here,

they tend to get attention among corporations and of their

executives.  All that said, as I've said in other white collar

cases, even a short sentence can have a huge deterrent effect

on other people.  I treat the interest in general deterrence

here as supporting the need for some prison sentence, but

unlike the first set of factors relating to just punishment, it

doesn't require that the sentence be particularly long.

Relatedly, under Section 3553(a), I am required to

consider the interest in specific deterrence.  That refers to

the need for the sentence I impose to send a message to the

particular defendant before me -- here, meaning you,

Mr. Sadleir -- that is sufficient to deter him from committing

future crimes.  In many fraud schemes where the defendant

presents as a repeated offender or likely recidivist, that

interest weighs heavily.

Here, in contrast, although that interest is present

to a degree, it's only so, in my judgment, to a very limited

M99WsadS

1  extent.  I do not know, Mr. Sadleir, whether to credit your

2  claims to be truly repentant in a way that might hold you back

3  from committing future crimes.  Your conduct leaves room for

4  doubt.  Even when the walls were closing in on the advertising

5  scheme and when the message should have gotten through to you

6  by then loud and clear not to commit further crimes lest you

7  court further punishment, you pivoted to the later frauds,

8  including the PPP fraud.  And unlike defendants who admit their

9  guilt promptly, you waited until nearly the last minute to

10  plead guilty.  So there is some reason to conclude that you

11  threw in the towel and you pled guilty not because you were

12  truly remorseful, but only because you got caught and had no

13  defense and appreciated that trial was not going to end well

14  for you.

15         That said, even if the impulse might still be there to

16  help yourself to somebody else's money, at your age, and

17  particularly with the notoriety of your conviction, it's

18  realistically unlikely that any sane person outside your family

19  will entrust you with their money.  I do not think the

20  opportunity to commit large-scale financial crimes is likely to

21  be there again for you.  And there's no reason -- zero

22  reason -- to believe that you would commit any other type of

23  crime.

24         And so bottom line is, for those very pragmatic

25  reasons, the interest in specific deterrence, although

1    nominally present, is not, in my judgment, weighty here.  And

2    for the same reason, unlike in many cases, the Section 3553(a)

3    interest in public protection, or incapacitation, is not

4    weighty here either.  That refers to the benefit the free

5    public gets from your being in federal prison, where, by

6    definition, you can't commit crimes that endanger them, because

7    I don't think you'll have the opportunity or means to commit

8    the one type of crime you've shown a predisposition to

9    commit -- fraud on investors or lenders -- a prison sentence

10   isn't really necessary to protect the public from that.

11         All right.  So far I've considered, at considerable

12   length, I'm afraid, factors that, by their nature, tend to

13   favor a substantial sentence and the first set of these in

14   particular does relating to the need for a just sentence and to

15   reflect the gravity of the crime.  But there are other factors

16   that favor you in the sentencing equation.  I want to review

17   them with you now.

18         To begin, you have accepted responsibility.  You did

19   so by pleading guilty and admitting your crime.  That makes a

20   difference to me, as it does under the sentencing guidelines.

21   Were it not for your guilty plea, please know that the sentence

22   I impose today would have been materially higher.  In the same

23   vein, I appreciate the introspective letter you wrote to me.

24   You describe your journey, the lessons you learned from your

25   father and your attempt to live up to your father's example and

1    your wish that your name, now shared by your son as the sixth

2    in the line of William Sadleirs, not be tarnished and your

3    desire to be viewed by your family with honor.

4          You apologized at the outset in no uncertain terms.

5    You write:

6          "I am profoundly sorry that I lied to people who

7    trusted me and that my actions betrayed the lessons of truth

8    and honesty taught my parents and grandparents, teachers and

9    friends over the past six decades.  There's no justification

10   for what I did.  I can now only do everything possible in the

11   few years that I may have to make restitution to those who have

12   been harmed by my dishonesty and to set an example of integrity

13   and resilience to my young children, family, friends and

14   colleagues."

