# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 23 CR 347 (JGK)

ALEXANDER MASHINSKY,

Sentencing

Defendant.

------------------------------x

New York, N.Y.
May 8, 2025
11:15 a.m.

Before:

HON. JOHN G. KOELTL,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
ALLISON C. NICHOLS
ADAM SLOAN HOBSON
PETER J. DAVIS
Assistant United States Attorneys

MUKASEY YOUNG LLP
Attorneys for Defendant
BY: MARC L. MUKASEY
TORREY K. YOUNG
MICHAEL F. WESTFAL
SAL H. CHAN

Also Present:

Brandon Racz, FBI

(Case called)

MS. NICHOLS: Allison Nichols, Adam Hobson, and Peter Davis, for the government, together with Special Agent Gurdeep Singh, of the FBI, and two paralegals from the U.S. Attorney's Office, Emily Cho and Anna Gamboa.

Good morning, your Honor.

THE COURT: Good morning.

MR. MUKASEY: Good morning, Judge. Marc Mukasey, from the firm Mukasey Young, for the defendant, Alex Mashinsky. To my left is my colleague, Mike Westfal; to his left is Torrey Young; to her left is the defendant, Mr. Mashinsky; and all the way at the end is our paralegal analyst, Sal Chan.

THE COURT: Okay. Good afternoon, all.

There is an agreed-upon forfeiture in this case. I signed a preliminary order of forfeiture, correct? Yes?

MR. HOBSON: That's correct, your Honor.

THE COURT: Is it necessary for me to sign the final order of forfeiture today?

MR. HOBSON: Not today, your Honor. We'll be submitting that in the future. We're, as you know, negotiating some aspects of it.

THE COURT: Okay.

Defense agrees with that?

MR. MUKASEY: Yes, Judge.

THE COURT: All right.

I have received the presentence report, prepared January 27, 2025, revised March 5, 2025.

I've reviewed the defense submissions, dated April 17, 2025, including the 41 letters of support, and the reply submission, dated May 2, 2025, and the letter, dated May 6, 2025.

I've also reviewed the 101 objections to the presentence report filed by the defendant, marked Exhibit B, which were filed along with his original submission.

I've also reviewed over 200 victim statements filed by the government, including the recent submissions on May 2, May 7, and May 8, 2025.

I've also reviewed submissions by the government on April 23 and April 30, 2025, containing letters on behalf of the litigation administrator of the Celsius bankruptcy and a member of the litigation oversight committee for the Celsius Bankruptcy Estates.

Before listening to defense counsel, the defendant, and the government, as well as any victims, all of whom can address particularly the 3553(a) factors set out in the statute, it's useful, at the outset, to set out the Court's findings with respect to the submissions that have been made and the applicable sentencing guidelines so that the parties can then address the 3553(a) factors.

There is no question that the total offense level in

this case is 43 and the criminal history category is I. That is the agreed-upon guidelines calculation in the plea agreement, and the parties have agreed to that.

Under the guidelines, the guideline sentencing range would be life. However, the guideline sentencing range is capped by the maximum penalties for the two crimes to which the defendant pleaded, a total maximum sentence of 360 months. Therefore, the guideline sentencing range is 360 months' imprisonment — 30 years.

The parties also agreed in the plea agreement to various enhancements to the basic guideline sentencing range. These included: An increase of 30 levels because the actual loss from the offense exceeded $550 million. Indeed, in its submission, the defense concedes that it subscribes to a "reasonable loss estimate of $590 million based on the statement Mashinsky submitted in the bankruptcy." Exhibit B to defense submission, at 67.

The parties also agreed to an enhancement of two levels because the offense involved ten or more victims.

The parties also agreed to a two-level enhancement because the offense involved sophisticated means.

The parties agreed to a four-level enhancement because the defendant was an organizer or leader of a criminal activity that involved five or more participants.

The parties also agreed to a two-level enhancement

pursuant to Section 3B1.3 of the guidelines because the defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission of the offense.

The Court notes that the presentence report mistakenly refers to this guideline in the plea agreement as "3B1.2," while the correct reference, which is correct in the plea agreement, is to 3B1.3. And the Court will correct the presentence report at page 6.

The parties also agreed that the defendant will forfeit in excess of $48 million, as well as nine specific assets traceable to the commission of the securities fraud alleged in Count Five.

The Court reviews some of these salient points in the plea agreement, not because the Court is bound by the plea agreement, but because the Court is actually not bound by the plea agreement, and the Court has to make an independent determination of the appropriate guidelines in the case. But because none of the parties argue that the guidelines are incorrect or that there is any reason to depart from the guidelines, the guidelines are, plainly, significant.

The parties have the right to argue for a sentence different from that provided in the guidelines pursuant to the relevant sentencing factors provided in 18 U.S.C. Section 3553(a), but the guideline calculation was agreed to by

the parties, and the Court independently finds that the guideline calculation is correct.

I go through all of this because many of the defendant's arguments are inconsistent with the parties' agreement as to the guidelines and the evidence submitted in connection with sentencing.

The defendant, seemingly, at various points, seeks to limit his criminal conduct to the two false statements to which the defendant pleaded guilty specifically, namely, his statement in December 2021, in violation of the commodities fraud statutes, as alleged in Count Two, that, "Celsius had received approval from regulators," even though he knew that was not true. Plea transcript, at 25.

The second false statement was a statement in violation of the securities fraud statutes charged in Count Five in September 2019 that he failed to disclose that he was selling his CEL token holdings even though he represented to the public, using electronic communications and wires, that he was not selling. *Id.* And, indeed, in his letter to the Court, he only explicitly regrets the two false statements at the plea allocution without reference to the millions of dollars of loss from his frauds. Defendant Exhibit T, ECF No. 149-1.

The defendant does not explain how there could be an agreed-upon actual loss of $590 million solely from the two

specific statements that he admitted to making, in violation of Counts Two and Five, at the plea allocution and to which the defendant pleaded guilty, without including relevant conduct, which is detailed at length in the presentence report.

The defendant also fails to explain how the agreed-upon amount of forfeiture for his gain from the securities offense in Count Five could be in excess of $48 million plus the specific properties, when the actual gain from the actual sale that he falsely denied was only $53,000. Government April 28, 2025 memo, at 64.

The Court has carefully considered the defendant's objections to the presentence report and overrules them, except that the Court will strike paragraphs 41 and 43(d) as insufficiently supported. The Court will also correct paragraph 56(a) of the presentence report, in lines 5 and 6, to note that the email is from Mashinsky to Cohen-Pavon and not from Cohen-Pavon to Mashinsky.

The Court notes that the objections to the presentence report in Exhibit B do not change the guideline calculations, and will not change the sentence.

The Court also notes that the Court has carefully reviewed the submissions of the parties, and neither party has sought a *Fatico* hearing with respect to the objections. Indeed, the defense argues, "A *Fatico* hearing is unnecessary. There is no dispute between the parties about the statutory

maximum, the application of the guidelines, or the stipulated guidelines range in the plea agreement. The objections, many of which are made for completeness and accuracy, can be resolved under Section 3553(a) based on the submissions and/or should not affect the sentence."

Of course, the Court will listen to the parties, after the Court is finished this introduction, with respect to all arguments concerning the appropriate application of the 3553(a) factors, but some additional comments are appropriate, given the number of objections raised by the defense.

To the extent that the objections are based on alleged completeness, it is unnecessary to amend the presentence report. The Court has considered the objections, and they do not make the statements in the presentence report false or misleading.

Examples abound as to how suggested changes by the defense do not change the substance of the presentence report and how the presentence report supports the guideline calculation agreed to by the parties.

The defense suggests rewording paragraph 22 to read, "Mashinsky misrepresented, among other things, the regulatory approval status of Celsius and his sale of CEL token holdings," thereby conceding that his misrepresentations were not limited to the two specific statements in Counts Two and Five.

In paragraph 23, the defense suggested deleting the

penultimate sentence, but would leave the rest of the paragraph, including the statement "Mashinsky made false and misleading statements in the Ask Mashinsky Anything (AMAs), and Celsius' employees from multiple defendants began to review the AMAs after they had aired false and misleading statements by Mashinsky and, at times, edited Mashinsky's misrepresentation out of the recorded version of the AMAs posted to the internet." Again, this concedes that the defendant made false representations in addition to the two false statements in the plea allocution. The alleged objection also leaves the final sentence: "Neither Mashinsky, nor Celsius issued corrections to notify the public and those who had watched the live recorded versions of the AMAs that certain of Mashinsky's statements were untrue or misleading."

The defense objected to portions of paragraphs 26 and 29 through 34 concerning false statements by the defendant in connection with the alleged $50 million raised in the initial coin offering, or ICO, but did not object to paragraphs 27 and 28, which include the statement, "Contemporaneous with and after the ICO, Mashinsky falsely and publicly stated that Celsius had raised the full $50 million, meaning that Celsius had sold all the CEL tokens it had made available for sale to the public through the ICO." The surrounding paragraphs explain why this was untrue — because a significant amount of the tokens were sold to an entity controlled by the defendant

and not to the public.

The defendant objected to portions of paragraph 50 that explained that the defendant "falsely and repeatedly" claimed that Celsius earned yield by deploying customers' crypto assets in a safe and secure manner, but did not object to that portion of paragraph 50 that asserted that "Mashinsky downplayed the risks to which Celsius customers were exposed through investing their crypto assets with Celsius by assuring them that Celsius was not making 'directional bets,' that is, gambling on the future in various crypto assets, but, instead, was earning yield with Celsius customer funds through a market-neutral strategy that did not depend on the prices of particular crypto assets rising or falling."

The defendant also did not object to certain paragraphs in the presentence report that showed that the defendant was aware of directional trading despite the statements to the contrary — see paragraphs 50(a) and (b) — referring to 2019 trades of which the defendant was aware, paragraphs 50(c), 50(d), and 50(e), other incidents to which there is no objection.

"And there is no objection to paragraph 52." After the events of late January 2022, including an internal investigation and presentation, Mashinsky continued to falsely state that Celsius did not engage in directional trading. As late as April 2022, Mashinsky stated, during a CNBC interview,

we are not what we call a data-neutral -- "We are what we call a data-neutral strategy. Celsius doesn't bet on the market going up or down."

In paragraph 53 of the presentence report, the probation department reported that, "Mashinsky repeatedly and falsely claimed that all of the loans extended by Celsius were either fully or partially collateralized, and that Celsius did not offer uncollateralized loans to counterparties, which Mashinsky touted as evidence that Celsius earned yield using Celsius customers' assets in a conservative, safe, and secure fashion."

Mashinsky only objected to the word "falsely," and attempted to justify the claim by the assertion that others made similar statements. But the evidence indicates that Celsius did make uncollateralized loans, and the statements to the contrary were false. And the fact that others made similar statements does not make the statements true. Indeed, Mashinsky does not dispute the portion of paragraph 54 of the presentence report that shows the statements were false.

In paragraph 56 of the presentence report, the probation department reported that "Mashinsky repeatedly and falsely claimed that Celsius had never had an institutional borrower default on a loan. As Mashinsky knew, multiple institutional borrowers had defaulted on their loans from Celsius by the time that Mashinsky was publicly stating

otherwise."

While the defense objects to the terms "repeatedly" and "falsely," the defense does not object to the rest of the statement, and there is evidence that the defendant's statements were false.

In support of the allegation of falsity, the probation department refers to an email at paragraph 56(a), lines 5 to 6. The email was incorrectly attributed to Cohen-Pavon to Mashinsky, while it should be from Mashinsky to Cohen-Pavon, but it supports the paragraph, and the Court will direct that the paragraph in the presentence report be corrected.

The defendant did not object to paragraph 66 of the presentence report that states, "In the lead-up to the June 12, 2022 pause, Mashinsky sought to allay Celsius' customers concerns about the solvency of the platform by publicly stating that he, like Celsius' customers, held an amount of his own wealth on the Celsius platform and was keeping his assets with Celsius. Mashinsky was secretly withdrawing his own assets."

The defendant does not deny or object to the statement in the PSR, but contends that the PSR, the presentence report, should contain a statement that the defendant was withdrawing funds to pay income taxes. But the defendant's reason for the withdrawal does not change the substance of the statement in the presentence report.

In paragraphs 86, 87, and 88, the defendant objected

to certain characterizations of Celsius' purchases of CEL tokens, but did not object to the statement that between July 2020 and the end of 2020, the defendant made public statements that Celsius was purchasing CEL in the market primarily to fulfill rewards obligations, and not revealing that Celsius was actually buying CEL well in excess of the amounts needed for weekly rewards to artificially support the price.

While the defendant objected to part of paragraph 89, he did not object to the portion of paragraph 89 that stated, "In addition to causing Celsius to purchase volumes of CEL for the purpose of artificially supporting and inflating CEL's price, at times Mashinsky personally purchased CEL using his own accounts and wallets."

The defense did not object to the statement in paragraph 98 of the presentence report that stated that, "During an AMA in March 19, 2021, Mashinsky misrepresented the nature and extent of Celsius' market activity and artificial control over CEL price."

The PSR, in paragraph 110, states, "Mashinsky repeatedly made false and misleading public statements regarding his own personal CEL trading activity, including, in certain instances, claiming that he had not been selling CEL, when he had been selling large volumes of his CEL prior to and immediately following these statements." The defendant did not

dispute the statement except to object to the words "large volumes."

