

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

December 4, 2025

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, New York 10007

      Re:       ***United States v. Do Kwon,*** S1 23 Cr. 151

Dear Judge Engelmayer:

      The Government respectfully submits this letter in advance of the sentencing of Do Kwon ("Kwon" or the "defendant"), scheduled for Friday, December 11, 2025 at 11 a.m. The Court should sentence Kwon to a term of twelve years' imprisonment and finalize the forfeiture of his criminal proceeds.

      Do Kwon built a cryptocurrency empire that attracted investors, users, and billions of dollars in capital from around the world, and he built it through deliberate fraud. Kwon's lies concealed the capabilities and risks of his products—not least, a "stablecoin" that was not stable— and when the products failed to perform as promised and the risks he hid materialized, his empire collapsed into insolvency. In just a few years, Kwon caused losses that eclipsed those caused by Samuel Bankman-Fried, No. 22 Cr. 673 (LAK) (S.D.N.Y.), Alexander Mashinsky, No. 23 Cr. 347 (JGK) (S.D.N.Y.), and Karl Sebastian Greenwood, No. 17 Cr. 630 (ER) (S.D.N.Y.), *combined.* The Terraform market crash triggered a cascade of crises that swept through cryptocurrency markets and contributed to what has since become known as "Crypto Winter." Kwon fled from the wreckage and, while in hiding, dissembled in interviews and tweets, blamed others for what had happened, and, once found, resisted extradition. Kwon's misconduct, the consequences of his crime, and his reaction to the discovery of his scheme all warrant a substantial prison term. Indeed, the circumstances of the offense, standing alone, would weigh strongly in favor of a maximum sentence.

      Three facts cut in Kwon's favor and weigh against the maximum allowable sentence: First, Kwon ████████████████████████ pled guilty within months of his arrival in the United States, which spared the public, the Court, and the Government the burden of a trial. Second, Kwon faces further prosecution in the Republic of Korea, which means there is at least a possibility he may receive further punishment abroad. Third, Kwon has already served time in Montenegro awaiting extradition.

These three facts by no means fully counterbalance the need for a sentence to impose just punishment and to promote respect for the law, nor do they eliminate, in light of Kwon's continued minimization of his conduct, the need for a sentence to achieve individual deterrence. But a sentence of twelve years' imprisonment would appropriately balance all of the Section 3553(a) factors and represent a sentence sufficient, but not greater than necessary, to achieve the aims of sentencing. Such a sentence would be appropriately punitive relative to the scale of the harm, promote specific deterrence, command the attention of others who might be deterred by Kwon's example, and comport with sentences for similarly situated defendants. The defendant's proposed sentence of five years, by contrast, would be utterly insufficient. In support of his request, Kwon undersells the gravity of his crimes, and he oversells the certainty of his conviction and sentence in connection with the pending charges in Korea. This Court should act based on the record before it: Kwon broke U.S. law, he caused harm to others, including U.S. victims, and he deserves a substantial sentence in a U.S. court of twelve years' imprisonment.[1]

I.    **FACTUAL BACKGROUND**

Between at least 2018 and 2022, the defendant lied to purchasers of cryptocurrencies created and issued by his company, Terraform Labs PTE, Ltd. ("Terraform"). He lied to investors and the public regarding the decentralization and stability of the Terraform blockchain. Presentence Investigation Report ("PSR") ¶ 12. Kwon falsely claimed that Terraform had developed functioning, reliable financial technologies on the cutting edge of a movement toward "decentralized finance" in that Terraform's products purportedly operated largely through automated mechanisms and economic incentives, and that Terraform's systems were governed by their users rather than by Kwon and his associates and subordinates. *Id.* Those representations were false. In reality, the Terraform products did not work as advertised. To cover up this fraud and prop up Terraform's products, Kwon engaged in deceptive conduct to pump up the value of Terraform's cryptocurrencies, and soothe retail and institutional investors into believing that the Terraform blockchain operated as advertised. *Id.* Kwon's deceit worked precisely as Kwon intended: At its peak in the spring of 2022, the total market value of all cryptocurrency associated with Terraform exceeded $50 billion, fueled in no small part by Kwon's deception. PSR ¶ 14.

Kwon and his accomplices carried out the fraudulent scheme through multiple categories of misrepresentations.

*First*, Kwon lied about the effectiveness of the "Terra Protocol," which claimed to use a computer algorithm to maintain the value of Terraform's so-called "stablecoin" pegged to the U.S.

---

[1] To facilitate the efficacy of the parties' advocacy, and given the complexity and scope of the issues germane to Kwon's sentencing, many of which could require internal conferrals with other components of the U.S. Government, the Government respectfully requests that the Court previewfor the parties any issues or questions likely to arise at sentencing in advance, to give the parties the opportunity to make appropriate inquiries.

dollar, TerraUSD ("UST"), at a value of $1 for one UST. PSR ¶ 13.a. Beginning at least in 2020, Kwon and his associates advertised the Terra Protocol, including the economic incentives it created in the market, as self-sufficient to maintain parity between one UST and one U.S. dollar. *Id.* In truth, after the Terra Protocol on its own failed to cause the restoration of UST's $1 peg in May 2021, Kwon reached an agreement with executives at a high-frequency trading firm (the "Trading Firm") to have the Trading Firm purchase large amounts of UST to artificially support UST's $1 peg. UST's $1 peg was restored in May 2021 only after the Trading Firm strategically purchased millions of dollars of UST for the purpose of artificially propping up the peg. *Id.*

*Second*, Kwon lied about the governance of the Luna Foundation Guard ("LFG"). PSR ¶¶ 13.b, 23.d. Kwon announced the LFG in January 2022 as an independent body separate from Terraform, which was granted billions of dollars' worth of financial reserves (including in the form of other cryptocurrencies such as Bitcoin) to defend UST's peg. PSR ¶¶ 13.b, 23.d. LFG was supposed to be governed by an independent body of industry experts, known as the LFG Governing Counsel. PSR ¶ 23.d. In actuality, Kwon simultaneously controlled LFG and Terraform, operated the LFG as an arm of Terraform rather than as an independent entity, overrode LFG's governing body to make significant financial decisions on LFG's behalf, and misappropriated hundreds of millions of dollars in assets from LFG. PSR ¶ 13.b.

*Third*, Kwon lied about the control, operation, and extent of user adoption of the Mirror Protocol ("Mirror"), an investing application on the Terra blockchain. Mirror purportedly permitted investors to buy and sell synthetic versions of stocks listed on U.S. stock exchanges. PSR ¶ 13.c. As with the Terra Protocol, Kwon claimed that Mirror operated in a decentralized manner, and as with LFG, he claimed to play no role in its governance. *Id.* That was untrue. Kwon and Terraform secretly used automated trading bots to manipulate the prices of synthetic assets issued by Mirror, and caused Terraform to inflate key user metrics to deceive investors about Mirror's adoption and decentralization. *Id.*

*Fourth*, Kwon falsely claimed that the Terra blockchain was being used to process billions of dollars in financial transactions for the Korean payment-processing application Chai. Kwon touted this statistic as proof of concept that Terra had "real world" utility, unlike its competitors. PSR ¶ 13.d. But Chai did not process transactions through the Terra blockchain; instead, it used traditional financial processing networks. In service of his Chai-related deception, Kwon and his associates used an automated process to copy Chai transactions onto the Terra blockchain to make it appear that Terra was used by Chai. *Id.*

*Fifth*, at the inception of the Terra blockchain in 2019, Kwon arranged for the blockchain to have a preexisting supply of approximately one billion Terra stablecoins, known as the Genesis Stablecoins. PSR ¶ 13.e. Kwon, over time, gave shifting false explanations to investors about how the Genesis stablecoins would be used. *Id.* Rather than using the stablecoins for the purposes disclosed to investors, Kwon used them to further his fraudulent aims, including by paying for bots to manipulate the prices of synthetic assets issued by Mirror, and paying to replicate fake Chai transactions onto the Terra blockchain. *Id.*

Kwon's lies were not incidental to the value of the tokens he marketed, sold, and held: they went to the very heart of the reliability and value of Terraform's cryptocurrency offerings. Purchasers and investors were deprived of information necessary to mitigate their own risk. And when the Terra ecosystem ultimately collapsed, over $40 billion in market value was wiped away, and the loss was sustained by those who—unlike Kwon—did not know the true risks to which they were exposed or the falsity of many of Terraform's purported features.

### A. Offense Conduct

#### i. Background

Kwon co-founded and incorporated Terraform in 2018. He served as its CEO from 2020 through 2023. PSR ¶¶ 17, 20. Terraform was predicated on the Terra blockchain, the basic design of which resembles that of many other blockchains, and which was purportedly decentralized insofar as it was controlled by the broader community of users on the blockchain, and not Kwon or his associates. PSR ¶ 18. Terraform promoted the private sale of LUNA as the Terra blockchain's first native token that would provide "equity in Terra's decentralized economy" by allowing holders to play a role in the governance of the system. PSR ¶ 19. Specifically, by "staking" LUNA within the Terra blockchain, *i.e.,* agreeing to lock up LUNA tokens within the system in a particular manner, holders of LUNA received the right to earn fees from transactions on the Terra blockchain and to vote on certain decisions affecting the blockchain. *Id.*

To distinguish Terraform from competitor cryptocompanies, Kwon touted the Terra blockchain, which issued "algorithmic stablecoins" supposedly able to maintain steady value, even under changing market conditions, pursuant to the Terra Protocol. PSR ¶ 21. Kwon marketed the Terra Protocol as creating stability in the value of Terra's stablecoins through an automated algorithmic mechanism in which users could exchange a Terra stablecoin on the Terra blockchain for a certain amount's worth of LUNA at a guaranteed price, and *vice versa,* regardless of the market price of the stablecoin at the time. PSR ¶ 18. Users could also exchange one type of Terra stablecoin for another through the Terra Protocol. PSR ¶ 18. In this regard, Terraform appeared unique: Whereas competitor stablecoins were typically backed by reserves of fiat currency or other monetary instruments, Terra's stablecoins were backed principally by the promise that they could be exchanged at a certain price. PSR ¶ 21.

