**Hecker Fink LLP**

NEW YORK | WASHINGTON, DC | LOS ANGELES

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

TEL (212) 763-0883 | FAX (212) 564-0883
WWW.HECKERFINK.COM

dpatton@heckerfink.com

December 10, 2025

**BY CM/ECF**

The Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
40 Foley Square, Room 2201
New York, New York 10007
EngelmayerNYSDChambers@nysd.uscourts.gov

    Re:    *United States v. Do Hyeong Kwon*, 23-cr-151

Dear Judge Engelmayer:

    We respectfully submit this supplemental memorandum on behalf of Do Hyeong Kwon, in advance of sentencing, to respond to the questions posed by the Court in its December 8 order, as well as to provide additional information responsive to the government's December 4 submission.

    **A.**    **The Court's Questions**

    <u>South Korea</u>: We understand from Do's South Korean counsel that South Korea's criminal system does not have a plea-bargaining process, and there is no way to resolve a criminal case short of trial. Indeed, even a guilty plea—if such a concept existed in South Korea—would not absolve the government of needing to present its case to a judge and obtain a verdict. There is no agreement or understanding between Do and his South Korean counsel on the one hand and the South Korean authorities on the other about the charges he faces there.

    If convicted, the mandatory minimum sentence for the charges Do faces in South Korea is five years' imprisonment. The maximum sentence is life in prison and fines and costs in the hundreds of millions of U.S. dollars. We understand that there is no way for Do's sentence in South Korea to be served concurrently with his U.S. sentence. Indeed, no part of Do's criminal case can begin to proceed until he arrives in South Korea, further complicating any advance resolution.

    Even if he were transferred to serve part of his U.S. sentence in South Korea, he would have to complete that sentence before starting any sentence that follows a South Korean conviction and would not receive credit for that sentence on a later South Korean sentence.

Hecker Fink LLP

2

Any more specific assessment of Do's sentence in South Korea would be speculative. Do's co-defendants are currently on trial in South Korea but have not yet been sentenced. But what is certain is that Do will face prosecution in South Korea for substantially similar charges arising out of the same facts as this case. He will do so without the benefit of double jeopardy protections.[1]

*Time Served*. We have requested that the government ask the Bureau of Prisons whether it (the BOP) will credit Do's time in Montenegro. We agree that the Court should treat 17 months and eight days of Do's detention in Montenegro as attributable to this prosecution. As the Presentence Investigation Report notes, that is the amount of time that Do was detained in Montenegro "pursuant to the extradition" the government sought. Indeed, as described in Do's letter, his time in Montenegro was grueling, far beyond even the worst conditions that he could possibly experience in detention here, and the Court should credit well above the 17 months Do spent there when considering what additional sentence to impose.

*Remission*. We understand this is a question directed only to the government.

*First Step Act*. Do is not eligible to apply earned time credits under the First Step Act pursuant to 18 U.S.C. § 3632(d)(4)(E)(i), as he is "subject to a final order of removal." Were he eligible, he would receive up to 15 days of credit for every 30 days of participation in sanctioned programming. *Id.* § 3632(d)(4)(A). Using a conservative estimate, if Do participated in programming 15 days per month, he would earn 7.5 days of earned time credits per month, ultimately reducing his sentence by roughly 25%.

A term of supervised release would serve no purpose.

*Prisoner Transfer*. We understand that determinations for eligibility for the International Prisoner Transfer Program are made exclusively by the International Prisoner Transfer Unit in the DOJ's Office of International Affairs. That Office posts guidelines for evaluating transfer requests, which do not describe a role for the sentencing judge.[2] In other words, we do not understand there to be a point at which the Court would make a recommendation to the DOJ or the BOP. That said, to the extent the Court agrees that Do's sentence, or at least some part of it, would be better served in South Korea, the Court could include that recommendation in the judgment akin to recommendations judges frequently make regarding the BOP's assignments to its facilities in the United States.

The United States and South Korea are both parties to the Council of Europe Convention on the Transfer of Sentenced Persons, which governs prisoner transfers between the two countries.