15         Those are the words of a person who appreciates the

16   grave wrong that they did and wishes to make amends.  You said

17   the right thing.

18         I also appreciated what you said to me in court today,

19   that you apologized forthrightly in particular to your family,

20   your employees, to the court and to prosecutors.  And although

21   perhaps a degree of hesitation could have been detected by a

22   listener, you apologized to BlackRock.  You added:

23         "I let the ends justify the means.  I betrayed my

24   family, my upbringing, and my education."

25         Thank you for saying that.  I found it sincerely said.

M99WsadS

1          I do need to say, though, that the credit I can give

2     you for accepting responsibility is limited somewhat by the

3     last-minute timing of your guilty plea, and I'm saying this for

4     your benefit, but I'm saying this to make a record for future

5     cases too. As a point of reference, under the sentencing

6     guidelines, there is a two-point credit for accepting

7     responsibility, and a third point is available for defendants

8     who plead guilty sufficiently in advance of trial to spare the

9     government and the Court resources preparing for trial. There

10    is generally thought to be a two-week cutoff for the third

11    point to apply. And the guidelines capture a broader point

12    that judges, including this judge, do take into account in

13    evaluating a guilty plea even where the guidelines are of

14    limited utility, which is, was the plea early; did it come in

15    time to spare the parties and the Court substantial resources?

16         Here, although your sentencing memo states that you

17    "took responsibility from the start," it was not actually until

18    the brink of trial that you notified the government and the

19    Court of your intention to plead guilty. The government was by

20    then deep into its trial preparation. So was the court. We

21    were notified of your decision to plead guilty on January 18,

22    the day before the final pretrial conference and the week

23    before trial, and my staff and I had spent a lot of time

24    preparing for jury selection and preparing a lengthy bench

25    resolving contested pretrial motions. So while I give you

M99WsadS

substantial credit for accepting responsibility, please know
that the sentence I impose today would have been lower by
several months had your guilty plea come earlier.

Second, under Section 3553(a), I am to consider a
defendant's history and characteristics, and at this point I'm
referring to your history other than in connection with your
crime, which I've already covered at some length.  From your
counsel's very thoughtful sentencing submission and from the
letters attached to it, I came to see a very different side of
you.

You were raised in comfort by loving parents in a
household that celebrated faith and education, and your journey
up until 2016 was that of person who converted on the many
opportunities that you had been given.  You did well in school.
You spent two years as a volunteer missionary.  Good for you.
I do not see that a lot in sentencing submissions.  You
excelled at collegiate athletics.  You joined the Peace Corps.
And early on, you sought out government service in Washington,
D.C., all before going to Harvard Business School and becoming
an entrepreneur.

You also engaged in philanthropy, giving time as well
as money.  In the meantime, you and your first wife Dayna
raised four children, and the letters I received praise you as
generous and loving and a terrific role model.  You got
remarried, to Hannah, in 2016, and the many letters I received

1    from her family compliment you for similar virtues.  You're

2    praised for being a very engaged and tender father who is very

3    devoted to your two young sons, ages, as of the writing, three

4    through five.  At the same time your family appears to have

5    been part of the motive here insofar as the advertising scheme

6    funded your home and its outfitting, it appears to have risen

7    from your desire to lavishly provide for your wife and

8    children.

9            I want to read aloud excerpts of some of the letters

10   that I received that caught my eye.  And I can't begin to read

11   all of them or all of the ones I received, so these are just

12   representative excerpts.

13           From your wife Hannah --

14           And that is you here, correct?

15           Thank you so much for the beautiful letter.  I can

16   only imagine the pain that you're in, and I can only imagine

17   how hard today is.  Your letter was fantastic.