The Court reviews these statements and objections to indicate that the conduct supporting the guideline calculations was more than sufficient to support the guideline calculations of an offense level of 43, a Criminal History Category I, and a guideline sentencing range of life.

The defendant has suggested a sentence of imprisonment of a year and a day. The probation department has suggested a sentence of 180 months' imprisonment. And the government has suggested a sentence of at least 240 months' imprisonment.

The appropriate sentence requires a careful consideration of the factors set out in Title 18, United States Code, Section 3553(a). Indeed, the sentencing statute commands that, "The Court shall impose a sentence that is sufficient, but no greater than necessary, to comply with the purposes set forth in Section 3553(a)(2)."

The Court will now listen to defense counsel, the defendant, and the government, and the victims, for anything that they would like to say in connection with sentence.

As I said at the outset, I'll call on each of the defense counsel, the defendant, and the government if there are any other objections to the presentence report that must be resolved and for any statement that the parties would like to make in connection with sentence, anything that the parties

would like to tell me.

In connection with calling on the government, I assume that the government knows if there are any victims who wish to be called?

MS. NICHOLS: Yes, your Honor. Four victims have indicated that they would like to speak today.

THE COURT: Okay.

So I'll start with defense counsel.

MR. MUKASEY: Thank you, your Honor.

THE COURT: Mr. Mukasey.

MR. MUKASEY: Thank you, Judge.

If it please the Court, my colleagues and I are going to sort of split up pieces of the 3553(a) arguments. We won't be repetitive. We'll try to be as efficient as possible.

I want to preface my remarks — and I am going to pass the baton in a moment --

THE COURT: I always ask if there are any objections to the presentence report that have to be resolved and have not been resolved.

MR. MUKASEY: I think your Honor has resolved the material objections.

THE COURT: Okay. Go ahead.

MR. MUKASEY: I'm going to start out to talk a little bit about 3553(a). I'm then going to pass the baton to two of my colleagues, and I'm going to finish up, and we'll try to be

as efficient as possible.

Judge, I want to preface these remarks today, by all of us, by saying that I don't want anything that any of us say today to be taken as disrespect for any of the people that were harmed by the collapse of Celsius. We've read the victim impact statements. They are rather brutal. We've listened to the victims, on video and otherwise, and we hear the intensity of their pain. That includes Mr. Mashinsky. We understand that people have suffered financially and suffered emotionally in ways that we can't even pretend to know, so our sympathies are with everyone as we proceed here.

I also want to say it's not our intention to repeat what's in our papers, but just to add some color to them, and maybe address some of the concerns that you mentioned in your introduction, so I hope the Court will indulge us for a few minutes.

Judge --

THE COURT: Whatever time, whatever time you want.

MR. MUKASEY: Thank you, thank you.

I've heard you say, Judge, in a panel — I think it was a panel about multidistrict litigations years ago — that when you have individual cases as opposed to a large class action case, you feel it. And I think sentencing for me, and for many defense lawyers, is the most daunting and humbling and formidable part of the job, and I can say that we feel it.

I can also say that with the exception of the days that Mr. Mashinsky's children were born, today is the most consequential and impactful and important day of his life, and I assure you, he feels it.

Alex's wife is here, his friends are here, supporters are here, but I want to point out one person who is not here, and that's Alex's son, who's graduating from college today in the Midwest.

Obviously, Alex wanted to be at that graduation — it's a moment of tremendous accomplishment for his son and his family — but Alex thought that in the interest of the greater good, and the larger Celsius community, that it was more important to be here today to proceed with sentencing and bring some closure to this matter for people who have been impacted.

I know I've heard your Honor also say that the Sentencing Reform Act of 1984, which you referred to earlier, is one of the most thoughtful and farsighted statutes that Congress has passed, and that, of course, requires, as your Honor noted, a sentence sufficient, but no greater than necessary, to accomplish the purposes of sentencing.

And I think 3553(a)'s thoughtful and farsightedness goes actually well beyond that directive into other areas that we're going to get into. But to start off, I respectfully submit that the presentence report's recommendation of 15 years is a sentence that is greater than necessary. It's too severe

for the conduct at issue in the case, and it's too severe for the man at issue in the case. The crimes here are serious, to be sure, but a 15-year sentence for a 60-year-old combat veteran, first-time nonviolent offender, who pleaded guilty, accepts responsibility, has expressed remorse, and who has no history of drinking or drugs or wrongdoing of any kind, small or large, in a case where, one way or another, a good measure of the economic damage will likely be remediated, in that kind of case, a 15-year sentence, which is really a slow death in prison sentence, is unnecessary. And if it pleases the Court, my colleagues are going to start out with some points about the nature and seriousness of the offense, and then I'm going to come back and discuss some remaining 3553 factors.

MS. YOUNG: Your Honor, it's impossible to assess Alex's conduct without first zooming out and considering it in the context of Celsius, the company.

First and foremost, Celsius was neither created, nor operated as an instrument to fleece people. It was, and after successfully emerging from bankruptcy, is, still today, a real company. Alex cofounded Celsius with a colleague from one of his prior companies, and they set out to create a lending platform that could enable fair distribution of yield to people who are pushed away from society by traditional banks. In other words, Alex set out to create a company to help others, and he joined alongside those people as the largest individual

customer.

For years, Celsius provided that service. It made real investments, real institutional loans, real retail loans, had thousand of real employees with remote operations in four continents, it paid customers approximately a billion and a half dollars in real rewards over several years. And billions were both invested and successfully withdrawn from that platform.

Now, to be clear, there's not a single customer who wired their life savings from their bank to Celsius or transmitted their 401(k) directly there because before becoming a Celsius community member, every individual would have to take their U.S. dollars and purchase cryptocurrency elsewhere before investing with Celsius, because Celsius did not accept U.S. dollars on its platform.

Now, the company began as a startup, but it quickly propelled. Over the years, it developed a phone application, with detailed terms and conditions, a massive cybersecurity apparatus to keep customer coins safe from hackers and other cyber incidents. It housed detailed data rooms that were reviewed by institutional investors and had a comprehensive plan for weekly hours-long YouTube videos, and a massive risk management team with about 25 employees who reviewed and approved all of Celsius' institutional loans.

Technology and resources were poured into the company.

It was not a shell. It was not a sham. And Alex did not clutch onto control or surround himself with dupes or lackies or pawns. For years, he surrounded himself with outside lawyers from the most prestigious of firms — Davis Polk, Morrison Foerster, Latham & Watkins, Akin Gump, and I could go on.

And Alex also culled comments from the executive team --

THE COURT: There is no allegation of an advice-of-counsel defense to any of the charges, right?

MS. YOUNG: Correct, your Honor.

THE COURT: Okay. Go ahead.

MS. YOUNG: Alex also culled an executive team with the most stellar of backgrounds — a chief investment officer from TIAA-CREF, a chief operating officer from Citigroup, head of corporate from Bank of America, chief risk officer from Morgan Stanley, and a chief financial officer from RBC. And these were not trophy advisory board members, like in other startup fraud cases, such as their names or big names are used to give the veneer of substance to the company. These were the day-to-day executives working at Celsius with Alex.

So, when my colleague, Mr. Westfal, discusses Alex's conduct in a few minutes, please keep in mind the caliber of people who came and stayed at Celsius. You might have seen them seated next to him on a marketing video, or supplied him

with information before he spoke, or agreed with a business model for purchasing CEL rewards by the company.

In the words of Celsius' head of compliance, who I believe remains in a different capacity at the company still to this day, Alex and the team put being in compliance as a top priority. And even the government's cooperator, when he was serving as outside counsel before deciding to join Celsius, publicly said that Celsius was building something good, that he, Cohen-Pavon, was going to be proud of.

So, there was no original sin in forming Celsius. Celsius is not a house built on sand. It was not designed as a Madoff Ponzi company with backroom employees and a board of family members. Alex put all the pieces in place for Celsius to do good and then do well.

Now, crypto, even as we stand here today, exists in a changing and challenging regulatory environment. And as the legal landscape for crypto changed, Celsius didn't duck into a back, dark alley and operate in the shadows. Celsius subjected itself to scrutiny. It registered in the United Kingdom and made public filings available. It didn't do its ICO in the Caymans or the British Virgin Islands. And out of an abundance of caution, Celsius complied with the SEC's Reg D accreditation requirements. It registered as a money services business. Unlike BitMEX, it complied with the Bank Secrecy Act and FinCEN's AML requirements. And Celsius submitted audited

financials using GAAP accounting principles, none of which were alleged here to be doctored, fabricated, or false.

So, in stark contrast to Celsius, you have one point which was a sham from the getgo. According to the government, at one point, Greenwood lied to investors about the utility of tokens, claiming that they could be used to secure positions in mining pools. And these pools were depicted in promotional materials as being mined with computer hardware. But there were no mining pools, and there were no computers.

This question of whether the company built was real and whether they were real products also seemed to be a difference-maker at sentencing *United States v. Milton*, which was a securities and wire fraud case involving statements on social media by the founder of a public truck company. And after trial, at sentencing, Judge Ramos asked, you know, were the trucks ever built, were they sold, and there, the answer was yes. And, similarly, here, the products are real.

Mr. Milton received a sentence of four years with a wire fraud conviction and a finding by the court of a $660 million loss and thousands of victims.

So, in thinking about Celsius as compared to other cases, it's nothing like FTX and Alameda. Those companies ceased to exist after bankruptcy. Five executives were convicted, with three receiving significant periods of incarceration. And as to Sam Bankman-Fried, who was sentenced

to 25 years after trial, the court, at sentencing, made findings of an $11 billion loss, fraudulent actions during bankruptcy, attempted witness tampering, multiple instances of perjury, and campaign finance violations, none of which are present here.

The government also stretches to draw parallels to *Wong* and *Ilori*, but 3553(a) makes clear that the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. And in *Wong*, he was a recidivist, even according to the government's sentencing papers. And in *Ilori*, he committed PPP fraud using stolen identities and falsified tax documents, while facing separate charges involving identity theft and money laundering.

The Court should have no concern with unwarranted sentencing disparities with respect to those cases.

As the Court assesses Alex and his conduct, I respectfully urge you to think of Celsius in the greater context. There is a parable about blindfolded men and an elephant. And the men who cannot see an approaching elephant, none of them have come across an elephant before, so they imagine what it is by touching a part of the elephant and thinking about what they know. And one touches only the leg and thinks it's a pillar, and one touches only the tail and thinks, nope, it's a rope, and the story goes on. But the point is that there are limits to perception, and there is

importance in having the complete context.

The view of Alex's criminal conduct should not only be a clipped public statement here or a Slack chat about a boss there, otherwise there's a flawed understanding of reality. There's a need to see the whole elephant and the big picture, and to see things like Alex's statements being made within a real and complex company, that a $590 million loss was less than 2 percent of Celsius' assets at its peak, and that Celsius in many ways operated conservatively in the crypto space.

And with that, I'll turn it over to Mr. Westfal, who will address the nature of Alex's conduct.

THE COURT: All right. Thank you.

MR. WESTFAL: Good afternoon, your Honor.

THE COURT: Good afternoon.

MR. WESTFAL: I'd like to start by saying --

THE COURT: It's actually still morning.

MR. WESTFAL: It's still morning? I just scratched out morning and wrote afternoon.

I do want to start by saying that it is one of the great privileges of my career to speak to you today about Alex Mashinsky. I want to say it's been one of the great joys of my life to get to know Alex and his remarkable wife, Krissy, who's here today, these past few years. I'll be addressing the nature and circumstances of Alex's offense and what, we submit, was in his heart and in his mind over the five years of

Celsius' existence.

Your Honor received many letters from Alex's friends and family, including those stating, with complete certainty, that Alex would never maliciously harm anyone, and that there is not a malicious bone in his body. This is the real Alex Mashinsky.

Against this background, we submit it is useful to evaluate Alex's conduct against the culpability spectrum that the Second Circuit has talked about in *Adelson* and that Judge Gleeson talked about in *United States v. Ovid*. And on one end of the spectrum are cases involving vicious predatory conduct that targeted the weak, that took advantage of the elderly, that intentionally inflicted harm on victims. And we respectfully submit that we are worlds away from that here.

On the other end of that spectrum is conduct that was described as follows by the former chief of the criminal division in this district. He said: White collar offenders often become involved in illegal conduct as a result of their position within a legitimate enterprise or in the context of a legitimate financial relationship with others. And according to the former chief, lengthy prison sentences are not required to deter recidivism amongst offenders at this end of the spectrum who did not target and seek out victims to harm, but, rather, committed crimes while engaged in efforts that were legitimate from the beginning. Judge Gleeson said the same

thing in *Ovid*.

Your Honor, the level of depravity described in the government's memo, that level of cruelty, is nowhere in the discovery that we saw. It is nowhere in the mountains of materials that we reviewed. And it is nowhere in Alex's prior history, which Mr. Mukasey will talk about shortly. And the reason we don't see it is because it's nowhere in Alex's heart. The level of ice-cold dispassionate aiming or training your sights on targets, we don't see in this case, because he's not capable of it. And I submit there is nothing in this case that shows Alex wanted to personally inflict pain or hurt on anyone.