Terraform publicly announced the launch of UST in September 2020, claiming in promotional materials that under the Terra Protocol, one UST could always be exchanged for $1 worth of LUNA by "burning" one stablecoin on the blockchain (*i.e.,* permanently removing the blockchain from circulation to reduce the total supply), and "minting" another (*i.e.,* creating a new token registered on the decentralized ledger). PSR ¶¶ 21-22. Terraform claimed that this interdependent relationship would maintain a $1 unit value for UST through an algorithmic maintenance of the supply of both coins. PSR ¶ 22. Simply put, if the price of UST dipped below $1, holders of UST would be incentivized to "burn" their relatively-less-valuable UST to mint $1-

worth of LUNA, thereby recouping any losses from the dip in UST's value. *Id.* By burning UST to effectuate the exchange, market participants reduced the overall supply of UST, creating scarcity, and causing the value to return to $1. *Id.* Conversely, if the value of UST were to exceed $1, holders of LUNA would be incentivized to "burn" LUNA and "mint" UST, thus increasing UST's supply, and creating downward pressure on the price until it returned to $1. *Id.* Through this mechanism, UST purported to guarantee that it would maintain a steady value of $1 through the arbitrage incentives created by the Terra Protocol's linking of UST and LUNA. *Id.*

Kwon was both the public face of Terraform—marketing the company and soliciting investments—and a co-developer on the back end, having co-authored a white paper concerning the design of core aspects of Terraform's technologies and developed certain software for the initial iterations of Terraform and its products. PSR ¶¶ 20, 25. Kwon committed to Terraform to the exclusion of other ventures: In 2020, Terra separated its business operations from Kown's other venture, Chai, owing to regulatory restrictions. PSR ¶¶ 17, 20.

### ii. Kwon Lied About the Efficacy of the Terra Protocol

Kwon, and others acting at his direction, promoted the Terra blockchain by emphasizing the design of its stablecoins, including UST, that operated through the purportedly automated and decentralized Terra Protocol. PSR ¶ 26. As part of his plea agreement, Kwon agreed not to contest or deny the allegations against him, including those related to the Trading Firm.

When soliciting investors for the first seed round of investments between April and May 2018, Kwon represented that his stablecoins would not rely solely on the Terra Protocol but also on substantial reserves of fiat currency. PSR ¶ 29. That messaging changed over time. Leading up to UST's launch in 2020, and amid a "growth" round of funding, Kwon instead represented to investors that Terraform's stablecoins would maintain their value through the Terra Protocol alone, because no additional financial reserve was required. PSR ¶ 30. By the time UST was launched in 2020, Kwon told investors that the economic incentives created by the Terra Protocol were the sole mechanism used to maintain the pegs of Terraform's cryptocurrencies. PSR ¶¶ 31, 32. Kwon even affirmatively represented that there was no reserve needed to back UST's value. PSR ¶ 32.a (Kwon confirmed to a business partner when asked, "no reserve"); PSR ¶ 33.a (Kwon during a recorded interview: "So Terra is different in the sense that it's an algorithmic stablecoin, so, which means there are no reserves that are backing the stablecoin."); PSR ¶ 33.c (Kwon in another recorded interview: "So Terra USD is in sort of a burgeoning class of stablecoins called algorithmic stablecoins and the idea is that while the currency remains itself pegged to a fiat currency like the dollar it's not backed explicitly by a dollar in the bank account instead it uses a set of game theoretic incentives that live on a blockchain uh to make sure that the currency retains its value against the dollar…"). Kwon expressly reassured multiple investors that while a stability reserve had at one point been necessary as a backstop for the Terra Protocol, the stability reserve (among other features) did not "make sense anymore." PSR ¶ 34. In approximately two years between the end of 2019 through the end of 2021, buoyed by Kwon's falsehoods regarding the efficacy and stability

of the Terra Protocol, the market capitalization of Terraform's cryptocurrencies increased from under $200 million to over $40 billion. PSR ¶ 35.

Kwon's actions were not confined to false representations regarding the Terra Protocol. Approximately one year before the catastrophic crash of UST and LUNA, Kwon frantically sought to cover up his deceit by artificially inflating the value of UST. Thereafter, he falsely claimed that UST's stabilization was not due to his own interference and machinations, but as a result of the Terra Protocol's own algorithmic stabilizing design. PSR ¶¶ 38-39. In that manner, Kwon managed to keep his crimes concealed and generate yet another false narrative regarding the so-called efficacy of the Terra Protocol.

By May 23, 2021, UST began trading substantially below $1 on cryptocurrency exchanges (below 92 cents) and LUNA, in a matter of days, simultaneously lost 75% of its peak value. PSR ¶ 38. The corresponding drops in value of UST and LUNA were contrary to the promises Kwon had made regarding the Terra Protocol's stabilizing mechanism. The total market capitalization of LUNA fell below the total market capitalization of UST, making it impossible even in theory for LUNA to prop UST, because the aggregate amount of UST in existence (theoretically exchangeable for $1 worth of LUNA) exceeded the aggregate amount of LUNA in existence. *Id.* This rapid, dual drop in value was an existential threat to Terraform and, specifically, the viability of UST.

The substantial drop in UST's price in May 2021 resulted in the "burning" of large amounts of UST to "mint" LUNA, which exposed a fundamental flaw in the Terra Protocol design that significantly limited its efficacy. PSR ¶ 39. Kwon had designed the Terra Protocol to impose increasingly large transaction fees when traders submitted a high volume of "burn" requests going in only one direction (*i.e.*, UST to LUNA). *Id.* Thus, in the eminently foreseeable circumstance where UST's price dropped precipitously and traders sought to "burn" large volumes of UST, the higher transactions fees associated with significant "burning" meant traders received less than $1 worth of LUNA, reducing the incentive to use the Terra Protocol, and undermining its purported stabilization. *Id.* This "throttle" on the Terra Protocol's effectiveness had a direct impact on the value of both UST and LUNA. Yet it was not disclosed in Terraform's promotional materials. *Id.*

In the wake of what could have been a catastrophic drop in UST's $1 peg in May 2021, Kwon negotiated a "gentleman's agreement" with the Trading Firm to help maintain UST's $1 peg. PSR ¶¶ 37, 40. A Trading Firm executive privately agreed with Kwon to purchase millions of dollars of UST and LUNA for the express purpose of artificially propping up UST's $1 peg. PSR ¶ 40. This agreement was never publicly disclosed. *Id.* As a result of that covert arrangement, the Trading Firm spent tens of millions of dollars to artificially prop up UST. The Trading Firm suspended certain automated trading strategies relating to UST and LUNA that had long been in place and began placing manual trades to support UST's peg. PSR ¶ 41.

The Trading Firm went to significant lengths to fulfill its "gentleman's agreement" with Kwon in May 2021. The Trading Firm's purchases of UST after the coin lost its $1 peg in May

2021 made up a substantial portion of purchases in a key market for UST at critical times. PSR ¶ 42. For example, during an approximately 30-minute period on May 23, 2021, immediately following a precipitous dip in UST's price, the Trading Firm made over 90 percent of the UST purchases in one major UST trading marketplace. Specifically, on the morning of May 23, 2021, the Trading Firm manually purchased millions of dollars' worth of UST using the stablecoin Tether on the KuCoin cryptocurrency exchange, contributing to an increase in the market price of UST. *Id.*

## Purchasers of UST                                     May 23, 2021 – KuCoin USDT/UST



In fact, the Trading Firm placed orders on a cryptocurrency exchange to purchase UST at prices that were higher than the prevailing market price on that exchange; in other words, the Trading Firm agreed to pay more than market price for UST as part of an effort to artificially inflate the value of UST towards its advertised $1 price. PSR ¶ 43.

Notably, these efforts to stabilize UST came *after* Terraform's own efforts to drive up the price of UST had failed to restore the peg. As evidenced by trading data, in the approximately 40-minute window prior to the Trading Firm's intervention, TFL was the largest purchaser of UST, but could not in itself restore the peg absent the Trading Firm.



**Top Purchasers of UST**                    May 23, 2021 – KuCoin USDT/UST

Ultimately, the Trading Firm authorized its traders to spend up to $100 million to defend UST's $1 peg, if necessary. PSR ¶ 41. The Trading Firm's efforts operated as intended: UST returned to an approximate market price of $1. PSR ¶ 44. The Trading Firm did not engage in these acts altruistically. In addition to receiving concessions from Kwon with respect to pre-existing investment agreements, the Trading Firm's restoration of UST's $1 peg permitted the Trading Firm to reap huge profits by exercising options under its agreements with Terraform to purchase LUNA at or around 40 cents per token. PSR ¶ 46. Indeed, following its May 2021 intervention, the Trading Firm sold significant quantities of LUNA before the May 2022 market crash when the price peaked at over $114 per token. *Id.* Over 90% of the Trading Firm's profits on LUNA were made between May 2021 and May 2022, at a time when the Trading Firm—but not other investors—knew of the fragility of the Terra Protocol, and the essential role the Trading Firm had played in concealing its weakness. *Id.*

Kwon claims in his submission that the Trading Firm orchestrated and micromanaged the Trading Firm's May 2021 defense of the peg, Kwon's public messaging regarding the defense of the peg, and the Trading Firm's reprieve from preexisting vesting conditions. Kwon Sentencing Submission ("Sent. Subm.") at 11-12. Kwon further states that he not only desired transparency, but that "[the Trading Firm's] role . . . would have increased investor interest in the Terra Protocol and Terra Blockchain." *Id.* at 11. That self-serving, uncorroborated, *post hoc* rendition of events is exceedingly difficult to credit given the lies that Kwon and his associates fed the public about the near-catastrophic depegging of UST:

- On May 24, 2021, Kwon caused Terraform to state the following on Twitter, in part: "The peg is gradually normalizing again and will continue to do so as volatility subsides. . . .

The drawdown in the price of LUNA, UST peg deviation, and collateral effects across the ecosystem in such extreme market volatility is about as intense of a stress test in live conditions as can ever be expected. We just experienced a black swan. Despite sharp dislocations the on-chain swap spread is mending. UST peg is normalizing, and UST's role as a centerpiece of demand for the Terra ecosystem has not changed – buttressing the growth of the Terra economy as the system bounces back from distress." PSR ¶ 47.a.

- On a May 29, 2021 podcast, when asked whether it was "accurate" that "there was no particular special action taken . . . by the Terra team, or even the community, in order . . . for UST to recover its peg," Kwon effectively disclaimed intervention by outside forces to defend the peg. He responded, "We've never had a stress test of this magnitude. And I think what we've proved is that the Terra Protocol indeed does need a lot of, what has been up to now, purely theoretical assumptions. *And that it can survive black swan events, and then sort of, sort of, you know, total death spiral of all of these different assets and economies all at once.* So I think that that's been good…" PSR ¶ 47.b. (emphasis added).

- In a June 9, 2021 article, Terraform's head of communications wrote about the May 2021 depeg that Terraform had defended those pegs "indirectly via arbitrage incentives," and that the Terra Protocol "valiantly" handled market volatility in May 2021. PSR ¶ 47.c. The following year, prior to the ultimate collapse of UST, that same individual directed a reporter for a national newspaper to that article, and stated about the May 2021 depegging event: "Terra absorbed what many critics call a 'Death Spiral' or 'Black Swan' in a 75% drawdown in the LUNA price, *with the UST peg recovering naturally via the protocol's mechanics and free market dynamics…* It's hard to imagine a more significant volatility event than what occurred during that period in such a young stage of the Terra protocol, and Terra passed the test." *Id.* (emphasis added).