---

[1] In its introduction, the government states that Do "oversells the certainty of his conviction and sentence in connection with the pending charges in Korea." Government Submission at 2. But it appears that the only basis for that dramatic statement is an audio recording of a conversation Do had before he was charged in South Korea, in which he suggested that he could reach a settlement with the Korean prosecutors. *Id.* at 31. No such settlement option exists for Do in South Korea. The only indication we have for the possible sentence that he faces in South Korea is the public statement of the prosecutor indicating that he would seek a sentence of over 40 years. Defendant Submission at 10.

[2] *See* Guidelines for the Evaluation of Transfer Requests Submitted by Foreign Nationals, Criminal Division, U.S. Department of Justice (Aug. 28, 2025), https://www.justice.gov/criminal/criminal-oia/guidelines-evaluation-transfer-requests-submitted-foreign-nationals.

Hecker Fink LLP

3

Should Do be transferred to Korea, the Convention would require that Korea "continue the enforcement of the sentence immediately," either as issued by the United States or by "convert[ing] the sentence, through a judicial or administrative procedure, into a decision" of Korea, "substituting for the sanction imposed in [the United States] a sanction prescribed by the law of [Korea] for the same offence." Council of Europe Convention on the Transfer of Sentenced Persons art. 9(1), Mar. 25, 1983, S. Treaty Doc. 98-23, C.E.T.S. No. 112. The United States would be able to ask Korea which approach it intends to take. *Id.* art. 9(2). Either way, Do would remain detained in Korea to complete his sentence.

We have also been informed by Do's South Korean counsel that there is no mechanism for Do to be released early were he transferred to South Korea to finish his U.S. sentence there. He would have to complete the entire sentence and then could begin any sentence he receives for a conviction in South Korea. He would not receive credit for the U.S. sentence in his South Korean sentencing.

*Victims*. We understand this is a question directed only at the government.

### B. Response to Additional Points Raised by Government

We also offer brief responses to a few points included in the government's submission.

#### 1. *Assistance to Terraform Labs Plan Administrator*

The government appears to misunderstand the circumstances of Do's efforts to assist the Terraform Labs Plan Administrator in recovering assets for TFL's creditors. In its sentencing submission, the government describes Do's efforts to assist the Plan Administrator as "late, compulsory, and ineffective." Government Submission at 28. Not one of those adjectives is accurate. Since just a few months after Do's extradition to the United States, we have been in discussions with counsel for the Plan Administrator about assistance Do could provide toward their efforts to recover funds through asset recovery and affirmative claims against third parties. Although we did not schedule an in-person meeting between the Administrator and Do until after Do's guilty plea was entered, we began planning for that meeting soon after his plea. Counsel for the Administrator provided us with topics for a potential meeting with Do; we negotiated confidentiality terms for the meeting; and we coordinated complicated logistics arising from Do's continuing detention. All of those factors meant that Do's meeting with the Administrator last month occurred as soon as undersigned counsel were able to arrange it, and the timing had nothing to do with any effort to delay on Do's part. We expect additional meetings will be easier to facilitate once Do has been assigned to a BOP facility to serve his sentence, and he plans to continue to assist the Administrator.

Do's assistance to the Administrator is also not "compulsory." The government attempts to connect the meeting last month to Do's settlement with the SEC. But that settlement required only that Do facilitate the transfer of certain assets to the Administrator. Government Submission at 18. Some of those efforts have already been successful, including exhaustive litigation efforts that Do undertook to recover 500 million PYTH tokens after the entity that controlled those tokens

wrongfully attempted to withhold them from Do and, ultimately, the Administrator.[3] While other efforts to transfer to the Administrator funds that Do is required to provide under his settlement with the SEC are continuing, Do's meeting with the Administrator was on a different topic: potential affirmative litigation that the Administrator may pursue against third parties who benefited from the collapse of the Terra ecosystem. *See* Exhibit A (letter from Terraform Plan Administrator describing meeting).