18           "William is my best friend, a loving companion, my

19   cheerleader, my rock, and an exceptional father.  He is my

20   support system.  He is dependable, has always been faithful,

21   and brings hope even when things seem hopeless.  He is

22   everything to me.  William can fix almost anything.  Our

23   children are convinced that he does magic, producing lost items

24   from their ears.  His bedtime reading is mesmerizing, and he

25   patiently explains how and why to a seemingly endless stream of

     1   questions.  I cannot raise our sons without William being a

     2   daily, nurturing presence in their lives.  We love him so much

     3   and need him with us."  And it goes on from there, but it was a

     4   gorgeous, loving tribute to you.

     5        From your niece by marriage:  "Since the first day we

     6   welcomed him into our family, he took the time to get to know

     7   each family member.  We have a huge family member, and he made

     8   sure to reach out and connect with all of us.  To him, bringing

     9   us all together in one place was his favorite thing and what he

    10   wanted above everything.  You'd often catch him smiling and

    11   soaking in the quality time we spent with each other.  Our

    12   family is very close-knit, and we'd feel the tremendous impact

    13   if William were to have to go away."

    14        From another nephew by marriage, Edmond:  "I still

    15   can't understand," he writes, "how William has the energy to be

    16   such a wonderful father to two young, energetic boys.  It is

    17   tiring being a parent but William was able to give so much

    18   attention to his family even while building a business from the

    19   ground up.  If there's one thing you can take away from his

    20   character, it is that he is a genuinely caring family man."

    21        From your nephew Issam, he attests to your role in

    22   your sons' life:  "They have so much," he writes, "to learn

    23   from William, such as how to be respectful to others, how to be

    24   caring and loving, how to be confident and hardworking, how to

    25   be a gentleman, know when to take responsibility when they have

done wrong, shake hands and make eye contact.  The list goes on and on."

From your friend of 50 years, a former volunteer missionary with you, Jonathan Neville:  "Ever since I've known Bill, I've observed his determination and perseverance in the face of immense challenges."  And he describes you -- of the famous man of the arena description from Teddy Roosevelt, which registered with me, and he describes the pride you took in your successes in Hollywood and your determination to make your company a success, including for its employees.

From Katie Rich, a film producer who worked with you: "Will is a good and decent man.  He made an uncharacteristic mistake."

From your son Paul:  "His ambition has landed him in positions of incredible responsibility.  He has no quit in him, and when his back against the wall, I have witnessed the weight of that responsibility in full.  He cares for those for whom he is responsible."

And from your niece Ursula:  "As a recent parent, I have a new appreciation for how selfless the best parents truly are.  William Sadleir cherishes his family above all.  He has a wonderful character and a bigger heart for those who truly know him."

Those, as I say, are representative, but they capture the whole.  These are really impressive and, I might add,

1    consistent testimonials to you.  On the day that a person is
2    sentenced, it is appropriate that they be considered in light
3    of the totality of their life's experience, the good as well as
4    the bad.  These letters reflect well on you.  They show me a
5    different side of you.  They are mitigating, and I've
6    considered them as such today.

7         I've also considered, finally, your arguments about
8    Covid and the impact of prison on you.  I don't find those
9    arguments particularly influential in the context of your case.
10   As the lawyers here know, I've treated time served and pretrial
11   custody by defendants during the period before vaccines were
12   available as equivalent to much greater periods of time in
13   custody in non-Covid times, and that principle would apply to
14   you save that you had, I think, just a day in custody if that.

15        I'm also mindful that, as an older person, you are apt
16   to experience prison as more difficult, and there is some truth
17   to that and I have factored it into my assessment of the just
18   sentence.  But it is also the case that you are much healthier
19   than many younger defendants that I sentence.  The Bureau of
20   Prisons has the capability to attend to inmates' medical needs,
21   including those that have been brought to my attention here.
22   The record of this case does not demonstrate any reason to
23   believe it will be unable to do so.

24        In the end, my judgment is that although a substantial
25   prison sentence here is absolutely necessary for the reasons

1    I've reviewed, primarily relating to the gravity of your

2    crimes, a sentence of the length that the guidelines recommend,

3    from nine to more than eleven years, is unnecessarily long.