So here's what we'd like you to take away, Judge, about the nature and circumstances of the offense:

The portrayal of Alex as some sort of financial serial killer who set out to harm people is a hoax. Yes, there were convictions, and, yes, his conduct was very serious, but there was nothing predatory about it. He didn't act out of evil, selfishness, or spite. Alex is not heartless. He didn't act with malice in his heart. He is not capable of that, even though he recognizes that his customers, quite clearly, have suffered deep, deep harm.

We submit that one of the key distinctions between Alex's case and other fraud cases is that Alex did not misappropriate or steal his customers' assets. But the government now belatedly, we submit, accuses him of

misappropriating or stealing his customers' assets.

THE COURT: There is an agreement of forfeiture of proceeds from the offense personally received of $49 million plus specific properties. That's personal gain. There are also the allegations that the company was marketed toward people who could be described, in some circumstances, as less sophisticated investors into a company that was portrayed as good as a bank, only with greater rewards. So, I just raise that with you, in particular, when you say that there is no allegation of personal aggrandizement, if you will.

Go ahead.

MR. WESTFAL: The distinction we're trying to draw, your Honor, is between the fraud defendants — I think like one coin, as Ms. Young mentioned — who create the illusion of a real investment when there's nothing there, or the defendants who say we will take your money or crypto and invest them in all of these things that don't exist, and, instead, they take them for themselves.

What Mr. Mashinsky has agreed to do in his forfeiture is, based on his sales of his own money — not customer funds. There's not an allegation or evidence we're aware of that he ever touched a single token of his customers or stole a single penny from Celsius. We think that distinction is important, your Honor.

I would also say that we agree with the government

that Celsius was marketed towards retail customers. We disagree that Alex targeted them to inflict hurt upon them. What was in his heart and those of his employees was to help customers, not hurt them.

Alex told customers that Celsius would pool their assets, invest them in a variety of yield-generating activities, and that's what Celsius did. And then, according to the government and the PSR, Celsius paid too much of its revenue back to those customers in the form of "unsustainably high weekly reward rates."

Celsius' weekly reward rates averaged 4-1/2 to 5 percent over the life of the company. For these reasons, your Honor, we respectfully submit that the nature and circumstances of the conduct should be viewed toward the lower end of the culpability spectrum.

In its sentencing submission, the government alleges that Alex engaged in the predatory conduct that I just described. The government posits that Alex, "lured retail investors to place their life savings onto the Celsius platform where they trusted the defendant to keep it safe." But is that really what Alex said and did? We submitted a sample of AMA clips to the Court. Was it really in Alex's heart to look his customers in the eye and lure them into turning over their life savings? What Alex said in the clips that we submitted include: Again, I'm not asking you to take a hundred percent

of your spend and put it all in savings, but you should be able to spend 10 to 20 percent of your income and generate returns on it which will eventually be enough to pay all of your bills. That's financial independence.

Alex told his customers: If you made the mistake of putting 100 percent of your net worth in the CEL token — and it is a mistake — take some off the table. Why? Because you shouldn't have 100 percent of your net worth in anything, definitely not in something volatile.

Alex told his customers: If you already have a retirement plan that is either in stocks, bonds, or other assets, real estate, then you can take more risk on Bitcoin or Ethereum — meaning, because you should keep your retirement plan in place — and he continued: If you don't have a retirement plan, then you probably should not take as much risk. These are very volatile assets.

What was really in Alex's heart and mind, your Honor, was to educate Celsius customers about the crypto world and to help them achieve financial independence. Many victims have written letters of support for Alex, saying this is what his weekly AMAs meant to them. That was why he spoke directly to his customers every Friday afternoon for an hour and a half for more than three years — to help them.

It is trite, I submit, to say that Celsius was Alex's baby. It was not his baby. It was his life. It was his heart

and his soul, and he gave everything he had to it for more than five years.

I'd like to say, your Honor, a few words about the government's allegations of market manipulation.

Your Honor, this is the first case I have seen where an entire company decided to commit market manipulation by memorializing their efforts to support the price of a security in written policies and procedures, where those price support efforts were discussed candidly and with approval from the company's general counsel, chief risk officer, chief financial officer, and the entire executive committee, where the price support was executed through crypto wallets that were posted publicly on the company's website, updated regularly, and they are still there to this day, and where the only person who admitted guilt told a potential equity investor in the fall of 2021 that the company was supporting the price of its CEL token.

If you believe the government's theory of market manipulation, then you would also have to believe that Roni Cohen-Pavon was disclosing rampant criminality at Celsius in order to attract an investment from a sophisticated private equity firm, represented by a leading global law firm, and a Big Four accounting firm.

We have also shown, your Honor, that when Alex was discussing potential public statements with one of Celsius'

traders, he advised the trader that he, Alex, would not make statements that could be deemed market manipulation. That was in the middle of an alleged market manipulation scheme.

I would also note, your Honor, that the government has, in our view, not attempted to show your Honor whether Celsius' supposedly manipulative purchases were 1 percent of the market, 99 percent of the market, or somewhere in between. That evidence was not submitted from what we've seen.

But against that backdrop, the government says, your Honor, that Mashinsky wanted something for nothing, so he created an utterly useless CEL token, manipulated the market until it appeared to have value, lied about what he was doing, and then he sold and traded CEL for currency that had value, and he used that currency to maintain a luxurious lifestyle. He has three homes. His children have trust funds. That is not what happened here.

The government makes no mention of the fact that Alex's two family homes were purchased before Celsius, with savings from a 30-year career in business, and that the main trust fund that the government seems to be focused on was created more than 15 years before Celsius ever existed.

The last thing I would say on the manipulation allegations, your Honor, is this: We are sitting here at sentencing, and we still don't know who the alleged coconspirators are. The likely culprits have all denied market

manipulation in federal court filings and videotaped FBI interviews. Even the government's cooperator has denied manipulation outside of a narrow three-month period, and told the government shortly before his plea that he understood the price of CEL token reflected Celsius' success as a company.

THE COURT: I'm sorry, weren't there pleas of guilty in this case to both Counts Two and Five?

MR. WESTFAL: From Mr. Mashinsky?

THE COURT: Yes.

MR. WESTFAL: So, yes, the answer is yes.

THE COURT: Okay. Go ahead.

MR. WESTFAL: On that point, your Honor, we would state this: Under 10b-5, there are three distinct aspects or ways to commit securities fraud — false and misleading statements, course of business/course of conduct, or a scheme, three separate predicates that could get you to securities fraud. The government submitted requests to charge to the Court that would have proposed to tell the jury that they would only have to find one of those predicates, and that the scheme of manipulation was in addition to allegations about false statements.

If your Honor finds there were other coconspirators, whether one or two or dozens, we ask that you take into consideration that none of those individuals, other than the government's cooperating witness, has been charged or faces any

prison time, let alone a death in prison.

The government's failure to even charge these individuals weighs heavily in favor of leniency for Alex, even if the Court were to find what we submit is a far-fetched manipulation theory. On this score, I would point your Honor to Judge Gardephe's decision in *United States v. Michael Avenatti*. The government elected in that case not to charge a criminal defense attorney, who it named as a coconspirator of Avenatti, in his indictment, and who stood to benefit from the purported scheme. That defense attorney suffered no consequences at all.

Judge Gardephe said that it would not be justice for Avenatti to be sentenced to a lengthy term of imprisonment — in that case, 9 to 11 years — when the other lawyer referenced in the indictment as a coconspirator wasn't even charged. Judge Gardephe sentenced Avenatti to 30 months, instead.

I'd like to end, your Honor, with two points about the government's fraud allegations.

In our objections, we intended to set forth what we believe were Alex's good-faith bases for his statements, otherwise mitigating circumstances, and relevant context around each of the allegations. Context matters, in our view, your Honor, and we believe that the context can be seen in the AMA videos themselves, which we provided to you.

The context can also be evaluated based on the

information that Alex saw and heard at the time. I think this is probably the most important question about what was going through Alex's mind, what was he seeing and hearing, what was happening at Celsius at the time, not now. And I'd like to focus on two points in that regard: First, Celsius' financial condition in the lead-up to the pause; second, Alex's actions after the June 12, 2022 pause on withdrawals.

Your Honor, the government has said that there were "clear signals" that Celsius was headed for insolvency in the months leading up to the pause, relying heavily on Alex withdrawing assets from Celsius so he could pay taxes. We reject the government's hindsight, your Honor. We submit this is the government's attempt to end-run an absence of evidence of predatory conduct.

So I'd like to talk about some of the so-called clear signals of insolvency, and I know that we have these in your papers, your Honor, but I think it's important to say them out loud.

Your Honor, we submitted a recording of a December 28, 2021 executive committee meeting, where Roni Cohen-Pavon presented Celsius' preliminary financial results for the year. He predicted that Celsius would have a P&L loss of $80 million, and then said that this doesn't mean anything about Celsius' financial strength, it is important to say, noting that the results did not account for Celsius' mining company that had

just been valued at $3.4 billion and another subsidiary that had just been valued at $500 million.

Cohen-Pavon described these financial results as, quote, an accounting methodology and an accounting thing based on the drop in the price of CEL token. And he concluded his remarks by telling the executive committee, "Obviously, this cannot be shared outside of ExCo."

The government says it was Alex's fraud that covered up Celsius' financial condition.

On April 19, 2022, Cohen-Pavon predicted to the Celsius executive committee that, "In a bull market, we are going to print money."

That was less than two months before the pause. We're still not hearing an expectation of imminent insolvency in these statements.

In May of 2022, Celsius' chief financial officer, who joined from the Royal Bank of Canada, told customers publicly that Celsius was going to be around for the next 150 years.

In June, he told customers that the company's "strong liquidity framework established practices around liquidity data and modeling were elements that I was happy to find similar to other large institutions, and that puts us in a strong position to weather the recent market turbulence and ensure that clients who needed access to their digital assets could get them free and clear."

That was the chief financial officer in June of 2022.

The chief financial officer also told the government that by June 9th, or three days before the pause, there were still no discussions inside Celsius about pausing withdrawals. Cohen-Pavon told the bankruptcy examiner that he was unaware of internal concerns about Celsius' inability to meet its liabilities. And he said that "The consensus was that because Celsius had so much undeployed Bitcoin, a run on the bank would be fine."

I will end with a few excerpts of how, again, the chief financial officer described Celsius for potential investors on June 6th, less than a week before the pause. He said: "Celsius is a strong, well-known player in crypto, strong funding, and client base. Bitcoin at 30,000, not likely to last. In growth mode. We are well positioned to win in this marketplace. No run on the bank. Even with Luna and Tether downturn, we have plenty of liquidity. Strong capital management, liquidity management, risk management, compliance, KYC, AML looking to be regulated. Everything is fine," he said. "We have a diversified revenue model and new revenue streams."

The government, we submit, refuses to acknowledge the possibility that Alex viewed his company the same way that his chief financial officer did.

But this is exactly what Alex told an employee the day

before the pause. He said: As long as people can withdraw, they will not listen to social media commentators, they will come back when the storm is over, and so will CEL.

It's also why, when Alex heard about a customer struggling with a potential loan liquidation, on May 25, 2022, he instructed his team to "Send all of these cases to the head of retail lending, we will try to help as many as we can."

Your Honor, when Celsius paused withdrawals on June 12th, Alex was Celsius' largest customer, by far. He held, at rock bottom prices, more than $20 million worth of crypto on the platform, at the pause. His wallets are still posted on Celsius' website to this day.

Alex believed in Celsius, and he believed in CEL token until literally the very end. It was not his baby. It was his life. And despite all of this, the government would have the Court believe that Alex knew Celsius was bankrupt for months, or years, or who knows how long, and that Celsius was a sham, a house of cards, he definitely read Ponzi Scheme in their papers, and that it all collapsed because of one man.

I'd like to conclude, your Honor, by touching on Alex's actions after the pause, in which we will introduce Mr. Mukasey's discussion of Alex's personal history and characteristics.

Your Honor, Alex knows that his victims want their money back, and they should get back every last coin.

From the moment Celsius paused, Alex fought to make that happen. The first thing I'd like to say, your Honor, is that Celsius did not pause because it ran out of coins. It wasn't missing $4.7 billion in customer coins. The company made the difficult, conservative, prophylactic decision to pause withdrawals in order to protect customers. Celsius paused because there was a substantial amount of customer coins in illiquid investments, like Celsius' Bitcoin mining company, not undisclosed or risky investments — Bitcoin mining — and that's an investment that can't just be withdrawn in a matter of hours or days, it takes time.

From the time Celsius paused, Alex did everything he could to maximize recovery for customers, including clear actions that the government and one of its letter-writers now outright deny. When Celsius' independent directors and outside counsel were planning a fire sale of customer assets into U.S. dollars, Alex said no, and he replaced them using his own money, because he knew that customers wanted coins, not dollars.

Alex then put together the first iteration of Celsius' plan to return coins to customers. We could only give your Honor a redacted excerpt of that plan, but it was 20 pages long. And Alex presented it to 36 individuals at the bankruptcy advisors and law firms for Celsius and the UCC, including White & Case, the firm that told you this never

happened.