- In a videorecorded October 4, 2021 interview of Kwon posted on You Tube, Kwon was asked whether "Terraform Labs participates at all in market making to keep UST at peg." Kwon responded that "we don't really do much of that anymore," and stated that "there's like a number of large market makers that participate in stabilizing the peg of UST. Most of them – *I don't think any of them have a contractual relationship with us.* It's just something that they do because they feel like they can make money out of it…". PSR ¶ 47.d. (emphasis added).

- On a March 1, 2022 episode of a talk show that was publicly distributed on Twitter, and that was hosted by personnel from the Trading Firm, Kwon spoke about the May 2021 depegging event, stating, in part, "it took a few days for the slippage cost to naturally heal back to spot… the protocol automatically self-heals the exchange rate back to whatever the spot price is being quoted by the oracle. So that's why it took several days for the peg to recover." PSR ¶ 47.f.

These misrepresentations regarding UST's stability had the intended effect of artificially boosting investor confidence. The total market value and trading volume for UST and LUNA increased substantially between May 2021 and May 2022. PSR ¶ 50. UST's total market value increased from approximately $2 billion to approximately $18 billion, and LUNA's total market value increased from approximately $5 billion to approximately $29 billion. The average daily trading volume of both coins also increased significantly over that one-year period: UST's average daily trading volume increased from under $100 million to over $800 million, and LUNA's average daily trading volume increased from approximately $500 million to approximately $2.5 billion. *Id.* While Kwon publicly boasted about the "natural" recovery of the peg to deceive his investors, he simultaneously admitted to a Terraform employee that the Trading Firm and Terraform Labs "had a prior contractual agreement dating back years. There w[ere] three conditions in this contract that had to be met. One of the last conditions, the third one, was that they would step in in a liquidity crisis such as in May 2021. So they had fulfilled the contract." *SEC v. Terraform Labs et al.*, No. 23 Civ. 1346 (JSR), (April 1, 2024 Trial Tr. 1094: 9-22, Testimony of Brian Curran). Kwon expressly told this employee "that if they had not stepped in, we might have been fucked." *Id.*

In the interim between the May 2021 and May 2022 depeggings, Kwon was dismissive of detractors. In response to criticism of the Terraform project, Kwon tweeted the following on July 1, 2021:



Those false reassurances—couched as bravado—continued into 2022:



On May 9, 2022, literally hours before UST and LUNA crashed, Kwon again tweeted to denigrate his critics.



In May 2022, the market price of UST dropped below $1 and failed to recover, despite the deployment of resources from Terraform and LFG to support the peg. PSR ¶ 53. Due to the exponential growth related to UST and LUNA, Kwon's attempts to mask the vulnerabilities in Terra's ecosystem in May 2021 were fruitless by May 2022. *Id.* Although, privately, Kwon had all the information needed to anticipate a death-spiral (which ultimately came to pass), he continued to publicly lull investors into believing all was well, tweeting the following message on May 9, 2022, shortly before LUNA's collapse:



Within a few days, the value of UST dropped to only a few cents, and LUNA's value correspondingly dropped from over $116 to almost zero, resulting in over $40 billion in investor losses. PSR ¶ 53.

### iii. Kwon Lied About LFG

Following the covert "gentleman's agreement" with the Trading Firm that avoided the catastrophic destabilization of the Terra ecosystem in May 2021, Kwon created the Luna Foundation Guard ("LFG") and the LFG Reserve to defend UST's $1 peg. Yet Kwon never disclosed that their genesis was rooted in the Trading Firm's intervention. PSR ¶ 49. The LFG Reserve was instead touted as merely providing "a further layer of support," *id.*, deceiving investors into believing that this reserve was a redundant means of protection for an ecosystem that was self-stabilizing. Further, Kwon issued and caused others to issue statements regarding LFG's independence from the Terra Ecosystem, and its organization under a Governing Council. PSR ¶ 54. Kwon and others made false statements touting LFG's independence, including a January 19, 2022 tweet asserting that LFG is governed independently by an international Council of industry leaders and experts…" PSR ¶ 54.a; Kwon tweeted that same day that the LFG Governing Council would serve as "a counterweight to TFL [Terraform] in the @terra_money ecosystem," and that "[d]ecentralization wins." PSR ¶ 54.b.; Kwon stated in a public forum on February 8, 2022 that "[t]he reason we've set up LFG is to decentralize decision making processes in the Terra ecosystem, and having multiple directors (all building on the Terra ecosystem) make the decision instead of one person is an important step in that direction." PSR ¶ 54.c.

Kwon also raised billions of dollars' worth of assets from investors to fund the LFG Reserve, repeating the same misrepresentations and false assurances that he peddled to the public. PSR ¶ 55. In one such instance, on November 16, 2021, Kwon emailed an investor that Terraform was looking to raise $1 billion worth of bitcoin assets "to put into a decentralized reserve smart contract to buttress UST's stability mechanism (users can redeem UST against Bitcoin)," and that "[w]e believe this will assuage lingering worries about the stability of UST's core stability mechanism…" *Id.* Approximately two months later, that investor agreed to contribute $50 million worth of assets to the LFG Reserve in exchange for LUNA tokens, with the agreement stating that it was made "in furtherance of the establishment [of] a decentralized asset reserve" that was "a non-profit initiative of the [LFG] to provide a further layer [of] support to maintain the UST's peg to the USD," that the LFG Reserve was "intended to remain as a decentralised asset reserve in perpetuity to the extent UST remains in circulation and is used by members of the community," and that "[n]either the [LFG] nor any of its Affiliates stand to profit from the proceeds of [the agreement] and/or [the LFG Reserve]." *Id.*

These were lies. In actuality, Kwon controlled and operated LFG as an arm of Terraform, making financial decisions for the LFG Governing Council without the members' prior approval, and treating the entities' funds as interchangeable when convenient for Kwon. In truth, LFG was a "non-director subcommittee" whose powers were limited to "advis[ing] and giv[ing] recommendations" and performing acts "deemed necessary or advisable by the Directors…" PSR ¶ 56.a. The directors consisted of Kwon and a Singaporean business consultant, who was appointed to satisfy local regulations, but who exercised no independent discretion or authority. *Id.* In other words, Kwon controlled LFG.

As to the LFG Reserve, Kwon had publicly stated in a March 29, 2022 podcast episode that the approximately $3 billion worth of bitcoin then in the LFG Reserve was held by the LFG Governing Council in secure "multisig" (short for "multi-signature") wallets, *i.e.,* cryptocurrency wallets that require multiple private keys to approve a transaction, implying that all council members had keys to access the wallet, further underscoring LFG's independence and reliability. PSR ¶ 54.d. That was a lie. The LFG Reserve was not maintained in a "multisig" wallet controlled by the LFG Governing Council but was instead in wallets controlled by Kwon. PSR ¶ 56.d.

As to LFG's defense of the peg in May 2022, Kwon had stated and caused others to state that the LFG spent approximately $2.8 billion from the LFG Reserve in a failed effort to defend UST's peg, and that this decision had been voted on by the Governing Council. PSR ¶ 54.e., f. In truth, of the approximately 80,000 bitcoin from the LFG Reserve purportedly spent to defend UST's peg, the LFG Governing Council did not vote on spending at least 28,000 Bitcoin worth of LFG assets: Kwon transferred those unilaterally. PSR ¶ 56.c. In the wake of the May 2022 crash, apparently indifferent to the devastation visited on the Terra community, Kwon exploited his secret control of the LFG Reserve to benefit himself and Terraform. After Terraform had already spent significant assets trying to defend UST's peg, Kwon caused the transfer of $300 million worth of the remaining bitcoin assets from the LFG Reserve into Terraform's trading account without the

authorization of the LFG Governing Council. PSR ¶ 56.d. To justify the misappropriation of those funds, Kwon lied and attempted to justify the transfer as reimbursement for money that Terraform had spent "on behalf of" LFG, in an attempt to minimize Terraform's net trading losses (approximately $600 million under Kwon's retroactive accounting), by making it appear that they were LFG's trading losses (approximately $1 billion). PSR ¶ 56.d., e. Kwon took these steps unilaterally and to the detriment of LFG. PSR ¶ 56.e. Publicly, Kwon was quick to pledge LFG's remaining assets (which he had depleted) to investors. Unsurprisingly, he did not similarly pledge Terraform's remaining funds, the majority of which represented monies misappropriated from the LFG Reserve. *Id.*

Making matters worse, Kwon took steps to place the misappropriated funds out of reach from potential investors or those who would seek recovery using those funds. He caused the transfer of the funds through multiple cryptocurrency addresses and accounts designed to conceal, among other things, their source. PSR ¶ 57.a. He further caused the transfer of some of those funds between blockchains, to conceal their source, PSR ¶ 57.b., including after South Korean authorities publicly announced criminal charges against Kwon. PSR ¶ 57.c. Despite having caused the transfer of cryptocurrencies into and out of OKX and KuCoin accounts, Kwon claimed in a social media post that he had not used those platforms in at least the last year, that he generally did not use those platforms, and disclaimed any memory of having effectuated those transfers. PSR ¶ 57.d.

The misappropriated funds were not used to defend the peg or reimburse investors. Instead, they were used to pay professional services fees and expenses for Kwon and Terraform. PSR ¶ 58. In justifying the transfers and covering his tracks, Kwon caused his agents to make misrepresentations to a financial services firm about the source of the funds, attributing them not to LFG's reserve but instead to development fees and investment activities. PSR ¶ 59. Kwon circulated a purportedly independent, third-party audit report following his misappropriation of LFG funds, claiming the report "show[ed] that all LFG funds were spent to defend $UST's peg parity with the Dollar as declared." PSR ¶¶ 62-63. In truth, Kwon dictated portions of that report and had cherry-picked a historical period of time during which Terraform spent approximately $1 billion defending UST's peg to make it appear that those expenses were done in response to the relatively recent crash, thereby reverse engineering the company's accounting to justify retention of the misappropriated funds. PSR ¶ 63. In short, Kwon's release of the report was designed to continue deceiving the customers and investors he had wiped out.

iv.  <u>Kwon Lied About Mirror</u>

Kwon issued the cryptocurrency MIR as a "governance token," namely, a token that permitted holders to vote on decision-making and thus democratize decisions that affected the Terra Protocol. PSR ¶ 67.b. Kwon claimed at inception that he and TFL had "no special owner/operator keys," and that MIR was fully "decentralized from day 1." PSR ¶ 67.a., b. He stated in a January 11, 2021 podcast episode that although he once held Mirror tokens, he had given them away and he had "nothing" and "Terra has nothing," that they consequently lacked any governance rights, and that "this is something that we do not control[.]" PSR ¶ 67.c. In a separate

podcast episode that was publicly distributed on March 11, 2021, Kwon reiterated that he had "no control, no profit incentive, and then uh no owner keys." PSR ¶ 67.d. In truth, Kwon secretly maintained a large supply of MIR tokens and exercised substantial control over Mirror, including by maintaining operator keys for Mirror. PSR ¶ 68. Kwon and others told those lies to perpetuate the myth of a fully decentralized system. *Id.* In reality, Kwon and his employees discussed internally the audacity of Kwon's lies regarding Mirror, and the need to both exercise their MIR tokens and operator keys to vote down community proposals, and to deploy that power selectively so as to avoid detection. PSR ¶¶ 68-69.