While the Plan Administrator has yet to bring its affirmative claims, it is both premature and ultimately misleading for the government to state that Do's meeting was "ineffective," and in his letter the Administrator himself wrote no such thing. Do is uniquely positioned to assist the Administrator in claims it intends to pursue, and Do has every intention to continue to help the Administrator recover whatever assets it can for the Terra community.

2. 

---

[3] Elsewhere in the government's submission, they accuse Do's delay in "effectuat[ing] the transfer of his interest in PYTH tokens" of causing a "drop[] in value" in those tokens, "resulting in a steep decline in potential recovery for investor-victims." Government Submission at 18. The effort to recover those tokens for the Plan Administrator was extraordinarily complicated and could only have been undertaken by Do, who was the rightful owner of those tokens notwithstanding the nominal token holder's brazen attempt to steal them.

We can discuss, in detail, those efforts at the sentencing hearing to the extent that would be helpful to the Court, but the proceedings are also described in filings in the otherwise unrelated FTX bankruptcy proceeding, where the litigation on this issue took place. *See* Motion to Enforce Order Granting Motion of Pyth Data Association for Relief from the Automatic Stay, *In re FTX Trading Ltd.*, Case No. 22-11068, ECF No. 29773 (Feb. 27, 2025); Order Granting Do Kwon's Motion, *Id.*, ECF No. 30358 (May 2, 2025). Suffice it to say, the litigation efforts were extensive and challenging, and Do authorized those efforts immediately upon being presented with the issues. The government is flatly wrong to accuse Do of any delay in effectuating the transfer of the PYTH tokens (nor would there have been any personal benefit to him to do so).

### 3. *Money Laundering Allegations*

Throughout its submission, the government describes transactions that TFL engaged in after the collapse of the Terra ecosystem as akin to a theft of funds so that Do could personally benefit. *See* Government Submission at 3 (stating Do "misappropriated hundreds of millions of dollars in assets from LFG"); *id.* at 14 ("Kwon took steps to place the misappropriated funds out of reach from potential investors or those who would seek recovery using those funds"); *id.* at 29-30 (arguing that Do's claim that he "gained comparatively little from the offense[] is not persuasive" and that he "fought to protect his access to" proceeds of his crimes "for years").

The only specific money laundering allegations in this case, however, point to one destination for allegedly misappropriated assets, which the government does not contest: a Mareva asset freeze injunction that TFL was required to post in connection with litigation brought by TFL investors in Singapore. *See* Government Submission at 30 n.19 (acknowledging that the proceeds of the money laundering allegations were transferred "in connection with actions [TFL's] professional services firm had already taken to contend with a lawsuit in Singapore brought by certain Terraform victims"). As noted in our earlier submission, the funds remain in the control of the Singapore court to this day, and the Plan Administrator is working to return them to the estate for the broader benefit of the bankruptcy claimants. *See* Plan Administrator's Second Status Update ¶¶ 16-21, *In re Terraform Labs PTE Ltd.*, No. 23-10070-BLS, ECF No. 1086 (Del. Bankr. Sept. 21, 2025).

### 4. *Comparable Sentences*

The government points to three additional sentences as "obvious comparators" that were "ignored" in Do's earlier submission: Sam Bankman-Fried, Karl Greenwood, and Hugh Austin. All three cases, however, lack the many features that make this case unique, including Do's time spent under harsh conditions in Montenegro, ████████████████ and the pendency of related charges overseas. But even setting those points to the side, the cases are distinguishable.

Taking the latter two first, Mr. Greenwood's and Mr. Austin's cases are substantially different from Do's. Mr. Greenwood's "OneCoin enterprise was a fraud from the beginning" and "at base, it involved nothing more than old-school snake oil." Sentencing Tr. at 36, *United States v. Greenwood*, 17-cr-630, ECF No. 581 (Sept. 20, 2023). Judge Ramos highlighted in handing down his sentence that OneCoin "was never a coin. There was never a blockchain. There was never a market. There was never a chance that it could be traded for fiat currency. There was never a chance that any victim would make any money except through the mechanism of a garden-variety pyramid scheme." *Id.* And while Judge Ramos acknowledged that the loss amount in that case was, like it is here, off the guidelines table chart, he noted that it was "more important" that he consider the "sad list of investors" who spoke at sentencing and the fact that the case involved "Mr. Greenwood and his co-conspirator simply putting their hands in the individuals' pockets, the victims' pockets, and taking it out taking out the money that they found in there." *Id.* at 36-37.