4    There are sentences below that range, meaningfully so, that

5    will embody just punishment for you and that are equal to the

6    seriousness of your crime, but I cannot find a sentence of no

7    jail or limited jail time defensible or even remotely plausibly

8    reasonable here.  The crimes here were too protracted, too

9    conniving, too damaging, too immoral, and too unnecessary to

10   make a sentence like that justifiable.

11        I've carefully considered the just and proportionate

12   sentence here.  The sentence that I'm about to impose is the

13   lowest that, in my judgment, can fairly accommodate all

14   considered 3553(a) factors.  With that lengthy explanation, I'm

15   now going to state the sentence I intend to impose.  The

16   attorneys will have a final opportunity to make legal

17   objections before the sentence is finally imposed.

18        Mr. Sadleir, would you please rise.

19        After assessing the particular facts of this case and

20   the factors under Section 3553(a), including the sentencing

21   guidelines, it is the judgment of the Court that you are to

22   serve a sentence of 72 months' imprisonment in the custody of

23   the Bureau of Prisons to be followed by a period of three

24   years' supervised release.

25        I impose the same sentence on each count, the terms to

1    run concurrently.

2            As to supervised release, the standard conditions of

3    supervised release shall apply.

4            In addition you shall be subject to the following

5    mandatory conditions:

6            You shall not commit another federal, state, or local

7    crime.

8            You must not unlawfully possess a controlled

9    substance.

10           You must refrain from any unlawful use of a controlled

11   substance.

12           You must cooperate in the collection of DNA, as

13   directed by the probation officer.

14           To some degree I'm giving the topic sentence of the

15   various recommendations, but I know that counsel have read the

16   presentence report in full.  I see counsel nodding.  I'm

17   incorporating the fuller explanation by reference.

18           You must also abide by the standard conditions of

19   supervised release, which are set out on pages 39 to 40.

20           Now, as it relates to the special conditions of

21   supervised release, you must provide the probation officer with

22   access to any requested financial information.  You must not

23   incur new credit charges or open additional lines of credit

24   without the approval of the probation officer unless you're in

25   compliance with the installment payment schedule as to

1    restitution, which I'll get to in a moment.

2         There is a proposed condition here -- and I'm not

3    going to impose it -- in which you would have had to submit

4    your person and property and residence to a search by the

5    probation department on the premise that there is reasonable

6    suspicion or when there's reasonable suspicion that you've

7    committed a crime or violating a condition of supervised

8    release.  I just don't see the factual predicate for that here.

9    In the event that you violate a condition of supervised

10   release, there may be a need for me to impose that.  I impose

11   that in many cases.  You don't have a history of parole

12   violations, probation violations, things like that.  You've

13   been strictly compliant with your conditions of pretrial

14   release.  I don't see a need for that condition here.

15        However I am going to add a condition of supervised

16   release.  I want you to perform 300 hours of community service

17   during your three years of supervised release.  Frankly,

18   Mr. Sadleir, it's a way that you can pay back the community for

19   the harm that you've done.

20        As it relates to a fine, I'm not going to impose a

21   fine in this case.  There are formidable restitution and

22   forfeiture obligations you'll have.  I don't think it's

23   realistic to expect you to pay a fine.  I also think, frankly,

24   the sentence that I imposed is fully equal to the 3553(a)

25   factors that could be served by a fine.  There's no purpose in

1    my imposing one here.

2              As to restitution, it is the judgment of the Court

3    that you are to pay restitution in the amount of $31,597,000,

4    and specifically, you are to make restitution in accordance

5    with the statutes that are recited in page 41 of the

6    presentence report.  I'm going to incorporate by reference the

7    payment instructions and schedule of payments that are set out

8    on page 41 to 42 of the presentence report.