In the words of Celsius' former independent director, David Barse, who worked closely with Kirkland & Ellis and Celsius' current management for years, he said, until Alex resigned from the company, it was clear to me that he was focused entirely on preserving value for Celsius' customers. The last thing Alex cared about was the recovery of a substantial amount of personal wealth he created. Even after he resigned from the company, until the conclusion of the bankruptcy, Alex continued to postulate proposals to protect the customers. Through the postbankruptcy time period -- excuse me. Through the postbankruptcy time frame, my observations and experience were that Alex operated with the highest moral character in attempting to right the wrongs of which he is accused.

Alex has been seeking forgiveness from his customers ever since. One of his former employees directed a letter to the Court that Alex "worked unimaginably hard to bring value to his customers. He was an incredible leader, and everyone knew his heart was in the right place. Alex placed his customers first. He was not perfect, he is not perfect, but he never intended harm on anybody because he is not capable of such depravity."

With that, I'll turn back to Mr. Mukasey. Thank you, your Honor.

THE COURT: Thank you.

Mr. Mukasey.

MR. MUKASEY: Thank you, Judge.

So, Judge, that leaves Alex's personal history and characteristics. And for people who don't know Alex, it's got to be hard, as Mr. Westfal said, to see him as anything other than one-dimensional, a conman, a crook, a liar, a fraud. It's very, very easy to slot people in these kinds of cases into a one size fits all kind of story about an arrogant swindler who fleeces people of their life savings and laughs all the way to his private island. If you punctuate that at a bankruptcy, that makes it look all the worse. You have a terrible man, who should probably die in prison. But that's just not the reality. That's rhetoric of people who, I think, only see things in cartoonish simplicity. It's dehumanizing, it's crude, and it's degrading. It's a caricature.

And I think the truth is a lot closer in a case like this to what Justice Sotomayor said in her book, which is that good people can do bad things, they can make bad decisions. It doesn't make them bad people. And I would add to that that human beings are complex, and they have their heroic moments and they have their antiheroic moments and they have their brave moments and they have their weak moments, and they're a blend of good and bad. I imagine that's why the Supreme Court said in a death penalty case called *Woodson v. North Carolina*

that sentencing has to be done with an understanding of the diverse frailties of humankind. Nobody's one thing or the other.

And I think it's because everybody's complicated, that we shouldn't be defined by the worst things we've ever done. And I think that's where the government has Alex wrong. Both of my colleagues said Alex is, by no means, perfect. He comes before the Court today as a felon and with a lot of damage in his wake, but he's most certainly not the greedy, corrupt, power hungry outlaw that the government would have.

In Russia, as a boy, and in Israel, Alex saw a lot of nasty things, but he never let it make him become nasty. He saw a lot of bitterness in those places, but he never let it make him bitter. And he saw a lot of hatred, but he never let it make him hate.

Instead, he's led a rather extraordinary life. He built a 30-year career on things that have absolutely nothing to do with the issues in this case. Way before anyone ever heard of cryptocurrency or the blockchain, and a token was a thing you used to get on the subway, Alex was on the cutting edge of telecommunications, then ridesharing, then wireless communications in the subways. He's consistently pushed himself to explore new frontiers and take on new challenges. And there's not a person that we've come across who truly knows Alex who says he did any of these things because he was greedy

or covetous or materialistic or ostentatious. He wasn't raised by his parents, and he hasn't lived on his own, to be about money or pride or status, power. He was raised to be a man of service, and he's lived to be a man for others.

In over 30 years, he's helped countless others. He's created thousands of jobs across his companies, he's given opportunity to innumerable people, and he's filled many of his businesses with the needy, the disadvantaged, the underprivileged, immigrants. I'll give you one anecdote, which is when Alex's office was in Midtown Manhattan, he saw a woman every day that he went to the office standing outside the building, and she looked like she'd fallen on hard times, and he struck up a conversation with her after seeing her day after day, and it turned out she had been homeless, and she had a daughter, and she needed a job. And Alex talked to her and said, can you be here every day, and can you follow the schedule, and can you be committed to this job? And she said, yes. And he hired her. And this woman followed him to a bunch of different companies, worked for him for a while. Alex's sisters letter actually refers to this, which is ECF 136, page 12, Exhibit 30. And, by the way, I'm told that's not the only time that he has hired an unhoused person literally right off the street.

And more of these episodes and vignettes are recounted in, I think, the remarkable letters you got from his family and

his friends and discuss his personal integrity, his humility, his work ethic, his charity, his kindness. This is a man with prodigious talent and creative imagination and gifts that he's used in a way for others, not for his own reward.

He's humble. He doesn't exalt himself. He's not mean or nasty or spiteful.

I'll give you a couple of other anecdotes.

For years, Alex worked with a Jewish cultural organization called Aish, where he lectured young people from around the country, who were needy and disadvantaged, about his own journey from the Soviet Union, to Israel, to the United States. And in 2012, he gave, apparently, a pretty impactful lecture that focused on the significance of hard work, ethics, tenacity, and the Aish staff wrote him a note, which I can include in the record later, that talked about how Alex had directly and positively impacted not one, but close to 30 young people with lessons that would resonate for years to come. That's the staff's words. That's living for others, I submit.

When Alex found and ran GroundLink, the precursor to Uber that we talked about in our papers, he made sure to dedicate a certain number of free rides on the service to passengers who needed transportation to medical facilities, I think particularly cancer treatment, that they couldn't afford. That's living for others.

These kinds of acts, in addition to just the charity

that we listed, obviously undertaken without fanfare, without publicity, obviously predate his involvement in this case, and they can't be attributed to some desire to create a record for sentencing. I think the points on Alex's generosity is this: He's never looked down on anybody unless it was to help them up. In the military, in his prior businesses, in the community, he's always been a person for others. He's always been a person of service.

In the case of Celsius, he tried, and he failed, but he sure as hell tried.

Now, if I may, I'd like to talk for a second about an aspect of sentencing a little different from punishment that I think is an important consideration, which is rehabilitation. Rehabilitation, redemption, second chances, those are equally important considerations under 3553.

And I think people have the power to change. People overcome, and it doesn't take a decade in prison. I think Judge Underhill in Connecticut wrote a very compelling article about it a few years ago. And if you want to talk about rehabilitation, and you value rehabilitation, I guess you have to ask yourself which is better, sending Alex Mashinsky to some prison in Iowa until he dies without friends or family or the opportunity to serve — I don't think that leads to any kind of rehabilitation — or taking a person who's capable of so much more service and getting more service from him.

The government thinks he's driven by greed? Sentence him to donate his time to people who need it. The government thinks he's tried to hurt people? Sentence him to help them. He's capable of magnificent things. He's brilliant. He's inventive and imaginative. He's been a soldier and a salesman for a telecommunication pioneer and a transit innovator, and he's been successful every step of the way.

And in the 18 months since he's been sidelined, since Celsius collapsed, he wrote a book about gravity that tackles Newton and entropy and quantum space time theory and all sorts of other stuff that I don't pretend to understand.

The point is it's kind of stunning what he's done since Celsius went into bankruptcy. What that says is it says there's an opportunity for rehabilitation, regrowth, real rebuilding. There's an opportunity to allow someone who's committed a crime to atone for his mistakes, to move past them, to put in the work to heal the hurt that he's caused, to restore. That would be real rehabilitation.

And another, I think, sometimes overlooked aspect of 3553 is the concepts of humanity and compassion and mercy. And, obviously, the justice system is founded on concepts of punishment, but also on principles of humanity and compassion and mercy. And Jack Weinstein, the late Judge Weinstein, in a case called *U.S. v. Blarek*, 7 F.Supp.2d 192, Judge Weinstein said that mercy is seldom included on the list of traditional

rationales for sentencing; it is, however, evinced by Section 3553(a). He said that the notion that undue harshness should be avoided by those sitting in judgment has long been a part of the human fabric and spirit. Lenity is often the desirable route.

So, the guidelines and the sentencing process obviously don't require humanity, compassion, and mercy to be left outside the courtroom door. And I think humanity can be seen in Alex's devotion and his service to his wife and his six kids, in his care for his ex-wife, who is not well, and his special attention to his youngest son, who we also wrote about in our submission.

Compassion? Well, obviously, compassion should be demonstrated for the victims here, of course, but compassion is not a limiting force. Compassion for the victims should in no way diminish some compassion for Alex's life and all the good he's done.

And as to mercy? Well, I submit that a 15-year sentence, a death-in-prison sentence, would lack mercy.

I will quickly address, before I sum up, the deterrence points the government raised. I think the fear of recidivism here is completely unfounded. His lack of a prior criminal history says he won't recidivate. His age says he won't recidivate. The statistics say he won't recidivate. His perfect record on bail says he won't recidivate.

And prison, by the way, is not the only punishment that has the power to deter. Losing your business, your assets, your reputation, your community, and being a pariah, who will be publicly shamed on the internet in perpetuity, seems like more than enough specific deterrence. So, I respectfully submit, the prosecution has achieved that goal.

I'll simply say that general deterrence, more jail time does not mean more deterrence. Convictions need to be tailored to -- sentencings need to be tailored to the individual, but to the extent general deterrence applies, this case has resonated, and will continue to resonate, with members of the financial community, the compliance community, the cyber community have taken note and will continue to take note. I don't believe there's a need to send Alex to prison for 15 years to send that message.

Alex understands that the road to redemption here is a long one. I think when he addresses the Court in a moment, you'll discern the seeds of redemption rather than kind of a brick wall of denial. If anyone here thinks that a lenient sentence means a happy ending for Alex Mashinsky, they haven't been paying attention. I don't think I have to explain to anybody that prison is painful, it's harsh, it's traumatizing, it's isolating, it's humiliating, it's dangerous, and the studies say that in a few years, it will wear Alex down to nothing.

And even without prison, his future is pretty bleak. He's looking at an impossibly punishing set of circumstances outside of prison. The conviction alone carries extensive, permanent, unavoidable collateral consequences that will stay with him for the rest of his life no matter what your Honor decides today.

I'm sure your Honor has heard this before, but I came across it. I read an article that you wrote about Judge Weinfeld. You said that Judge Weinfeld had a policy that he would generally sentence white collar defendants to a term of imprisonment because it was necessary for deterrence. But there was one defendant that Judge Weinfeld had in a white collar case who had led a life that was characterized by quiet acts of charity, and charity was done long before it was in the defendant's interest to do the charity. And Judge Weinfeld didn't sentence him to prison, and he said that the bread that the defendant had spread on the waters had now returned to him.

Alex's track record of doing good for others and using his talents to serve others presents a unique basis to consider leniency in this case.

Your Honor, we ask that you sentence Alex Mashinsky today with an open mind and with a gentle heart.

THE COURT: Thank you.

Mr. Mashinsky, I'll listen to you.

THE DEFENDANT: Can I use --

THE COURT: Yes, please. Keep your voice up, use the microphone.

First, as I've asked your counsel, are there any objections that I haven't resolved in connection with the presentence report that you want me to deal with?

THE DEFENDANT: Yeah, I have a prepared remark -- I'm sorry.

THE COURT: You want to take a moment?

THE DEFENDANT: I'm fine, your Honor.

THE COURT: Okay.

THE DEFENDANT: I have prepared remarks, but I would like to say a few more things.

Thank you, your Honor --

THE COURT: I'm going to listen to anything you would like to tell me in connection with sentence, but I always ask the first question as a matter of practice — whether there's anything else that I haven't dealt with in the presentence report that you want me to deal with, objections that I haven't already dealt with? Your lawyer says no, but I wanted to ask you.

THE DEFENDANT: I would like to comment that the $590 million in loss, in my view, are uncollected funds. These were things unavailable, and like Marc and others, my lawyers, have said, they were -- we had billions of dollars available on the platform; otherwise, we couldn't return billions of

dollars. And the only way after -- we had a balance of $25 billion, and we allowed everybody to withdraw down to 5 billion. We decided to protect all those remaining customers.

So, I...

THE COURT: Okay.

THE DEFENDANT: So not be left with my most loyal customers having to wait for the rest of their life for the rest of the coins, so we took the action with everybody on the board and everybody in my executive team — overnight, the decision was made in five minutes — to pause withdrawals and allow everybody equal opportunity at recovery.

MR. MUKASEY: I think your Honor can consider that under 3553 as part of his statement.

THE COURT: Okay. I've taken that into account. I will take it into account. It doesn't change anything in the presentence report.

Go ahead.

THE DEFENDANT: The reason I forfeited the 48 million and all my claims and everything else possible is because, as I said to your Honor before, I wanted to be part of the solution, not part of the problem. My entry of the plea is my effort to be part of the solution and not part of the problem.

I would like to finish my -- I don't have any other comments. I think we did -- I spent three years collecting all

the evidence possible to show your Honor that all my actions were always meant to be to protect my community and...

And I failed.

THE COURT: Why don't I take five minutes.

THE DEFENDANT: I don't think it's going to help, your Honor.

THE COURT: Well --

THE DEFENDANT: I would like to read my statement.

THE COURT: Okay. Are you sure? I'm happy to take five minutes. You can talk to your lawyers.

THE DEFENDANT: Thank you, your Honor, and --

THE COURT: Okay.

THE DEFENDANT: I want to thank the Court for your very careful attention to my case. I truly appreciate it.

Judge, every year in Yom Kippur, the Jewish judgment day, I ask myself whether, on the whole, my work and my life made the world a better place. For most of my life, I was pretty sure the answer was yes, but I could not say that about the last three years.