Just as Kwon lied about the decentralization of MIR tokens, he lied about the decentralized processes that dictated the prices of mAssets. A decentralized market of buyers and sellers purportedly determined the value of mAssets that would "mirror" the price of traditional assets without any centralized control by Terraform. PSR ¶ 70. During a podcast episode distributed on April 16, 2021, Kwon explained the purportedly decentralized process by stating that there were "no centralized counterparties" that dictated price. *Id.* In truth, Kwon caused Terraform to supply certain price data used by Mirror. PSR ¶ 71. Specifically, through Terraform, Kwon secretly funded and operated trading bots to ensure that mAsset prices mirrored the prices of traditional assets, by artificially generating market activity to ensure parity between mAssets and their corresponding traditional asset prices through robotic accounts masquerading as users. *Id.* This was true for the entire time that Mirror was live. That is, Mirror *never* functioned in the decentralized fashion Kwon advertised, requiring Kwon to deploy substantial capital and hire bots to manipulate mAssets up until the May 2022 market crash. PSR ¶ 72. Over $85 million worth of the Genesis Stablecoins was used to deceptively prop up and manipulate mAssets. *Id.* In line with the use of bots and capital to trade mAssets, Kwon lied to investors to deceive them regarding the popularity of mAssets and their widespread adoption. PSR ¶¶ 74-75. Kwon caused Terraform to engage in a significant number of transactions on Mirror to inflate key metrics. For example, Terraform's accounts were responsible for virtually all the collateral posted on Mirror in its first six months, and a substantial majority thereafter, and was further responsible for 40% of liquidity. PSR ¶ 75. By way of example, Terraform's accounts were generating over $400 million of liquidity at a time when Kwon, through Terraform, touted Mirror's milestone of having $1 billion in liquidity.

### v.  Kwon Lied About Chai

Kwon sought to attract investors with claims that the Terra blockchain was unique for its "real-world" application by the Korean payment application Chai. PSR ¶ 76. In 2019, Kwon claimed that Chai used a Terraform stablecoin pegged to the Korean won operating on the Terra blockchain to process billions of dollars in transactions. Kwon claimed that those transactions, in turn, would generate significant transaction fees for investors who agreed to lock up their LUNA tokens within the system, as an increase in such transactions would lead to greater rewards for LUNA investors. *Id.* Kwon touted the Terra-Chai symbiosis publicly and privately. In a June 21, 2019 article, Kwon claimed that "Chai runs, records transactions, and manages account balances on Terra's Columbus mainnet," and touted Chai's popularity as a payment processer. PSR ¶ 77.b.

In a July 26, 2019 "Terra Community Update," Kwon stated that Chai had launched 40 days prior using the Terra Protocol and that it was "already … one of the most heavily used blockchain applications in existence." PSR ¶ 77.c.

These were lies. Chai did not process transactions through the Terra blockchain. PSR ¶ 79. It instead used traditional bank rails to process transactions. *Id.* Kwon understood that South Korean regulators were not prepared to issue licenses to companies that used blockchain technology to manage payments. Thus, Kwon further understood that in order to launch and be eligible for a licensing, Chai *could not* use the Terra blockchain. *Id.* Nevertheless, Kwon perpetuated lies about Chai to distinguish Terra from its competitors. PSR ¶ 80. Kwon's lies were also designed to induce investors to "stake" their LUNA tokens, by making it appear that investors would generate higher rewards driven by Chai's payment processing through the Terra blockchain. Kwon knew that if investors did not see meaningful returns from a large number of stablecoin transactions, they would sell rather than stake their tokens, creating a glut of LUNA that would put downward pressure on the price and pose an existential risk to the entire ecosystem. *Id.* Kwon was so consumed with spinning this false narrative, that he even discussed with his co-founder faking Chai transactions on the blockchain and using Genesis Stablecoins "to generate staking returns" in a bait-and-switch that would permit Kwon to continue pitching investors on the interplay of Chai and Terra. PSR ¶ 81. Once Chai launched, Kwon did exactly what he set out to do: he "mirrored" Chai transactions through an automated process to create the illusion for investors that Chai processed transactions through the Terra blockchain, and used over $60 million worth of the Genesis Stablecoins to fake returns for those who had staked LUNA tokens. PSR ¶ 82. Kwon and others acting at his direction sought to quell a public report that exposed parts of this fraud, PSR ¶ 83, and schemed to hide his lies from South Korean regulators, PSR ¶ 85. At the same time, Kwon brazenly touted the business connections between Chai and Terra to investors, including by falsely stating to investors on April 10, 2019 that Chai was the first crypto firm to be granted electronic payment licenses by South Korean regulators, which "demonstrates Chai's unique ability to navigate difficult regulatory waters." PSR ¶ 86. Those statements were demonstrably false, and contrary to the representations made to South Korean regulators. PSR ¶ 85.

In March 2020, Terra and Chai internally announced that they would formally split, and that Chai's only relationship to the Terra blockchain would be as a means to fund cryptocurrency wallets; Chai would not use Terra as a payment processing platform. PSR ¶ 88. That same acknowledgment was not made publicly. Kwon succeeded in having Chai's co-founder commit in writing to permitting Terra to "represent Chai Wallet as a DApp [decentralized application] on Terra's blockchain," and that Chai Co. would "not contradict, or make any independent representations which would otherwise contradict, such representations made by Terra in respect thereof." PSR ¶ 89. Secure in the promise that he would not be contradicted, Kwon continued to make public misrepresentations about Chai using the Terra blockchain including in 2021 and 2022. PSR ¶¶ 89, 91.

### vi. Kwon Lied About the Genesis Stablecoins

Kwon programmed the Terra blockchain at inception to include pre-mined tokens for his own purposes and benefit, despite having repeatedly lamented the unfairness of this practice. PSR ¶¶ 92-93. The Genesis Stablecoins consisted of a Terraform stablecoin called TerraSDR, so named because it was pegged to a financial unit ("SDR") that was itself pegged to a basket of five currencies. PSR ¶ 93. Kwon programmed the Terra blockchain to unlock 100 million TerraSDR on an annual basis; 300 million total tokens were generated before a Terra blockchain governance vote was held to "burn" the remainder of the stablecoins. *Id.* Kwon lied to investors about the uses of Genesis Stablecoins. In a 2018 offering document, he claimed that the Genesis Stablecoins would be used to support Terra by distributing free tokens to users, enticing business partners with ecommerce discounts, and generally growing the Terra ecosystem. PSR ¶ 95. Subsequently, between 2019 and 2021, Kwon directly and indirectly gave shifting explanations about the purpose and use of Genesis Stablecoins, including suggesting that they would be used to defend UST's peg, to provide to new Chai users, to facilitate transactions for Chai and to mint UST. PSR ¶ 96. In truth, Kwon used Genesis Stablecoins for other purposes, including faking Chai transactions on the Terra blockchain, and funding bots to prop up mAssets.

### vii. Kwon Fights Accountability with the SEC

On September 14, 2022, after South Korean authorities publicly announced criminal charges against Kwon, PSR ¶ 57.c, Kwon traveled on a private jet from Singapore to Serbia. Even after leaving Singapore, Kwon continued to give various media interviews where he discussed Terraform, the collapse of UST and LUNA, and his plans for the future. During these interviews, Kwon did not publicize his whereabouts and would, in substance, profess ignorance about official interest in his location, even as Korea was widely reported to have published a "Red Notice" through Interpol, seeking Kwon's arrest.

On February 16, 2023, approximately five weeks before his arrest, the Securities and Exchange Commission ("SEC") sued Terraform Labs PTE, Ltd. and Kwon in connection with his fraudulent scheme. *See SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 8944860 at * 16 (S.D.N.Y. Dec. 28, 2023). After a nine-day trial, in April 2024, a jury unanimously found Kwon and Terraform liable for intentionally and recklessly orchestrating the frauds to which Kwon pled guilty. *SEC v. Terraform Labs et al.*, No. 23 Civ. 1346 (JSR) (S.D.N.Y.) (ECF No. 229). In June 2024, the SEC and the defendants reached a consent settlement agreement, which was ordered by the Court on June 13, 2024, in which Kwon and Terraform agreed to the following financial penalties: (a) Terraform was required to pay total monetary remedies of $4,473,828,306 (consisting of $3,586,875,883 in disgorgement, $466,952,423 in prejudgment interest, and a $420,000,000 civil penalty); and (b) Kwon was required to pay monetary relief totaling $204,320,196 (consisting of $110,000,000 in disgorgement, $14,320,196 in prejudgment interest, and an $80,000,000 civil penalty). Kwon specifically committed to effectuating the following within 30 days, or by July 13, 2024, to satisfy the civil penalty amount: (i) submitting a $4,700,000 payment to the SEC; (ii) submitting an additional $2,300,000 payment to the SEC from Kwon's

Swiss bank account; (iii) transferring all of LFG's crypto assets to the Terraform bankruptcy estate, *In re Terraform Labs Pte. Ltd.*, Case No. 24-10070 (Bankr. D. Del.); and (iv) transferring Kwon's ownership interest in all PYTH tokens Kwon had obtained, consisting of 500 million tokens. *SEC v. Terraform Labs et al.*, No. 23 Civ. 1346 (JSR) (S.D.N.Y.) (ECF Nos. 271, 273).

Kwon failed to pay the approximately $7 million owed to the SEC, and those monies remain outstanding today. Separately, Kwon belatedly effectuated the transfer of his interest in PYTH tokens to the Plan Administrator in May 2025, months after the 30-day deadline to which he had committed. *See In re Terraform Labs Pte. Ltd.*, Case No. 24-10070 (Bankr. D. Del.) (ECF No. 1086, Page 8). By that point, the tokens were no longer worth approximately $200 million dollars, but had dropped in value to approximately $75 million, resulting in a steep decline in potential recovery for investor-victims,[2] and a shortfall in the amount Kwon had bound himself to transfer pursuant to the settlement agreement.