Those factors that Judge Ramos considered in handing down a 20-year sentence for Mr. Greenwood are not present here. Even taking the most slanted description of Do's crimes from the government, there is no doubt that the Terra ecosystem was a vibrant and important component of worldwide crypto markets. People used the Terra Blockchain and its related products and built on

top of them. Many of its most passionate users and developers wrote letters on Do's behalf that we hope the Court will consider in finding that Do is not like Mr. Greenwood, running a "garden-variety pyramid scheme" in the guise of crypto.

Mr. Austin's case similarly involved a garden-variety fraud that was cloaked in crypto, but was ultimately just a scam. Judge Castel described Mr. Austin's offense as a four-year "crime wave." Sentencing Tr. at 49, *United States v. Austin*, No. 23-cr-508, ECF No. 123 (June 9, 2025). Judge Castel described Mr. Austin as "someone who has a form of narcissism" and that his statements in his sentencing, after trial, suggested that "his theory of the case is there was no fraud anywhere." *Id.* at 50. And Judge Castel very deliberately contrasted Mr. Austin's case—where he said he thought "every penny of the $12 million" of the loss amount was "richly and directly attributable to Mr. Austin"—with other cases where "the loss is a staggering number" but overstates the "actual extent of criminality." *Id.* at 55-56.

The obvious differences in nature of the misconduct here are precisely why the Court cannot give great weight to the loss amount alone, large as it is. Mr. Greenwood's OneCoin scam was always destined to collapse and cause billions of dollars of harm to the individuals whom he defrauded. Mr. Austin was never going to provide the services and cryptocurrencies that he fraudulently offered to individual investors. This case is different. As noted in our earlier submission, the Terra ecosystem was brought down by a deliberate attack on the stability of UST that exploited weaknesses in the peg mechanism. Defendant Submission at 5-7. While the entire amount of that loss falls on Do both as a matter of the sentencing guidelines calculation and on his own conscience, how that loss came occurred is something the Court must consider in looking at this case in light of the government's comparators.

As for Mr. Bankman-Fried, the government of course acknowledges the most glaring difference between this case and his, namely that Mr. Bankman-Fried contested his responsibility for his crimes all the way through trial, sentencing, and long thereafter in his continued public statements downplaying his conduct. Judge Kaplan called him "a man willing to flip a coin as to the continued existence of life and civilization on earth." Sentencing Tr. at 53, *United States v. Bankman-Fried*, No. 22-cr-673, ECF No. 426 (May 9, 2024). Judge Kaplan described how Mr. Bankman-Fried knew for years that his company was misusing company funds for Mr. Bankman-Fried's own gains, and that he played a "game" because he viewed the cost of getting caught as worth the risk. *Id.* Most importantly, Judge Kaplan said that he never heard "a word of remorse for the commission of terrible crimes." *Id.* at 54.

That description stands in stark contrast to Do who repeatedly acknowledges and expresses remorse for his criminal conduct in his letter to the Court. That letter, in which Do straightforwardly owns up to his false statements and details how he got so off track by using language like "insane arrogance," does not pull punches. That he also painstakingly provides context to a series of complex events does not mean he is "minimizing" his conduct. It is a genuine effort at truthful contrition, and it separates him in a meaningful way from the cases the government cites.

Hecker Fink LLP

7

          Respectfully submitted,

          _____
          David Patton
          Michael Ferrara
          Sean Hecker
          Andrew L. Chesley
          Christopher Morel
          Hecker Fink LLP
          350 Fifth Avenue, 63rd Floor
          New York, New York 10118
          Telephone: (212) 763-0883
          shecker@heckerfink.com
          mferrara@heckerfink.com
          dpatton@heckerfink.com
          achesley@heckerfink.com
          cmorel@heckerfink.com

          Counsel for Defendant Do Hyeong Kwon

Encl