9              Counsel, I take it there's no need, Mr. Schwartz, for

10   me to read all these details aloud.

11             MR. SCHWARTZ:  There is not, although when you say you

12   are going to incorporate them by reference, there will be

13   either in the judgment or a separate order those terms.

14             THE COURT:  Right.  The judgment will recapitulate the

15   payment instructions and schedule of payment provisions that

16   appear in the PSR.

17             MR. SCHWARTZ:  Perfect.

18             THE COURT:  That is correct, and I will, of course,

19   issue the restitution order.  But specifically, you are to --

20   restitution is to be made payable in installments, and you

21   shall commence monthly installment payments payable on the 15th

22   of the month of an amount not less than $500 or an amount equal

23   to 15 percent of your gross income, whichever is greater, each

24   month.

25             Understood, Mr. Schwartz?  Does that give you the

1    requisite specificity?

2           MR. SCHWARTZ:  Yes.  I just wanted to make sure that

3    no one had to have access to the PSR to understand those terms.

4           THE COURT:  Yes.  That will be in the judgment so that

5    there is a one-stop shop for this.

6           All right.  I am required to impose a mandatory

7    special assessment of $100 per count, meaning $200, which shall

8    be due immediately.

9           Now, as to forfeiture, I intend to issue a forfeiture

10   order along the lines of what the government has proposed in

11   its preliminary order.  However, defense counsel has indicated

12   that you have not had an opportunity to confer with the

13   government and that there may be modest modifications to it.

14          Defense counsel, I take it you're in agreement that

15   the quantum, $31,597,000 in U.S. currency, and the specific

16   property, specifically the Tesla, are properly forfeited.

17          MR. SCHWARTZ:  Yes, and that's reflected in the plea

18   agreement as well.

19          THE COURT:  Right.  Look, I will give counsel one week

20   to submit an agreed forfeiture order, which either will be

21   identical to the one submitted or will make agreed-upon changes

22   to it.  But I'm imposing forfeiture in that amount and

23   specifically forfeiting not only that dollar amount but towards

24   the Tesla.

25          With that, does either counsel know of any legal

M99WsadS

```
 1   reason why the sentence shall not be imposed as stated?
 2              MR. LENOW:  No, your Honor.
 3              THE COURT:  Mr. Schwartz.
 4              MR. SCHWARTZ:  No, your Honor.  No.
 5              THE COURT:  OK.  The sentence as stated is imposed.
 6              Government, are there any open counts?
 7              MR. LENOW:  Yes, Count Three, so we would move to
 8   dismiss all open counts consisting of Count Three.
 9              THE COURT:  Granted.
10              Mr. Sadleir, to the extent you haven't given up your
11   right to appeal your conviction and your sentence through your
12   plea of guilty and the agreement you entered into with the
13   government in connection with that plea, you have the right to
14   appeal those things -- your conviction and sentence.  If you're
15   unable to pay for the cost of appeal, you may apply for leave
16   to appeal in forma pauperis.  The notice of appeal must be
17   filed within 14 days of the judgment of conviction.
18              Mr. Schwartz, have you any recommendations you'd like
19   me to make to the Bureau of Prisons?
20              MR. SCHWARTZ:  Yes, your Honor.
21              We would ask that you recommend designation to a
22   facility near Tallahassee, Florida.  With a sentence of this
23   duration, it's anticipated that that's where the family will
24   relocate.  There are other members of the family there already.
25   I think Pensacola is probably the nearest appropriate facility,
```

1   but the recommendation is in proximity to Tallahassee, Florida.

2            THE COURT:  Government, any objection?

3            MR. LENOW:  No, Judge.

4            THE COURT:  All right.  I'm happy to make that

5   recommendation.

6            Any other recommendations, including with respect to

7   medical care?

8            MR. SCHWARTZ:  No.  I mean the conditions are as set

9   forth at sentencing, and the BOP, I anticipate, will factor all

10  that in.