During that time, I failed my community, and I'm here to take responsibility for that. My false statements were inexcusable, and I made a lot of decisions that caused people's coin to become unavailable. I never wanted to hurt anyone. I never targeted anyone. But I know many of the victims that are here today or who are standing by to see me punished for what

happened. I understand that. I've read their letters, and I am responsible.

As someone who came from nothing, I recognize how hard people work to earn, save, and invest in crypto. I worked very hard, along with many others, to try to recover all those coins and more, and I'm glad to see that many customers already got back more than their bankruptcy claims.

It's not an excuse. I just hope this will ease some of the pain and suffering for many of the victims.

I respectfully ask the victims for forgiveness and apologize for all -- to all of them for my mistakes. I'm truly sorry. I wanted to be of service to people. I wanted Celsius to be a service to help people. I destroyed that, and I'm sorry.

This country -- I would like to tell a short story, your Honor.

THE COURT: Go ahead.

THE DEFENDANT: My father, my grandfather, they're all refuseniks in Russia. The only reason we were allowed to leave was because the United States of America donated 300,000 metric tons to free 300,000 Jews, and my parents, and later my grandparents, were allowed to leave Russia. When people used to ask me why did I come to the United States, I used to joke and say that four metric tons of wheat that were paid for my family to leave Russia.

This country has given me everything. It allowed me to fulfill my dreams, live a life that I would never imagine, and I would never, never try to hurt anybody here after everything that the United States has done for me.

This country gave me an opportunity to rebuild my life and build a family and serve others. I hope the Court will give me one more opportunity to rebuild my life, serve others, and get a little more time in the future with my family.

Thank you, your Honor.

THE COURT: All right. Thank you, Mr. Mashinsky.

I'll listen to the government.

Let me ask the government initially, are there any objections to the presentence report that I haven't dealt with?

MS. NICHOLS: No, your Honor.

THE COURT: No other objections?

MS. NICHOLS: No, your Honor.

THE COURT: I'll listen to you. Whether you wish to call the four victims first or after you speak, it's up to you.

MS. NICHOLS: I'd like to call them after, your Honor.

THE COURT: Okay, fine.

MS. NICHOLS: I'd like to speak about the 3553(a) factors here today, and I'm going to focus --

THE COURT: Do you want to use the podium? You can speak from there. That's fine.

MS. NICHOLS: Can you hear me, your Honor?

THE COURT: Just speak up, use the mic.

MS. NICHOLS: Yes, your Honor.

I plan to focus most of my remarks on the characteristics of the offense and the characteristics of the defendant, which are, as they often are, intertwined here. But before I turn to Mr. Mashinsky and his words and his actions, which are why we are here today, I'd like to give a moment of time to additional victims who could not be here. And I know the Court has read the submissions, but I would just like to highlight a few.

Joseph Forucci wrote that he invested in Celsius because he hoped to change the trajectory of his and his daughter's life.

Geoffrey Cirkel wrote: What hurts the most is not just the money, it's what the money represented — the security of my family, the education of my children, the belief that the financial system, even in the crypto space, had some basic level of transparency and ethics. I am now forced to start over financially as a parent, as a provider, as a human being, who once had faith in innovation and progress. I am trying to rebuild not only my financial life, but also my ability to trust.

Daniel Frishberg wrote that Mashinsky's lack of an apology or anything resembling remorse added insult to injury.

And this was a theme in the victim letters, your

Honor.

Rien VanMarcke wrote that he had convinced his aging mother and other close friends to invest their savings based on Mashinsky's promises of security and fairness. He writes: When Celsius collapsed, I had to tell them that it was all a lie. The guilt of failing those who trusted me still haunts me. He goes on to say: Mashinsky's cruelty didn't end with the collapse. His family mocked the victims with unbankrupt yourself merchandise funded by stolen savings while flaunting luxury lifestyles online for his wife and children.

And those T-shirts, unbankrupt yourself, sold by the defendant's wife, was also a theme in the victim letters.

Finally, Rejoy Varghese writes: I worked tirelessly to save for my four children's education, dreaming of giving them opportunities that I never had. Those four Bitcoins represented years of sacrifice, long hours, and unwavering commitment to my family's future. They were not just numbers on a screen. They were my hope, my promise to my children that they could pursue their dreams without the burdens that I faced. When I entrusted my savings to Celsius, I did so with trust and optimism, believing in the vision Alexander Mashinsky presented, but that trust was betrayed. Greed corrupted his vision, and he unjustly enriched himself at the expense of hard-working people like me.

Mr. Varghese is the "every man" of Celsius' victims,

of Mashinsky's victims. Mr. Mashinsky is, in the words of his own counsel, a predator. He preyed on hope.

And in some of the submissions that we have seen in advance of sentencing today, there was minimization of Mr. Mashinsky's actions. There was a suggestion that these victims, who believed in what Mashinsky was selling, should have known better, they should have sifted better between the truths that he was selling some days and the lies that he was telling others.

Mr. Mashinsky knew exactly what he was doing when he was getting on those AMAs every week and selling these people hope. He knew, but they did not, that it was a false hope.

And despite the efforts in the bankruptcy, which I am going to come to a bit later, your Honor, those victims are not going to be made whole despite the large numbers that we are talking about in terms of the criminal forfeiture and the recovery efforts in the bankruptcy.

I'd like to talk about the defendant's actions at Celsius, and I'd like to do it in a chronological order, your Honor, because what we have heard today from counsel and in the written submissions is not true. It is not true that for years Celsius provided the service that it claimed to provide. It is not true that the products were real. It is not true that an unexpected dip in the crypto market is the cause of Celsius' collapse. Alex Mashinsky's fraudulent schemes are the cause of

Celsius' collapse.

Celsius was probably a good idea. It was innovative. But it did not operate the way that the defendant said. And it was his lies that induced these customers to turn over their savings to the platform.

In the beginning, there was the ICO, and as the Court has already found, Mr. Mashinsky lied about the amount of money that the ICO raised, and this is right out the gate. Those lies were important and material because they gave Celsius a sense of momentum, a sense of proof of concept. So many people believed in this business model was essentially the claim, and it wasn't true.

In 2019, directional trading, explicitly, specifically, personally done by Mashinsky, caused a $13 million loss. And at that time, the company's assets under management were only about $100 million. So this loss was, frankly, catastrophic. And the CFO at the time came to Mashinsky at the end of 2019 and told him, you have to stop taking customer coins because the customers do not know that they are putting their money into an insolvent company. This was a face-to-face conversation with Mashinsky, and he did not take that advice. That CFO resigned.

At the beginning of 2020, uncollateralized loans made up more than 70 percent of Celsius' institutional book, fully uncollateralized. And as the chart in the government's

submission at page 20 shows, fully unsecured loans continued to make up about 20 percent of Celsius' book for the remainder of 2020. Much of the remainder of those were only partially collateralized, with about 10 percent fully collateralized, and as the PSR sets forth, and as the Court has found, Mashinsky repeatedly claimed that Celsius only took fully collateralized loans. This was not true.

In early 2020, a recovery committee was formed, sometimes also known as the bankruptcy committee. This was a committee whose task was to see whether Celsius had to go under or could continue to be a going concern. It was disbanded in the late summer of 2020. But before it was disbanded, the CEL manipulation began.

Celsius began making, in June 2020, excess purchases of CEL on the market in order to support the price. These purchases were directed by Mashinsky, as set forth in the PSR and as the Court has found.

Counsel refers to this as a government theory and as allegations, but it is neither. It is the offense of conviction, and it is offense conduct that has been now found by the Court, and it is set forth in the PSR.

Defense counsel says that it is somehow not believable that an entire company could have decided to commit market manipulation, but that is what happened, as directed by the company's CEO. And Celsius, the entity, has entered into a

nonprosecution agreement with the government in which it admitted facts that were based on its own internal investigation, including that the rise in the CEL token was not the product of market forces, but was, instead, attributable to the fact that Celsius executives, including Mashinsky, had orchestrated a scheme to manipulate the CEL token by taking steps to artificially support the price of CEL. That's in the NPA, which is the government's Exhibit 2, at paragraph 11.

At the beginning, your Honor, of 2020, when the recovery committee was first formed, one of the things that it did was lock up CEL rewards for company insiders as a cost-saving measure, so insiders, like Mr. Mashinsky and other executives, would no longer be earning the rewards that noninsider customers were entitled to based on their own deposits on the platform.

Mr. Mashinsky, as the largest holder of the CEL token, other than Celsius itself, was entitled to a great number of these rewards. But in the summer of 2020, these rewards were then unlocked. And Government Exhibit 31 is a conversation between the CFO at the time, Harumi Urata-Thompson, and a trader, Johannes Treutler, on August 5, 2020. Defense counsel has commented in their reply submission that the government has submitted conversations that Mr. Mashinsky is not on to support the conduct here, and I think this conversation, among many others, is important, in part, because it refers to

conversations that the participants were having in realtime with Mashinsky himself.

Ms. Urata-Thompson mentions two conversations with Mashinsky about the topic of his CEL rewards. She had challenged him on whether the company could afford to pay him the rewards which he was ostensibly owed based on his CEL token holdings, which, again, he had gotten for free. Celsius was paying Mashinsky at this time $28,000 a week in CEL rewards, even as it had spent over $2 million during a four-month period bolstering the price of CEL in the market, and even as it had a deficit of half a million dollars for that month.

Mashinsky has said, and his counsel has said, that he was not motivated by greed. But this conversation proves that lie. He was pushing back to ensure that he could continue to get what he wanted — wealth for himself, wealth for his family — even while the company was headed for a $6 million operating loss that year.

The excess purchases that the company engaged in in the year 2020, again, at Mashinsky's direction, were effective. The price of CEL went up from a low of 5 cents in October 2019 to 5.50 at the end of 2020.

Mashinsky at times personally participated in this manipulative trading. For example, on October 21st, 2020, as set forth in Exhibit 137 to the government's submission, Mr. Mashinsky checked in with Johannes Treutler, the trader, to

ask how much dry powder do you have left. And when Treutler indicated he did not have enough, Mashinsky said that he would jump in.

He then purchased 300 ETHE worth of CEL "to support the morning sellouts earlier today." Treutler told Mashinsky that he had saved the day.

Mashinsky did not want those coins, your Honor. And Treutler knew that. He was not building a position in CEL. Treutler offered that Celsius' OTC desk, over-the-counter desk, would cover Mashinsky's purchases in order that he be made whole after his buying supported the price.

To be clear, as set forth in the PSR, these purchases of CEL in the market, excess purchases compared to what the company said that it was doing, were not part of any sort of sanctioned sell/buyback program, they were not blessed by attorneys, and they were not written or approved. The company said that it was doing one thing by buying certain amounts to cover customer CEL rewards, and then, undisclosed, it was buying far more than that. It was also buying to combat negative news articles, including at Mashinsky's direction in July 2020.

So, by the end of 2020, your Honor, Celsius experienced its first institutional default. And as the Court has already discussed, Mashinsky was copied on an email that said that that counterparty was in default on their loan and

would likely default on a second loan.

Over a year later, in November 2021, Mashinsky said that Celsius had never had an institutional default. And this is not the only such statement, they're set forth in the PSR, but I want to talk about this one, because Mashinsky added: And, obviously, we expect it to happen at some point, referring to institutional defaults, but it hasn't happened yet.

And I call this to the Court's attention because the AMAs here are peppered with similar indicia of various similitudes. Mashinsky is not just lying; he is saying it in the sort of folksy way that purports to be transparent — hey, things happen, any company could suffer an institutional default, when it happens, I'll let you know, but we have never had one. And it was this affect that induced so many of his customers to trust him.

Mashinsky is not a buffoon who cannot remember information that he is given and emails that he has received. He has calculated a persona for maximum effectiveness with this kind of phony transparency.

In 2021, early 2021, the price of CEL hit 650. And, at that point, it was so high, that even Mashinsky agreed that the company could ill-afford to support the price at those levels, so he directed the team to cut back on the market purchases to pay rewards. This directive, among others, shows his understanding that the market buys that he was directing

were driving CEL's price. And around the same time, the company discovered that it had been selling customer Bitcoin to pay on these purchases of CEL, which was, at this point, much more expensive than it had been before, and the company realized that it was short Bitcoin and had to conduct extra purchases to make up the price.

Mashinsky does not deny that he was made aware of this, but he has repeatedly said — including today, and including to the bankruptcy examiner — that Celsius never used customer coins to pay for its CEL purchases. That is not true.

Towards the end of 2021, Roni Cohen-Pavon took over for Treutler as the key person orchestrating Celsius' criminal market manipulation of CEL. There are a number of conversations between Cohen-Pavon and Mashinsky over the last months of 2021 that show that Mashinsky knows exactly what's happening. Mashinsky tells Cohen-Pavon in October '21, the price will not take care of itself.

Cohen-Pavon replies: We're not just sitting and watching the price. The issue is that people are selling, and no one is buying except for us. The main problem was that the value was fake and was based on us spending millions just to keep it where it is.

He goes on: This week, we spent "only" $4 million on top of rewards, and the price is still going down.

In this conversation, Mashinsky acknowledged that CEL

lacked value, but denied that this was an issue as long as the price continued to go up, artificially buoyed by Celsius' buys. He said, "Everyone wants to buy these tokens because they think the price is going up."