## II.   PROCEDURAL HISTORY

On March 23, 2023, a grand jury sitting in this District returned a publicly filed Indictment, 23 Cr. 151 (PAE), which charged Kwon in eight counts: conspiracy to defraud (Count One), commodities fraud (Counts Two and Six), securities fraud (Counts Three and Seven), wire fraud (counts Four and Eight), and conspiracy to defraud and engage in market manipulation (Count Five). That same day, Kwon had been arrested and detained in Montenegro after he attempted to use a false passport to travel to the United Arab Emirates, which had no extradition treaty with the United States. PSR ¶¶ 8, 16. Kwon was convicted in Montenegro and served four months of his sentence, after which Kwon remained in custody pending his extradition to the United States on December 31, 2024. *Id.* Kwon was charged on January 2, 2025 in a Superseding Indictment charging him with the same eight counts, and an additional count charging money laundering conspiracy.

On August 12, 2025, Kwon pleaded guilty pursuant to a plea agreement to Counts One and Four of the Indictment. Sentencing is scheduled for December 11, 2025. Pursuant to that plea agreement, Kwon consented to entry of a $19,286,774.74 forfeiture money judgment, and forfeiture of his right title and interest in certain enumerated assets. ECF No. 47.

---

[2] *See* Pyth Network-USD Price, Yahoo! Finance, https://finance.yahoo.com/quote/PYTH-USD/history/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_r eferrer_sig=AQAAAL7aUYY4HGjea5MxOYq56c69SXf0CgCwUYvzLE0-- nT9BgLEBkxTLsppOlXCl2Ko9sfvdXjSORZaFa0b03oco- I9FfIXRefFgaoBPXF45f1HDSSsNVzJBb5VFOjA7Bsld2g5HxuJx37-z_I-UzD0J- 3c_4KS1rOvt0gWLBFOYS80 (PYTH token trading at a high of 0.42 on June 12, 2024, as compared to a high of 0.15 on May 23, 2025).

III.    **APPLICABLE LAW**

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  *United States v. Booker*, 543 U.S. 220, 252 (2005).  Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

IV.    **DISCUSSION**

    A.    **The PSR Calculation**

Consistent with the plea agreement between the parties and the Government's position on the amount of "loss" involved under U.S.S.G. § 2B1.1(b)(1), the PSR correctly calculates the applicable Guidelines as follows:

- Pursuant to U.S.S.G § 3D1.2(b) and (d), Counts One and Four are treated as a single group. Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the group is the offense level for the most serious of the counts compromising the group. In this case, that is Count Four. PSR ¶ 107.

- The applicable guidelines are found in U.S.S.G. § 2B1.1, and, because Count Four has a statutory maximum term of imprisonment of 20 years or more, the base offense level

is 7 pursuant to U.S.S.G. § 2B1.1(a)(1). PSR ¶ 108.

- There was over $40 billion in investor losses in this matter. Because the loss was more than $550,000,000, 30 levels are added. U.S.S.G. § 2B1.1(b)(1)(P). PSR ¶ 109.

- Because the offense involved more than 10 victims—indeed, an estimated hundreds of thousands, if not more—an increase of 2 levels is warranted pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).  PSR ¶ 110.

- Because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, an increase of 2 levels is warranted pursuant to U.S.S.G. § 2B1.1(b)(10). PSR ¶ 111.

- The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; therefore, four levels are added. U.S.S.G. § 3B1.1(a). PSR ¶ 113.

- The defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense; therefore, two levels are added. U.S.S.G. § 3B1.3.  PSR ¶ 114.

- The defendant does not meet the criteria under U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders) because he received an aggravated role adjustment under U.S.S.G. § 3B1.1. Therefore, he is not entitled to a reduction in the offense level. U.S.S.G. § 4C1.1. PSR ¶ 117.

- Because the defendant accepted responsibility through the entry of his guilty plea, his offense level is decreased by a total of 3 levels pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b). PSR ¶¶ 118-19.

- The total offense level would therefore be 44. However, pursuant to Chapter 5, Part A (Application Note 2), in those instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43. PSR ¶ 120.

Accordingly, the applicable Guidelines offense level is 43. PSR ¶ 120.

As described above, Kwon was convicted in Montenegro for falsifying a document and sentenced to a term of four months' imprisonment. Because, pursuant to U.S.S.G. § 4A1.2(h), sentences resulting from foreign convictions are not counted, Kwon has a criminal history score of zero and his Criminal History Category is I. PSR ¶¶ 122-23. Based upon the calculations set forth above, the Guidelines sentence applicable to the defendant's offenses would be life imprisonment.  Because that term is greater than the statutorily authorized maximum sentence, pursuant to U.S.S.G. §§ 5G1.1(a) & 5G1.2(d), the applicable Guidelines sentence is the statutorily

authorized maximum sentence of 300 months' imprisonment. PSR ¶ 159. Probation recommends a sentence of 12 years' imprisonment.

### B. This Court Should Impose a Twelve-Year Term of Imprisonment

The Government respectfully submits that this Court should impose a term of twelve years' imprisonment. Such a sentence would fall within the heartland of sentences recently imposed within this District for similar conduct. The sheer scale and impact of Kwon's yearslong fraud is notable. Kwon deprived UST and Terra purchasers of the ability to make fully informed decisions about their purchases, and artificially inflated the value of Terraform's cryptocurrencies, which directly enriched and raised Kwon's profile. Kwon's fraud was only uncovered when the worst-case scenario came to pass: undisclosed risks created a death-spiral that wiped out over $40 billion of market share. Investors did not learn of Kwon's fraud until too late.

Kwon's professed contrition for his crimes is belied by the many grievances and deflections that permeate his submission. Kwon lodges inflammatory accusations of purported misconduct by foreign governments and government officials.[3] He shifts blames and minimizes his own role in UST's near-depegging in May 2021.[4] He offers no explanation—much less contrition—for the claims in the Indictment he is not required to concede. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[5] And while Kwon invokes at various points the lengthy sentence he faces in Korea,[6] he has painstakingly avoided factual concessions related to that case,[7] rendering the outcome of those proceedings both unknown and unknowable.

Let it be clear: the half-truths, evasion, and outright lies were Kwon's. They cannot be diminished or excused by shifting blame to the Trading Firm, Sent. Subm. at 11-14, Kwon's attorneys, id. at 7, third-party trading firms, id. at 6, Montenegrin officials, id. at 7-8,[8] or investors

---

[3] Sent. Subm. at 7-8

[4] Id. at 13 ("TFL would have benefited from disclosing its relationship with [the Trading Firm], and failed to do so only at [the Trading Firm's] request . . . . on the whole it is impossible to know what the net effect of a complete disclosure of [the Trading Firm's] role would have been"), id. at 6 ("Third-party trading firms plainly played a significant role in depegging UST"); id. ("[T]his type of risk was generally understood").

[5] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[6] Id. at 1 ("Korean prosecutors have publicly stated they will seek a sentence of 40 years").

[7] See e.g., id. at 14 (Kwon "is substantially constrained by the fact that Chai is the core subject of the Korean charges"), id. at 1 (Kwon agreed not to contest the conduct in the Indictment "which remain[s] subject to the Korean prosecution").

[8] Kwon's effort to cast himself as a victim of a coordinated attack upon Terraform is a transparent attempt to shift the blame for the damage he caused to others. As a threshold matter, the Government does not credit Kwon's claims. In any case, it is irrelevant whether other "trading

who (he now claims) assumed the risks of depegging, *id.* at 5, 13. The magnitude and severity of Kwon's crimes are difficult to overstate, warranting a twelve-year term of incarceration.

1. The Nature, Circumstances, and Seriousness of the Offense Warrant a Substantial Term of Imprisonment.

Kwon's fraud was colossal in scope, permeating virtually every facet of Terraform's purported business. His rampant lies left a trail of financial destruction in their wake. Behind virtually every lie and misrepresentation at Terraform stood Kwon, and he persisted in promoting those lies during the May 2022 crash and thereafter. From the beginning, Kwon embraced an interest in capitalizing on the "huge ginormous bubble" in cryptocurrencies "before it crashes," a reflection in his own words of one's "moral constitution." PSR ¶ 24. In light of these facts, Kwon's claim that "[t]his case is fundamentally different" because it was not a "house[] of cards from the outset" rings hollow. Sent. Subm. 2. And when the time for accountability came, Kwon fled. He voluntarily left his family behind, obtained a false passport, crossed multiple jurisdictions, and flew on private planes to evade detection.

*First*, Kwon's fraud was as brazen as it was "ginormous." It was not the result of a single lapse in judgment, confined in time and scope. It resulted from a series of considered lies, delivered publicly by tweet, privately in investor presentations, and through manipulative actions that sought to instill false confidence. The lies unfolded over years. And they extended long after the jig was up. Even after the calamitous market crash of May 2022, Kwon continued to obfuscate, evade responsibility, and delay a reckoning.

To drive users into his Terraform ecosystem, Kwon created a mirage of financial products and opportunities, all of which rested on a fundamental scam: the notion that Terraform was a unique, purely decentralized system, with real-world utility. This fraud was accomplished through a multitude of lies. Kwon knew that the Terra Protocol could not sustain the peg linking UST and LUNA, and he set up secret deals to disguise that hidden truth. The peg was literally predicated on intentional market manipulation. That manipulation was not only the result of Kwon's "gentleman's agreement" with the Trading Firm, but also Terraform's own participation in trading UST when the peg broke in 2021. *See supra* Page 8. After Kwon successfully manipulated the market to defend the peg in 2021, he continued to lie and credit his mystical algorithm as the source of Terra's success. Kwon's public relations team falsely claimed that Terra "passed the test" by surviving a "death spiral" or "Black Swan" event "with the UST peg recovering naturally via the protocol's mechanics and free market dynamics." PSR ¶ 47.b. In July 2021, when a British economist expressed concerns about Terra's algorithmic concept, Kwon derisively tweeted: "I don't debate the poor on Twitter, and sorry I don't have any change on me for her at the moment." Kwon's fraud only metastasized from there. He created the LFG and pretended that it had the

---

firms played a significant role in depegging UST" in May 2022 and fails to mitigate the overwhelming evidence of Kwon's expansive fraud.

oversight of an independent governing council, when he knew he had retained power and discretion over LFG's actions and funds. And in 2022, he deployed that power to use an enormous supply of LFG's assets for his own benefit: to cover up the failure of the UST/LUNA "algorithm" and keep the fraud of Terraform alive. Kwon further pumped up interest in Terraform by claiming that it had a use case—the Chai payments platform—and that was also a lie. To cause others to believe that lie, Kwon went so far as to create false records to make it appear that Chai transactions were occurring on the Terra blockchain when, in reality, Chai did not depend on Terra at all. Mirror and its mAssets were similarly a product of Kwon's fabrications, and he orchestrated the use of trading bots in an elaborate scheme to deceive Terraform customers about the state of Mirror and its purported market. On each of these fronts and over the course of years, Kwon deceived victims about the riskiness of their investment in UST and LUNA.