11           THE COURT:  Very good.

12           Government, do you have any objection to the defendant

13  self-surrendering?

14           MR. LENOW:  No objection.

15           THE COURT:  OK.  I note as well that he has an

16  important court proceeding to attend soon.

17           What is the date of the California sentencing?

18           MR. LENOW:  It is the end of this month, Judge.  I

19  can't remember the date, but it's the last week in September.

20           THE COURT:  All right.

21           Mr. Schwartz, I would have in mind a surrender date, I

22  would have ordinarily thought, about two months from now.

23           MR. SCHWARTZ:  I suppose my request between ensuring

24  that BOP has time to make its designation and the time of year

25  and Mr. Sadleir's family would be to have a report date shortly

M99WsadS

1    after New Year's.

2                THE COURT:  After?

3                MR. SCHWARTZ:  New Year's Day.

4                THE COURT:  I think that's a little long, candidly.

5    That's four months.  There's really no need for that, but I'm

6    happy to give Mr. Sadleir two months, and in the event there

7    hasn't been a designation by then, I'm happy to receive a

8    written application for you to extend the surrender date.

9                One thing I don't want is Mr. Sadleir to be taken into

10   custody by the marshals and then have to travel via BOP

11   transportation from place to place to get to his ultimate

12   designation, nor is there a need for him to be in a municipal

13   jail, whether our MDC or the California equivalent.  To the

14   extent the application for more time is premised on the

15   possibility there isn't a place that he's been designated to,

16   if you make a request -- you have to give me a little bit of

17   notice, not at the last minute -- for an adjournment, if there

18   literally has not been a designation, I will be open to

19   granting that and expect I very likely will.

20               MR. SCHWARTZ:  Understood.

21               THE COURT:  With that, how about November the 9th?

22   That's two months from today.

23               MR. SCHWARTZ:  Sure.

24               THE COURT:  OK.

25               Look, Mr. Sadleir, you are to surrender to the

1   institution designated by the Bureau of Prisons before 2 p.m.

2   on Wednesday, November 9 or as notified by the probation or

3   pretrial services department.  In the event you have not been

4   given a facility to surrender to, I expect your counsel will

5   have asked for and received an extension of surrender date, but

6   just so that we have a rule in place in case that has not

7   happened, in the event that there has been no institution

8   designated and you have not sought or obtained an extension of

9   the surrender date, you then have to surrender by that time --

10  2 p.m. on November the 9th -- to the U.S. Marshal for this

11  district.  I don't expect that's going to come about, but I

12  need to have a mechanism in place to cover that circumstance.

13          Your conditions of release continue up until the time

14  you report to begin your sentence.  If you fail to report for

15  your sentence, you may be charged with another criminal

16  offense.

17          Do you understand that?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  All right.

20          Is there anything further from the government?

21          MR. LENOW:  No, your Honor.

22          THE COURT:  Anything further from the defense?

23          MR. SCHWARTZ:  No.  Thank you, your Honor.

24          THE COURT:  All right.

25          Look, Mr. Sadleir, I want to wish you well.  This is a

M99WsadS

```
 1    tragic circumstance, and I'm very sorry that you made the
 2    choices that you've made and I don't doubt that for a variety
 3    of reasons you're deeply remorseful today.  I think your
 4    sincerity in saying that is clear.  I'm truly sorry that this
 5    has happened, but please know that the many positive aspects of
 6    you, including the testimonials of the people who know you
 7    best, played an important role in helping to keep the sentence
 8    down.  There's much to celebrate about the life you've lived,
 9    and I hope that during the time that you are in custody you're
10    able to reflect on what makes life worth living and you live up
11    to the depictions of you that I read consistently in those
12    letters from your family, such that in the time you have left
13    after your release you are that William Sadleir again and make
14    the name proud again.
15              All right.  We stand adjourned.  Thank you.
16              (Adjourned)
17
18
19
20
21
22
23
24
25
```