Who benefits from that speculative frenzy? Alex Mashinsky. In the same year, in 2021, Mashinsky is, not once, but several times, selling crossed with the company's excess buying, and his sales separately violate the company's CEL trading policy. In early 2021, the CFO at the time brought this to Mashinsky's attention and told him to stop violating the policy, and told him that his selling into the company's buy orders was making it very difficult for the company to continue to keep CEL's price where it was. He does not stop.

Other employees discuss this pattern of Mashinsky selling into the company's buy orders, and, again, he notes in his reply submission that as to some of those, he is not on the communications. But it cannot be — and it is not true — that Mashinsky was the only person at the company who did not understand that this was happening.

Employees complained that they were spending so much money to support the price for CEL, only to allow Mashinsky to be able to sell higher. He did know, and he was told in early 2021, but he could not be deterred.

Also in '21, his repeated lies during the AMAs begin to come to a head. His risk team begins reviewing them and

putting in place an editing process to take out the misrepresentations.

In early 2022, new executives come in with impressive backgrounds in finance. There is also a massive equity investment that results in those equity investors getting board seats and access to company management, including the new executives.

These new professionals identify problems with the company. They're not new problems, but they are of renewed focus at the highest levels of Celsius.

Mashinsky continues to ignore the problems. He continues to oppose lowering rewards rates, and he churns through the entire equity investment in mere months. He does not listen to these new advisors. We highlight some examples of this in our submission. I'll just flag a couple.

In May 2022, Celsius' CFO told Mashinsky that the CEL token rewards rates need to be lowered because, otherwise, they will continue to dig a deeper hole for many months.

Mashinsky ignored this advice and said: Follow my lead on CEL. I don't need help in marketing. I am going to bring in a few billion, just like I brought in my first 20 billion.

These messages show that there was no amount of bad news that Mashinsky could receive that would change his attitude towards CEL and his belief that the way for Celsius to

continue to appear to be solvent was simply to raise new money from new investors.

Chris Ferraro, who has served as the chief restructuring officer during the bankruptcy and joined the company in March 2022, shortly before it folded, testified in a deposition that Celsius had spent approximately $300 million purchasing cryptocurrencies for its accounts to cure directional positions and make them market neutral, as Mashinsky had promised.

Even after the huge losses in January of 2022, resulting from directional positions at Celsius, Mashinsky said, in an April interview, that the company was delta neutral. After that interview, a chart was made for him by senior executives at Celsius, setting out his false statements, and he was confronted with it and told to stop repeating these lies. And it was only at this point that Terra Luna imploded.

So it is not true that Celsius' collapse was caused by external forces beyond anyone's control.

After the price drop across the crypto industry that resulted from the Terra Luna implosion, Mashinsky did a few things in response. He engaged in more AMAs to try to reassure his customers. He tried to push retail loans to get more collateral from his customers. He engaged in more buying to prop up the price of CEL, including by going to a trader directly after the CFO told him that they could not spend more

money on propping up the price of CEL. And he took his own money off the platform.

Mashinsky's knowledge that the company was in a dire position is best illustrated by his actions. He claims in his reply submission, for the first time, that on April 8, 2022, he made deposits to the platform. We checked this. There were not deposits on that date. There were other deposits in the month of April in Bitcoin and ETHE. Those were very nearly to the dollar canceled out by withdrawals that his wife made from her account, worth about $2.95 million, on April 10, 2022. This offset the assets that Mashinsky was bringing onto the platform.

And then, as set forth in the PSR, and as we have already discussed, in May, he takes almost all of his ETHE and Bitcoin off the platform.

That brings us to the bankruptcy, your Honor. Mr. Mashinsky claims again today that he is being helpful. He claims that the last thing that he cared about was his own wealth. And that is not the case. He has pointed to him voluntarily sitting for an interview with the bankruptcy examiner as evidence of his good faith. Among other things, he told the bankruptcy examiner, "People might say I'm a God, but I'm not. I'm only human. I just went on a show once a week to tell people what I feel."

He gave factual information that the bankruptcy

examiner did not appear to credit, including denying that Celsius manipulated the price of CEL or that it engaged in directional bets.

He was forced out of the company in September of 2022. So it is not true that he was the architect of the restructuring plan that was eventually put into place during Celsius' bankruptcy proceedings. I understand that he met once, in August, with the unsecured creditors committee, but that meeting was not integral in any way to the plan that was put into place, as led by Chris Ferraro and the other employees of the company during the restructuring process.

I'd like to talk about the claims briefly in the bankruptcy. The plea agreement requires Mr. Mashinsky to withdraw with prejudice the claims that he has asserted on behalf of himself and the entities that he controls. He has not done this, as of today. I have spoken, just this morning, with Mr. Mukasey about this, and I think that we can get there, your Honor, but for today's purposes, the agreement in the plea agreement has not been fulfilled, and so --

THE COURT: Excuse me. Hold on.

Yes?

MR. MUKASEY: Your Honor, I'm sorry for interrupting.

THE COURT: I'm sorry, no, go ahead.

MR. MUKASEY: I just want to clarify --

THE COURT: I'm sorry?

MR. MUKASEY: I just want to clarify: Last night, at about, I don't know, 5:00 o'clock, I sent an email to the government saying, are there any issues we need to discuss in advance of sentencing? I want to make sure the whole thing goes as smoothly as possible.

The government said, you know, we don't really know how it's going to go. If you want to write us an email, we'd be happy to listen to it. I think it was in good faith.

No mention of this alleged noncompliance with the bankruptcy undertakings in the plea agreement. It hit us this morning, you know, out of thin air, that the government thinks Mr. Mashinsky has not done what he needs to do with respect to withdrawing claims. We are not his bankruptcy counsel. We are --

THE COURT: Fine. It won't affect the sentence, whether the claims are withdrawn from the bankruptcy.

MR. MUKASEY: I just want to put on the record that we are going, we endeavor, to live up to the language of the plea agreement, to make sure that Alex does whatever he can to do that.

THE COURT: Okay. Thank you.

Government?

MS. NICHOLS: Thank you, your Honor.

I appreciate what the Court said about it not affecting the sentence. I think it does affect the

restitution, because in the plea agreement, the consideration for him agreeing to withdraw with prejudice the claims that he has asserted on behalf --

THE COURT: In the plea agreement, the government does not seek restitution because it says that it will seek restitution for victims in the course of the bankruptcy proceeding, and, therefore, it urges the Court not to impose restitution as part of the sentence in this case — yes, I know that.

If the government alleges now that there is something different in the bankruptcy that should affect that provision, the Court would not be in a position to formulate an order of restitution today, obviously. I appreciate that restitution is something that could be determined in the future, after 90 days or even a further extension, put the defense says it will comply with the provisions of the plea agreement with respect to withdrawing claims in the bankruptcy.

MS. NICHOLS: Exactly so, your Honor. And so all the government is asking for today is that the Court order that restitution to the victims does apply, and we can have a conference in 90 days, but it sounds like it could very well be resolved ahead of then.

THE COURT: Mr. Mukasey, do you have anything?

MR. MUKASEY: I just want a moment to look at the plea agreement, Judge.

THE COURT: While you're doing that, I want to take a break for the court reporter, in any event. I was going to wait until this portion of the government's presentation ended, but since there is a break, I'll take a ten-minute break now.

(Recess)

THE COURT: All right. The government.

MS. NICHOLS: Thank you, your Honor.

We had a chance to talk again with defense counsel during the break. And all the government is asking is that the Court defer the question of restitution for 90 days. I understand that's acceptable to the defense.

THE COURT: Okay.

MS. NICHOLS: The Court has already said that this is not going to affect the sentence, so I won't continue, but I think the reason why the government thinks that it's significant is that, despite Mashinsky's gestures at prioritizing recovery for victims, he's, once again, not putting his money where his mouth is, and he wants his family and his children, and trusts for the benefit of his children, and CEL token in his wife's name that he gifted her during the fraud, to come before the recovery of the victims here. I do think that that is worth the Court's consideration at sentence.

In the final reconciliation of the numbers here, Celsius' customers lost access to approximately $5 billion as of the date of the pause. As the litigation trustee has said

in his letter to the Court, even under the most conservative estimates, Celsius was missing at least 1.3 billion at that time, and the true number is higher because some of the assets that Celsius held on its books at the time of the bankruptcy turned out to be worthless.

So, when we fast forward to the first distribution to creditors in the bankruptcy in January 2024, crypto prices have come up during that time period compared to what they were as of the bankruptcy petition date. Celsius was able to distribute just shy of $3 billion, constituting 58 percent of claims. But that is obviously not making customers whole because, first of all, it's not a hundred percent, and, more saliently, Celsius benefited from the run-up in prices and customers did not, because their claims were valued as of the petition date, they were dollarized as of the petition date.

So if the customer assets that Celsius had held on the bankruptcy petition date were valued at today's crypto prices, those same assets would be worth approximately $12 billion. And I think, your Honor, that is where some of the anger and the hurt is coming from in the victim letters here, because it wasn't crypto that was a bad bet, it was Mashinsky. And they realize that if they had held their Bitcoin somewhere else, it would be worth far, far, far more than they will ever get back for it.

As I've already said, as he agreed in his plea

agreement, Mashinsky benefited tremendously from this fraud. He made about $46 million selling CEL token into the artificially inflated prices — CEL token that he got for nothing because it was gifted to him during the ICO. He got an additional $2 million in bonuses for CEL hitting certain price thresholds, again based on the artificial manipulation.

Where did that money go? Some of it, the government froze through a TRO in the summer of 2023 and expects a forfeit of that property.

A lot was spent on Mashinsky's lifestyle. There was about $30 million in CEL proceeds in a particular Fidelity account, and some of that was disbursed to other accounts, but the rest was spent. That $9 million penthouse in Manhattan was renovated over the course of the fraud. Mr. Mashinsky has two other properties, real property.

According to the PSR, during the fraud, two new trusts were formed to benefit Mashinsky's children, and one of the older trusts routinely covered Mashinsky's living expenses with the consent of the trustee, Mashinsky's sister.

At the end of this, Mr. Mashinsky will still be a wealthy man, but his victims cannot say the same.

Your Honor, I have covered the nature and circumstances of the offense. I have covered the characteristics of the defendant that are relevant here to the conduct that he engaged in.

I'd like to speak very briefly about specific deterrence, general deterrence, and respect for the law.

Your Honor, the government's view is that you can, and should, listen very carefully to what Mashinsky has said, what his counsel has said, in considering whether he has truly made himself accountable for these crimes. He apologized today for mistakes, but throughout this sentencing proceeding, he has acknowledged with specificity very few mistakes. And there is a real concern that a significant sentence is needed to impress upon him specifically that what happened here was not a fluke, it was not a whoops-a-daisy, it was not the volatility of the crypto market; it was him, it was his lies, it was his fraud.

The Court should also consider general deterrence and respect for the law. The government is asking for a big sentence, your Honor. We do not do that lightly. We're asking for a big sentence because deterrence is necessary given the scope of the fraud here.

Deterrence and respect for the law is particularly important in the crypto industry, which is new and ever-changing. A strong sentence is needed to send the signal that fraud is not acceptable in any space, whether it's traditional finance or the crypto industry or some as yet unconceived innovation that may come in the future.

The government is asking for a significant sentence in order that the Court show future fraudsters that crime does not

pay.

So, with that, your Honor, unless the Court has other questions for the government, there are a number of victims who have asked to speak. I think the number has increased to six today, and I will start with --

THE COURT: Could I stop you?

MS. NICHOLS: Yes, your Honor.

THE COURT: We have gone for almost three hours, and I think it's fair to have a lunch break before I listen to the victims — fair to the victims, as well as to the court reporter. I could go on without lunch, but in deference, I think we should break until 2:30. So, we'll break until 2:30.

(Luncheon recess)

AFTERNOON SESSION

2:30 PM

THE COURT: All right. Government?

MS. NICHOLS: Thank you, your Honor.

There are a few people who have indicated that they'd like to speak, and in no particular order, I'll call Cam Cruz.

THE COURT: Please state your name.

MR. CRUZ: Good afternoon, your Honor. My name is Cameron Cruz.

THE COURT: And could you keep your voice up.

Mr. Westfal, maybe raise the volume on the lectern mic? Thank you.

Go ahead, sir.

MR. CRUZ: Yes, thank you.

My name is Cameron Cruz. I am one of Mr. Mashinsky's many victims, and I serve on the litigation oversight committee, although I'm speaking in my only personal capacity today.

And I think I'd just like to express the severe damage and hurt that Mr. Mashinsky's actions have caused. And just hearing the defense and their expression of what occurred is very different from the reality that thousands of Celsius customers across the world have experienced.

Ms. Young brought up the idea of an elephant and how metaphorically people are touching the elephant, they would get

different impressions of what occurred. I would submit that the defense is at the opposite of the elephant from the victims of Celsius. We are at the tusk end, and we have been gored. At the other end, we are hearing simply things that are not true. There was something about expressing the damages 2 percent of the total assets that Celsius managed. This is a horrific minimization of what occurred.

I've spoken to countless victims across the world, one of which, just as an example, doesn't want to be named, but he is an Australian customer who lost all of his Ethereum loan collateral, and because he had acquired it at low prices, he now owes massive tax bills and is effectively wiped out. His wife and kids are destitute, and he used to have what he thought was a fortune. And he was induced into Celsius because of what Mr. Mashinsky put forward as the Mashinsky method. The defense had mentioned that he is working on a new book about gravity, but he seems not to understand the gravity of the situation.