*Second*, Kwon's crimes are extremely serious when measured quantitatively and qualitatively from the perspective of his victims. Kwon's multi-billion-dollar fraud harmed victims around the world, ranging from individual investors to sophisticated institutions. That Kwon specifically targeted retail investors only magnifies the impact of his lies. Through tweets, podcasts, and videotaped interviews posted online, Kwon aimed his misrepresentations at ordinary crypto investors who were swept up in the false promise of Terra's emerging financial ecosystem. Kwon and his enablers and co-conspirators coaxed investors into trusting the durability and self-regulation of the Terra ecosystem by deceiving them regarding the true underpinnings of Terraform, and the extent to which it was protected from a death spiral. Had Kwon been honest about these risks, including in May 2021 with the initial depeg, investors could have decided to take their money elsewhere, or pressured Kwon into adopting meaningful protections, such as the more robust, effective version of LFG that Kwon claimed existed, rather than the toothless committee Kwon actually installed. Investors were deprived of that chance, because Kwon tricked them into believing safeguards were already in place and that UST had withstood stress tests. Consequently, when the market crashed, everyday investors felt the catastrophic effects of Kwon's crimes.

Kwon implies in his submission that victims assumed the risk of a collapse which is inherent in an "algorithmic stablecoin,"[9] and asserts that the "most committed members" of the community were impervious to the devastating fraud he perpetuated. That assertion is grossly out of touch with the harm caused to the many victims who did *not* assume the risk of Kwon's intentional deceit, and who do not support his right to be deceitful. Indeed, Kwon's begrudging concession that "some members of the Terra community would not have purchased UST or LUNA

---

[9] *See* Sent. Subm. at 4-5 ("Similar to a run on a bank, as more and more users fear losing funds—and therefore withdraw them or stop trading—the mechanism could collapse even if it was otherwise functioning perfectly. Indeed, Do and TFL on a number of occasions disclosed the risks of UST depegging . . . . The possibility of a 'death spiral' was described in the original white paper setting out the Terra Protocol . . . the most committed members of the Terra community understood that it could collapse and today do not hold those risks against Do[.]"); *id.* at 6 (discussing the "risk" of a market crash as "generally understood for algorithmic stablecoins like UST").

had appropriate disclosures been made about [the Trading Firm's] role" is immediately undermined by his speculation that "it is impossible to know what the net effect of a complete disclosure of [the Trading Firm's] role would have been." Sent. Subm. at 13. Setting aside that Kwon's lies are not confined to the Trading Firm's involvement, it is no mystery what investor-victims cared about. Victims testified in open court as SEC witnesses in its civil suit against Kwon. For example:

- Nader George, a retail investor, testified at trial that he was reassured by Kwon's public tweets "that for UST to depeg from the dollar [] is mathematically impossible and that the depeg risk is impossible. So, that reassured me more that I chose the right project to invest in." *SEC v. Terraform Labs et al.*, No. 23 Civ. 1346 (JSR), (March 29, 2024 Trial Tr. 970:8-12).[10] George further testified that on May 9, 2022, when he heard about the depeg, he was once again reassured by Kwon's tweet: "deploying capital-steady lads." Trial Tr. at 972:9-14. He testified that even then, he did not sell his UST because "I believed Do Kwon that like what happened in 2021, this should be a brief depeg. So I kept on holding my UST for a few more days until I—until I saw that it's falling really away from the dollar." Trial Tr. at 973:6-10. Although he tried to sell his UST to "save any of [his] investment," he did not:

  > I kept on seeing tweets again from Do Kwon reassuring that he's very close to having a recovery plan. . . . So I kept on panic buying and panic selling because I was hopeless at that moment. And my whole body was shaking thinking what have I done to my family. I wanted to use this money to help my kids with their education. And now I'm seeing it being, you know, lost in front of my eyes.

  Trial Tr. at 973:16-24. Of George's $400,000 investment, he recovered only $28,000. Trial Tr. at 973:25-974:2.

- Arash Vakil, another retail investor, testified that he invested $188,000 of his own savings, trusting that he was making a safe investment. *SEC v. Terraform Labs et al.*, No. 23 Civ. 1346 (JSR), (March 25, 2024 Trial Tr. 103:3-4). He believed himself to be a main street investor, "[j]ust the normal guy who's looking for a place to—to park money get a return on—a higher APY than they would normally from a traditional savings bank." Trial Tr. 119:1-8. "[T]his was my savings account. These were nonspeculative assets. I wasn't looking to do anything risky with it. This was supposed to be safe." Trial Tr. at 107:2-4. Terraform's public

---

[10] Trial transcripts are publicly-available in connection with *SEC v. Terraform Labs et al.*, No. 23 Civ. 1346 (JSR) (S.D.N.Y.). Should it be helpful to the Court, the Government can furnish copies of these transcripts upon request.

statements regarding the interaction of UST and LUNA "gave [him] confidence in [his] investment," Trial Tr. at 116:2-4, and he understood that he "had no risk of losing [his] principal which was my investment," Trial Tr. at 117:25-118:3. When asked about the May 2022 crash, he stated that he held onto his tokens even as the price dropped because of statements Kwon made at the time, which he characterized as follows: "everyone don't freak out, I'm a new father, everything is fine. That was the general consensus of the statement." Trial Tr. at 134:11-135:9. Vakil testified that he did not believe his investment was risky "[b]ecause of the public statements that Terraform Labs made, Do Kwon made that continued to reiterate and reinforce the fact that this was a stablecoin." Trial Tr. at 184:14-20. Ultimately, Vakil "lost all hope for the restoration of the token back to the $1 peg" and recovered only $13,000 of his original $188,000 investment. Trial Tr. at 135:10-17.

- Boris Revsin, a representative of an institutional investor, testified that of the $35.9 million invested on behalf of Republic Capital, "[t]he majority of the investment was lost" as a result of the market crash. *SEC v. Terraform Labs et al.*, No. 23 Civ. 1346 (JSR), (March 26, 2024 Trial Tr. 276:6-10). Like George, Revsin also invested in part because UST "had maintained its peg" through "the ecosystem and the arbitrage mechanism" which he viewed as a "stress test," Trial Tr. at 262:24-263:5, *i.e.*, proof that UST worked as Kwon advertised.

*Third*, Kwon shirked responsibility for the devastation caused by his fraud, and he continues to minimize his extraordinarily serious conduct. A moment caught on video during a podcast interview in October 2022, while he was on the lam and refusing to reveal his location, captures Kwon confronted with the damage he had caused in vivid and stark terms. The interviewer cited "stories of people who had lost a lot of money in Terra," such as an investor with "a malignant tumor" who "received $50,000 from insurance for therapy, but then he lost 90% of it in Anchor"; another investor who "lost a quarter of a million dollars"; and "a man in Taiwan who had $2 million in Terra, [and], had that value plunged to about a thousand dollars and committed suicide." *See* Ex. A (Transcript of Unchained Podcast, Oct. 18, 2022, available at https://unchainedcrypto.com/do-kwon-of-terra-it-was-never-really-about-money-or-fame-or-success-ep-408/). The interviewer offered Kwon the floor: "Here's your opportunity to say something to the people who lost what in many cases was their life savings." *Id.* When the interviewer noted that they "didn't hear words like 'I'm sorry,'" in Kwon's initial answer, Kwon responded, in substance and in part:

> I am sorry. . . I think, and it, it could seem, you know, with the way that we've been responding to allegations and news reports and things like that, that, that we're being defensive or something like that, but that is absolutely not the case. I believed in the stability of

> UST, and I do understand that my beliefs and statements about how stable and safe UST would be led a lot of, uh, you know, traders and, you know, holders without the tools to understand the complex economic mechanisms, uh, underpinning UST to gain confidence in a system that ultimately failed. . . . The only thing that we are attempting to do is that in the process of people dealing with this grief, uh, there's been a lot of people making allegations like, you know, *it was a fraud*, . . . , I think it is important for their closure, uh, for them to have a correct representation of what exactly happened. Right? *And while it is easy to think this entire thing crashed because it was a scam, or to point fingers to, you know, somebody and just assume there was some theft going on or something like that, that was absolutely not the case.*

*Id*. at 3-5 (emphasis added). This too was a lie. Even in moments of purported apology and reflection, even when it had all come undone, Kwon continued to lie to the public and to Terra investors. Kwon continued to deny commission of his fraud at Terraform until he was brought to the United States to face trial.

　　*Finally*, the sheer loss amount associated with Kwon's fraud counsels in favor of a substantial term of imprisonment. "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). "[T]he sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses." *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009). Over a five-year period between 1996 and 2001, the Commission engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses, with the involvement of relevant stakeholders including the defense bar, the Department of Justice, probation officers, and the U.S. Judicial Conference. *See* Federal Register Notice BAC2210-40, 62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment regarding economic crime sentencing reform). The Commission explained that the resulting amendments, which became effective on November 1, 2001, were based on the determination that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability." Sentencing Guidelines for the United States Courts, 66 Fed. Reg. 30,512, 30,533 (June 6, 2001). Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the Commission, following a collaborative process with relevant stakeholders, that loss amount should be a central consideration in determining the seriousness of an offense to which that Guideline applies. Indeed, "[e]ven if the enhancements may lack robust empirical support related to deterrence, they have foundations in empirical data and national experience related to the goals of fair sentencing and retribution." *United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018).

For all of these reasons, a sentence of 12 years' imprisonment is necessary to meet the nature, scope, and impact of Kwon's crimes.

2.   A Substantial Term of Imprisonment is Necessary for Specific Deterrence

Kwon's post-crash conduct, coupled with his relative youth, make specific deterrence a meaningful sentencing factor notwithstanding Kwon's guilty plea.