He is claiming that he is guilty, but everything that he is saying through his defense is as if this is no big deal. Like he even submitted a letter from one of his children that said his dad had not done anything severe. And this would have been reviewed by, presumably, counsel and the parents, but this is what they're teaching their kids — that this is not anything severe. People's lives have been ruined.

In the span of the three years we've been waiting for justice, the estate has published that they are aware of 231 creditors who have passed away while we are waiting for justice. They will not see justice; they did not survive. And the defense has put a focus on how painful it is to be behind bars. What about the pain of these people and their families that have lost their family members waiting for justice?

Mr. Mashinsky seems to think that he can turn himself in weeks later — he wants to attend a wedding. I ask Mr. Mashinsky how many funerals have you attended of your victims? Can you even remember the names? You say you've read our letters. Can you remember -- how many names can you remember?

You said that you --

THE COURT: Just address the Court.

MR. CRUZ: Very well.

He has said that he has spoken to us. In December of 2022, I publicly invited Mr. Mashinsky to a conversation. Instead, he blocked me. And he has blocked many of us on Twitter. The people he has spoken to are the people that still believe that he is innocent, many of which have written letters in his defense.

And he has maintained this posture that he is pleading guilty, but he has said only two misstatements. If you review the corrections that his team has submitted, that I believe the

prosecution has included in their exhibits, where they reviewed his AMAs for misstatements, any one of these AMAs would include much more than two misstatements. So he is averaging over two misstatements per hour, let alone two misstatements over five years. It's just, frankly, offensive to those of us that have had to listen to these AMAs, and have had to listen to the lies and the clear misstatements.

And the record will show that he knew about these horrific losses, and he simply thought he could cover it up and fix it, but it only made matters worse. Rather than tell his customers about these losses, he just carried on.

I came to Celsius in late 2021, after most of the horrific incidents occurred. And their promising yield or interest, whatever you want to call it, between 5 and 8 percent, maybe 5 and 9 percent, depending on what assets you hold, in reality, my return was negative 100 percent because the life of my funds was less than six months on the platform, and I got back maybe 40 percent of my original investment.

This is not uncommon. Many people have been wiped out. I was lucky that I only put perhaps two years of my -- or I got back about two years of my savings lost, but there's others that have put their life savings in here. And to go back to the Mashinsky method, the idea of being able to live off of the interest you have, that was an invitation to put your life savings at risk, because you would need to generate

that healthy return to fund your lifestyle.

So he was inviting people to deposit their life savings. The day before the pause, he encouraged a customer to deposit or to open a retirement account on Celsius for a reward of a thousand dollars. If you're inviting people to have their retirements on your platform, these are long-term savings that need to be protected, the type of investment that should never be engaging in or exposed to this type of horrific loss.

And when I discovered the losses that my funds were subjected to, that occurred prior to my arrival, it made it even more offensive to me because he had hidden these. He had actually also suppressed -- there were independent journalists that had uncovered many of the Celsius loss events, including they lost the keys to 35,000 of Ether, they had failed to get back collateral on a loan to Equities First, and so this was a half a billion dollar impairment, but did they tell their customers? Instead of telling their customers, they just pretended like everything was okay. They said we know that we have borrowed, say, over a hundred billion dollars secured against our collateral, which now is appreciating value, and you don't have it anymore, but we'll pretend like the loans are intact, we're just going to say you owe us an uncollateralized loan.

So this was a huge problem they concealed while Mr. Mashinsky went on AMAs saying they had no defaulted loans.

It's just simply not reality.

The defense also mentioned there was no, what was the term, original sin. The ICO was a fraud. They did not raise $50 million; they raised $32 million. The "I" in ICO stands for "initial." This is original sin literally in the term itself. Celsius was founded on fraud, and it compounded. You can't take shortcuts like Mr. Mashinsky did. And he continued to do that from the beginning to the end, until he ran out of time.

He's presented here that he looked out for his customers by pausing at the end to protect us. The reality was, they run out of Bitcoin to distribute. They had no choice. The Bitcoin had all flown out the door.

They only paused because they had no options, and, unfortunately, customers that have lost their money, many of us have much more limited options in our own lives. And I think that is where the focus should be today — on the victims and how much we have suffered, many of which are too overcome to report on their victimhood because to lose your life savings and get a small amount back poses an incredible toll, and it's very difficult for people to not only lose their money, but have to face the shame and humiliation of having believed in somebody who asked for their trust and who returned so little.

The defense has said that Celsius was Mr. Mashinsky's life. So I ask the Court to judge him based on Celsius, then,

rather than all these other elements that they're trying to introduce. This is really one of the worst crimes, and needless, because he could have come forward at any point over the five years and been honest. But even here, today, he's not being honest. He's minimizing what he's done, and for that, I ask you to impose a harsh sentence today.

Thank you, your Honor.

THE COURT: All right. Thank you.

MS. NICHOLS: David Smith.

MR. SMITH: Hello. My name is David Smith, D-a-v-i-d, S-m-i-t-h.

THE COURT: Good afternoon. Go ahead.

MR. SMITH: Yes.

I didn't intend to speak here today, and I didn't even know earlier this week if I was going to come. I thought, as I was asked to speak, you know, would that be helpful to other people, because I've heard that term come up before. Because I also realize by putting myself on the public record, I'm, yet again, exposing myself to potential problems, which have been ongoing, you know, from being involved in Celsius. It's not over for me today — it continues. People continue to try to scam me. Today, there's a hearing somewhere else, you know, where I could be representing my interests in a different court matter over there. And, so, the victimization, you know, continues to this very day, it's not even over, and it probably

won't be over for years.

And I think in this society, the reason I'm speaking here today is because crime cannot pay. We need to have a society where people do not commit crimes and so this doesn't happen to more people. It already happened to me and those of us here and the people who have lost their lives during this time, and I just hope that we have less and less, ideally none, of that, which was one of the promises of this new technology where you could have transparency and understand what was going on.

And I think Ms. Young's words stuck out to me, as well, when she talked about the elephant and talked about focusing on small pieces. And I think that's what's been tried to happen here today — they try to focus on small pieces instead of talking about the broad picture of what happened, where this company and Mr. Mashinsky engaged in risky behavior and self-enriching behavior, lies to cover that up. And after the fact, when everything went south, maybe he did try to recover for everybody, because that was then in his and his family's interests, because if I was made whole, I wouldn't have any problem, I wouldn't be here today. There wouldn't be a court hearing somewhere else, you know, that I'm not at.

And so that elephant really stood out to me, where I think they tried to focus on minutia instead of the very simple broad picture.

My understanding of this company was that they have overcollateralized assets. And, so, when they lend you a Bitcoin, they've got maybe 1.6, maybe 2 Bitcoin, something like that, behind. So, then, following that model, it's very hard to lose funds, you'd have to be hacked or have something go awry. I never imagined that the CEO of the company would lie about what was going on and would engage in the risky behavior, the trading, all these things, that have been talked about here.

Talking about the company still existing, that was pointed out as a benefit, I don't understand that at all. I wish that the company right now does not exist because I continue to be victimized and continue to wonder when am I going to get the value there. I wish it would have been shut down two and a half years ago and sold when this whole thing went. And so I don't know why that would be viewed as a positive.

So I think viewing, again, the totality of what happened, I think you can look at microscopic instances in this man's 60 years of life, like the 30 people that he helped that were cited, or helping somebody find a job, who it sounds like they were not particularly qualified, but were given a chance, and I think all the facts get twisted to find whatever fits the narrative that he is a good person who was looking out for us. But I think when you look at the totality, at one point, it's

helping people who don't have a track record, it's helpful to him, so that gets put out. Another point is having people who worked at TIAA-CREF is helpful, so that gets put out. But the only consistent thing that I've seen is that there's minimizations, like Cam said, and protection of his own assets, minimization of what he did, enriching his own family and lies, and that seems to be really the common theme to me when you look at the totality of that, and that there isn't remorse.

For those reasons, I do think there needs to be a harsh sentence so that this doesn't happen to tens of thousands or hundreds of thousands more. There are a huge amount of victims in this case.

Thank you.

THE COURT: Thank you.

MS. NICHOLS: Santos Caceres.

MR. CACERES: Good afternoon, Judge. Thank you for allowing me the time to speak today.

THE COURT: Would you spell your last name for the reporter.

MR. CACERES: My first name is Santos; my last name is Caceres, C-a-c-e-r-e-s.

THE COURT: All right. Thank you. Go ahead.

MR. CACERES: Judge, I'm here today to tell you a little bit about my story and where I come from, and just for you -- for the court and for you, your Honor, to have an idea

of perhaps a different side of the story. There's always two sides of a coin.

And I just wanted to start off by saying that I grew up in Argentina, and I became a natural citizen of the United States about four years ago. In the year 1999, I traveled from Argentina to the State of Alabama to pursue an education. I graduated with a degree in business administration, which I'm very proud of. And since the year 2000, I've lived in the United States, and I'm happy -- I'm proud to be a citizen of the United States of America.

I wanted to tell you a little bit about my story because I grew up in Argentina as a Catholic boy, and one of the things that my father always taught me was to take responsibility for my decisions. Unfortunately, my father passed away when I was 12 — he had lung cancer, and -- but that was in 1994. And, to this day, I remember very vividly, when he told me one day you're going to be a man, and you're going to have to learn how to take your own decisions and take your own responsibility.

Having said so, I am a victim of Celsius. I did lose a good amount of money. I was a CEL token holder — I got 100. There's many, many difficult things that I've lived in the last two years, for sure, not only myself, but also my wife. She is also a creditor of Celsius, and we have two little kids. You know, I feel -- I feel the pain of every single victim here.

I've gone through it myself.

I also tried to remain optimistic, I tried to remain positive of the future. So far, what I believe -- I was always scared for this to be a Chapter 7 liquidation, and really, really be hurt deeply, but, fortunately, this bankruptcy and the United States Code allows businesses to reorganize and go through Chapter 11 reorganization, and, to my understanding, a Chapter 11 reorganization is an opportunity to reorganize the business, restructure the business in a way that, hopefully, we would -- as creditors, will get close to being whole in our losses.

Having said that, I remain optimistic, I remain positive of the future that comes. So far, I was distributed about 60 percent in coin, liquid coin, as the effective date. I was also given -- my wife and I were given shares of Ionic Digital, which is the new Celsius mining company, about 14.9 percent. That takes my wife and I out to 75 percent recovery so far.

I believe the Celsius debtors have -- forgive me, I'm not perfect with the numbers, but I believe they do have $1.3 billion ready to be distributed.

I also believe the litigation oversight committee has anywhere from 3 to 5 billion dollars, depending how you want to value all these claims.

Ionic Digital is doing very well. They do have 2,600

Bitcoins in the treasury. It's not yet a public company, but it's aiming to become a public company. And one of the reasons why I was happy about receiving shares of Ionic Digital is that it is my belief that the shares of this company will outperform their underlying asset, which is Bitcoin. If I run a comparative analysis of all the public miners in the United States, their market capitalization is close to -- let's just say it's averaging between 2 and 4 billion dollars. I did receive shares of a company that was valued at 750 million, so I do believe today, although they're not tradeable, the shares, I do believe that the shares are valued more than the 20-dollar effective date.

So, when I put that into consideration -- and, obviously, the markets have gone up since the effective date, and when I do put everything into calculation, my wife and I, today, our holdings surpassed a hundred percent of the recovery. I do feel for the creditors that only have Bitcoin, and they only have Bitcoins. Those were the ones that suffered the most losses. But for creditors that did have stable coins, alternative coins, coins that are not very famous or powerful in the markets, and coins that have completely disappeared from the markets, people that do have stable coins, they have been able to benefit from the crypto prices going up. So, for example, a creditor that had only stable coins, today that creditor, it's over a hundred percent easily of today.

So the last thing I want to say is that there's always two sides of a story. I haven't been a creditor that can say, oh, everything is fine. I've felt it, it's been very difficult, but, again, if I go back to my childhood beginnings, where my father did tell me when you take a decision, you take the responsibility, you don't need anybody to protect you, you don't expect anybody to step in and try to solve your problems, you become a man, and you take care of that, and I believe that's what I'm doing today.

My wife and I, we're going to make it. We'll remain very, very optimistic about what's coming. We believe in the new Celsius Ionic Digital, and we believe that those 3, 4, $5 billion in claims that the litigation oversight committee is working really hard on — and they're doing a great job — I do believe we're going to be getting recoveries for the next year, two, three, four, five years to come.

Having said so, and just to finish, Judge, thank you for your time, and I just want to say that, briefly, I know Mr. Mashinsky, he's a human being, he's done mistakes, he's caused a lot of pain to people, he's here willing to take responsibilities for all the things he's done. He's not shying away. And I think that today can be a very good day for all of us involved — victims, the Court, defense counsel, Alex, Krissy, the kids, and everybody else that is invested in this case.

So, thank you for your time, and have a nice day.

THE COURT: Thank you.

MS. NICHOLS: Hugh Mitton.

MR. MITTON: Good afternoon, Judge.

THE COURT: Good afternoon.

MR. MITTON: Hugh Mitton, H-u-g-h M-i-t-t-o-n.