*First*, Kwon's post-collapse efforts to evade capture and punishment belie his claims to have been individually deterred. Kwon elides precisely how he avoided arrest by absconding from Serbia to Montenegro, but acknowledges he managed to do so, and was only caught with two different fake passports as he was attempting to leave Montenegro for yet another country, the United Arab Emirates. *Id.* In a stunning sleight of hand, Kwon's recitation of this pivotal inflection point in his scheme is replete with allegations of misconduct by people *other than Kwon*.[11] Indeed, the most revelatory portion of this summary is Kwon's concession that he preferred to be extradited to Korea because he "would not have faced subsequent extradition to the United States." Sent. Subm. at 7. In other words, Kwon's acceptance of responsibility in this case materialized long after his arrest, and only when prosecution here was inevitable. Kwon's implied bafflement that he was extradited to, and compelled to face charges in, the United States is misplaced. Do targeted U.S. investors, employed U.S. individuals to work on the project, including William Chen, spoke at a cryptocurrency conference in New York during which he chanted "UST",[12] announced a sponsorship agreement with the Washington Nationals,[13] pegged UST to the U.S. dollar, and caused tremendous losses to his U.S. investors, which are reflected in Terraform Labs' own bankruptcy filings here in the United States.

*Second*, to the extent Kwon implies that he is reformed based on his engagement with the TFL Plan Administrator ▓▓▓▓▓▓▓▓▓ Sent. Subm. at 9, such claims overstate Kwon's willingness to assist.

---

[11] The Government does not credit Kwon's claims of misconduct in connection with his extradition to the United States. The record reflects that Kwon's extradition received full consideration by multiple Montenegrin Courts including the Supreme Court, and Montenegro's Ministry of Justice. His continued attacks on the extradition process itself do not reveal any illegality and are a distraction from the efforts of multiple jurisdictions to hold Kwon accountable for his many crimes. More to the point, this is no basis to extend unusual sentencing leniency to Kwon.

[12] *See Terraform Labs PTE Ltd. et al. vs. Securities and Exchange Commission*, No. 21 Civ. 08701 (JPO) (ECF No. 1 ¶¶ 16-17); *SEC v. Terraform Labs et al.*, No. 23 Civ. 1346 (JSR) (ECF No. 33-8 Tr. 47:2-7).

[13] *See Nationals, Terra Create First-Ever Sports Partnership with Decentralized Autonomous Organization*, Feb. 9, 2022, https://curlyw.mlblogs.com/nationals-terra-create-first-ever-sports-partnership-with-decentralized-autonomous-organization-20843cc704d3.

As to the Plan Administrator, any aid Kwon provided was not motivated by good faith or initiated of his own accord. Instead, in June 2024—two years after the market crash—the defendant entered a settlement agreement with the SEC requiring that Kwon assist the Plan Administrator in recovering certain assets. *SEC v. Terraform Labs et al.*, No. 23 Civ. 1346 (JSR) (S.D.N.Y.) (ECF Nos. 271, 273). Even after legally binding himself to assist, Kwon has made meager efforts to comply. In May 2025, Kwon filed a motion seeking to recover 500 million PYTH tokens for the benefit of the Plan Administrator. Sent. Subm. at 9. And on October 19, 2025—one week before his sentencing submission was due to this Court—Kwon met with the Plan Administrator to discuss the recovery of assets. While Kwon pledged and pledges future engagement with the Plan Administrator, Sent. Subm. at 10, that does not reflect contrition. Kwon is legally obliged to assist the Plan Administrator in recovering certain assets, such as all the cryptocurrency LFG held. In the approximately 18 months since that commitment was made, by his own account, Kwon has filed only a single claim for the benefit of the bankruptcy claimants, and participated in only a single meeting with the Plan Administrator, which only occurred one week before he was due to make his sentencing submission to this Court. *Id.* at 9-10. Such efforts—late, compulsory, and ineffective—do not warrant the extraordinary leniency that he seeks.



*Third*, Kwon's submission also demonstrates the serious risk that at his earliest opportunity, he will seek to re-enter the cryptocurrency markets with dubious intentions. It is not uncommon for white collar defendants to recidivate despite having received terms of imprisonment. *See, e.g.*, *United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (S.D.N.Y.) (investment fraud scheme following over a dozen prior convictions); *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (S.D.N.Y.) (orchestrating a Ponzi scheme after having served a prior two-year sentence for bank and wire fraud); *United States v. Vitaly Borker*, No. 22 Cr. 273 (JSR) (S.D.N.Y.) (defendant convicted of wire fraud for operation of fraudulent eyeglasses website after two prior federal convictions for the same conduct); *United States v. Joseph Meli*, No. 19 Cr. 480 (RA) (S.D.N.Y.) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78 month sentence for the same scheme); *United States v. Edward Durante*, No. 15 Cr. 171 (ALC) (S.D.N.Y.) (beginning a new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. John Galanis*, No. 15 Cr. 643 (PKC) (S.D.N.Y.) (defendant convicted of securities fraud after 1973 and 1988 convictions for mail fraud and securities fraud).

By his own account, Kwon traveled to Serbia "hoping to re-domicile TFL in that country" even "[a]fter Singaporean authorities froze TFL's bank accounts." Sent. Subm. at 7. In other words, Kwon knew he had committed a fraud, knew that he was under scrutiny by law enforcement for committing that fraud, and he was already plotting how to keep running the very business built on that fraud. That Kwon has marshalled letters from those who claim they still believe in him, even after his conviction for this massive fraud, only underscores the risk that Kwon will rally such supporters in service of a future scheme. Below is only a sample of the supposed "supporters" that Kwon cites in his own favor:

- CJ Han, who is facing prosecution in South Korea for his own participation in the Terraform fraud.  Han was arrested in Montenegro with Kwon while they were both trying to use fraudulent passports to travel to the United Arab Emirates.  Han was extradited to South Korea to face criminal charges there in February 2024.

- Su Zhu and Kyle Davis of Three Arrows Capital, who present themselves as "investors" continuing to support Kwon. Three Arrows Capital plunged into liquidation leaving billions in losses by the summer of 2022, and came under investigation by the SEC and CFTC.[14]  Zhu and Davies shirked their creditors and vanished, ultimately heading to Dubai.[15] In September 2023, Zhu was himself arrested in Singapore.

- William Chen, a former Terraform employee, whose contemporaneous text messages demonstrate his knowledge of the Chai and Mirror frauds.  For example, while working at Terraform, Chen wrote, in substance and in part that, "mirror isn't decentralized," that it was a "fake it till u make it thing" to "provide the initial illusion to make em [investors] believers," and that he "can't belirve [sic] do [*i.e.*, Do Kwon] just goes out and tweets TFL holds no MIR" when that is false.  *See* Ex. B.

It is stunning that Kwon would summon these individuals as voices of support, while simultaneously failing to apprise the Court of material facts about their conduct.

*Fourth*, Kwon's claim that he was not motivated by greed, and gained comparatively little from the offense, is not persuasive. Kwon was regarded as a billionaire thanks to his Terraform fraud. His true wealth may never be reliably known. Kwon did not provide a financial statement or documentation to the Probation Office. PSR ¶¶ 153, 157. In December 2021, Kwon bought a

---

[14] *US Regulators Probing Bankrupt Crypto Hedge Fund Three Arrows Capital*, BLOOMBERG, Oct. 17, 2022, https://www.bloomberg.com/news/articles/2022-10-17/us-investigating-bankrupt-crypto-hedge-fund-three-arrows-capital.

[15] *Three Arrows Founders Break Silence Over Collapse of Crypto Hedge Fund*, BLOOMBERG, July 22, 2022, https://www.bloomberg.com/news/articles/2022-07-22/three-arrows-founders-en-route-to-dubai-describe-ltcm-moment.

Singapore penthouse at a purchase price of nearly $40 million, with more than $18 million down.[16] News reports reflect that South Korean prosecutors identified and froze another approximately $40 million worth of cryptocurrency belonging to Kwon in 2022.[17] The façade of Terraform's success also brought Kwon into a rarefied world of opportunity, including his listing in Forbes Magazine's "30 Under 30" in 2019.[18] Kwon plainly benefitted from his crimes, and fought to protect his access to those benefits for years.[19]

Kwon's efforts to evade responsibility, shift blame for the gravamen of his conduct, and overstate his remedial efforts, demonstrate precisely why the need for specific deterrence is particularly acute in this case.

3.    A Substantial Term of Imprisonment is Necessary for General Deterrence and to Promote Respect for the Law.

A substantial term of imprisonment is also necessary to deter others from engaging in similar acts of criminal deception and to promote respect for the law.

In enacting Section 3553(a), "Congress viewed deterrence as 'particularly important in the area of white-collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is a particularly important sentencing factor in fraud and other white-collar cases because the decision to commit those crimes is often a calculated cost-

---

[16] *Do Kwon Appealing Against Dismissal of $18.4m Claim Over Aborted Purchase of Ardmore Penthouse*, THE STRAITS TIMES, https://www.straitstimes.com/singapore/courts-crime/man-fails-in-claim-for-18-4m-refund-over-aborted-purchase-of-ardmore-park-penthouse (last visited Dec. 3, 2025).

[17] *Crypto Fugitive and Terra Founder Do Kwon Set to Lose His South Korean Passport*, THE STRAITS TIMES, https://www.straitstimes.com/business/companies-markets/crypto-fugitive-and-terra-founder-do-kwon-set-to-lose-his-south-korean-passport (last visited Dec. 3, 2025). While Kwon denied ownership of the funds, in the same context he also denied any use of the exchanges KuCoin and OKX, which is contradicted by the evidence in this case. PSR ¶ 57.d.

[18] *See Forbes*, Profile: Do Kwon, https://www.forbes.com/profile/do-kwon/ (last visited Dec. 4, 2025).

[19] Kwon's claims about his use of the $57 million that he misappropriated from LFG, moved through multiple cryptocurrency exchange accounts, and into a Swiss bank account before transferring to a professional services firm, PSR ¶ 57.a-c., miss the mark. The record reflects that Kwon and Terraform needed to transfer this amount in connection with actions their professional services firm had already taken to contend with a lawsuit in Singapore brought by certain Terraform victims. In order to disguise the fact that the funds were crime proceeds stolen from LFG, Kwon and his co-conspirators laundered the money prior to remitting payment, and Kwon and Terraform gained the benefit of that fraudulent use of funds.

benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."). As Judge Posner observed, "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*).

Here, a substantial term of imprisonment is necessary to telegraph the serious consequences that await would-be crypto-criminals who attempt a fraud as massive as Kwon's. The collapse of UST was highly publicized and closely followed by many in the industry, and significant efforts have been undertaken to recompense victims of Kwon's crimes. That notoriety counsels in favor of a twelve-year term of imprisonment for the purpose of promoting general deterrence. *See, e.g., United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017) (affirming district court's sentence which took into account, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity"). Should Kwon receive the leniency he seeks, others may be emboldened to engage in similarly audacious crimes, believing that such schemes are hard to detect and, even if they are detected, are unlikely to result in significant repercussions, as compared to the potential upside of becoming "one of the richest men in the world." Sent. Subm. at 22.  *Cf. United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("It is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence.").