THE COURT: I'm sorry, last name again is?

MR. MITTON: Mitton.

THE COURT: Okay.

MR. MITTON: Forgive me, I'm a pretty nervous public speaker.

So, I invested in Celsius because I saw a video of Mr. Mashinsky saying that you deposit coins with them, and they loan them out to institutional investors, and that these loans are collateralized, meaning they're pretty safe, and then the percentage of the money that they get from the borrowers, they'll pay back to me at 5 or 6 percent, whatever it was.

So imagine my surprise when I learned, after the pause, that they've been doing other things with my money, like investing in this Bitcoin mining operation, which they never mentioned once. And on top of that, they invested in Luna coin, which, in itself, was a fraud, and I would argue like very obviously a fraud, paying 20 percent interest, and then they -- I heard that they had a risk analysis done on this as well, which is very surprising to me.

So, there were just a number of things going on behind the scenes, which were very different to the public image that was the reason I bought into Celsius, and Mr. Mashinsky would have had to sign off, presumably, on all of these, as the CEO of the company.

In the time that's passed since the pause, I didn't just lose my money, I've lost my sleep, I've lost my mental health, and I've also lost my time trying to figure out what's going to happen, if I will get anything back and if I need to do anything in this.

I also noticed that the defense counsel said that his son is attending university and he's missing the graduation, but it doesn't make mention of all the people that can no longer afford to send their children to university.

I think the worst part is that through all this, Mr. Mashinsky hasn't apologized, he hasn't owned it. We never got a single email saying sorry or making himself accountable for what happened. All I did see was videos his wife posted on social media of her dancing in their penthouse apartment.

Thank you for your time, your Honor.

THE COURT: Thank you.

MS. NICHOLS: Hollis Waite.

MR. WAITE: Hollis Waite, that's W-a-i-t-e.

THE COURT: Okay. Go ahead.

MR. WAITE: So, I didn't come here expecting to speak.

I didn't even realize it was an option until about two hours ago. So forgive me if I'm a little scattered.

I am a 49-year-old father of two daughters, age six and ten. As a victim of Celsius, now I'm woefully unprepared for the upcoming expenses of college and everything that the kids are going to need.

So, my youngest daughter is struggling a little bit with reading lately, and I would love to be able to spend more time with her because I know that I could fix that. But because I also have to look to the future and these expenditures coming up, I've been unable to sort of scale back and take a job which is less demanding. At the moment, I currently work, you know, a minimum of 60-plus hours a week, and, basically, I just have to make a judgment call here.

So, I used -- I do work in finance. I used to be on the central risk desk at a very well-known bank. And, essentially, the purpose of that job is to make sure that traders don't take excessive risks with customer funds. We run it through some complex equations and make sure that, you know, people aren't doing anything that's too likely to blow up. The reason for that is that people who are custodians of customer funds are generally incentivized to risk as much as they can because, you know, it's not their money. If they make large profits, they're going to get a cut of that as a commission, whereas if it fails, well, they're not going to bear the full

brunt of that. So, in a way, it's sort of like an extension of the concept privatized gain, socialized losses.

And you'd be surprised by how often people try to figure out ways to get around the system and just increase the amount of risk that they're taking. But one thing that anyone who's even remotely involved in finance would know — and I'm assuming that this includes Mr. Mashinsky — is that taking excessive risks with customer funds without their knowledge is essentially stealing. Whether you get away with it or not, then you still, in a sense, have taken something from them.

And this is something that I feel -- I don't think that Alex is uniquely dishonest in this regard. I think that there's people, probably millions of people, like in a similar situation that would have done a similar thing — they say, okay, well, maybe we can take a little bit more risk and I can save my business, or maybe I can make a higher commission, or maybe I can accomplish something else which benefits me personally. And I think that this situation is bigger than Alex Mashinsky. I think it's necessary that we send a message to people that there is -- that taking excessive risks is theft, and that people who do it will be punished, so that others think twice about making these kinds of decisions.

So, although I don't think it's likely that Alex would be a recidivist, I'm sure he's learned his lesson, and I agree that he's -- regardless of the sentencing, he's going to face

excessive -- he's going to face a lot of embarrassment, personal embarrassment, and it's going to be hard to get a job or whatever, but I think that we really do need to send a message to all the other would-be white collar criminals.

So, that's all. Thank you.

THE COURT: Thank you.

MS. NICHOLS: That's all that we're aware of, your Honor.

THE COURT: All right.

That concludes the presentations by the defense, the defendant, and the government.

I will place the presentence report, the recommendation, and the addendum in the record under seal. I'll place all of the parties' submissions to me also in the record under seal.

The parties can submit redacted copies for the record, not under seal, after redacting such things as personal identifying information, health information, and the like.

For the reasons that I explained at length at the outset, I adopt the findings of fact in the presentence report, except on page 6, paragraph 9, it should read 3B1.3, not 3B1.2;

Second, I've stricken paragraphs 41 and 43(d);

And, third, paragraph 56(a), lines 5 and 6, the email should read from Mashinsky to Cohen-Pavon, and not from Cohen-Pavon to Mashinsky.

Therefore, I conclude that, under the current guidelines, the total offense level is 43, the criminal history category is I, and the guideline sentencing range is 360 months — 30 years.

I appreciate that the guidelines are only advisory, and that the Court must consider the various sentencing factors in 18, U.S.C., Section 3553(a) and impose a sentence that is sufficient, but no greater than necessary, to comply with the purposes set forth in Section 3553(a)(2).

The offense in this case is extremely serious. The defendant committed commodities fraud and securities fraud that resulted in the loss of about $590 million.

The defendant personally profited from those crimes by more than -- well, personally profited by more than $45 million from the securities fraud.

The letters from the victims in this case were extraordinarily moving. They show that people lost their life savings, or a substantial portion of them, and that many people suffered severe psychological injuries from their financial losses.

The letters also demonstrate that the fact that victims have received some compensation from the bankruptcy process cannot make up for the time that they have been deprived of their savings, and cannot make up for the psychological harm inflicted on them, and do not even make up

for the complete monetary losses.

It is also true, however, that no matter what the sentence, the sentence will not cure either the monetary or the psychological harm that has been caused to the victims, but a sufficient sentence is necessary, under the terms of the statute, to reflect the seriousness of the offense and the need for just punishment.

On the other hand, it is also necessary to weigh the mitigating factors.

The defendant had a traumatic upbringing. He was a refugee from an early age, and he went on to found several tech companies without any suggestion of any unlawful activity in those companies. Indeed, there is no suggestion that the defendant had any prior unlawful activity.

The defendant had a distinguished military career in the Israeli Army, including being wounded.

He has a large and supportive family.

There is reason to believe that the monetary consequences of this conviction, together with the collateral consequences, and together with a substantial prison sentence for this 59 or 60-year-old defendant, will be sufficient for deterrence.

On the other hand, a substantial sentence is still necessary, given the seriousness of the offense and the need for a just punishment measuring the actual offense.

I've already set out before what each of the parties seek in terms of a sentence. They range from a year and a day, by the defense, to 240 months, at least, from the government.

Where to draw the line?

On balance, given all of the appropriate factors to be considered, a sentence sufficient, but no greater than necessary, the Court determines a sentence of 120 months' imprisonment on Count Two and 144 months' imprisonment on Count Five, both to run concurrently.

I will obviously allow voluntary surrender.

The Court will impose a term of three years' supervised release on Counts Two and Five, to run concurrently, with the mandatory standard and special conditions of supervised release listed on pages 88 to 90 of the presentence report.

The defendant has a low risk of substance abuse, and the Court will not order drug testing.

The Court will order forfeiture pursuant to Count Five in the amount of $48,393,446, and the specific property listed on pages 90 and 91 of the presentence report.

The Court will not order restitution at this time, but defer an order of restitution, and the parties should report back to the Court on an appropriate amount of restitution, including victims, by no later than August 8th.

The Court will impose a $50,000 fine. The Court finds

that the defendant has the ability to pay that fine in view of the presentence report.

The Court will impose a $200 special assessment.

The sentence is consistent with the factors in Section 3553(a) and is sufficient, but no greater than necessary, to comply with the purposes of Section 3553(a)(2).

I have explained the reasons for the sentence.

Before I actually impose the sentence, I'll recognize each of the parties for anything that they wish to tell me before I actually impose the sentence.

Mr. Mukasey?

MR. MUKASEY: Nothing yet, Judge. We'll have a request after you impose sentence.

THE COURT: Okay.

Mr. Mashinsky, anything before I actually impose the sentence? I'll listen to you for anything you wish to say, anything at all.

THE DEFENDANT: I mean, your Honor, the evidence submitted, I feel, shows that I took actions based on information that was provided and based on information that was available to me, and I feel that while I am here to take responsibility, I'm taking responsibility for a thousand employees who have not done -- not one of them has come forward and admitted to anything they've done.

So, I am the CEO, and I'm here to take responsibility.

So I'm not -- that's it, your Honor.

THE COURT: All right. Thank you.

I'll recognize the government for anything the government wishes to tell me.

MS. NICHOLS: I apologize, your Honor. We just didn't hear the fine amount.

THE COURT: The fine was $50,000.

MS. NICHOLS: Thank you, your Honor.

THE COURT: I'll state the sentence now, and then I'll allow the parties to make any legal objections.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of this Court that the defendant, Alexander Mashinsky, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 144 months, that is, 120 months on Count Two and 144 months on Count Five, both sentences to run concurrently.

The defendant will voluntarily surrender to an institution designated by the Bureau of Prisons by 2:00 p.m. on September 12th of 2025.

I recommend to the Bureau of Prisons that the defendant be incarcerated in the New York City area, but not at the MDC.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years on Counts Two and Five, to run concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release, the defendant shall comply with the mandatory, standard, and special conditions of supervised release listed on pages 88 to 90 of the presentence report;

The defendant shall not commit another federal, state, or local crime;

The defendant shall refrain from any unlawful use or possession of a controlled substance;

The defendant must cooperate in the collection of DNA, as directed by the probation officer;

The defendant must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule. This special condition of supervised release is necessary because there will be a fine imposed of $50,000; there is a significant forfeiture provision; and this condition will assist probation in monitoring the defendant's compliance with his financial penalties. Plainly, the defendant's conduct involved unlawful activity involving financial crimes.

I will impose a fine of $50,000. The fine is payable

within 90 days.

The defendant has the ability to pay a fine based on the presentence report.

I will order forfeiture consistent with the preliminary order of forfeiture, which includes a monetary term of $48,393,446, and the specific property listed on pages 90 and 91 of the presentence report.

With respect to restitution, I will delay any order of restitution until the parties report on the appropriate level of restitution and the appropriate victims. The parties should make the report no later than August 8, 2025.

It is further ordered that the defendant shall pay to the United States a special assessment of $200, which shall be due immediately.

I've already explained the reasons for the sentence.

Does either counsel know of any legal reason why the sentence should not be imposed as I so stated it?

MS. NICHOLS: No, your Honor.

MR. MUKASEY: No, Judge.

THE COURT: Okay.

I'll order the sentence to be imposed as I've so stated it.

There's a waiver of the right to appeal the sentence, correct?

MS. NICHOLS: Yes, your Honor.

MR. MUKASEY: Yes, in the plea agreement.

THE COURT: Does either party know of any reason why the waiver is not effective?

MS. NICHOLS: No, your Honor.

MR. MUKASEY: No, Judge.

THE COURT: Mr. Mashinsky, the reason that I ask these questions is that, generally, a defendant has the right to appeal the sentence. The notice of appeal must be filed within 14 days after the entry of the judgment of conviction. The judgment of conviction is entered promptly after the judge announces the sentence.

If the defendant cannot pay the cost of appeal, the defendant has the right to apply for leave to appeal in forma pauperis. If the defendant requests, the clerk will prepare and file a notice of appeal on the defendant's behalf immediately.

In this case, the parties advise that you have given up, or waived, your right to appeal the sentence as part of the plea agreement, and so it appears that you have waived your right to appeal the sentence. But I go over this with you now because I want to make sure that you talk to your lawyers so that you're fully informed of all of your rights.

Do you understand?

THE DEFENDANT: I understand, your Honor.

THE COURT: Does the government move to dismiss all

open counts?

MS. NICHOLS: Yes, your Honor.

THE COURT: And the defense agrees?

MR. MUKASEY: No objection.

THE COURT: All open counts dismissed on the motion of the government.

Mr. Mukasey, you said that there was something else. Did I cover it?

MR. MUKASEY: You came pretty close, Judge.

I appreciate the voluntary surrender. I appreciate that you were going to recommend no service of time in MDC.

I know that beggars can't be choosers when it comes to the Bureau of Prisons, but it you could recommend Otisville --

THE COURT: Sure.

MR. MUKASEY: -- potentially, if it's a possibility, the camp. I know it's of limited utility, but the recommendation might help.

THE COURT: FPC Otisville?

MR. MUKASEY: Yes.

THE COURT: Yes. Okay, I will recommend to the Bureau of Prisons that the defendant be imprisoned at FPC Otisville --

MR. MUKASEY: Thank you.

THE COURT: -- and not at the MDC.

Okay. Good afternoon, all.

Anything further?

MS. NICHOLS: No. Thank you, your Honor.

MR. MUKASEY: No, your Honor.

THE COURT: I thank the reporter.

(Adjourned)