As for promoting respect for the law, this sentencing factor is implicated in particular by Kwon's post-conduct attempts to flee, and his private conversations regarding potential criminal charges. In private, Kwon expressed his belief that he could reach "sort of a settlement of some kind" with Korean prosecutors should he ever be charged, negotiating a "2-year sentence but 18 months deferred or something," but that even with such a possible outcome, he instead wished to double down on an aggressive defense strategy and "tell them to fuck off, right?" Ex. C-T.[20] Kwon acknowledged in this private conversation that he had cultivated "potential countries that can offer political protection and things like that." *Id*. This was not idle chatter: Kwon in fact sought refuge in foreign jurisdictions to avoid apprehension.

 Kwon's efforts to flee illustrate the difficulty in holding accountable moneyed defendants with the means to evade law enforcement, particularly in the context of a complex, multinational, sophisticated fraud like Kwon's. They also underscore the need for a substantial sentence to promote general deterrence and respect for the law. Kwon claims that the Government's victory in the extradition contest has served as a general deterrent by demonstrating the "long arm of the

---

[20] Exhibit C-T is a transcription of portions of an audio recording which was produced to Kwon and his defense team under bates number SDNY_DHK_0000001323. The audio clips, marked as Exhibits C-1, C-2, and C-3 can be provided to the Court upon request.

U.S. law." Sent. Subm. at 22. But of course, the prospect of getting caught is different from the prospect of facing significant punishment. A term of five years can hardly be considered a steep punishment, given the gravity and immensity of Kwon's fraud. If anything, Kwon's requested sentence would encourage—rather than deter—would-be cryptocriminals, inviting them to build global, multi-billion-dollar fraud schemes that carry minimal consequences when the bottom falls out.

    4.  <u>A Sentence of 12 Years is Necessary to Avoid Unwarranted Sentencing Disparities.</u>

Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008). The Government does not contest that a downward variance from the Guidelines Range is warranted, and the Government's sentencing recommendation reflects that consideration. Nonetheless, the defense's requested five years' imprisonment does not avoid unwarranted sentencing disparities between Kwon and other defendants who have committed similar crimes. Recent sentencing data only underscores the incongruity of Kwon's request. Probation notes that from 2020 to 2024, there were 31 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 43 and a Criminal History Category of I. The average length of imprisonment imposed was 158 months, and the median length of imprisonment imposed was 138 months. PSR at p. 53.

Kwon invites the Court to consider the six-year sentence imposed on William Sadleir, but the defendants' schemes have little in common. *See United States v. Sadler*, No. 20 Cr. 320 (PAE) (S.D.N.Y.) (ECF No. 101). Sadleir defrauded victims out of approximately $30 million. *Id.* at 2-3. Kwon inflicted investor losses—reaching over $40 billion—that dwarf Sadleir's. According to Kwon, the "factors that the Court noted there as supporting significant punishment are absent here." Sent. Subm. at 20. Maybe so. But other—arguably more egregious factors—are present in Kwon's case. Kwon sought to evade justice, obtaining a fake passport and seeking cover in Dubai, where he hoped to avoid prosecution by either Korea or the United States. Moreover, Kwon downplays the significant mitigating factors in Sadleir's case. Not only was Sadleir nearly 70 years old at the time of his sentencing, he also suffered from a history of heart disease that required surgery, as well as ongoing treatment. *Id.* (ECF No. 90 (Sent. Tr. at 43:10-44:23)).

Kwon also points to the twelve-year sentence imposed on Alexander Mashinsky, describing Mashinsky as the "most similarly situated defendant." Sent. Subm. at 21. Kwon claims that the §3553(a) factors favor a "far shorter sentence . . . than the one Mr. Mashinsky received." *Id*. That is incorrect. While Mashinsky was not detained pending trial and contested core aspects of his conduct, neither did he obtain a fake passport and try to live on the lam in a foreign country. *See United States v. Mashinsky*, No. 23 Cr. 347 (JGK) (S.D.N.Y.) (ECF No. 162). In any event, the magnitude of Mashinsky's crime pales in comparison to Kwon's: $5 billion versus $40 billion in investor losses.

At the same time, Kwon ignores obvious comparators who received significantly steeper sentences than the 12 years the Government seeks. Conspicuously absent is Samuel Bankman-Fried, another prominent crypto executive whose billion-dollar company was exposed as a massive fraud when the crypto market crashed in 2022. *See United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK). Judge Kaplan imposed a sentence of 25 years on Bankman-Fried who, like Kwon, perpetrated a fraud of staggering proportions in his twenties and then attributed his brazen criminal conduct in part to youth and inexperience. True, Bankman-Fried exercised his right to a trial. But that scarcely justifies a *twenty-year* delta between Bankman-Fried's sentence and that requested by Kwon. Nor does Kwon reference the 20-year sentence that Judge Ramos imposed on the co-founder of the cryptocurrency "OneCoin," whose multibillion-dollar fraud scheme took in more than $4 billion from 3.5 million investor-victims worldwide. *United States v. Greenwood*. No. 17 Cr. 630 (ER) (S.D.N.Y.) (ECF No. 583). Kwon also neglects to mention the 18-year sentence that Judge Castel imposed in *United States v. Austin*, No. 23 Cr. 508 (PKC) (S.D.N.Y.) (ECF No. 119). The defendant in that case fraudulently offered services related to the cryptocurrency industry and inflicted more than $12 million in losses on more than two dozen victims.

Given the size and scale of Kwon's fraud and the catastrophic financial damage left in its wake, Mashinsky, Bankman-Fried, Greenwood, and Austin provide far more relevant comparators than William Sadleir.

## C. Forfeiture and Restitution

In connection with Kwon's sentencing, the Court entered a consent order of forfeiture imposing a forfeiture money judgment in the amount of $19,286,774.74, and forfeiting certain specific property as set forth in that order. ECF No. 47. The Government respectfully requests that the Court incorporate the consent order of forfeiture in its pronouncement of Kwon's sentence.

With respect to restitution, because of the complexity of the case and the number of victims involved, awarding restitution to victims in accordance with 18 U.S.C. § 3663A would be extremely costly and administratively impractical. The cost and time associated with calculating each investor-victim's loss, determining whether the victim has already been compensated through the pending bankruptcy, and then paying out a percentage of the victim's losses, will delay payment and diminish the amount of money ultimately paid to victims. Therefore, consistent with the Government's frequent approach in complex cases with numerous victims, the Government is not seeking restitution in this matter as it would be impracticable in this case, 18 U.S.C. § 3663A(c)(3), and will instead endeavor to make uncompensated victims whole through the Department of Justice's remission process.

Restitution to persons "directly and proximately harmed" by fraud and money laundering is typically mandatory. *See* 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). In such a case, the Court is ordinarily authorized to determine a restitution amount and a schedule of victims and payments. However, an order of restitution is not required when "the number of identifiable victims is so large as to make restitution impracticable," or when imposing restitution would require

"determining complex issues of fact related to the cause or amount of the victim's losses" which "would complicate or prolong the sentencing process." *Id.* § 3663A(c)(3). In those situations, instead of ordering restitution, courts have authorized the Government to compensate victims through the process of remission under the forfeiture statutes and related regulations. *See, e.g., United States v. Madoff*, No. 09 Cr. 213 (DC) (S.D.N.Y.) (ECF No. 106); *United States v. Bonventre*, No. 10 Cr. 228 (S.D.N.Y.) (ECF No. 318) (Madoff Ponzi scheme); *United States v. Sharma*, No. 18 Cr. 340 (S.D.N.Y.) (ECF No. 407) (multi-million dollar cryptocurrency scheme); *United States v. Dos Santos*, No. 20 Cr. 398 (S.D.N.Y.) (ECF No. 283) (multi-million dollar cryptocurrency scheme); *United States v. Samuel Bankman-Fried*, No. 22 Cr. 673 (S.D.N.Y.) (March 28, 2024 Minute Order).

Separately, the forfeiture statutes authorize the Attorney General to "grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a violation of this subchapter, or take any other action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this section." 21 U.S.C. § 853(i)(1). The applicable regulations are set forth in 28 C.F.R. Part 9. In order to qualify for remission, a crime victim must provide information to the Government to support specific elements, including that they suffered a specific pecuniary loss directly caused by the criminal offense, that the victim did not contribute to the offense, that the victim has not been compensated for the loss from another means, and that the victim has no other recourse available. *See generally* 28 C.F.R. § 9.8(b).

It is the policy of the Department of Justice, consistent with the Crime Victims' Rights Act, to ensure that crime victims receive "full and timely restitution as provided in law." *See* 18 U.S.C. § 3771(c)(1). Accordingly, when the Government seizes property in connection with a criminal case, the Government's goal is to forfeit the property and then, in remission proceedings administered by the Attorney General through his delegee, the Chief of the Money Laundering, Narcotics and Forfeiture Section ("MNF") (formerly the Money Laundering and Asset Recovery Section), to distribute funds to victims. Frequently MNF will distribute those assets through a remission program by which victims may petition for portions of forfeited property. *See, e.g. United States v. Sharma*, No. 18 Cr. 340 (LGS), 2022 WL 1910026, at *2 (S.D.N.Y. June 3, 2022). Victims' interests will be best served through reliance of the remission process overseen by the MNF.

An alternative arrangement whereby restitution is calculated and distributed to victims by the Government and the Court would be impractical to administer and would come at great expense to victims' recovery. In order to enter an order of restitution, the Court would need to determine and corroborate—to the tune of over $40 billion—each victim's losses. That would require determining and corroborating for each investor-victim the amount of funds he or she invested, the value of any returns, and the amount recovered through the bankruptcy or other means. That task, challenging as it would be for the global fraud which the defendant led, is compounded here further for victims who purchased UST or LUNA tokens via other cryptocurrencies, given their ever-fluctuating value. In short, there are millions of potential victims and substantial complexity in computing each victim's investments and withdrawals.

Instead, permitting the Government to distribute finally forfeited funds through administration of the pre-existing remission process will more be efficient, and not "complicate or prolong the sentencing process." 18 U.S.C. § 3663A(c)(3).

## V.    **CONCLUSION**

For the reasons discussed above, the Government respectfully submits that a sentence of no fewer than twelve years' imprisonment is sufficient, but not greater than necessary, to achieve the legitimate ends of sentencing.

Respectfully submitted,

JAY CLAYTON
United States Attorney

_____/s/_____
Marguerite B. Colson
Sarah Mortazavi
Kimberly Ravener
Assistant United States Attorneys
(212) 637-2587/2520/2358