PCBRKWOs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          23 Cr. 151 (PAE)

DO HYEONG KWON,

                                     Sentence
             Defendant.

------------------------------x

                                     New York, N.Y.
                                     December 11, 2025
                                     11:00 a.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                 District Judge

                       APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  SARAH MORTAZAVI
     MARGUERITE B. COLSON
     KIMBERLY RAVENER
     Assistant United States Attorneys

Hecker Fink LLP
     Attorneys for Defendant
BY:  DAVID E. PATTON
     SEAN HECKER
     MICHAEL FERRARA
     ANDREW L. CHESLEY

Also Present:

Alexandra LeBaron, Paralegal Specialist USAO

PCBRKWOs

(Pages 2 through 8 SEALED)

PCBRKWOs

(In open court)

MS. MORTAZAVI:  Good morning, your Honor.  For the government, Sarah Mortazavi, Kimberly Ravener, Marguerite Colson, and Paralegal Specialist Alexandra LeBaron.

THE COURT:  All right.  Good morning, Ms. Colson, Ms. Ravener, Ms. Mortazavi, and Ms. LeBron.  You may all be seated.

And for the defense.

MR. PATTON:  Good morning, your Honor.  David Patton for Mr. Kwon.  Also at counsel table are Mike Ferrara, Andrew Chesley, Sean Hecker, and, of course, Mr. Kwon is present.

THE COURT:  Very good.  Good morning, Mr. Patton, Mr. Ferrara, Mr. Chesley, Mr. Hecker, and, of course, you, Mr. Kwon.  Good morning as well to the many members of the public who are here.  Good morning as well to people who may be following along in the overflow room, and good morning as well to the handful of victims who I understand are auditing by telephone in anticipation of speaking.

For the benefit of those victims, I need to say this for the record.  You may not record or transmit anything from this proceeding.  I'm sure you already know that, but I'm obliged to say that for the record.

All right.  We're here for the sentence in the case of United States v. Do Kwon.  At the outset, there's an issue that I need to take up with counsel about whether to proceed today

PCBRKWOs

or whether it is prudent to put off sentencing for a bit in light of the many victim submissions that I have received in the past 24 hours.  I will take that up in a few minutes after reviewing the materials, which include those, that I have received in connection with sentencing.

As background, on August 12, 2025, Mr. Kwon pled guilty to Counts One and Four.  Those charged him respectively with a conspiracy to defraud, in violation of 18 U.S.C. Section 871, and with a substantive crime of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2.  That day I scheduled this sentencing for today at this time and issued a public order to that effect.

In preparation for today's proceeding, I have reviewed the plea agreement, which is an important document for this sentencing insofar as it is more customized than the usual plea agreement.  I have also reviewed the transcript of the guilty plea proceeding.  I have also reviewed the presentence report, dated December 2, including the recommendation and addendum to that report.

In the past two or so weeks I've also received and reviewed the additional following submissions:

First, the defendant sentencing submission, dated December 26.

Second, the numerous attachments to this submission. These include a length letter from Mr. Kwon, which is Exhibit

PCBRKWOs

A; numerous letters from friends or family of Mr. Kwon's or members of what the defense refers as members of the Terra community, which collected at Exhibit B; an article analyzing Terra's collapse, which is at Exhibit C; a declaration by Mr. Kwon's lawyers from Montenegro, which is at Exhibit D; a Twitter posting by Mr. Kwon, which is at Exhibit E; financial records of Mr. Kwon, which are at Exhibit F, which is sealed; a Slack conversation of others, which is at Exhibit G, which is also sealed; a transcript of sentencing in the case of United States v. William Sadleir, which is Exhibit H; and a transcript of sentencing in United States v. Alexander Mashinsky, which is Exhibit I.

Third, I have reviewed the government's sentencing submission, dated December 4.

And fourth, I've reviewed three exhibits to that submission.  Exhibit A is a transcript of a podcast with Mr. Kwon from October 2022.  Exhibit B are text messages from William Chen, a former Terraform employee, and Exhibit C-T is a transcript of an audio recording of Mr. Kwon from August 2022.

Fifth, I reviewed the preliminary order of forfeiture at Docket 47 which I entered upon Mr. Kwon's guilty plea.

Six, I have reviewed the defense's supplemental sentencing submission.  It responded to the Court's order at Docket 58, which I issued this Monday, December 8, which posed a series of factual questions for counsel.  The defense's

PCBRKWOs

response which, in fairness, goes beyond responding to the questions the Court posed to also reply to arguments in the government's sentencing submission is docketed at Docket 59.

Seventh, I have reviewed the government's supplemental submission responding to the Court's order at Docket 58.  It is docketed at Docket 60.

Eighth, I also received yesterday from the government, along with its response letter, a proposed judicial order of removal for Mr. Kwon and supporting documentation.  Those are at Docket 60-1.

Ninth, I received yesterday from the government, a little after 11 a.m., a binder containing some 260 letters from victims.  The government first gave the Court notice of the existence of these letters an hour or so earlier in a voicemail to the Court's chambers.  The government also notified the Court at the time that several of the victims, approximately six, sought to speak remotely at the sentencing, including one through a Russian translator.  I understand that copies of the victims' letters were provided to the defense around the same time as they were provided to the Court.  I understood that the government was going to docket these in redacted form.  As of a few minutes ago, redacted versions of these letters had not yet been filed on the docket of the case.

Tenth at about 7 p.m. last night, I received from the government another 30 or so letters from victims.  I assume,

PCBRKWOs

but do not know, that these were contemporaneously provided to the defense. As of a few minutes ago, redacted forms of these letters had been filed on the docket in the case.

Eleventh, at 10:33, which is to say 27 minutes before the start of the sentencing, my chambers received from the United States Attorney's Office another approximately 25 victim letters, bringing the total to 315. The government also attached a copy of the Montenegrin court's extradition decision. I have reviewed these in the past half hour.

Before inquiring into the issues presented by the recent letters from victims, I want to complete the colloquy with counsel about materials received. Beginning with the government, has the government received each of the submissions that I have identified and has there been any other submission made in connection with this sentencing?

MS. MORTAZAVI: We have, your Honor, and we're not aware of any additional materials.

THE COURT: All right. Same question to you.

MR. PATTON: For Mr. Kwon, no. I don't believe there's anything we have not received. We've received all of the materials that your Honor has described.

THE COURT: Including the letters from 10:33 a.m.?

MR. PATTON: Yes.

THE COURT: And are you aware, Mr. Patton, of any other materials that have been submitted in connection with

PCBRKWOs

this sentencing?

MR. PATTON:  Not aware of any other materials.

THE COURT:  OK.  I need then to pursue with, initially the government, the issue of victims' submissions.  As of Monday, I had not received a single letter from a victim in this case.  The only information I had about victims was the testimony from the civil trial before Judge Rakoff.  That was surprising to me.  In cases of this nature, it is common to get letters, many letters, from fraud victims.

My order on Monday therefore asked, among other questions, about victim notice.  The government's letter in response stated that it had published notice of this sentencing on the website associated with this case.  The government's letter did not say when it had done that.  The government's letter also said that it had asked the Terraform bankruptcy plan administrator to notify the pool of cryptocurrency loss claimants of the upcoming sentencing and the right to be heard.

In the past 24 hours, I received, as I said, approximately 315 letters from victims.  I can't tell for sure, but it appears to me as if the vast majority of these result from the notice given to victims by the plan administrator, which appears to have first been given the day of my order, this past Monday, December 8.  Some of these, however, appear to have been prompted by the posting on the website associated with this matter, which, although I can't tell, appears to have

PCBRKWOs

first been made a week ago Monday, December 1.

Counsel, I have read all 315 letters.  That required rearranging my schedule, canceling a celebratory judicial function dinner, and staying up past midnight to read them, plus reading the new ones that came in this morning.  But I wanted to make sure that if everyone else was ready, I was not holding this up.  I wanted to make sure that sentencing was able to go forward if otherwise possible, so I am prepared to proceed today, but there are separate important questions about whether it is fair to the victims and whether it is fair to the defense to go forward today.

To enable me to make that judgment, I have some factual questions for the government.  I issued an order on August 12 scheduling this sentencing for today at 11 a.m.  When did the government first give notice to victims of the sentencing date and how was that done?

MS. MORTAZAVI:  It was done December 1, your Honor, by virtue of the website, and I regret the timeline.  There's no question this should have been done earlier.  There was simply miscommunication amongst the team.  I take responsibility for that.  There was an assumption that victim notification would happen instantly as things were docketed.  That was not the case.  Once we made inquiries, we understood that that was not the case, and we sent out the notification via the website.

THE COURT:  And what prompted you on December 1 to put

PCBRKWOs

the notification up on the website?

MS. MORTAZAVI:  Once we made inquiries with our victim witness coordinator to confirm that notification had been made, we then learned that it, in fact, was not an automatic process, that we needed to initiate something.  That was prompted by our preparation of our submission.

THE COURT:  It does not appear to me as if most of the victim letters that I received have been prompted by that notice, is that fair?  It looks like they are prompted by what the bankruptcy administrator did later.

MS. MORTAZAVI:  That certainly seems to be the case, and I'm happy to speak to that timeline as well.

THE COURT:  We'll get to that in a moment.  But what did the notice on the public website from December 1 tell victims about their right to be heard?

MS. MORTAZAVI:  It told victims that they had the right to submit a victim statement and gave the contact information for a representative of the U.S. Attorney's Office who would accept that statement and the right to be heard at sentencing, and provided the same contact information again.

THE COURT:  How long has the website been up?  In other words, I want to make sure that victims had fair notice of the existence of the website.  To the extent you are relying on the website as having supplied adequate victim notice, I want to understand a little better how victims over time would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PCBRKWOs

have come to have been aware of the existence of the website.

MS. MORTAZAVI:  I'm unaware of what notifications would have been sent out once the website was live.  My understanding is that it went live shortly after the Court's order permitting the government to make victim notification via the website.  But I would have to make further inquiries to determine what further steps were taken to notice victims.

THE COURT:  I really want to know that the website was up since the guilty plea.

MS. MORTAZAVI:  The website was up before the guilty plea, your Honor.

THE COURT:  OK.  And do you know in the ordinary course how a website of that nature becomes known to victims of a case of this nature?

MS. MORTAZAVI:  I do not, your Honor.  I would have to make further inquiries.

THE COURT:  Is there anything about the nature of the responses you got from victims that gives you any insight into that?

MS. MORTAZAVI:  None that I can see, but I did make the same observation as your Honor that the majority of the victims' submissions came not from the people who had read the website and written in but the people informed from the bankruptcy.

THE COURT:  Let's turn to the issue of the bankruptcy.

PCBRKWOs

How did it come to pass that the bankruptcy administrator gave notice on December 8?

MS. MORTAZAVI:  We, in receiving Mr. Kwon's submission, of course, were alerted to certain statements he made about the bankruptcy.  We then conferred with the plan administrator regarding those statements.  In the course of those conferrals, they volunteered to us that they had the ability to email the pool of crypto claimants and to post a notification on the crypto docket.  Prior to that point, the government was unaware that these were mechanisms that we could take advantage of in order to notice victims.

We thought it prudent not to pass up the opportunity, given that it was offered to us, and so we learned of this capability on Thursday.  The next day we asked the plan administrator to carry through on their proposal.  And, as your Honor knows, a stream of letters started to come in the following week when it was finally posted on Monday.

THE COURT:  So in other words, you were in touch with the bankruptcy administrator prior to my December 8 order prompted by the statements about the bankruptcy in the defense sentencing submission, and it took until Monday, December 8, for the bankruptcy administrator to reach out to the claimants?

MS. MORTAZAVI:  That's correct.  And I just want to reiterate, your Honor, it was unknown to the government that this was a mechanism to notice victims and volunteered by the

PCBRKWOs

plan administrator -- apologies -- the plan administrator's counsel.

THE COURT:  In the ordinary course, you would be relying in a case with a scale of victims of this nature on the website.  It happens to be that there's this separate bankruptcy mechanism that you're availing yourself for the subset of victims who are in some way participating in the bankruptcy.

MS. MORTAZAVI:  That's correct, your Honor.  And I would add what we stated in our letter, which is with respect to the victims with whom we had interfaced during the investigation, we had also separately reached out to them to give them notice of their rights, and they did not write in.

THE COURT:  Do you have an estimate from the bankruptcy administrator of approximately how many claimants are participating in that process?

MS. MORTAZAVI:  Approximately 16,500 claimants.

THE COURT:  And what, if any, deadline or instructions did the bankruptcy administrator give those claimants about participating in this proceeding?

MS. MORTAZAVI:  There was no deadline communicated, only notice of the sentencing proceeding.

THE COURT:  They were notified though that the sentencing proceeding was today at this time?

MS. MORTAZAVI:  Correct.

PCBRKWOs

THE COURT:  Such that it would be implicit that a victim letter that came in after 11:00 today was not likely to be absorbed prior to imposition of sentence?

MS. MORTAZAVI:  That would be implicit, yes.

THE COURT:  All right.  So it's fair to say 16,500 claimants received personalized notice by email on or about December 8, and the rest of the victims in this case, which have been estimated to be in the hundreds or thousands or maybe even clearing a million, would have gotten notice, if at all, through the website?

MS. MORTAZAVI:  Correct.

THE COURT:  OK.  I am mindful that the last slug of letters came in at 10:33 a.m.  If we proceed today, is it possible we're going to get more letters -- you're going to get more letters when you get back to the office that by definition none of us would have been able to read or hear because we've been here at the sentencing?

MS. MORTAZAVI:  I can't guarantee that that hasn't happened, your Honor.

THE COURT:  OK.  Does the government believe that Mr. Kwon's victims have had adequate notice of the sentencing?

MS. MORTAZAVI:  We do, your Honor.

THE COURT:  Why?

MS. MORTAZAVI:  Because there has been notice published through the website that was publicly available and

PCBRKWOs

that this Court designated as an appropriate means of noticing victims.  That has been live for approximately 11 days.  The website has been alive for much longer, and so anybody who has been keeping track of this case would have been noticed of it and had an adequate period to learn of the sentencing.

THE COURT:  Putting aside the right of victims to be heard, did the website alert the public to the date of the sentencing?

MS. MORTAZAVI:  It did, your Honor.

THE COURT:  Going back some time, not as of December 1 but for some time?

MS. MORTAZAVI:  It only did as of December 1, your Honor.

THE COURT:  So as of November 30, somebody looking at the website would know that Mr. Kwon had pled guilty and would infer logically that a sentencing was going to happen.  But they wouldn't have known until December 1, assuming they were checking the website with regularity, when the sentencing would be and that, in effect, they had ten days to get something to the Court?

MS. MORTAZAVI:  December 1 was the first time the victims were alerted to the date of the sentencing and their right to be heard.

THE COURT:  All right.  One of the issues that naturally presents itself, given the late notice, is it

PCBRKWOs

realistic to have expected the victims to check the website between the approximately ten-day window between when notice went up and today.  Do you have a view on that?

MS. MORTAZAVI:  I think it is realistic, your Honor, given the manner victims who are most invested and most likely to write in follow this case, including the fact that the pool of victims who consider themselves victimized who have taken proactive steps and, again, were most likely received personal notice as of Monday.

THE COURT:  I take it from press accounts, if somebody were following the case, one would have been able to determine that I had scheduled sentencing for December 11.

MS. MORTAZAVI:  That's correct, your Honor.  It's been widely publicized.

THE COURT:  Not just the general progress of the case, but the sentencing date?

MS. MORTAZAVI:  Yes, your Honor.

THE COURT:  Separately, a number of victims say that they seek restitution.  They may not mean that.  They probably do not mean that.

I'm sorry.  My law clerk makes the valuable addition to the conversation that on August 12, 2025, a press release issued by the U.S. Attorney's Office announced that sentencing was to be held on this day.  Thank you.

Government, a number of the victims say that they seek

PCBRKWOs

restitution.  They may not mean that in the formal sense of the technical word restitution.  They probably don't.  I take them to mean, in the vernacular, they want compensation whether via restitution, rescission, a claim in the bankruptcy, or something else.  ^Nonetheless, the plea agreement states that, "The Court must order restitution as specified below."  And it goes on to say that the defendant further agrees to make restitution in an amount ordered by the Court.

The government's sentencing letter of December 4 states that because of the complexity of the case and the number of victims, the government has decided that making restitution would be "extremely costly and administratively impractical."  And it cites many examples of comparably if not less complex cases in which the government and the Court have gone that route.  This is not unprecedented.

The government's letter states the government will instead "endeavor to make uncompensated victims whole through the Department of Justice's remission process."  I will have some questions later on in sentencing about the mechanics of that process, which is one I'm less familiar with, and I will do that so that anyone reviewing the record of this proceeding understands better how rescission works.

For now the question is just about notice to the victims vis-a-vis restitution.  Has anything been said to the victims to the effect that the government was going to be

PCBRKWOs

pursuing restitution in this case, and if so, was anything said to the victims to the effect that the government had changed its mind?

MS. MORTAZAVI:  Nothing was communicated to the victims regarding the pursuit of restitution.  And as the Court is aware from having viewed many plea offers and plea agreements, the restitution language is language we include in every agreement, and it is essentially intended to capture that the parties will do whatever the Court orders with respect to restitution.  It does not arrive at a restitution figure nor does it state necessarily that restitution is appropriate; only that Mr. Kwon will agree to pay restitution, whatever the Court orders it to be.

It's often the case that post-sentencing, there's a 90-day period in which restitution and disputes over restitution can be resolved by the Court.  It happens to be that the parties are in agreement, given there is at the very at least a pool of 16,500 claimants with respect to the bankruptcy and with respect to the fraud in todo hundreds of thousands of victims, that it would be impractical, administratively burdensome, and costly to attempt to do restitution in this matter.

I will note, your Honor, in other cases when there is a parallel bankruptcy, it is often the case that the government defers restitution or puts any restitution monies towards the

PCBRKWOs

bankruptcy because there is already a preestablished mechanism to ensure that victims are identified and repaid.

THE COURT:  I'm not pushing back at all on the concept here.  Understand that.  I'm eager to understand this rescission idea and how it relates to the bankruptcy and all that.  We'll get to that later.

I'm really focusing on notice, and my concern that a victim not be misled.  I think you've reassured me on that, which is that the government has not publicly committed to seek restitution without notifying the victims later on that it has changed their mind.  Had the government done that, there would have been something of an argument that a victim should have that notice before communicating views to the Court insofar as victims are communicating views not merely about Mr. Kwon and his conduct but about the concrete relief they are seeking.

You are representing to me that the government has not publicly said to victims, we're seeking restitution, and therefore there's not a prompt to expect a corrective by the government.  Do I read you right?

MS. MORTAZAVI:  Correct, your Honor.

THE COURT:  Thank you very much.

Let me begin with defense counsel, and I'm going to focus first on the interest of the victims and then we'll turn to the interest of the defense.

Mr. Patton, will you be taking the lead on this?

PCBRKWOs

MR. PATTON:  Yes, your Honor.

THE COURT:  Just move the mic closer to you.

To begin with, does the defense believe from the vantage point of victims that it is fair to the victims to proceed to sentencing today?

MR. PATTON:  Yes, your Honor.

THE COURT:  Why?

MR. PATTON:  Well, I think in addition to the various formal processes of notification, whether it was the December 1 government website, whether it was through the bankruptcy court, this case has received an awful lot of attention.  And so whether the government made efforts on its own to publicize the sentencing date or the proceedings in this case, they have been well publicized.  And this case is far flung in terms of people who are involved in it.  There are many victims around the world, probably South Korea, Singapore being most notable. I understand this has been getting a lot of attention there, so I think there's every reason to believe that people have been aware of the timing of these proceedings and would have had ways to look into how to have their voice heard.

THE COURT:  OK.  Mr. Patton, fair point.  It is possible that you and I will get an email or a filing on the docket of the case today or tomorrow reporting another several dozen victim letters.  I need to protect the record here.  If we proceed today and we get post-hearing victim letters, will

PCBRKWOs

the defense make an appellate issue of that?

MR. PATTON:  No, your Honor.

THE COURT:  Do I have a categorical statement that you are waiving any right that the defense may have with respect to an appeal based on the receipt post-sentencing of additional victim letters?

MR. PATTON:  Yes, your Honor.

THE COURT:  OK.  Turning now to the interest of the defense.  You've told me that you have received the 315 or so victim letters that the Court received, which is to say 260 at about 11:00 yesterday, 30 at 7 p.m. yesterday, and 35 at 10:33 a.m. today.  I take you've received those at or about the times indicated?

MR. PATTON:  Correct your Honor.

THE COURT:  Has defense counsel had enough time to review those letters?

MR. PATTON:  I'm using the plural of that word, your Honor.  It takes three or four of us to equal one of Judge Engelmayer's efforts last night and this morning.  So I can't say that we have each individually read every one.  We have collectively, and we've discussed them with Mr. Kwon.

THE COURT:  All right.  That works for me.  Has Mr. Kwon had the opportunity to read any of those letters?

MR. PATTON:  Some, I believe, or at least portions have been read to him.

PCBRKWOs

MR. HECKER:  That's right.

MR. PATTON:  Because, just given the logistics of the jail, he did not actually have access to the letters.

THE COURT:  I just want to make a record here.  Were you able to show him any of the letters yesterday?

MR. PATTON:  We were not able to visibly show him.  I believe one of us spoke on the phone to him and described, in general terms, the letters and got into the specifics of a few of them.

THE COURT:  And same as to the letters that came in after hours yesterday and this morning.

MR. PATTON:  Very briefly this morning.

THE COURT:  OK.  I appreciate that the letters, each individually, tell a story particular to the senders, but can certainly be described collectively.  The question is whether you feel, through your narrative efforts and your colleague's, Mr. Kwon has a fair understanding of what the letters viewed in the whole convey.

MR. PATTON:  I think that is fair, your Honor.  And obviously the colloquy we had in the robing room indicates that detailed attention has been paid to some of them.  I can tell you that in broad terms in describing them, we've talked about sort of the buckets that they fall into in terms of sort of what they say.  Because, as the Court knows from reviewing them, they are not all damning of Mr. Kwon.  Some of them are

PCBRKWOs

more nuanced than that.  And so we've discussed those aspects of the various letters and sort of what buckets they fall into. I think that's about what I can say about how we've discussed it.

THE COURT:  Look, I will say only that which would be obvious to any reader of the letters, they are impactful taken as a whole.  Has the defense had enough time to absorb them such that if there is something you want to say in response, you are fully prepared to do so?

MR. PATTON:  I think so, your Honor, yes.

THE COURT:  Do you want more time?

MR. PATTON:  No, your Honor.

THE COURT:  Have you conferred with your client about whether he wants more time?  And I say that because if there's a request by the defense for an adjournment, I've come here with a Post-It with ten different days I'm prepared to offer you at your choice—not the government's choice, your choice—for a new sentencing date because 315 letters is a big deal to show up in 24 hours.  As a matter of process rights, and adjournment is yours if you want it.

MR. PATTON:  We appreciate that, your Honor, and agree it is a big deal.  If you would permit me a moment?

THE COURT:  Sure.  Just understand if you want an adjournment, it's yours, and I'll give you the run of ten days on my calendar to choose among.

PCBRKWOs

MR. PATTON:  Thank you.

THE COURT:  All right.  Mr. Patton.

MR. PATTON:  Your Honor, we would like to proceed.  I think we have enough of an understanding.  As I said, Mr. Kwon has an understanding sort of the buckets that they fall into.  We have collectively read them specifically, and in addition, some people who have shown up in support of Mr. Kwon have traveled from some distance.  So with all that in the mix, we would like to proceed today.

THE COURT:  Do you mind if I take a moment to just confirm with your client that he feels the same way?

MR. PATTON:  No.

THE COURT:  Good morning, Mr. Kwon.

THE DEFENDANT:  Good morning, your Honor.

THE COURT:  Have you had an opportunity to follow the discussion we've just had about the victim letters that arrived in the last 24-and-a-half hours?

THE DEFENDANT:  Yes, your Honor.  I'd like to say even though I haven't had the opportunity to physically read the letters as of yet, I promise to do so at the earliest opportunity.

THE COURT:  And I'm glad you will, but here is what is important.  Those letters are a big deal.  They are important.  They are letters from people who claim to, in the main, have been harmed by the offense conduct in this case.  I have read

PCBRKWOs

them.  They are relevant to me.  I want to make sure that the defense has every opportunity to respond to them, and in particular that you have every opportunity to have a private dialogue with your lawyers to make sure that no stone is unturned and if there's something that the defense wants to say, you have a chance to say it.  I'm offering the defense an adjournment and encouraging you to consider that with your lawyers.

Mr. Patton has told me that you are taking a pass on that, and you are prepared to proceed today.  I'll respect that, but I want to make sure that you understand if you would like an adjournment, I will grant you one.  There is a day available next week.  There are days available the week after.  There are days available in January, and I'll give the defense a choice among them.  But it's important to me that you understand that fair process matters here.

You haven't had much time to adapt to the letters.  You personally have not, apparently, read any of them.  They've been described to you, some individually, more, I think, collectively.  Do you want to proceed today?  Are you sure you want to?

THE DEFENDANT:  Yes, your Honor.  I just would like to tell you that yesterday one member of my legal team read some of the more emotionally resonant letters verbatim over the course of several phone calls.  So even though it would be a

PCBRKWOs

stretch to say I am fully versed in all the letters, I am aware of the contents of several.

THE COURT:  OK.  I'm representing to you and your lawyers that the letters are impactful.  They registered with me as one would expect letters of that nature to do.  I'm therefore putting that out there so that if the defense feels there's something more it wants to do or prepare, you've got the opportunity.

Mr. Patton, I've heard from your client.  This is your final opportunity to seek an adjournment.  I'm offering it to you.

MR. PATTON:  We would like to proceed, your Honor.

THE COURT:  OK.  And then I'll ask you the obligatory appellate question.  Are you waiving any right to seek to appeal on the basis of the fact that sentencing went forward today barely 24 hours after this substantial packet of letters came in?

MR. PATTON:  We are, your Honor.

THE COURT:  Look, with all that, I spent time inquiring of counsel from both sides and of Mr. Kwon about this matter because it's important.  I did have concerns about whether it was appropriate to proceed both from the perspective of victims and the perspective of the defendant.  Guided by the very helpful colloquies I've had with counsel, I am persuaded that it is fair and appropriate to proceed and I will.

PCBRKWOs

With respect to the victims, I note the following:

This has been a case that has obtained very wide publicity.  Anybody who cared about the case would be able to figure out in a nanosecond that sentencing was scheduled for today, and indeed it has been scheduled for today since the date of the guilty plea in August.  In addition, AUSA Ms. Mortazavi has represented to me that for the past ten days not only the date of the sentencing but the opportunity of the victims to participate in it has been made known on the Justice Department website.  And indeed it's apparent to me reviewing victim's letters that victims have alerted to that and acted upon that and filed letters.

Separately, the bankruptcy administrator has given notice to the 16,500 people who have taken enough of a personal interest in this case to seek money and has given personalized notice to those people.  That notice has assuredly had an impact.  It appears to me, on my review, that the significant majority of victim letters I've received have come through that mechanism.

All of which is to say the victims have, in practice, had notice of this proceeding and of their ability to participate.  I'm delighted that so many chose to do so, but I have no doubt that the remaining had either actual or constructive notice of this proceeding.  With respect to the defense, to state the obvious, Mr. Kwon is represented by an

PCBRKWOs

all-star team of wonderful, engaged lawyers, and when Mr. Patton tells me that every letter has had the personal attention of at least one of them, that registers with me.

I'm sorry that Mr. Kwon won't get to read the letters himself until some later time should he choose to do so, but it is clear to me that they have been more than adequately synopsized to Mr. Kwon. And as one might imagine, it's less any individual letter that has an impact here. It's the collective of them, and that can be synopsized rather easily. And so I am persuaded that the defense has had adequate notice. Beyond that, I have offered up an adjournment, and thoughtful defense counsel have elected to forgo that. So given all that, I think it's appropriate from the defense's perspective to proceed.

Before we leave the subject, government, I'm obliged to say the obvious, which is you need to do better. It looks to me as if the government didn't give notice to the victims here until December 1 by the website, and then fortuitously by the separate mechanism, with respect to a subset of the victims, via the bankruptcy proceeding a week later on December 8. In future cases, you need to give notice to victims much further beforehand, and you need to set a deadline for victim submissions meaningfully beforehand, so we don't have victim submissions flooding in in the last 24 hours, which is a recipe for disruption and chaos.

PCBRKWOs

The timing of the notice gave victims less time than is ideal to collect their thoughts and write the Court. An individual who was on vacation or distracted by something in their lives would have had less of an opportunity to be heard than should be. It is simply not acceptable to drop 315 letters on the Court and the defense 24 hours before sentencing. Putting aside that a Court cannot be expected to drop everything to review all that in a 24-hour period, it's simply disrespectful to the defense function.

The defense needs to review the letters to potentially adapt their sentencing remarks to them. Not every defendant has four estimable counsel in the way that Mr. Kwon does. And most of all, it's not fully respectful to the victims. The victim has a right to expect his or her letter to be delivered to the Court with ample time for review and reflection and not to be dumped on the Court with 314 others at metaphorically the last minute. I hope the government will use this case as a prompt to put in place a more systematic approach to give victims the right to be heard. End of homily.

With that, let's proceed forward. Mr. Patton, have you read the presentence report?

MR. PATTON: I have, your Honor.

THE COURT: Have you discussed it with your client?

MR. PATTON: Yes.

THE COURT: Mr. Kwon, have you read the presentence

PCBRKWOs

report?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Have you discussed it with your lawyers?

THE DEFENDANT:  Yes.

THE COURT:  Have you had the opportunity to go over with them any errors in the report or anything else that should be taken up with the Court?

THE DEFENDANT:  No, your Honor.

THE COURT:  The question is whether you had the opportunity to speak with your lawyers about any errors, not whether there are any errors.

THE DEFENDANT:  Yes, your Honor.

THE COURT:  OK.  You have.

And government, have you reviewed the presentence report?

MS. MORTAZAVI:  We have, your Honor.

THE COURT:  Putting aside just for form's sake the guidelines and focusing on just factual accuracy, does anybody have any objections to the report regarding its factual accuracy, beginning with the government?

MS. MORTAZAVI:  No, your Honor.

THE COURT:  Defense?

MR. PATTON:  Not other than what we've put in our papers, your Honor.

THE COURT:  Well, there's no factual dispute that you

PCBRKWOs

are seeking to be litigated, correct?

MR. PATTON:  No, your Honor.

THE COURT:  In other words, the factual recitations about the offense that are in the presentence report per the plea agreement are ones that I am to take as true?

MR. PATTON:  Correct.  We are not contesting them per the plea agreement.

THE COURT:  All right.  Hearing no objections, then I will adopt the factual recitations in the presentence report. The report will be made a part of the record in this matter. It will be placed under seal.  In the event an appeal is taken, counsel on appeal may have access to the sealed report without further application to the Court.

Counsel, I would ordinarily ask at this point whether there's any reason why the parties' sentencing submissions should not be publicly filed.  I know that they have been, and the limited redactions in them are appropriate.

Turning to the sentencing guidelines, the Court is, of course, no longer required to follow the sentencing guidelines, but I am required to consider the applicable guidelines in imposing sentence.  To do so it's necessary that the Court accurately calculate the guideline sentencing range.

In this case there was a plea agreement in which the parties stipulated to a particular calculation of the sentencing guidelines.  Counsel, am I correct that the

PCBRKWOs

calculation in the presentence report is in accord with your agreement?

MS. MORTAZAVI:  Yes, your Honor.

MR. PATTON:  Yes, your Honor.

THE COURT:  Then based on the parties' agreement, the absence of objection, and my independent evaluation of how the guidelines apply here, I accept the guideline calculation in the presentence report.  I find the offense level to be 43, the criminal history category to be I, and that the sentencing guidelines but for the statutory maximum would recommend a term of life in prison.  However, because Count One carries a maximum term of five-years imprisonment and Count Two carries a term of 20-years imprisonment, the maximum the Court can impose is 25 years or 300-months imprisonment.  That becomes the guideline recommendation.

The next subject I need to touch upon is departures, which is to say in the now anachronistic sentencing guidelines framework to the extent I'm even obliged post the recent amendments to comment on departures, I say the following:  In the plea agreement both parties agree that neither an upward nor a downward departure, again, within the guideline framework is merited.  Having reviewed the presentence report, the parties' submission share that conclusion.  I find that no departure is available as a matter of law.

All right.  Having taken care of at some length, I'm

PCBRKWOs

afraid, all those preliminaries, we now get to the heart of the matter. Does the government wish to be heard with respect to sentencing?

MS. MORTAZAVI: Yes, your Honor.

Your Honor, hundreds of victims, as this Court has explained in great detail, wrote in, and we respect and appreciate the time that the Court took to read those letters. They were impactful. They have written in to describe Mr. Kwon's conduct. They've described it as calculated and callous, dangerous behavior driven by greed and ambition, arrogance and lies. That's how the victims have described the defendant and his scheme. Severely depressed, devastated, drowning in debt, struggling to find a way to survive. Those are the words his victims used to describe the impact Mr. Kwon's fraud had on them.

I want to read just one victim letter out loud in the record for the Court at this time, that I think adequately captures exactly why some of the arguments that Mr. Kwon has made in his sentencing submission are not well taken. This is from Exhibit K, Page 38.

THE COURT: The initials of the writer, please?

MS. MORTAZAVI: The initials are XM.

THE COURT: XM?

MS. MORTAZAVI: XM.

In 2021 and 2022, like many others, I became

PCBRKWOs

interested in the mechanics of the Terra ecosystem.  I invested dozens of hours studying the system, reading documentation, reviewing audits, watching expert analyses, and attempting to understand how UST maintained its peg and how Anchor generated yields.  During that time, UST appeared stable.  On the few occasions when it deviated slightly from its peg it consistently returned to one dollar within hours or days.  To me and to thousands of others this demonstrated technological resilience and resiliency.  All public communications from Terraform Labs and from Do Kwon reinforced the idea that UST's mechanisms were sound, transparent, and under control.  On.

May 7, 2022, when UST began to lose its peg, my heart quite literally stopped.  I felt panic, disbelief, and a sense of helplessness that is difficult to express in words.  I did not sleep for four days.  I refreshed Twitter constantly waiting for updates from Do Kwon.  Every message he posted reassured us.  There's nothing to worry about.  We are working on it.  UST will repeg.  We were told to wait.  We were told to trust.  We were told everything was under control.  Then he disappeared.  No explanations, no transparency, no leadership.  Just silence while the system collapsed and our savings evaporated.

I ultimately sold my UST at half its value, realizing a loss of more than $800,000.  Only later did I understand the truth.  The stability of UST had been artificially supported by

PCBRKWOs

external actors who injected capital to prop up the peg. These interventions created the illusion of resilience while concealing systemic failure. Do Kwon was not only aware of these manipulations, he was actively involved in orchestrating them. And perhaps most devastating of all, while he told us publicly not to worry, he and people close to him were quietly exiting their own positions. He urged retail investors like me to stay calm knowing full well this meant the complete destruction of our savings.

This was not a mistake. This was not mismanagement. This was fraud executed with arrogance, manipulation, and total disregard for the lives of ordinary people.

As I said, your Honor, that letter puts the lie into many of the arguments advanced by Mr. Kwon in his submission.

I want to take a moment to acknowledge the victims who are planning to speak here today. In the courtroom is Chauncey St. John, and by phone, Agron Darlishta, Tatiana Dontsova, Jake Collis, and Stanislav Trofimchuk.

THE COURT: They are four by phone?

MS. MORTAZAVI: Four by phone. They have all requested the opportunity to speak. And before they do, this is my opportunity to address the victims devastated by Mr. Kwon's crimes and to ask that the Court impose a significant sentence of 12-years imprisonment.

This crime had devastating, life-altering implications

PCBRKWOs

from everyday investors.  As the Court knows from the letters, victims took their own lives, families fell apart, retirements postponed, savings dissolved.  There were irreversible consequences to Mr. Kwon's crimes, and it is important that the sentence imposed by this Court reflect the gravity of those crimes.

This case has to do with a wide-ranging fraud. Mr. Kwon told many lies many times about many different aspects of TFL.  And in choosing in his submission to include letters of support that advance a narrative that there was no crime here, which several of the letters say, Mr. Kwon has revealed his perspective on these charges, and it is a troubling insight into his views.

Mr. Kwon's fraud cut to the heart of investor interest, the safety of their investments.  Terraform distinguished itself from other crypto companies by selling the concept of stability:  A stablecoin that investors could trust not to lose value.  And the idea that others trusted that stability enough to adopt it through use cases like Chai.  It was marketed as different, reliable, and self-sustaining, and all of that was false.  The market changes between May 2021, with the first depeg, and May 2022, with the ultimate crash, proved the effect of those lies.  UST increased in value almost ten-fold in that time.  Terra's growth was fueled by those lies.

PCBRKWOs

Mr. Kwon has asked for extraordinary leniency here, but the government's recommendation for a 12-year sentence already takes into account many of the arguments that Mr. Kwon raises before this Court and reflects significant leniency. That prison term is appropriate.

In evaluating the Section 3553(a) factors, this Court should consider how Mr. Kwon's arguments bear upon the need for specific deterrence, general deterrence, just punishment, and promoting respect for the law.  What is alarming with Mr. Kwon's submission is the extent to which he and his supporters are pushing a skewed and inaccurate version of this fraud.  Mr. Kwon's position and the defenses contained in the letters put forward a narrative that strongly undercuts Mr. Kwon's professed contrition.

It seems that there's an effort to tightly circumscribe this prosecution to only a narrow fraud involving the May 2021 depeg, and minimize and justify culpability to suggest that this was hardly a fraud at all.  Whatever statements Mr. Kwon made in his letter to the Court, expressing remorse and contrition, have to be considered in the context of everything else that he submitted for this Court to consider. The totality of his submission disclaims responsibility, deflects blame, and distracts from his crimes.

To confine this fraud to the May 2021 depeg alone is a gross mischaracterization of what this case is about, and even

PCBRKWOs

as to that event, Mr. Kwon's explanations are suspect. Mr. Kwon's letter suggests that market manipulation was customary in the industry and that investors actually knew or should have known that a trading firm intervened in order to help prop up UST.  And we vehemently reject that view.  We vehemently reject any attempt to shift blame to victims and suggest that they should have known better.  Many investors did not know, and there is no reason they should have known.

We, likewise, find it incredibly hard to credit Mr. Kwon's explanation that he was pressured by the trading firm into keeping their gentlemen's agreement secret and that Mr. Kwon would have otherwise told everybody about the involvement of the trading firm.  That view is just extremely difficult to square with the public statements that Mr. Kwon made directly and indirectly regarding the restoration of the peg.  Mr. Kwon affirmatively stated that the stabilization was proof of concept, that UST had survived a black swan event, and those were statements that investors relied on.  No one compelled Mr. Kwon to push a public narrative that was the exact opposite of what had actually happened, but that's what he did.

It should be apparent at this point that the prevalence or legality of the intervention of a trading firm to help prop up a stablecoin is not up for debate.  Mr. Kwon has already admitted that this conduct was illegal.  He has

PCBRKWOs

admitted that it was wrong.  He has pled guilty to it, but this is not confined to the May 2021 depeg alone.  It comprises every fact that the government has alleged in the indictment, that Mr. Kwon does not dispute, that is formed as part of the PSR and that we are asking the Court to consider as part of the facts informing the sentence.

So that it is not misconstrued in the future, we want to be clear.  Mr. Kwon has agreed not to contest that the allegations in the indictment are true; that the Chai fraud happened; that the Mirror fraud happened; that he lied about LFG; that he lied about the Genesis Stablecoin.  And it is important to state clearly and without reservation those aspects of this fraud as well.

Mr. Kwon lied about LFG, which further reassured investors that buying UST was a safe investment.  He claimed that the LFG was independent, and it was not.  He claimed that LFG controlled the reserve that they were deployed to defend the peg.  They did not.  He claimed that LFG used all of its assets to defend the peg in the 2022 May market crash.  It did not.  The equivalent of almost $1 billion in Bitcoin was misappropriated by Mr. Kwon.  Funds that he should not have had access to, that he claimed only LFG would have access to, but that he secreted away.

He lied about the Mirror protocol.  Mr. Kwon made automated trading bots to manipulate the prices of synthetic

PCBRKWOs

assets to make it appear that people were buying and selling those assets and that there was a genuine market for these synthetic products when there was not.

He lied about Chai. He made it appear that Chai was using the Terra blockchain to process transactions when it was not. And, in fact, Korean regulations prohibited Chai from using the blockchain to process transactions. Mr. Kwon told this lie to set TFL apart by showing that the blockchain had real-world applications, had attraction and possibilities beyond a blockchain that just existed within its own ecosystem. That was not true.

And importantly, Mr. Kwon used up funds that could have been spent defending the peg on maintaining those lies. He used Genesis Stablecoins to pay for bots to buy mAssets, to make it appear as if there was a market for those assets, and he used those stablecoins to mirror Chai transactions on the blockchain.

Some of Mr. Kwon's supporters suggest in their letters that he faced the consequences of his actions, and one of them suggests that he did so honestly. That is simply inexplicable in light of undisputed facts here. After the devastating crash and after aspects of Mr. Kwon's fraud finally came to light, Mr. Kwon attempted to outrun the people who would hold him accountable. He spent several months in Singapore trying to rebuild TFL. And when the Singaporean government froze TFL's

PCBRKWOs

bank accounts, he fled to Serbia, then to Montenegro, and attempted to flee to yet another jurisdiction, the United Arab Emirates, which had no extradition treaty with the United States.  He traveled with a false passport and had a second false passport in his possession.

Mr. Kwon was not someone who honorably sought to face consequences of his crimes.  He fled.  He fled multiple times. He fled using false passports, and the only reason he is in this courtroom today where he can be held accountable for his crimes is because of the efforts of multiple governments to ensure that he was detained and extradited to face his crimes. This is a strong factor suggesting that Mr. Kwon poses a risk of recidivism.  Even when everything came crashing down and Mr. Kwon knew he was being targeted by government officials, he persisted.

As an aside, Mr. Kwon's statements in his submission about the perceived unfairness of the Montenegrin extradition process elides an extremely significant and stunning concession.  The reason Mr. Kwon wanted to be extradited to South Korea, not the United States, is so that he could avoid these charges entirely.  Because South Korea may not have been obliged to extradite him here, but the United States would be obliged to extradite him there.  In other words, Mr. Kwon's acceptance of responsibility only materialized after he was extradited and once his prosecution in this jurisdiction was

PCBRKWOs

unavoidable.  This Court should consider Mr. Kwon's sanitized counternarrative when evaluating the risk of recidivism, the need to promote respect for the law, and general deterrence.

Before touching on some of the other factors this Court should consider, I want to address an argument that Mr. Kwon advanced which is that investors were investing in an inherently risky asset and assumed the risk of their investment.  That is equal parts inaccurate and insulting, and it is difficult to fathom the cynicism of blaming investors for having believed his lies.  It diminishes the investors who trusted Mr. Kwon's public statements and who believe they were misled.  Multiple victims wrote in to this Court explaining that they bought UST believing it was stable, including because Mr. Kwon marketed the trading firm's intervention in May 2021 as proof of concept.  And in the midst of the 2022 crash, Mr. Kwon reassured investors that the market would stabilize even as he was aware of weaknesses in the ecosystem; witnesses that he had caused and exacerbated through his public statements and through his design of TFL and LFG.  And as a result, many victims held UST even as it dropped in value because they believed in what Mr. Kwon was selling.

With respect to Mr. Kwon's history and characteristics, I just want to make brief mention.  It is clear that Mr. Kwon had many advantages in life, advantages that most people clamor for, loving parents who worked hard to

PCBRKWOs

advance his education.  He did not struggle financially.  He was not given opportunities to distinguish himself and to lead a successful and law-abiding life.  He was offered opportunities to study at elite institutions.  He had no trouble landing prestigious jobs at companies that are household names.

Mr. Kwon's crimes were not the product of necessity.  He did not commit these crimes out of desperation because he needed to support himself or his family.  He had many lawful means of employment, including by running Terraform honestly in the precise manner he had advertised.  He could have made choices to offer Terraform in a manner less perhaps less splashy, less high profile, but morally and legally honorable, and he did not do that.  Those advantages in his background and the choices he made to further the fraud should all be considered in fashioning a sentence.

With respect to the nature and circumstances of the offense, your Honor, I've spoken to you about the facts of this fraud.  I think it is compelling to speak to this Section 3553(a) factor as viewed through the lens of the victims.  I'm going to defer to my colleague, Kimberly Ravener, who is going to read just a few excerpts of a few letters for the Court's consideration.

THE COURT:  Very good.

Ms. Ravener.

PCBRKWOs

MS. RAVENER:  Thank you, your Honor.  Your Honor, I'll begin with the letter contained at Exhibit L.

THE COURT:  To the extent you are quoting letters, because I have some that I have tagged, give me the initials of the author, which is how I would intend later to refer to them.

MS. RAVENER:  Certainly, your Honor.  SB.

MR. FERRARA:  Your Honor, apologies.  Does the government have copies?  These came in this morning, and we just didn't have time to print them and bring them to court. We were actually already here.

THE COURT:  Government, are you able to make those available?

MS. RAVENER:  Your Honor, give us a moment.

THE COURT:  Of course.  And for everyone's benefit, my expectation is we will take a comfort break either after the government or after the victim's speak.

MS. RAVENER:  Your Honor, if you would indulge us a moment?

THE COURT:  Of course.

MS. RAVENER:  Thank you, your Honor.

As my colleague indicated, I'll focus on just a few excerpts.

"I was financially vulnerable at the time.  I was trying to complete my college education, juggling bills, responsibilities, and the pressure of trying to build a future

PCBRKWOs

for myself.  When I found UST and Terra, they appeared to be exactly what I needed, a safe place to house the small amount I had worked so hard to save.  And Mr. Kwon presented himself as someone who deserved trust, someone brilliant, someone confident, someone who spoke with such certainty about the stability of his own system that many of us, including me, believed him without hesitation.

"My total loss was $11,399.68.  To some that is just a number on a page, but to me, it was years of effort.  Money saved through sacrifice.  Money meant for tuition, groceries, gas, and the basic security I desperately needed.  Watching it evaporate, literally overnight, was one of the most terrifying experiences of my life.  I felt helpless, ashamed, and deeply betrayed.

"This wasn't just a financial loss.  It was the destruction of stability I barely had to begin with.  It created tension and anxiety in my family.  It forced us into financial hardship we were unprepared for.  Plans were delayed.  Opportunities were lost.  And the stress, the constant stress, lingered long after the collapse.  There were nights I couldn't sleep because the fear and regret sat like a weight on my chest.  But even with all of that, I know my story is just one of thousands."

And SB continues to conclude the letter, "Your Honor, what happened was not an accident.  It was not a natural market

PCBRKWOs

event.  It was the consequence of deception; deception that lurid vulnerable, hopeful people into believing that their money was safe.  People like me.  I ask you sincerely to consider the human cost of this tragedy, the fear, the humiliation, the broken plans, the families burdened, the futures derailed on the sheer scale of a collapse that took billions from people who had no way to protect themselves.

"A meaningful sentence is not just about punishment. It is about acknowledging the suffering of tens of thousands of victims.  It is about affirming that truth matters, trust matters, and that leaders who misuse the trust of the public on this scale must be held fully accountable."

And with the Court's indulgence, I'll conclude on the letter from SB and turn to an additional letter.

THE COURT:  Go ahead.

MS. RAVENER:  For everyone's reference, this is a letter from a victim with the initials OVH that was submitted under seal as Exhibit E at Page 36.

OVH writes in part, "Your Honor, for the past several years, my life has been divided into two distinct eras:  Before these crimes and after.  The consequences of this wrongdoing did not simply erode my savings, they invaded my home, my peace of mind, and the future I believed I was working towards.

"I write not merely as an investor but as a person whose trust was weaponized.  I committed to what I believed was

PCBRKWOs

a legitimate opportunity.  One repeatedly presented as safe, robust, and built on stability.  I acted carefully, read the material provided, and believed the assurances communicated publicly by individuals such as Do Kwon, who positioned himself as a visionary architect of the system.  I accepted those representations at face value, trusting that those leading the project knew what they were doing and understood the weight of the trust placed in them.

"Instead, I watched my capital, the product of years of labor, evaporate.  Worse than losing the money itself was the realization that it vanished because the representations I relied upon were, in retrospect, reckless, misleading, and utterly indifferent to the people who trusted them.  The assurances from figures like Mr. Do Kwon carried authority.  When they proved hollow, the consequences fell not on those who made them but on families like mine.

"I struggle to sleep.  I question my own judgment, doubting every decision that led me here.  I face the painful task of explaining to my family with embarrassment and a sense of personal failure why the security we had relied upon were suddenly gone.  Plans for our future were suspended.  We changed how we lived.  Reduce our expectations for our son's education and did our best to cope with the emotional shock that followed."

OVH continues, "What offends me most is not only that

PCBRKWOs

this harm occurred but that it could have been prevented had basic honesty, caution, or accountability been exercised. The human cost seems invisible to those who benefited from the illusion, but it is not invisible to me. It is etched into my relationships, my mental health, and my sense of financial safety.

"Your Honor, this is not market risk. This is human damage cascading through families, destroying trust in institutions, and teaching ordinary people that deceit thrives without consequence. I ask that when sentencing is considered, the Court recognizes the real people standing behind the numbers; the anxiety, humiliation, and loss we carry daily; the fact that those harms continue even now long after the headlines faded. Justice cannot restore our losses, but it can affirm that we matter, that playing with the security of ordinary individuals is not trivial and cannot be dismissed as the cost of speculation."

Your Honor, with that, we would ask that any of the victims present by telephonic means or in the courtroom be offered an opportunity to speak.

THE COURT: Yes. I'll offer them an opportunity to speak, but I have questions for the government.

Are you done with your presentation?

MS. MORTAZAVI: Yes, your Honor.

THE COURT: Let me put the questions to the

PCBRKWOs

government, and then I think we'll hear from the victims. Then we will take a comfort break before we hear from the defense. I'll begin with a number of questions more about mechanics rather than the heart of the matter.

First of all, forfeiture, I've entered a preliminary order of forfeiture. I take it that you're moving that it be converted to a final order?

MS. MORTAZAVI: It will be preliminary as to the defendant. We're asking that the Court orally incorporate it into the sentence.

THE COURT: All right. Which will make it permanent?

MS. MORTAZAVI: As to the defendant, yes, your Honor.

THE COURT: All right. Next, you have told me that restitution is unworkable, given the sheer number of victims here, and that instead you have in mind a procedure called rescission. I'm also mindful that there's the separate proceeding going on in bankruptcy court. Can you concretely explain to me what you have in mind as to how people who want to get their money back will be able to participate in doing so?

MS. MORTAZAVI: Certainly, your Honor. The remission process is one that is offered by the Attorney General and specifically the Money Laundering, Narcotics, and Forfeiture Section that is the designee of the Attorney General to administer this program. It is purely within the discretion of

PCBRKWOs

the Department of Justice, and the premise is for whatever funds the government forfeits, in the ordinary course those funds would not be put towards restitution because those are two completely separate financial penalties that a defendant should face.

However, often when evaluating the equities and the interests of justice, through the remission program, a victim can apply to have forfeited funds paid to them to recompense them for any of their losses connected with the crime.  The U.S. Attorney's Office for the Southern District of New York has no role in that process.  That is entirely one that is conducted by the MNF, and it is predicated on the actual forfeiture of any funds.  It is often the case that MNF might in a complex case such as this, where there is a bankruptcy, work in tandem with the trustee or plan administrator to ensure that there isn't double collection or that there is not an inappropriate ordering of victims in a way that would disadvantage the bankruptcy in any way.  But those are obviously highly fact specific, case by case, and it's determined based on whoever puts in the application.

THE COURT:  So the items to be forfeited, are you able to give a rough, nonbinding ballpark as to the value of them?

MS. MORTAZAVI:  At the moment, the government has not been able to recover and forfeit any funds.  Pursuant to the preliminary order of forfeiture, Mr. Kwon has forfeited his

PCBRKWOs

interest in many things, including TFL broadly, including cryptocurrency broadly. The point of having him forfeit his interest in those assets is so that the government maintains the right in perpetuity to pursue any assets that are subject to the preliminary order of forfeiture so that it can then forfeit them, and they can go through the remission process. So there's no estimate at the moment of what his assets are. There has been zero dollars actually collected, but this authorizes the government in future, once it discovers assets, to pursue them.

THE COURT: Is there any estimate of the assets that are collectively available in the bankruptcy process?

MS. MORTAZAVI: I don't believe I have that information, your Honor.

THE COURT: All right. So if somebody has put in a claim in the bankruptcy process, subject to however distributions are equitably made there, that person will have an opportunity to collect or try to collect through that process. I think what you are saying to me is that to the extent that any of the funds forfeited in this case turn out to have any value, such a claimant can independently pursue rescission through that mechanism, but that there should be communication between the bankruptcy court and the money laundering section in the Justice Department to make sure that there is some harmony to the system and no double recoveries.

PCBRKWOs

MS. MORTAZAVI:  The one clarification I would make, your Honor, is that there is often coordination, but there is no mandatory coordination.  So it is prudent and oftentimes is the case that the Justice Department will coordinate with the bankruptcy trustee.

THE COURT:  Is there any category of victim in this case who would be ineligible to participate in the bankruptcy proceeding?  You've mentioned that 16,500 people or so are doing so.  The question is:  Is there some limitation by national, business form, or something else that would limit who could participate in that?

MS. MORTAZAVI:  My understanding is there's no nationality limitations.  There may be a timing limitation wherein claimants have to file their claim by a certain point, but if someone later emerges, they could be out of luck.  I'm not categorically stating that that is the case.  I know of at least one late claimant who was permitted to have their claim included in the bankruptcy, but it is possible, at least, there could be a victim who would not be compensated through the bankruptcy, but who would be entitled to recompense remission.

THE COURT:  Understanding that the U.S. Attorney's Office cannot control and but can only seek to persuade main justice in what it does, isn't there logic in this situation, to the extent that there will become forfeitable things that have any value, for those to be made available in effect as

PCBRKWOs

part of the pool to be distributed in the bankruptcy proceeding?  What's the logic of any other system in which you have two separate pools going?

MS. MORTAZAVI:  Well, often the bankruptcy trustee itself will make an application through the remission process if there are sizable forfeited funds to contribute to the bankruptcy.  So, again, much of this occurs through dialogue and informal conferrals when there are assets to actually disperse.  The reason why there are separate mechanisms is because the purpose of forfeiture is punishment.  It is not strictly to pay victims back.

THE COURT:  Sorry.  I understand that's why it starts off that way.  I thought you were saying to me that the Department of Justice in this case, out of respect for the victims, is prepared to treat the forfeitable funds as available to victims as opposed to keeping it for itself.  If that premise is right—maybe you are backing away from that—why wouldn't they make those funds available for distribution as part of the bankruptcy process which is holistic as opposed to the happenstance of who puts in for rescission?

MS. MORTAZAVI:  Apologies if I misconstrued, your Honor.  My understanding is that that dialogue is, again, ongoing and informal.  So it could be the case that once there are forfeitable assets, that component of the Justice

PCBRKWOs

Department will confer with the trustee, that the trustee could, on behalf of the claimants, put in an omnibus remission request to have all the forfeited funds just transferred to the bankruptcy.  It's not uncommon for those sorts of arrangements to be made, but it's hard to tell at the outset what MNF will agree to.

THE COURT:  Then two things.  One is:  Would you please work with the bankruptcy administrator to make sure that he or she knows who to contact and how to do it to put in an effective request that the forfeitable funds, if any of them come to fruition, are made available?  I want to make sure that we don't have another ball dropping here with respect to notice as we did with respect to victims.  It strikes me as eminently sensible for the funds, if at all possible, to be channeled into one forum.  I'm asking you to take ownership of teaching the bankruptcy administrator how and when to do that.

MS. MORTAZAVI:  That's well taken, your Honor, and I will coordinate with the bankruptcy trustee.

THE COURT:  Right.  And the second issue becomes, just yes or no, is the Justice Department committing that the forfeitable funds will be made available to victims?  I thought you said so, but I want to make sure I heard that right.

MS. MORTAZAVI:  What we are prepared to say, your Honor, is that the remission process exists.  The Justice Department will always consider remission requests and will

PCBRKWOs

particularly do so in this case.  They are aware of this case.  I cannot commit to what they will do.

THE COURT:  Then take this as a strongly worded judicial recommendation, understanding I don't have power over this.  It would hard to imagine a case in which it would seem more inappropriate for the government to hold on to the forfeited funds when there are, from the government's own account, hundreds of thousands if not a million victims here who are all but certain to be paid pennies on the dollar through any other process.  So to the extent there's forfeitable funds, the victims have a far greater moral claim to it than the federal government.  I hope you'll convey that to the powers that be.

MS. MORTAZAVI:  I will, your Honor.

THE COURT:  All right.  Next, with respect to restitution, we looked up the cases that you've cited in which courts have made findings to the effect that restitution is unworkable including on the count of the number of victims.  Those appear to be good models for this case.  Will you get a form order key to this case that I can issue to make those findings?  I'm certainly prepared to do so.  It makes good sense.

MS. MORTAZAVI:  Certainly, your Honor.

THE COURT:  Supervised release, you agree that there's no purpose here because the defendant will be removed following

PCBRKWOs

his term of imprisonment?

MS. MORTAZAVI:  Yes, your Honor.

THE COURT:  And I take it separately, so to the extent that he makes a request to serve the back half or part of it of the sentence elsewhere, by definition he wouldn't be in the United States when his term of imprisonment ceased to be served?

MS. MORTAZAVI:  Correct.

THE COURT:  All right.  With respect to removal, I got the draft order you gave me yesterday.  Have the parts of the documents, other than the one that the Court has to execute the order, have those been executed now?  I think as they were sent to me, some were unsigned.

MS. MORTAZAVI:  I believe my colleague may have handed this up to the courtroom deputy, but -- and I see it's being handed up to your Honor.

THE COURT:  I just want to make sure that all the other documents are signed, and they are.

So you are asking me then to sign the order of judicial removal?

MS. MORTAZAVI:  Yes, your Honor.

THE COURT:  And defense, just to speed this along, there's no objection to my executing that now, correct?

MR. FERRARA:  Correct.

THE COURT:  All right.  Next, the prisoner transfer

PCBRKWOs

application.  From your letter, I take it that there is no role for the Court in the judgment.  That is an opportunity that is available by treaty.  It's an application the defendant makes. This Court has no say in that one way or the other?

MS. MORTAZAVI:  Correct.

MR. FERRARA:  I just wanted to flag one thing on that point.

THE COURT:  Sure.  Just speak into the microphone.

MR. FERRARA:  There was no disagreement.  There are two different documents that read a little differently on this point, and I want to make sure that we have a good record as to the prisoner transfer.

THE COURT:  It's on my list of things to put to you.

MR. FERRARA:  Oh, very good.

THE COURT:  So I'm happy to hear from you then.  If you don't mind, I'll save it for then.

MR. FERRARA:  Of course, your Honor.

THE COURT:  But government, from your perspective, there's nothing in the ordinary course that this Court does to make that happen; that happens organically without me?

MS. MORTAZAVI:  Correct.

THE COURT:  I want to ask a question I asked in my recent order.  Let's suppose I sentence the defendant to X years in prison.  And at the halfway mark, however measured, he moves for a transfer and it's granted, and he is sent to South

PCBRKWOs

Korea.  And the next day somebody in South Korea says, we don't respect the U.S. Court's judgment.  We don't like the sentence.  We want to make some sort of a statement.  We're letting him free, does the U.S. government have any rights in that situation?  What happens to the sentence that I hypothetically determined was appropriate?

MS. MORTAZAVI:  By treaty, Mr. Kwon is entitled to make that prisoner transfer request at any time, as we stated in our letter, even the day after this sentencing occurs.  So that is a matter that has already been determined between the two countries.  And to our knowledge, there is no mechanism to ensure that he remains in custody in South Korea once he is transfered, and no means to compel the South Korean government to respect a request that he remain in custody.  As a practical matter and having spoken with the office of international affairs, we understand they customarily do not and in this case have not received assurances that Mr. Kwon would remain in custody for the entire term of imprisonment by this Court.

THE COURT:  I mean, I assumed that the purpose of this treaty was to achieve humane interests, which is to say to allow Mr. Kwon to be closer to his family, when he serves sentence, not to let some sovereign unlock the door and let him out.  Which is it?

MS. MORTAZAVI:  I cannot speak to the wisdom of the treaty, your Honor.  All we know is the terms of the treaty,

PCBRKWOs

which are that Mr. Kwon, at any point after the sentence, has the right to make the application.  And the U.S. government has no mechanism by which to ensure that he is in prison in South Korea.

THE COURT:  Is there any history with respect to South Korea of letting people subject to this treaty out of custody before the time such custody would end had the defendant been in the United States?

MS. MORTAZAVI:  I'm unaware of any prior cases, your Honor.

THE COURT:  In either direction?

MS. MORTAZAVI:  In either direction.

THE COURT:  And under the plea agreement, although Mr. Kwon has whatever rights he has under the treaty, the U.S. has agreed to support the application after half of the sentence has been served?

MS. MORTAZAVI:  To clarify, the U.S. Attorney's Office has conditioned its support on him serving half of the sentence imposed by this Court.  The ultimate decision is another component of the U.S. government, which will make that determination.  They will take the U.S. Attorney's Office's recommendation into account, but ultimately they could overrule our recommendation.

THE COURT:  In either direction?

MS. MORTAZAVI:  In either direction.

PCBRKWOs

THE COURT:  Turning to the SEC action before Judge Rakoff, what money was Mr. Kwon required to pay as a result of the judgment in that case?

MS. MORTAZAVI:  Your Honor, I don't have the exact numbers.  I understand that pursuant to the settlement that was entered into, he was personally responsible for paying a little over $200 million, and that under the terms of the settlement——pardon me.  I'm just refreshing myself——he could have extinguished that obligation by paying a $7 million sum.

THE COURT:  And your papers indicate that he has not paid that, is that correct?

MS. MORTAZAVI:  That's correct, based on my conferrals with members of the SEC.

THE COURT:  And that sum represents what?  I just want to describe it correctly.  What is that?

MS. MORTAZAVI:  That's an amount that was entered into between the parties.  It wasn't keyed on any particular category such as disgorgement or interest earned.  This was the figure that they entered into.

THE COURT:  But in other words, there's a settlement in which he binds himself as part of settling the case to pay $200 million, which is dischargeable by the payment of $7 million?

MS. MORTAZAVI:  Correct.

THE COURT:  And that has not happened?

PCBRKWOs

MS. MORTAZAVI:  And that has not happened.

MR. FERRARA:  And we would like to speak to that, your Honor.

THE COURT:  And you will have an opportunity.

MR. FERRARA:  Very good.

MS. MORTAZAVI:  Your Honor, the one addition to that is that there was a deadline by which he would have to make the payment, which was 30 days after the settlement.  So this was not a sort of freestanding obligation of his.  He blew a deadline.

THE COURT:  When was the deadline?

MS. MORTAZAVI:  July 13, 2024.

THE COURT:  Mr. Kwon did not submit, it appears, a financial statement to the probation department.  Is the submission of such a statement required or discretionary on the part of the defendant?

MS. MORTAZAVI:  Discretionary.

THE COURT:  And do you have any insight as to his personal finances, this financial status?

MS. MORTAZAVI:  We do not, your Honor.

THE COURT:  Are you aware of assets of his?

MS. MORTAZAVI:  We are not aware of assets of his.

THE COURT:  There was a reference to a penthouse apartment that at some point he purchased.  Do you know what became of that?

PCBRKWOs

MS. MORTAZAVI:  I do not, your Honor.  I will state, in connection with the inquiry that your Honor made about the SEC, that Mr. Kwon has at no point stated that he does not have access to the funds to pay the settlement as required, which we think is also notable.

THE COURT:  Thank you.  The South Korea action, is that on hold before Mr. Kwon gets there or might it proceed forward before he arrives?

MS. MORTAZAVI:  It cannot initiate before he arrives in South Korea.

THE COURT:  And at this point, you understand it to be in the nature of pending charges, results to be determined?

MS. MORTAZAVI:  Correct.

THE COURT:  All right.  Now, turning to more substantive matters.  In the United States, is it correct that Mr. Kwon was the only person prosecuted in connection with this scheme?

MS. MORTAZAVI:  That's correct.

THE COURT:  Were others prosecuted elsewhere?

MS. MORTAZAVI:  In South Korea, there were multiple others prosecuted.  Not all of their names were disclosed.

THE COURT:  Is there any context to that?

The absence of charges against other people could mean essentially that he acted alone, or no one else was nearly culpable enough to be worthy of charges.  Were there charges,

PCBRKWOs

it could reflect venue issues; it could reflect an allocation of prosecutorial responsibility.  To the extent you can say, what to make of the fact that he is alone charged?

MS. MORTAZAVI:  Can't speak to all of the discussions and deliberations that went into the decision to charge Mr. Kwon or any decision not to charge any other individual. Mr. Kwon was clearly at the helm of this conspiracy.  This was his company.  This was his vision.  These were his lies.  These were his public statements that people relied on.

THE COURT:  Right, but conspiracy presupposes coconspirators.

MS. MORTAZAVI:  Correct.  And your Honor noted, there are instances where there is someone who is far and away more culpable than the next most culpable person.  I'm not speaking to this case in particular, only in terms of generalities.  I'm not authorized to speak to the deliberations of the U.S. Attorney's Office, but I make that note.

THE COURT:  Was Mr. Kwon's primary conduct something that occurred overseas?  In other words, was he based in the U.S. in connection with the actions that are at issue in 2021 or 2022?

MS. MORTAZAVI:  It touched U.S. persons --

THE COURT:  I got that.

MS. MORTAZAVI:  -- but he was headquartered overseas.

THE COURT:  And so presumably his coconspirators

PCBRKWOs

likely were not situated in the United States?

MS. MORTAZAVI:  That's correct.

THE COURT:  OK.  The Montenegrin time served, I think it is now understood from the letters recently that 17 months and eight days of it, all net of the four months that he served for passport fraud, will be counted by the Bureau of Prisons as to the sentence imposed.  Is that correct?

MS. MORTAZAVI:  Correct.

THE COURT:  It looks to me as if the parties' clarity on that point is a new thing and that at some earlier point, the defense, at least, either was unsure that it would be counted or believed it might not be.  Is it correct that the Bureau of Prisons has only given us clarity on that point recently?

MS. MORTAZAVI:  Correct.

THE COURT:  So when the government agreed to cap its sentencing request at 12 years, what, if any, premise was there as to whether or not that the 17 months and eight days would count towards that 12 years or not?

MS. MORTAZAVI:  The parties had no discussions on this score.  The government's assumption was that he would be credited for time that he had spent awaiting extradition.

THE COURT:  The defense's assumption appeared to have been the opposite.  I can't tell, but it appeared to me the opposite, such that one would treat your commitment as being

PCBRKWOs

understood to be 12 years plus 17 months and eight days. But you are telling me when you made that commitment, you were understanding your commitment to be a 12 years all-in commitment, i.e., assuming that the Bureau of Prisons would count that time?

MS. MORTAZAVI: Correct.

THE COURT: All right. Look, here is the big issue which is why did you agree to the 12-year cap?

MS. MORTAZAVI: Your Honor, we took into account the fact that Mr. Kwon took responsibility early, that he had been in prison overseas, and that he faced charges in another country. That puts him in a slightly different posture than many other defendants who are responsible for wide-reaching fraud that is comparable to the one at issue here. And we placed large emphasis on that, and we believed that it was the appropriate sentence when looking at other sentences that were imposed on similarly situated defendants.

THE COURT: In other words, this was not a situation where this was horse trading independent of the 3553(a) factors. Your representation to me is that the United States believes that a 12-year sentence is a reasonable application of the 3553(a) factors.

MS. MORTAZAVI: We believe so, your Honor.

THE COURT: Was there any political influence exercised to lead the government to this position?

PCBRKWOs

MS. MORTAZAVI:  Not at all.

THE COURT:  If the Court were to disagree about the assessment of the 3553(a) factors, is there a systemic argument you would make as to why the Court should nonetheless heed the government's recommendation?

MS. MORTAZAVI:  We would not.

THE COURT:  The 325 victims' letters, do they affect at all the government's view as to how the 3553(a) factors apply?

MS. MORTAZAVI:  They, of course, informed the government's view, but we had understood prior to those letters being submitted, based on widespread public reporting, that this crime had devastating effects.  There were, of course, a number of news articles reporting on that, and the government quoted from a podcast interview of Mr. Kwon in which he was posed with some very severe instances of the impact on victims. So we were aware that these were the consequences of his actions.

THE COURT:  Very good.  That ends all my questions.  I want to hear from the victims.

Let me just confirm with our court reporter if she needs a break.  Do you need a break?

(Court reporter responded)

I'll hear from the victims.  Let's start with the one in person.  Ms. Mortazavi, guide me through.  That is who?

PCBRKWOs

MS. MORTAZAVI:  That is Chauncey St. John, your Honor. Is Mr. St. John here?

THE COURT:  Mr. St. John, approach the podium here. Mr. St. John, good afternoon.  Would you kindly begin by stating your name and slowly spelling it, and speak into the microphone.

JUROR:  Chauncey St. John, C-h-a-u-n-c-e-y, S-t period J-o-h-n.

THE COURT:  Welcome.  Thank you for being here, and I appreciate the courage it always takes for somebody to get up and speak in front of a big courtroom.  I'm happy to hear your statement.  I hope you will keep it succinct.  We have a lot of ground.  I, most of all, hope you speak slowly and distinctly for the benefit of our court reporter.  The floor is yours. I'll interrupt if you are speaking too fast.

JUROR:  Thank you, your Honor.  I want to stay that despite suffering personal losses personally, I probably wouldn't be here today if I was speaking only for myself. Unfortunately, I'm speaking on behalf of hundreds of nonprofits and charities as well as my extended family.

I was among the first builders on the Terra blockchain.  I'm the founder of Angel Protocol, now known as Better Giving, a charitable platform designed to fund nonprofits and establish on-chain endowment accounts.  I chose to build on Terra because I truly believed in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PCBRKWOs

transformative potential of blockchain to help bring about a more equitable world.  I was led to believe that Terra was already achieving real-world impact through its Chai payment network and bought into the dream of a decentralized economy with decentralized currency at its core.

Before Terra's collapse, Angel Protocol raised $6 million in public funding for our company, and processed another $6 million in donations to nonprofits held through our protocol of noncustodial accounts.  We onboarded hundreds of charities worldwide that shared our dream of a better world through blockchain technology.

The damage to the charitable organizations we served was catastrophic.  My company drained its own runway to fully repay 97 percent of the smaller charities we served, sacrificing our future to clean up Terra's mess.  But larger nonprofits still lost more than $2 million; charitable funds intended for real-world aid that vanished immediately.  The most egregious example is Walk Church, a nonprofit that entrusted us with more than $1 million of its own funds.  Because of the crash, we could repay them only $100,000.  Others included organizations such as Solar Electric Light Fund, which saves lives across Africa with solar-powered solutions, and Global Brigades, which conducts humanitarian mission work serving children and families in need.  It's difficult to quantify the amount of life-saving work that was

PCBRKWOs

cut short due to the trust placed in the Terra ecosystem.

The impact on my family has been equally severe.  It wasn't just my own savings that were lost, over $1 million at the time of the crash.  My extended family, my in-laws, my wife's brother and sister, all invested heavily, including by contributing their 401(k) funds.  Their hopes for a comfortable retirement have been destroyed by their confidence in the Terra ecosystem, an ecosystem I helped champion based on lies about the stability of UST peg.

While I accept full personal accountability for my decisions, I can also say honestly that if we had known what Mr. Kwon knew, that the peg had already failed and had been bailed out previously, we never would have invested our funds, and that's precisely why he never disclosed that truth.  I have to live with the guilt of their losses everyday; losses that mean my in-laws will need to continue working well into their old age.  My wife and I are now saddled with debts we can no longer afford, losing not only funds but years of our lives, reputation, and future earning potential.

I did reach out to Mr. Kwon privately right before the end, the day after the infamous, "Steady lads, deploying more capital," tweet.  I asked him what I should do because we were entrusted with charity funds and needed to decide whether to capitulate.  He told me then to "get out what I could" because it wouldn't recover, but by then it was already too late.  We

PCBRKWOs

scrambled to withdraw funds as the peg collapsed rapidly.  To add insult to injury, when Terra attempted to make victims whole through a new token air drop, Angel Protocol and the charities we supported received nothing due to a Terraform Labs calculation error.  There was no rescue.  There was no recovery.  Only a reckoning of broken trust, as we were left to sacrifice what remained of our company to remediate a destructive implosion that would continue to reverberate for decades.

In the sake of full transparency, it is worth noting that Do Kwon, I was grateful for his initial support for Angel Protocol, which wouldn't have existed without his $300,000 contribution through Terraform Labs, to give us initial start-up funds.  I wouldn't be able to stand up here honestly without acknowledging that, and I do appreciate that.

All that being said, I want Do to know that I forgive him personally, and I pray to God to have mercy on his soul.  I simply ask the Court to look at the wreckage of these lives and these charities when deciding the appropriate sentence.  Thank you.

THE COURT:  Thank you, Mr. St. John.

Government counsel, who is the first victim who will be speaking remotely?

MS. MORTAZAVI:  Your Honor, there are four victims participating telephonically, and I will announce them in no

PCBRKWOs

particular order, starting with Agron Darlishta.

THE COURT:  All right.  Is Agron Darlishta on the phone?  Is that a Mr. or a Ms.?

MS. MORTAZAVI:  I'm looking to our victim witness coordinator.  It appears as if she's trying to coordinate with the victim.  Perhaps while she's doing that, we can move to Ms. Tatiana Dontsova.

THE COURT:  Is Tatiana Dontsova on the phone?

Mr. Smallman had given me the names of the two people whom he indicated have indicated they are on the phone.  Neither is those people.  He has Jake Collis and Stanislav Trofimchuk.  Should we turn to them?  Is Jake Collis on the line?

MR. COLLIS:  This is Jake Collis.

THE COURT:  Mr. Collis, this is Judge Engelmayer. Just yes or no, have you been able to follow along and hear the hearing so far?

MR. COLLIS:  Yes, I have, your Honor.

THE COURT:  Would you kindly state your name and spell it, for the benefit of our court reporter who is taking everybody's words down.

MR. COLLIS:  My name is Jake Collis.  J-a-k-e, C-o-l-l-i-s.

THE COURT:  Mr. Collis, welcome.  I'll ask you to speak slowly and distinctly and keep your remarks brief.  With

PCBRKWOs

that, I'm happy to hear from you.  Just listen.  If you hear me trying to interrupt, stop speaking.  I'm likely to interrupt you to guide you as to something about the acoustics or your manner of speech that is making it hard for the court reporter to take down your words.

With that, Mr. Collis, the floor is yours.

MR. COLLIS:  Thank you very much.  My loss is not financial like many of the people affected by the crash itself, which was caused by Mr. Kwon and TFL as a collective.  It was more personal to me.  I lost a dear friend, and there's no compensation that's enough for my friend's life.  There's no sentence that seems enough, and Do Kwon's damage will not end here.  The sentencing will not finish the pain that still exists.

We as a community, in two communities because he created a divide, have to live on.  They have no head.  There's no one in charge.  He has left these two helpless blockchains to fend for themselves with no leadership.  And we have to push on, continuing fixing what they broke.  And nearly four years ago, I devoted myself to the revival and the stabilization of Terra Classic, which was the original chain that they abandoned.

In the aftermath of the collapse, when everybody was suffering life-changing losses and the community was overwhelmed with fear and certainty, I committed myself to

PCBRKWOs

doing whatever I could to prevent further harm.  So I began documenting my research and sharing educational content for my YouTube channel I created to help people understand what was happening, to bring transparency where there was confusion and clarity where Do Kwon was bringing none.

As my involvement deepened, I actually launched LUNCdash, which I later then established myself as a validator, to try and help people as much as I could.  LUNCdash began as an information hub, and then it grew into the widely used Terra Classic wallet effectively replacing his defunct Terra Station mobile wallet that, again, he left for us to fix, and we had no access to, so we had to build our own.  I funded it myself.  I charged nothing.  I never saw any profit from any of it.  It was built because our ecosystem needed it because he couldn't provide it to us, and it remains community focused as a nonprofit resource.

Over the years, many of us have contributed to proposals, upgrades, and government initiatives aimed at strengthening the chain.  We've used tools to build and the knowledge we've gained to investigate all of these unresolved issues, unidentified gaps, and ensure that we tried to hold him accountable wherever we could.  My goal has always been to safeguard the community and our ecosystem's integrity.  I take pride in the work that I've done, both in service to the Terra Classic community and to the broader community that have

PCBRKWOs

endured financial losses, and I hope one day we look and know that we did the right thing.

The purpose of my statement goes a lot deeper than just face value of my personal loss and all of the financial losses.  My statement summarizes all of the independent research I conducted over the course of nearly four years following this case.  It's to do with the handling and disposition of assets associated and owned by Terraform Labs and Do Kwon and any related parties.  And the purpose is to provide the information I believe is relevant to the ongoing criminal proceeding and sentencing considerations.

I relied on public information that courts made available for the civil case, which was Trial Exhibit T3-01. Using those materials, I performed extensive chain-based analysis harnessing an archive note that we developed that gives us the ability to draw all information that we would like out of the chain.  We have identified TFL's wallet ownership, transaction flows, remaining balances, and my focus specifically is on working to find whether the Terraform crypto assets belonging to TFL under the final judgment were burned or disposed of.

Now, Trial Exhibit T3-01 had 90 percent of its contents burned.  The research that is available and the data shows that eight wallets on chain still exist, and they are not burned and they hold 5.90 percent of the total UST supply.

PCBRKWOs

This is around $9.65 million currently at market value.  So it's a systematic risk to our entire blockchain, and it is further proof that TFL, Do Kwon, and Chris Armani didn't comply with the final judgment fully.  They were ordered to destroy the keys, and Chris Armani stated that destroying the keys wasn't sufficient and that TFL did not know who had access to any of the wallets being on chain or off chain.

THE COURT:  Mr. Collis, this is Judge Engelmayer.  I'm going to give you two more minutes.  I appreciate what you have to say.  I don't want to cut you off immediately, but you've got two more minutes because we need to move on with other speakers.  Go ahead.

MR. COLLIS:  That is absolutely fine.

I believe that Do Kwon's guilty plea, just to tidy up here, is being done in an attempt to bury a lot more evidence, a lot more people who were coconspirators in this, and there's substantial data shows that TFL was sending around $2 billion UST to Binance as well.  The CX wallets were redacted in Trial Exhibit T3-01, and we're unable to identify how much is on there or whether they burned it and whether these funds were accessible to anybody that was part of the TFL team.  And that was in Chris Armani's work.

That's all I've got.  Thank you, your Honor.

THE COURT:  Thank you, Mr. Collis.

Next up is Stanislav Trofimchuk on the line.

PCBRKWOs

MR. TROFIMCHUK:  Yes, your Honor.

THE COURT:  I remind everybody else on the line to please mute your lines.

Mr. Trofimchuk, would you state your name and spell it slowly please?

MR. TROFIMCHUK:  Good afternoon.  My name is Stanislav Trofimchuk.  S-t-a-n-i-s-l-a-v, and the last name is T-r-o-f-i-m-c-h-u-k.

THE COURT:  Good afternoon, Mr. Trofimchuk.  I'll give you the same instructions I've given the others.  Please speak slowly and distinctly and keep your remarks brief.  The floor is yours.

MR. TROFIMCHUK:  Your Honor, before I begin, may I comment on the topic I discussed earlier?

THE COURT:  You are already speaking too fast for the court reporter to take down or for me to understand what you're saying.  Please slow it down.

MR. TROFIMCHUK:  I'm sorry, your Honor.  Before I begin, may I comment on the topic you've been discussing earlier regarding the restitution?

THE COURT:  You are at liberty to use your few minutes to speak to any topic relating to this proceeding.  Go ahead.

MR. TROFIMCHUK:  OK.  The notice on the Department of Justice website on December 1, among other things, lists the victims rights.  It says, "The alleged victims of Kwon's crimes

PCBRKWOs

have the following rights."  And the number six in that list says, "The right to full and timely restitution as provided by law and the Court."  I believe that is what led victims to believe they can seek full restitution in their letters and statements, at least that was the case for me.  And I'm sure we all would love to have your permission on exactly how that could be executed if that could be noted by the government, please.

THE COURT:  Mr. Trofimchuk, I'll interrupt to say your point is well taken that there could be, I'm sure, greater clarity on the government website to victims as to the means by which those who want to make their interest in compensation known, how to go about doing that.  I'm looking at government counsel and requesting that following this proceeding due attention be given to making sure that the website explains in a practical way how people claiming to be victims and seeking compensation can take action.

Go ahead, Mr. Trofimchuk.

MR. TROFIMCHUK:  Thank you very much, your Honor.  I appreciate it.  My statement is just about five minutes, if I could have that time.

THE COURT:  Mr. Trofimchuk, try to keep it a little bit shorter.  Thank you.

MR. TROFIMCHUK:  OK.  Your Honor. We came to the United States in 2006 from Ukraine as a young family with a

PCBRKWOs

ten-month-old baby.  We were chasing the American dream and a brighter future.  Like most immigrants, we had to work very hard to build life for ourselves.  For seven straight years, I worked multiple jobs, on weekends, endless hours because my wife didn't have work permanently all that time.  I barely saw my children growing up.  She carried the burden of raising our two boys almost entirely alone with no family nearby to help out all.

After 13 years, we finally became U.S. citizens.  I could finally breathe.  I started a small business, came home at reasonable hours.  Life finally felt like it was moving forward.  By early 2021, though we were not rich, we had a modest house in Texas, a growing business.  Savings were set aside for our sons to go to college.  We were closer than ever to making it.

Then in February 2022, the world exploded across Ukraine.  Both my wife's elderly mother and my parents, who were still living in the south of Ukraine at the time, found themselves on the front line.  We dropped everything at that point.  We flew to Ukraine, pulled them out of a war-torn country, relocated the entire family, our parents, ourselves, our children, to Croatia, one of the few places that felt safe.

THE COURT:  Mr. Trofimchuk, with respect, and I'm sorry for your family's situation in the Ukraine, this proceeding is about Mr. Kwon.  You've got two more minutes.

PCBRKWOs

Please focus your attention on what is germane to this matter. I appreciate the broader context.  Thank you.

MR. TROFIMCHUK:  Thank you, your Honor.  That's when we discovered Terra.  That was the time we discovered Terra UST through Mr. Kwon's Twitter.  He described UST as Stablecoin that always holds $1, the protocol was safe, a reliable way to a certain 24 percent yield.  It didn't felt like gambling.  It felt like the answer we had been praying for.

We sold everything.  The house, the business, the cars.  We scraped together just over $190,000.  In late April 2022, I converted it all to UST and locked into these Terra protocols on Mr. Kwon's repeated statements for months. We all know just two weeks later.  I watched the UST fall on its back.  In panic, I almost sold everything to limit the damage, but then I saw Mr. Kwon's tweet, "Deploying more capital——steady lads."  And the price started recovering that day, so I trusted him again and decided to keep the UST.

What followed was two weeks of pure terror.  The Terra blockchain toppled.  We all know what happened.  Finally, on May 23, when the protocol liquidity was restored, and UST was trading below 67 cents.  Our $190,000 had become less than $13,000.  Seventeen years of our life was just gone in two weeks.

People say you should never risk money you can't afford to lose, but that never felt like risk.  The founder of

PCBRKWOs

the project said it was too big to fail, and Luna would protect every dollar. It sounded like the safest investment ever. That was only the beginning of the collapse. Then less than two weeks after the collapse, my wife said she could no longer trust I could keep her and her mother safe. A few weeks later, the divorce papers arrived. Our teenage sons chose to stay with me but college was never mentioned again. But boys quit school and now work as car mechanics to put food on the table.

Today I'm 44 years old. I live Croatia with my parents taking whatever jobs I can find. I'm waiting for the war in my home country to end. My ex-wife lives in another country babysitting neighbors children to survive. My sons, instead of studying engineering degrees, they are fixing cars, and I cannot return to the United States. There's no home, no business, no savings, no future. Everything we built over nearly two decades vanished in May 2022.

I could never imagine that a person I never met, never spoken to, could destroy my family so completely, and yet that's exactly what happened. I know there's others out there who have stories that are even darker than mine, and we'll hope for at least some kind of compensation to start, that we can start rebuilding and have a chance to rebuild our lives. Thank you for listening.

THE COURT: Mr. Trofimchuk, thank you very much. I know I'm speaking for everybody here in saying that we wish you

PCBRKWOs

the best, and I'm sorry for all your family has gone through.

MR. TROFIMCHUK:  Thank you, your Honor.

THE COURT:  Coming back to the two names we called before.  Is Agron Darlishta now on the line?

All right.  I hear nothing.

And is Tatiana Dontsova on the line?

Again, I'm not hearing any response.

AUSA Ms. Mortazavi, is there anyone else you understand on the line?

MS. MORTAZAVI:  Your Honor, if I could have a moment?  I understand there's a Russian interpreter present for one of the victims, and it could be that the Russian interpreter is in a position to simultaneously translate.

THE COURT:  Is that person here?

MS. MORTAZAVI:  In the back of the courtroom.

THE COURT:  Bring the Russian interpreter to the microphone at the podium.

MS. MORTAZAVI:  And if I could have a moment, your Honor?

THE COURT:  The record will reflect that there is a Russian translator at the podium.  For the translator, let me just ask you to please state and spell your name.

THE INTERPRETER:  Andrew Harkuscha, H-a-r-k-u-s-c-h-a.

THE COURT:  Thank you.  Harkuscha?

THE INTERPRETER:  Correct.

PCBRKWOs

THE COURT:  All right.  Mr. Harkuscha, it looks to me as if you have a phone with you, and you seem to be speaking to the person for whom you are translating.  Is that correct?

THE INTERPRETER:  That is correct.

THE COURT:  So I won't be hearing that person's voice.  I'll be hearing from you what that person is saying to you.

THE INTERPRETER:  Yes, unless you want it on the speakerphone.

THE COURT:  I'm happy to hear it through you.  Just get the name and spelling of the victim whose words you will be translating.

THE INTERPRETER:  Tatiana is spelled T-a-t-i-a-n-a, and the last name D-o-n-t-s-o-v-a.

THE COURT:  Thank you.  I will ask you now just to communicate the following to Mr. Dontsova.  Please briefly set out for us what she wants you to state in open court on her behalf.  Please ask her to keep her remarks brief, but we're eager to hear them.

MS. DONTSOVA:  Hello, Honorable Judge Mayer.

THE COURT:  Close enough.

MS. DONTSOVA:  On the 11th of May of the year '22, I invested $81,000 in Luna coin.  $81,000.  I received this money by selling my only residence, my only apartment.  I moved from the capital of Moscow to the capital Tbilisi in Georgia.  I intended to change where I was living permanently.  Documents

PCBRKWOs

showing that I have sold my apartment, I have submitted.  The day after I invested in the Luna coin in the market, the apartment that I sold had turned into a couple of coins.  The $81,000 turned into $13 that I could haul off in the palm of my hand.

I thought that the people involved with Luna coin would take rational measures.  Instead of doing that, Kwon came up with another coin, Luna 2.  He is not showing any responsibility for these investors -- for those who invested in the initial Luna coin.  Now, this coin is called Lunc.

As of May 11 of '22, I am now officially a homeless person.  I am wandering the streets of Georgia and Tbilisi.  I have no money for renting a living space.  I have serious health issues that have developed and I'm in need of hospitalization, but I have no financial resources in order to get the necessary medical treatment.

I am a single woman who is 58 years old.  I have no work, and I am not receiving any form of pension.  My family, my husband, my mother, my father passed away a few years ago.  I have no children.  I don't have any children.  I have no one to rely on and no one to seek help from.  I have no resources to finance my existence.  I demand and request that this matter be resolved, that it be done swiftly, and a swift decision be taken that is irreversible.  And likewise, I request full compensation of my losses.

PCBRKWOs

So you understand the moral damage that has been done to me and the condition that I find myself, starting on May 11 of '22, it has been exactly three years and seven months. For three years and seven months, I'm in a state of deep depression. I thank you for having the opportunity to have delivered my word in court, and I hope for a quick resolution of this matter. I say that with great thanks in advance, and on that, I will finish. I'm located in Georgia.

THE COURT: Thank you, Ms. Dontsova.

MS. DONTSOVA: The only thing I'd like to add, I watched an interview where Mr. Kwon was being interviewed where he mentioned that he does not stay in touch with poor people. It might be one of his talents to make rich people into poor people.

THE COURT: Mr. Harkuscha, thank you. Please convey to Ms. Dontsova my thanks for her participating. Please convey to her my best wishes that her situation turns for the better, and alert her that she should look at the website, and ask somebody to translate it to her if she needs that help, as it will give her an update on what happens here today and what her rights are.

MS. DONTSOVA: Yes, I will absolutely do that.

THE COURT: Thank you. You may take a seat.

I'm informed that the last victim may be on the phone. Agron Darlishta is on the phone.

PCBRKWOs

UNIDENTIFIED SPEAKER:  Hello, Mr. Darlishta.  This is Judge Engelmayer.  Would you state and spell your last name for the record?

MR. DARLISHTA:  My name is Agron Darlishta.  I am from Macedonia.

THE COURT:  Mr. Darlishta, listen to what I'm saying. Please spell your last name.  I've got your name.  Now spell it, please.

MR. DARLISHTA:  My name is A-g-r-o-n, D-a-r-l-i-s-h-t-a.

THE COURT:  Mr. Darlishta, listen, you are speaking perhaps a little bit away from the phone such that it's a bit hard for your words to come out clearly.  When you speak again, please speak slowly, loudly, and distinctly and near the phone.

MR. DARLISHTA:  OK.

THE COURT:  I can give you two to three minutes to speak.  Just briefly, succinctly share with us what you have to say.  We are eager to hear.  Go ahead, Mr. Darlishta --

MR. DARLISHTA:  OK.  Thank you, Mr. Judge.  Just I wanted -- because I lost a couple of thousand of monies.  At most I lost 36,000, because I invested it in Luna network because we have a belief on Luna.  After Luna corruption because everything was through that with Binance, every exchange in the bank was Luna.  Everything change because of halted the trading.  They stop the trading.  They called them

PCBRKWOs

or buy, whatever, just on banking.  Binance also, it's included with Luna network and the day the market crash.  At the time of the Luna was crashed, entire market was down.

So basically I am asking just a compensation because we have too much, my high loss, is what you might say.  Because of which I think is link between Luna and Binance, everything there together with UST and with Do Kwon.

THE COURT:  Thank you, Mr. Darlishta.

MR. DARLISHTA:  I lost my home.  I lost my car.

THE COURT:  Mr. Darlishta, as with the previous victims who spoke, please know that we wish you the very best.  To the extent you want to be updated on what happens in this case, the website is a good resource, both to report what happens today and to inform you of your rights.  To the extent there will be an opportunity or may be an opportunity to get compensation coming out of this proceeding or the bankruptcy proceeding, the website will be updated to explain to you your rights.  With that, I thank you.

Counsel, we're going to take a lunch break now.  Everyone has been here for quite some time.  It's 1:28.  I'll see you in your seats at 2:30.

Before we break, Mr. Patton, let me just --
Mr. Patton?

MR. PATTON:  Your Honor, would it be possible for Mr. Kwon to be in pretrial services so that we could sit with

PCBRKWOs

him and meet with him during the break?

THE COURT:  Yes.  Marshals please accommodate that. We have a lot of ground to cover, and I want to make sure that Mr. Kwon can have meaningful discussions with his lawyers during the next hour.  Particularly given the late-arriving victim statements, it's more important that Mr. Kwon have useful time for the lawyers.

Mr. Patton, the issue for me is just planning out the afternoon.  Without holding you to it, have you an estimate of how long the defense presentation, including Mr. Kwon's remarks, is likely to take?

MR. PATTON:  Your Honor, our——for lack of a better word——affirmative statements to the Court should take no more than ten or 15 minutes.  Obviously to the extent that your Honor has questions, it will go longer.

THE COURT:  That's helpful.  Look, I expect that after I've heard from the defense, I'll need some time to absorb what I've heard from everybody, so we'll need a material break after that.

Have a good break, everybody.  I'll see you promptly at 2:30 after lunch.  Thank you.

(Recess)

THE COURT:  Be seated.  I see a couple of empty spots at the government table.

MS. MORTAZAVI:  That's right, your Honor.  My

PCBRKWOs

colleagues had to attend to another matter and cannot be here for the remainder of proceedings, but AUSA Ravener and myself are prepared.

THE COURT:  Very good.  And defense, we've got everybody here.

Welcome back, everyone.  I'll hear now from defense counsel.

MR. PATTON:  Thank you, your Honor.  Do you mind if I speak from the lectern --

THE COURT:  As long as you speak into the microphone.

MR. PATTON:  Your Honor, there's a dynamic in a lot of sentencings that I know your Honor is familiar with where the defense tries to place criminal conduct, misbehavior, in context, and where the government will often accuse us or debate us about whether that is really context or whether it's minimizing or excuses, and we'll shoot back that we think it's relevant to what may not be an entirely black-and-white situation.  And I think we obviously have that going on here to a degree.  But I want to be very clear from the outset what is black and white because I was surprised to hear some doubt about this.

Do Kwon committed serious crimes, and he said so.  And he has said so from the jump, from the time he got here.  He made false statements.  He misled investors.  It caused real harm.  We've heard about how real that harm was in many ways

PCBRKWOs

this morning.  He hasn't pulled his punches.  I hope you see that in his letter to your Honor.  I hope you see that in our letter to the Court.  I'll talk a little bit more about the context piece of it as we go here, but I do think that's relevant, important context and it's not minimizing and it's not excuses.  And I wanted to be very clear from that at the outset.

I first met Do almost two years ago in a Montenegrin prison.  It was the winter of 2024.  And it was cold, and it was cold in the visiting room.  I was in there in a jacket, and Do came out wearing flimsy prison garb and was visibly cold.  And I am still struck by what occurred to me in spades at that moment, which was, my God, what an extraordinary rise and fall in a few short years.

Do started working on what would become Terraform at age 26, and he spent the next two years, night and day, coding and coding and coding.  He was not just somebody who talked a good game and got people to give them their money.  He didn't just develop some meme coin and market it.  He developed some very sophisticated technology that a lot of very smart and sophisticated people and investors took a look at and thought was truly transformative and had the potential to really solve a lot of problems in the world of cryptocurrency and the blockchain.  He did that out of a very genuine belief in its potential.

PCBRKWOs

He was somebody who had a lot of alternatives, who was incredibly bright, and came out of Stanford with a computer science degree and was a very talented programmer.  He wasn't somebody who started off wanting to get into crypto.  He was compelled by it when he learned more about Bitcoin and read those white papers and reflected on his own experiences in South Korea, and that was a genuine drive to build a better mousetrap, to do something useful and good.  And a very real community did develop around that.  Not just people who worked at Terraform, but your Honor has heard about some of it here today; people who also just had their own projects, their own hopes for developing new tools, and worked on the Terraform blockchain to develop those.  And Do was incredibly generous with his time on those things.

There was obviously a selfish aspect to it.  He wanted the Terra blockchain to thrive, but a lot of them didn't have terribly blockbuster financial prospects.  And yet I think you've seen in a lot of materials that even for those, this just fascinated him.  He was genuinely fascinated by the technology and by the potential, and it's clear that that is what drove this, not some effort to scam people out of their money.

And it took off.  It was truly a dizzying ascent to the point where, from a flicker in Do's imagination at age 26, by 30 on paper he is worth tens of billions of dollars.  And

PCBRKWOs

many others made extraordinary sums, mostly trading firms, sophisticated trading firms. And, of course, as we've heard a lot of retail investors, a lot of people who were not sophisticated and who didn't have money to lose, also invested and bought into this in large part because of false statements that Do made about just how stable the products were, exactly how the products worked.

But those false statements were not equivalent to a Ponzi or a house of cards. It wasn't like some very high profile examples, something where there was a backdoor where Do was essentially stealing money. And when the funds ran out, the jig was up, and he had been enriching himself by essentially engaging in theft. That's not what this was. He genuinely believed in the product.

And, yes, this certainly falls in the category of the unfortunate Silicon Valley credo of "fake it 'til you make it." It's not an excuse to say you believed in something, and therefore, I thought it would be OK to exaggerate its capabilities and lie to the public about what it's really all about. But there is a difference in kind there, and that's not us minimizing or making excuses. It's providing what I think is genuinely relevant context to the conduct here.

I want to go through just a few of the factors——some of which, I think, did lead the government to enter into this plea agreement——that I acknowledge, normally in a case with the

PCBRKWOs

kinds of losses that we're talking about, for us to be asking for five years and for us to have a plea agreement where the government agreed to cap its request at 12 years, would be unusual.  But there are some truly unusual aspects to this case——I think some of them, frankly, unique——some of which went into the thinking in the plea agreement and was discussed, but I don't think it is entirely captured by the plea agreement. So I want to go through some of those.

The fact that he does face future prosecution in Korea and how he ended up here in the United States as opposed to South Korea in the first instance, I think is an enormous part of the story here.  Frankly, it's just so hard for me to wrap my head around the government's argument that somehow that's an aggravating feature that he wanted to be extradited to his home country of South Korea, rather than the United States, and that was somehow an effort to avoid accountability.  It was nothing of the sort.

It was highly unusual that he was sent here rather than South Korea.  They did lodge the extradition request first.  The business was operated there.  It's where he's from. I don't want to turn this into an extradition argument in Montenegro, but I assure you, your Honor, all of the factors weighed in favor of him being extradited to South Korea.  And it was perfectly valid for him to want that outcome to be charged and jailed in his home country and near his family.

PCBRKWOs

For other reasons your Honor sort of alluded to, the rationale for prisoner transfers, and, yes, that would have prohibited in all likelihood his being sent here for very valid reasons that treaties invoke the same constitutional theories we have regarding double jeopardy.  And that's not somehow a——I don't know——bastardization --

THE COURT:  Sorry.  Is it really double jeopardy?

MR. PATTON:  Not officially, no, your Honor.

THE COURT:  Had it gone in the opposite direction, what would have prevented the U.S. from having a detainer under which if he got picked up, he could be prosecuted here?

MR. PATTON:  I think under South Korean law, they would have been unlikely to send him had they themselves already prosecuted him.

THE COURT:  So it's a one-way ratchet in that going to the U.S. first exposes him to the potential of two prosecutions; going to South Korea exposes him to the first of only one?

MR. PATTON:  Correct.

THE COURT:  So in addition to the desire to be home and near family, there's a strategic component, which is you are limiting yourself to one prosecution?

MR. PATTON:  Yes.  But with respect, your Honor, I disagree with the notion that that is somehow strategic.

THE COURT:  No, no.  I'm not saying that it's the work

PCBRKWOs

of a rational economic actor, but it is also strategic.

MR. PATTON:  It's also grounded in principles that are related to double jeopardy.  It's baked into the treaty——is my understanding——that South Korea, having prosecuted him for the conduct, would not have then sent him to a foreign country to be prosecuted for that same underlying conduct.

THE COURT:  And yet, that same South Korea, you're saying, will perhaps not respect whatever sentence has been given here or not credit it against whatever they determine the just sentence to be.

MR. PATTON:  I think they feel very strongly that he should have been sent there.  This was not a --

THE COURT:  I appreciate that.  But at the end of the day, just for a math exercise, let's assume the government's sentence is imposed.

MR. PATTON:  Yes.

THE COURT:  And let's assume hypothetically South Korea agrees his conduct merits prosecution there, but in their mind's eye——I'll make this up——the proper sentence should have been 15 years, a three-year difference.  Is what you are saying is South Korea would not, in effect, give credit to the 12 such that they would be seeking only three years additional?  Because on your premise, that's what he would have gotten in South Korea, 15.  Why would we assume that South Korea is in effect going to disrespect the time he does here?

PCBRKWOs

MR. PATTON:  Your Honor, it's not an assumption, although I'm not an expert.  But it comes from lengthy conversations with Korean counsel there who say, A, that the prosecution is taking this very seriously and is out for a severe outcome there.  B, if the charges there, the elements, don't precisely line up with the charges here, which they have a menu of options, so that will surely not be the case.  There will surely be slightly different elements to the Korean charges, which means that, no, the Judge may not impose concurrent time.

Can we guarantee that a judge over there would not consider in some way, in some discretionary way, what has gone on in the past?  No.  I would hope that they would.

THE COURT:  I would assume that Mr. Kwon has equally able counsel in South Korea?

MR. PATTON:  He does, your Honor.

THE COURT:  And while it will be some time before he is accountable there, you'd like to think that that system, particularly treating a citizen of that country, will be open to an argument that says he has already done time for an offense that either is coterminous or overlapping with the one or ones they are charging him there for.

MR. PATTON:  I know from speaking with them that they say, at least to the extent your Honor is talking about, some sort of imposition of concurrent sentences, that that will not

PCBRKWOs

happen.

THE COURT:  It's not so much the imposition of concurrent sentences, and I don't pretend to know the system. It's that the system there, you're saying, is so inflexible that it would not permit a rational finder of fact, a rational jurist, to take into account that he had already served X years here.  And I'm finding that hard to believe, that I should take as a given that the second sentencer will not factor in the first sentence in sentencing.

MR. PATTON:  Your Honor, I think -- and again I think a lot of this depends on who that sentencer is and precisely what the charges are.  But I agree with your Honor that I would hope that that sentencer would at least in some informal way, if not some more direct way, consider the time he spent, whether it's Montenegro or here, whatever it may be.

THE COURT:  Right.  But part of your argument requires me to assume an immaturity in the South Korea system presented with these facts; which is to say, they are not going to give your client effectively credit.  I don't mean in a mathematical sense.  I mean in the exercise of judgment sense that we all do when we sentence for the time previously served.  You are holding that out as the imaginable horrible, that South Korea is going to be irrational when they get their hands on him, and I need to guard against that by going light here.  That's effectively the argument.

PCBRKWOs

MR. PATTON:  It's not, your Honor, for a few reasons. We have been told by Korean counsel that the court over there will make up its own -- that they are very strong-willed in terms of sentence they impose.

THE COURT:  And they would have said that about me too.  But the issue is whether it goes beyond that to say they are going to make up their own mind and they have strong opinions, to say they are not going to consider that he has already done time for this offense.

MR. PATTON:  There's no guarantee that they will.

THE COURT:  There's no guarantee that I would have either, but I would have.  What I'm having difficulty with is you are baking into sentencing advocacy this rather dark portrait of what they would do to what amounts to a citizen there.  It's hard to credit the worst-case assumption that you are making.  I can't rule out that he's going to wind up with a Draconian, inflexible sentencer, but I can't preclude the opposite, which is that he's going to have somebody who takes a look at the fact pattern here and says he has done enough time.

MR. PATTON:  Fair enough, your Honor, but every indication we have received is that they are going to be seeking a very severe sentence over there.  From public statements from the prosecutors, from what his defense lawyers have told us repeatedly over the past year, from how the proceedings against codefendants are proceeding apace with very

PCBRKWOs

serious charges.  There's just every reason to believe that he is going to be treated quite severely, and frankly no basis to think that he won't.

THE COURT:  But very severely is -- it's their business how they sentence him.  The concern here is that it would be unfair for him to be punished twice for what amounts to the same conduct.  And I certainly agree that were I the second sentencer in a situation like that, I would be keenly analyzing the extent of the overlap and giving credit in announcing the ultimate sentence for the extent of that overlap.  You know that, and that's the tradition in this court.  And routinely when we inherit a case that has a state law analogue overlap, you factor that in figuring out, in effect, the net sentence.  Whether or not the Bureau of Prisons would give credit, you are, of course, factoring that in.

The issue is why I should assume that South Korea isn't up to that challenge, and it's all very imponderable.  You are asking for leniency based on conjecture about what is going to happen in another country quite some time from now.

MR. PATTON:  I think conjecture is overstating the speculative nature of it.  He is facing those charges.  We have every indication that they are going to throw the book at him when they can.

THE COURT:  And he will have the David Patton of South Korea and then some, matching the rest of your team, making

PCBRKWOs

rational arguments that would be heard by a rational jurist.

MR. PATTON:  Maybe.  Maybe not.

THE COURT:  And you can use this transcript there to capture the fact that the judge here absolutely expected that the South Korea court, if it gets around to sentencing him, would, in practice, give him credit for the time he served here to the extent the offenses are overlapping.  I am saying that now as explicitly as I can to reflect what my intention and expectation would be.

MR. PATTON:  And as much as I respect that, I'm not sure it's going to carry a lot of weight in South Korea.  I think that that is what we have been repeatedly told by the version of me over there, is that we should not expect that there's going to be much forbearance depending on what goes on here.

I can only report what we've been told, and I think the government is aware of this.  Just so the Court is aware, I mean, it is common, certainly in organizations in the corporate world, to try to work out some sort of global resolution where there are competing jurisdictions internationally.  And we attempted to try to work that out so that this would not be a guessing game.  And the Korean -- what we were told by the government was—by our government—is that that's a nonstarter. They just don't do that.  They don't engage in any sort of plea bargaining.  It just would not be possible to work out any sort

PCBRKWOs

of global agreement.  That was our hope at the outset.

THE COURT:  And once there is certainty here or once his arrival there is closer in time, are you saying there's no plea bargaining in South Korea or it just wasn't available at this stage to work out a global plea?

MR. PATTON:  Nothing that even resembles what we think of as plea bargaining.  That is, regardless of the position Do takes over there, there will be a fact-finding trial.

THE COURT:  There's no chance of a pretrial disposition?

MR. PATTON:  Correct.

THE COURT:  And then assuming he is found guilty at this trial, is what you're saying is that the sentences there are so determinate that the fact of his doing what time he does here could have no tether, could have no place?

MR. PATTON:  Yes.  Yes.

THE COURT:  And that's a projection or that's a certainty?

MR. PATTON:  No.  That is what we have been repeatedly told from Korean counsel.

MS. MORTAZAVI:  Your --

THE COURT:  Ms. Mortazavi, it's not your turn.

MS. MORTAZAVI:  Certainly, your Honor.

MR. PATTON:  I do think it's, in many ways, yes, at the end of the day this is about how much time Mr. Kwon is

PCBRKWOs

going to spend in prison, but it is also largely about where he is going to spend that time in prison.  And so I do think that requiring incarceration here in the United States is a fundamentally different thing where you had very legitimate, competing extradition requests.

And I'm not going to repeat myself about how strongly we feel about where he should have gone, but him spending time in prison half way around the world away from his wife and four-year-old daughter and his parents and frankly just about anybody he knows is punishment of an entirely different kind, not just degree.  And that is largely where we are pressing for him to be able to go to South Korea sooner rather than later to face what is surely going to be a very severe process over there.  But he can at least do it in his home country and near family, and that's very much a part of what this is all about.

THE COURT:  And once he goes there—let's suppose he goes there halfway through the sentence I impose—is it correct that the South Korea courts are not bound by what you and I might consider consecutivity, which is to say they could prosecute him and have his sentence begin before the back half of his U.S. sentence is over?

I mean, the government's representation to me is there are no guarantees that the back half of the sentence I impose will be lived out in South Korea.

MR. PATTON:  And I don't know where they're getting

PCBRKWOs

that other than the sort of the generic "anything is possible." We have been told by Korean counsel that South Korea is required to have Mr. Kwon serve his U.S. sentence.

Well, there are two ways they can do it. They can either just detain him pursuant to the U.S. sentence, or they can convert it to a Korean sentence.

THE COURT: And if they converted it, would it have to be consecutive as to any Korean sentence that is imposed?

MR. PATTON: Yes.

THE COURT: In other words, if he is tried shortly after getting there and convicted, are you telling me that there's some statute there that would require that the Korean sentence not begin to run until the back half of my sentence had been fully carried out?

MR. PATTON: Sorry, your Honor. May I have a moment?

THE COURT: Yes.

MR. PATTON: My apologies, your Honor. Now I've lost what your Honor's question was.

THE COURT: The portrait you are giving me is that if he invokes the rights under the treaty and is transferred there at the halfway point, let us say, of the sentence I impose, what you're telling me is that whether the back half of sentence I impose is fully served out on its own terms or it's converted to a Korean sentence and served out on its own terms, any separate sentence of a Korean sentence of your client could

PCBRKWOs

not begin to run until the last day of my sentence is served out there.  And you are representing to me that that is an iron-certain thing.

MR. PATTON:  I believe that is correct, your Honor. The one exception is if there are charges that truly have identical elements to the charges here.  But from our understanding from Korean counsel, what the codefendants have been charged with, those offenses, would have distinguishing elements.

THE COURT:  So even if one is wire fraud and another is securities fraud or one is wire and one is mail, even though they have the same fraud at the heart of them, the different instrumentalities or subtleties like that would treat them as if they are distinct?

MR. PATTON:  Correct.

I also want to touch on something that your Honor asked the government about, which was:  Was there any political interference in the arrival at the plea agreement here?  A question that——I'm sure your Honor agrees with me——would have been unthinkable not too long ago.  I think it is extraordinarily significant that there has been no political outreach in this case.  We have talked with no one outside of the SDNY about this case.

The agreement was reached purely based on a lot of the things we're discussing with your Honor now.  I think there

PCBRKWOs

are, as I said, other good reasons.  But we have seen political interference in a lot of high-profile cases, including a lot of high-profile crypto cases.

THE COURT:  That's why I asked.

MR. PATTON:  And I will also say and I'm not trying to cast aspersions, but I think it's just important to keep in mind in the overall whole scheme of things.  The government has been very forceful in its language about market manipulation here, and your Honor has pointed out that this was charged as a conspiracy.  There were other people out there.  We know that the 2022 crash was -- I mean, we provided your Honor some material on this.  This is not -- I don't consider this mitigating with respect to Mr. Kwon.  Obviously people held those assets because of his false statements.  But the crash was very much the result of a targeted attack, of targeting strategic trading, as was the year earlier retreat from the depeg.  Some of the biggest trading firms in the world were involved in that, many of them based here in the United States. They were not beyond reach.

So I know that there was no political calculation here.  I know that to a certainty.  I don't know about other instances, but I know there's been a lot of strong language used about what went on here.  And if the government's version is to be believed, there were a lot of people that were engaged in some very wrong conduct.  So I thought it was important to

PCBRKWOs

be very clear about the political piece of this certainly with respect to our table.

THE COURT:  With respect to the conduct that is the falsification to retail investors about the way in which the peg was being stabilized, is it your view that there are -- there's anybody comparable to Mr. Kwon?  I appreciate the separate allegation of market manipulation by outsiders, but if we focus on Terra, he is far and away the bad actor here, correct?

MR. PATTON:  No doubt, your Honor.  I also think that pointing out the obvious fact in a conspiracy case that there were multiple people involved, that is not shifting blame. It's just providing the full picture.

I think Mr. Kwon -- I hope your Honor has gotten this impression, and you're going to hear from him momentarily, so it's not just from his letter and our submission.  He feels extraordinary remorse, and the acceptance here went well above and beyond pleading guilty.  Some of that we discussed in our papers, and I'm not going to discuss here.

Some of it has to do with working with the plan administrator for the bankruptcy estate, and the government is just wrong to suggest that that was required by the SEC settlement.  It was not.  That meeting was about potential offensive claims that the administrator could bring.  Mr. Kwon was under no obligation to sit down and meet with them.  In

PCBRKWOs

fact, the administrator, I think, was a little surprised that that was a thing that somebody in the middle of a criminal proceeding would do that.

THE COURT:  Just apropos the question I asked the government.  Have you any idea what has been collected by the plan administrator so far?

MR. FERRARA:  Yes, your Honor.  Happy to because I think it's important because Mr. Kwon has taken quite a number of steps.  Mr. Kwon has committed --

THE COURT:  Just the dollar amount, please.  I'm just trying to get a number.  I'm not trying to --

MR. FERRARA:  That's harder because it fluctuates so much.  A lot of it is crypto assets.  There's frozen assets. There's a variety of things that we are trying to --

THE COURT:  Right.  Independent of what has been covered by the forfeiture where the government has said it hasn't actualized yet, what, if anything, does the bankruptcy administrator have to distribute?

MR. FERRARA:  Well, for example, Mr. Kwon litigated and turned out a Pyth token, a certain token.  And I think it's got to be worth $100 million today.

THE COURT:  But that's in the hands of the bankruptcy administrator?

MR. FERRARA:  Correct, for example, yes, and there are a variety of other things.  It's just important that your Honor

PCBRKWOs

understands that candidly I don't know what the government was referring to with the $7 million obligation. There are a number of outstanding obligations. He is working to pay them. A number of his assets have been frozen. We're taking steps, including litigating in the bankruptcy, to get them unfrozen. Currently, he's got funds at Arrington Capital that we're working to get directly to the plan administrator.

So we're working hand in glove to do this. It's true that there was a deadline of last year. It's been incredibly complicated. Everyone is trying essentially to hold on to Mr. Kwon's money, and we're working to get it to push it out.

THE COURT: Thank you.

MR. PATTON: And just on some specifics on that, the litigation surrounding Pyth, I mean, we should get acceptance of responsibility credit for that. That was an enormously heavy lift. Many of my colleagues here -- sorry -- who are not here helped with that. I was in bankruptcy court in Delaware litigating the Pyth tokens with colleagues who actually know what they are doing in bankruptcy court.

This has been a genuine extraordinary effort. Part of the money that the government is talking about, the $7 million, part of that is in a Swiss bank account that the Swiss have frozen. We have given the bankruptcy estate every authority that we can to get that money, and the Swiss are just refusing to give it to the estate. We have done everything we can.

PCBRKWOs

Mr. Ferrara mentioned the Arrington.  That's where he has some personal assets.  They're refusing to give them up, at least initially, and then they came back and wanted a haircut on the value.

THE COURT:  Mr. Patton, in that vein though, it's hard to know what to make of the personal asset side of the puzzle because there isn't a financial statement given to the probation department.  Why not?  That would have helped me in sorting out the claim that he has turned over everything that is not tied up by a regulator or a court, yet there's no statement.  That was surprising.

MR. PATTON:  Your Honor, I think that perhaps we should have.

THE COURT:  I'd strike the perhaps.  I mean, it makes it hard to test the argument that he has no $7 million to give or it's all tied up.  Somewhere out, there's a multi-million dollar penthouse he bought.

MR. PATTON:  I can speak to it.

THE COURT:  You can speak to it, but it's too little too late to speak to it at the sentencing hearing.  The whole point of the PSR is to give us a factual record the other side can object to.  He had a choice to make.  He chose not to disclose finances.  It makes it harder then to credit counsel who says, well, he would have paid the $7 million but his assets are tied up.  Well, where is the rest of it?

PCBRKWOs

I can't assume an inability to pay when he is being opaque about his finances.  Can't do that.  I have to hold against him that he settled a $7 million case, chose not to pay the $7 million that was the quid pro quo, or part of it, for the settlement, and then is hiding behind his right not to give a financial statement.  I can't give him credit for that.

MR. PATTON:  Your Honor, I think a lot of that financial disclosure and those efforts—and maybe this is on us—we have been dealing directly with the estate and with the administrator.

THE COURT:  Sorry.  Sorry.  The government faulted the defense in its sentencing letter for the absence of the financial statement.  It would have been obvious to you that it was a glaring omission to me in a white collar case of this nature for the defense to say, sorry, no information.  The probation department says he refused to give a financial statement, and so this is no surprise.  This has to be treated as a deliberate decision.  It's a strategic one.  It's your right, but it forecloses other arguments being persuasive to me.

I'm not buying the idea that there's something last minute about this.  Unanswered questions about what your client retained, whether he could have paid the $7 million, are out there that were capable of being answered had we have had a financial statement and then had the government had the

PCBRKWOs

opportunity to do what a litigant does when they want to challenge a fact in a PSR.

MR. PATTON:  Fair enough, your Honor.  I don't think there's been a lack of attention paid to tracing Mr. Kwon's assets.  I'll just put it that way.  There's the SEC, the bankruptcy court, civil litigants.  This has been a heavily, heavily litigated matter.  So I don't that the government was left without --

THE COURT:  It's from them that I get the $7 million not being paid.  It's from them that I get the penthouse.  I'm saying there was an opportunity to engage with this factually called the PSR.

MR. PATTON:  The $7 million I don't think is in dispute, your Honor.

THE COURT:  No.  But what you've said to me is, it's not in dispute that my client owes the $7 million.  It's he simply doesn't have the wherewithal to pay it because that darn Swiss bank account refuses to let it out, which leaves open the question of what about other assets he may have.  And the absence of the financial statement makes it impossible for me to credit that he is stone cold broke other than what is tied up in the Swiss account.  I can't buy that.  I need a financial statement.

I've had fraud miscreants in any number of cases who have submitted financial statements, and at least it's out

PCBRKWOs

there for everyone to pick over and debate and challenge the accuracy of.  And here it's a stiff arm to same.

MR. PATTON:  Fair enough, your Honor.  I can address the penthouse issue, which was that that was in Singapore a Singaporean version of essentially a lease to buy that required an enormous amount down, but he didn't actually own it.  And it has been forfeited.  That's something we have discussed with the plan administrator.  So there's just -- it isn't his to do anything with.

THE COURT:  He leased to buy and he paid something like $30-some-odd million for a lease?

MR. PATTON:  It is essentially an enormous security deposit, and then you -- my understanding is, in lieu of paying rent and eventually you have then purchased the property.  But if you don't follow through, then you --

THE COURT:  Don't follow through with what, the purchase?

MR. PATTON:  Sorry?

THE COURT:  If he didn't have to pay rent, what is it that he failed to do?

MR. PATTON:  There are additional amounts due.  That is like an initial down payment, and if you don't complete the final amount, you lose it.

THE COURT:  OK.

MR. PATTON:  So I do think that in terms of amount of

PCBRKWOs

cooperation, the affirmative litigation that he has engaged in to try to make the estate as whole as possible, the other things we've discussed in our submission, that very much distinguishes this case from frankly most others but certainly the ones that have been cited and discussed in the materials.

I'll finish by saying -- and, your Honor, Mr. Kwon will make a statement when I'm done or in whatever order your Honor wants to do it.  I don't know if your Honor wants to --

THE COURT:  I have a few questions for you.

MR. PATTON:  -- ask additional questions.

I'll come back to our request really being about sooner rather than later having Mr. Kwon return to South Korea to do what prison time he must.  He has a four-year-old daughter who basically does not know him, who has a relationship with him only by phone from the prison.  That is much more severe punishment than anyone similarly situated who is here and --

THE COURT:  Mr. Patton, there's no doubt about it.  Period, full stop.  It has to also be said that he engaged in this conduct knowing full well the risk he was taking with the quality of the future journey of his child.  The timing of it says that he was the one playing with fire, and he was the one who was taking the risk.  Whether in a retributive South Korea system in the way you painted or getting charged in any of the other countries that could have prosecuted what is a worldwide

PCBRKWOs

fraud, he basically was saying to his daughter, my Terra is more important to me than your prospect of spending time with dad. Because when you carry off an offense like this, the world is going to come after if you get caught.

So I have great sympathy for his daughter. I have enormous sympathy for his daughter. She didn't ask for this, but there's a distinction between him and her. He made a choice. He made a statement to her. He is making it back now with the lovely letter that he wrote, which was directed to how she would view it, and I thought that was a beautiful thing. But his actions spoke very loudly about where she fit in his cosmology when he took a risk of decades of his liberty when he had a little one in his life.

MR. PATTON: Your Honor, the only thing I would say is I don't think it's entirely fair. That sort of presumes a calculation that I don't think occurred here.

THE COURT: I'm sorry. I'm sorry. Wait a minute. You are telling me with all the false statements in the PSR and your statement to me a moment ago about the frauds he committed, that this wasn't a calculation; it just blurted out? That's why the government says there's minimizing. You don't make all these false statements about the stability of the peg to a bunch of retail investors like that without making a considered decision that you are going to -- this wasn't a blurt. This was a repeated set of things towards a common

PCBRKWOs

scheme.

So if you are saying to me, no, he didn't have his daughter in his mind's eye when he made that statement, I suppose that is very plausible. He was focused on his business. But he is a rational Stanford graduate who had to understand that when you are breaking the law in the way that he flagrantly did, you're risking your liberty with all that could follow loved ones. So loads of sympathy for her. Much less so for him on this front.

MR. PATTON: Only thing I mean, your Honor, I guess I go back to there are varieties of fraud, and I don't think this is minimizing to point that out.

THE COURT: No, sure. I'm sure I'll talk about this later. This is not a fig leaf of a company, but nor is this an evanescent, one shot false statement that is aberrant. This was a way of doing business for quite some time.

MR. PATTON: And I understand, your Honor. But I do want to just make sure it's clear because I think one of the victim letters that was referenced today said something along the effect of while we were losing our money, he was cashing out or something to that effect. And that was not happening here. He was not -- there was no backdoor. There was no, aha, I see this terrible thing coming, and I'm going to enrich myself in the community.

THE COURT: When in this series of events did he put

PCBRKWOs

money down on the lease-to-buy penthouse?

MR. PATTON:  I believe much earlier.

THE COURT:  Before 2022?

MR. PATTON:  I can find out in 2021.  I don't know exactly.  It was in 2020.

THE COURT:  In 2020, OK.

MR. PATTON:  Look, again, this is not to take away from the seriousness of the offense.  But you can imagine somebody who was, in fact, engaging in some brazen theft having a much more calculated decision about how that would impact their family or their results.  I think it's very clear that Mr. Kwon, in fact, very much believed in Terraform and very much believed in Luna and UST, that both things can be true. He made false statements and he misled investors, but he also believed that it would continue very successfully.  He thought that it was, in fact, going to be a successful venture.  So sometimes things are not quite so crystal clear in that sense of calculating pros and cons of misconduct.

And that's all I have on that, your Honor.

THE COURT:  Fair enough.  A few more questions for you.  I don't know if you are complete.

MR. PATTON:  Yes, your Honor.

THE COURT:  A mechanical question for you.  It is now agreed that the 17 months and 8 days will be counted by the Bureau of Prisons towards your client's sentence, and I intend

PCBRKWOs

to make that crystal clear in the judgment so that there can be no doubt.  And in the event there's a miscalculation on that, that will enable you to get back to the Court for when we figure out that kind of relief.  But at the time of the plea, it looks to me that the defense was at best uncertain whether that would happen.

MR. PATTON:  That is not the case, your Honor, and frankly I was a little surprised to hear the government's position on this.  We had plea negotiation meetings with the co-chiefs of the security unit.  I believe at the time it was Andrew Thomas and Nick Roos.  And as you might imagine in these conversations, we were making our pitch frankly for a number lower than 12.  And some of the -- I don't know whether it was pushback, but some of the discussion coming back at us was he is already getting credit for 17 months.

THE COURT:  So you are saying it was a meeting of the minds that the government's 12 included the time already served in extradition custody?

MR. PATTON:  Explicitly, and it came from the government.  They said to us, you are asking for X number, but in reality that already means Y number because he has already done 17 months that he is going to get credit for.

THE COURT:  I was trying to figure out whether the government's 12 years should be read at 13 years, 5 months, and 8 days, and both of you told me, no, it should be read as 12

PCBRKWOs

years, giving him credit for the extradition time.

MR. PATTON:  Absolutely, your Honor.  Stating the obvious, we're hoping it's not 12, but yes.

THE COURT:  Anything you want to say just about you are in agreement with the government's view that restitution is impractical here?

MR. PATTON:  I think so, your Honor.

THE COURT:  And therefore, I should issue an order along the lines of those in Madoff and the others that the government has given that so finds with the expectation that it's not that the victims are worse off.  It's that the practical solution is either to put in for rescission to the extent that some forfeited asset might become real or to participate in the bankruptcy proceeding where there's a greater possibility of cold hard cash.

MR. PATTON:  Correct, your Honor.

THE COURT:  OK.  I want to give you an opportunity in case there's something you want to say in response writ large to the victim letters that came in the last day plus.  Anything you would like to say?

MR. PATTON:  The only thing I'll point out, your Honor, is this goes back to something the government was saying.  I think they criticized us for including letters of support that said something along the lines of absolving Mr. Kwon.

PCBRKWOs

I just want to be very clear.  We have never suggested any such thing.  And I did find it interesting that in a not insignificant number of letters that we received——I think there were at least three or four that I saw just this morning at 10:30 when they came across——where there was a variety of views of victims on this.  Anger not just at Mr. Kwon.  There was plenty of that, and obviously plenty of harm that is directly a result of his conduct.  But there were people who said, you know, I have much more anger directed at what was very intentionally a trading attack, or I understood that investing cryptocurrency was not the same as buying U.S. treasury bonds, right.  Both of those things can be true, and I think we often think of victim statements or victim letters as only counseling in favor of severity.  And I just think it's important for the Court to keep in mind that there are people who suffered tremendous losses who are willing to extend some amount of grace here.

THE COURT:  No, and some of them expressed real admiration to your client.

MR. PATTON:  That as well.

THE COURT:  Thank you.

Before I turn to Mr. Kwon, Ms. Mortazavi on the specific point about what we can expect from the South Korea legal system, you began to rise.  Is there something you wanted to add?

PCBRKWOs

MS. MORTAZAVI:  I apologize for interrupting, your Honor.  I just wanted to make the point clear which we stated in our filing, but I thought it was worth reiterating given some of the statements made by Mr. Patton, which is that in our conferrals with the Office of International Affairs, which has in turn conferred with the Korean Ministry of Justice, there are several points that I think make whatever future sentence is imposed, assuming that Mr. Kwon is, in fact, convicted, which is in itself is attenuated, makes that that much more qualified, including the fact that under South Korea's system, he could be entitled to parole after serving a third of his sentence; that prosecutors give no recommendation until all the evidence is in, but the courts often impose sentences far below that recommended by prosecutors; that there is no precedent for property-related crime in South Korea resulting in a sentence of 30 years or more.  Those are extremely rare.

And in particular, based on the questions raised by the Court and answered by Mr. Patton, what we have been told is that Mr. Kwon will receive credit for the time that he has spent in custody in the United States on these charges. Article VII of the criminal act in Korea was cited to us, and a 2017 Supreme Court decision——I can give the pincite if it's helpful, but I don't to have to——was also cited to us as reasons why the Korean Ministry of Justice believes, as your Honor believe it would be at the outset of its line of

PCBRKWOs

questioning, which is if Korea believes a 15-year sentence is appropriate and he is sentenced to 12 here, he will not serve a 12-year sentence and then 15-year sentence.  It could very well be he serves a 12-year sentence, then a 3-year sentence that is reduced to 1-year sentence.  And we just wanted to make those points.

THE COURT:  Thank you, Mrs. Mortazavi.

MR. PATTON:  Your Honor, we disagree with the comment about parole because we asked specifically about this.  Yes, it is theoretically possible to receive parole.  But what we have been told, along with statistics, is that parole in South Korea is subject to a rigorous review process, and in practice it's only granted to people who have served at least 80 percent of their time.  And then even after that, it's not -- it's hardly a guarantee.

I will just say that there's an awful lot of speculation about Mr. Kwon not facing severe consequences in Korea when frankly, I mean, what he has already admitted to, the idea that he will not be convicted in South Korea, I just think is far more speculative than the reality of what he faces.

THE COURT:  All right.  Thank you, Mr. Patton.

Mr. Kwon, if you would like to make a statement, I'd be delighted to hear from you.  Just kindly speak into the microphone and, as with everybody else, slowly and distinctly.

PCBRKWOs

THE DEFENDANT:  Thank you, your Honor.

I wanted to tell you four things today.  First, we've all heard from many victims, one of whom I knew personally, and I've got to say, listening to them and as well as the synopsis of some of the victim letters from yesterday, it was not easy. All of their stories were harrowing and reminded me, again, of the great loss/losses that I've caused.  And I promise to read all the letters at the earliest opportunity and take the stories they contain to heart.  I wanted to tell these victims that I am sorry, and that if an opportunity arises, I hope to be able to speak to or write to them personally.

Second, I wanted to say that I do not blame anyone else for my being here today.  I don't argue, nor will I ever argue, that my conduct was industry standard and market practice, as some of the letters that I've received seem to be suggesting, because if they were, these were bad industry standards and market practices, and I, as one of the previous market leaders, should be held responsible for them.  As I've written in my letter, Jump was not responsible for providing the full picture to the Terra community.  I was.  My lawyers are not responsible for my choices, as I am ultimately responsible for choosing to do with what the -- with the advice that I am given.  The blame should be pointed at me for everyone suffering.  It has pained me greatly to watch many of the people close to me, some of them in the room today, be

PCBRKWOs

subject to endless litigation and blame for what was my fault and responsibility.

Through my letter, my only aim was to provide the necessary context around my actions because, as the government rightfully points out, this case is important.  It is important to understand the many structural challenges around creating and operating crypto ecosystems, which I think is necessary to prevent a failure like Terra's from ever happening again.  I failed to meet the many challenges of creating and operating the systems in the right way, which brings me before your Honor, but my hope is that by telling the full story, it will prevent other crypto founders from standing where I am today or rather sitting.

Third, I wanted to tell you that Terra was more than just a business for me.  I believed and continue to believe that building a truly decentralized currency is one of the most pressing challenges of our time.  And this I can say with complete honesty, that I gave it my all to try to make Terra successful.  It was not enough or too much based on your perspective.  But I know I only got as far as I did thanks to the amazing community of users and builders who believed in my dream of decentralized money.  And it pains me all the more sharply because I've hurt the very people to whom I owe everything.

It has been extremely humbling and in some ways even

PCBRKWOs

more painful to find out many in the community have chosen to show their forgiveness by sending in letters of support for the courts and for my family. I would like everyone to know that I've spent almost every waking moment in the last few years thinking of what I should have done differently and what I can do now to make things right.

Fourth and lastly, I have realized recently that it has been almost four years since the Terra crash and three years since I properly have seen my family. The defense sentencing proposal before your Honor is not a request to be set forth but a request to do my sentence in my home country where I can have some role as a husband and father even if I am behind bars. I love my daughter and daughter very much, and I hope your Honor will not think too harshly of my request to minimize the time I will spend away from them.

I wanted to say one last thing and this is not for your Honor. I understand that many of the people that I've worked with over the last few years are in the audience today. I wanted to let you all know that it has been the honor of my life to work with you, and thank you so much for coming. That's it.

THE COURT: Thank you, Mr. Kwon.

All right. It's 3:35. Let's regather at 4 p.m., and I'll pronounce sentence then. Thank you.

(Recess)

PCBRKWOs

THE COURT:  You may be seated.

Is there any reason why sentence should not now be imposed?

MS. MORTAZAVI:  No, your Honor.

MR. PATTON:  No, your Honor.

THE COURT:  All right.  As I have said, the guideline recommendation in this case would ordinarily be life imprisonment, but light in the statutory maximum, it is 300-months imprisonment.

Under the Supreme Court's decision in *Booker* and the cases that followed it, the guidelines range is only one factor a court must consider in deciding the appropriate sentence. The court is also required to consider the other factors set in Title 18, United States Code, Section 3553(a).  These include: The nature and circumstances of offense and the history and characteristics of defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense; the need for the sentence imposed to afford adequate deterrence to criminal conduct; the need for the sentence imposed to protect the public from further crimes of defendant; and the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The court must also avoid unwarranted sentence

PCBRKWOs

disparities among defendants with similar records who have been found guilty of similar conduct. The court is also required to impose a sentence sufficient but not greater than necessary to comply with the purposes set out above. And here I find that the sentence I'm about to pronounce is sufficient but not greater than necessary to satisfy the purposes of sentencing that I have just reviewed.

For many reasons, Mr. Kwon, this sentence is unusually challenging. Among them are the following: The frauds to which you have pled guilty are vast in their monetary scale and in the number of victims they harmed and in their geographic reach. Your frauds occurred in the emerging area of cryptocurrency. Your frauds involved a novel product within that field. They involved attempts by your company to market what it claimed to be first-ever successful algorithmic stablecoin. You are being prosecuted in two countries, here in and also South Korea, and during your extradition, you were sentenced to four months in prison by a third, Montenegro, for passport fraud. You were held in rigorous conditions of pre-extradition custody. Since arriving in the United States, you have about been held half a world aware from your family, and you will serve your prison sentence, or at least the first half of it, it appears, half a world away from them.

In connection with this sentencing, the Court has received an exceptional number of letter testimonials to you by

PCBRKWOs

your wife, and your college friends, and your coworkers, and investors.  These attest to the good you have done and the lives you have positively touched in your young life.  On the other hand, the Court has also received an exceptional number of letters from victims.  These blame you and false and misleading statements by you for the devastation of their lives caused by your company's disintegration.

And finally, the parties have entered into a complex plea agreement with terms that I've rarely seen in my years on the bench.  All of which is to say that this is complicated and that there is a lot of ground to cover in assessing what the just sentence is in this case.  And my explanation today of the sentence I impose will take some time.  I have benefited from truly, truly superb sentencing submissions from both sides for which I deeply thank the talented counsel in this case.

I will begin with the set of factors that most strongly favors a long sentence.  These factors concern the need for the sentence to fit the crime.  Section 3553(a) uses different words to capture the concept.  It says that the sentence must reflect the seriousness of the crime; that it must promote respect for the law; that it must reflect just punishment.  I am going to call these the just punishment factors, and I will be very blunt with you at the outset.  The interest in just punishment for what you did, Mr. Kwon, makes the sentence your counsel has recommended of five years

PCBRKWOs

imprisonment, or anything even remotely close to it, utterly unthinkable and wildly unreasonable.  To condition your expectations, such a sentence is completely out of the question.

Indeed, putting aside other factors that I will cover later that to some degree offset this interest, the interest in just punishment here is so strong that, in my judgment, even the 12-year sentence that the government urges would be unreasonably lenient, and here is why.  There are numerous ways to measure the seriousness of a fraud crime.  One is mathematical.  The fraud to which you have pled guilty caused the collapse of your company, Terra, which cost victims more than $40 billion of dollars, and there are hundreds of thousands of victims, maybe more than a million.  There were so many victims that the government has concluded that it is impractical to make restitution.

To put those numbers in perspective, even in this district, where the biggest financial frauds in the world tend to get prosecuted, those numbers, $40 billion loss and perhaps a million victims, are eye-popping.  Largely for those reasons, the huge loss and the number of victims, the sentencing guidelines would recommend a life sentence for you were it not for the 25-year cap that applies.  Your offense level, 44, which the guidelines round down to to 43, because 43 is the highest available, is literally the most extreme it can be

PCBRKWOs

under the sentencing guidelines.

Now, the guidelines have lots of flaws.  As counsel have heard me say many times and defense counsel here have rightly quoted me, the guidelines tend to give much too much weight to numerical factors like loss.  But there is a directional wisdom to the guidelines.  Such is the case here. Your offense caused real people to lose $40 billion in real money.  Not some abstract paper loss, not some accounting loss, not some market cap up and down, money that mattered to the real lives of real people and family, retail investors.  This was a fraud on an epic generational scale.

In the history of federal prosecutions, very few cases have caused more monetary harm than you did, Mr. Kwon.  You could count those cases on the fingers of one hand and have a bunch of fingers left over.  Those are hard facts.  They demand a very long sentence.  With or without sentencing guidelines, that reality would be obvious.

Your fraud was also unusually serious in qualitative respects.  Your lies to investors were extended.  They were flagrant.  Over at least a four-year period, from at least 2018 to 2022, you publicly lied to the market and to purchasers of the cryptocurrencies that your company, Terraform Labs, created and issued.  As the presentence report, whose facts are not in dispute, drives home, there wasn't just one lie.  There were a host of them.  You lied to investors about a whole series of

PCBRKWOs

the subjects of obvious importance to them.

The central lie, of course, went to the heart of Terraform's business model.  I'm referring to your repeated false claim that Terraform solved a previously unsolvable claim in cryptocurrency.  You falsely claimed that Terraform developed functioning, reliable, algorithmic technologies to assure a stable value of its so-called stablecoin.  You relentlessly and repeatedly held out the Terraform protocol as such.  You falsely claimed that its built-in economic incentives assured that one UST would always maintain its $1 peg.

That was not true and you knew it.  You had secretly put in place a backstop to buttress the peg if necessary.  In mid-2021, the falsity of your claim to the public to that effect was dramatically underscored to you.  That was when the peg failed to hold on its, and so you and Terra were required to call upon the backstop, an outside firm, Jump Trading.  You caused Jump Trading to secretly and artificially prop up the peg by making millions of dollars of purchases of USTs.

After you did that, you were presented with a moment for choosing.  Do you tell the truth about what had happened?  Do you reveal to investors that the peg didn't hold because of an algorithm?  Do you reveal that you propped it up artificially, or do you lie?

In retrospect, from where you are sitting today, that

PCBRKWOs

choice was a pivot point in your life, maybe the pivot point. To state the obvious, you chose poorly. You choose to lie. You chose the path of fraud. You choose to double down on the fiction that the Terra protocol worked organically. You pretended to investors that the peg had held intrinsically thanks to the Terra protocol. You chose to conceal what happened.

Shortly after, in July 2021, when a British economist expressed concerns about Terra's algorithmic concept, you doubled down again. Instead of admitting she had a point, you publicly tweeted derisively, "I don't debate the poor on Twitter, and sorry I don't have change on me for her at the moment." The historian Robert Caro teaches us that the thing about power is that it reveals. It reveals a person's true character. I find that moment, in which you, from a position of wealth and great power and with your dark secret about what had actually salvaged the peg as yet unrevealed, you belittled a well-founded skeptic. I find that moment revealing in that way. I find that moment revealing about who you truly are.

Your investors believed you. They believed in you. They believed in you personally with a passion. They trusted you. You were an icon in the crypto space, and where you led, your followers followed. Your words gave them false confidence in USTs going forward. They continued to pile into Terra and to invest in USTs. Its value grew some ten-told. And so a

PCBRKWOs

year later, in mid-2022 when the peg fatally collapsed and USTs went into a death spiral, that took down with it hundreds of thousands or more unwitting investors.  That's what caused the $40 billion in investor losses.

And there were other lies you told the investing public.  They are chronicled in detail in a PSR.  It is as damning a PSR as I have read in a fraud case.  And although the PSR is publicly available, the sentencing letter and the indictment present a fair synopsis of it.  Those documents chronicle lies by you that were numerous, protracted, flagrant, and impactful.

You lied about the governance of the Luna Foundation Fund, which held billions in reserve to defend the UST peg. You pretended it was independent.  In fact, you secretly controlled it.  You lied about the Mirror protocol.  You claimed not to have any role in its governance.  That also was untrue.  You lied about the payment processing application Chai.  You claimed it was using the Terra blockchain to process billions of dollars in financial transactions.  That was not true.  In fact, Chai used traditional financial processing networks.  You also caused a false and misleading audit report to be distributed to cover up your crimes.  And there were other lies.  During your fraud, your falsehoods lent Terra a false illusion of stability and reliability, and when the company collapsed in 2022, they gave you, for a time anyway, a

PCBRKWOs

false cover story.

There are many cases in which I sentence defendants for white collar criminal acts that their lawyers call "aberrant." There are acts that are one-off, fleeting mistakes in an otherwise lawful life. That argument is not available to you. The opposite is so. For some four years, dissembling about Terra was a business practice of yours.

Lest any of that seem abstract, the testimony of victims in the civil case before Judge Rakoff, against Terra in which you were named defendant alongside Terra but in which you did not appear, underscored the impact of your falsehoods on real investors. The government's sentencing letter, on Pages 24 to 25, summarizes the testimony of three victims who personally relied on your public tweets. A retail investor, Nader George, testified that he was reassured by your public tweets that it was impossible for UST to depeg from the dollar. He held and held in May 2022 even as the UST fell away farther from the dollar because he was reassured by your tweets. In one of them you wrote, "Deploying capital—steady lads." Mr. George testified, "I believed Do Kwon that like what happened in 2021, this should be a brief depeg." When Mr. George finally stopped believing and finally stopped holding, he lost all but $28,000 of his $400,000 investment. He had planned to use that money for his kids' education.

Another investor, Arash Vakil, lost all but $13,000 of

PCBRKWOs

his $188,000 investment.  He testified that he too had held steady until near the very end, reassured by your tweets about, which he characterized as conveying "don't freak out; I'm a new father; everything is fine."  The money he lost were his savings.  And a third investor lost nearly most of a $36 million investment he had made on behalf of a client.

The 315 letters or so I received in the past 30 hours from victims of yours were much to the same effect.  They are from victims the world over——the U.S., Australia, France, Germany, Italy, South Korea, Turkey the United Kingdom, and Vietnam.  At least six of them say they were so despondent after losing their life savings to your fraud that they either attempted or contemplated suicide.  Many of them cite your false public statements as having specifically lulled them to hold on to their UST positions during the death spiral causing them heightened damage.  Those included your infamous message "steady lads——deploying more capital," which alone seems to have caused many people and families to lose their savings.  So many of them recount anguishing stories of all they lost and the collateral sufferings of their families——divorces, inability to pay for school, inability to pay for medical costs, substance abuse, emotional trauma.

Victims, to the extent you are here, to the extent you are reading this transcript, to the extent you are among the several who audited to participate today, please know that the

PCBRKWOs

Court has read each and every one of your letters.  I have heard your voices, and I have registered your anguish.  Time does not permit me to quote all of them.  I'm going to quote from just six that are fairly representative.

From victim CC, "Based on these materials and the stated mechanisms for maintaining UST's stability, I believed I was making a prudent investment.  The representations were clear and compelling.  Do Kwon and other TFL leaders repeatedly assured investors that the system was sound and would survive market stress.  I relied on those representations...when UST began to depeg on May 7, 2022, I initially held my position based on the very assurances that Do Kwon himself had made, tweets like 'deploying more capital——steady lads,' 'close to announcing a recovery plan for dollar UST,' and 'Terra's return to form will be a sight to behold.'

"I trusted these statements because they came from the founder of the project.  That trust was devastated.  My final loss totaled approximately $62,000.  It represented savings I had accumulated and carefully allocated to what I genuinely believed was a lower risk stable asset with yield."  And he goes on from there.

Second letter from a victim whose first name begins with K.  "I did not consider taking my life over my own money loss but over the catastrophic failure I brought upon my father, the man who deserved the world.  He put $100,000 of his

PCBRKWOs

retirement savings into it due to my advice, and now he is over 70 years old and he cannot fully retire because if he stops working, he can no longer afford to live." And she recounts how for 60 years, he worked tirelessly and that the money he put in was the entirety of his life savings. "It was his hope for a comfortable end, a reward for a life of honest, grueling labor."

And he writes, "I wanted to crush myself into a ball to vanish to take away the pain I had caused him. As much as it hurts me, I've come to terms with the fact that I can't financially support children nor own my own home. Perhaps Do Kwon's imprisonment may help bring some semblance of closure and acknowledgement from the justice system that the harm done to families like mine was real."

From OH, from whom I think we heard from earlier today from Ms. Ravener. "The assurances from figures like Mr. Do Kwon carried authority. When they proved hollow, the consequences fell not only on those who made them but on families like mine. Plans for our future were suspended. We changed how we lived, reduced expectations for our son's education, and did our best to cope with the emotional shock that followed. The betrayal was profound. Justice cannot restore our losses, but it can affirm that we matter."

From another victim whose first name begins with K. "Since we had no income aside from our investment, our family

PCBRKWOs

was left with absolutely nothing.  We have been surviving by working temporary, part-time jobs just to afford a single meal a day.  We've become physically weak, emotionally broken, and severely depressed.  Our family relationships have deteriorated, and our home has become cold and silent, devoid of warmth at home.  At our age starting over feels impossible. We see no future in front of us, only the ongoing pain from the immense loss we suffered.  We sincerely ask for the strictest punishment for him."

From BW, "My husband and I placed the majority of our family's savings into Terra's stablecoin because we believed it was designed to be stable, reliable, and secure.  We understood stablecoins to be a safe, stored value, and we relied heavily on Mr. Kwon's public statements, interviews, and reassurances that the system was robust, built for stability, and protected by its mechanisms.  When the ecosystem collapsed, our savings disappeared within days.  At the time, our daughter was nearly one year old.  Instead of celebrating her first birthday, a milestone I looked forward to, I found myself in a state of shock, fear, and profound devastation."  Well, there's a description of the account on her pregnancy and it goes on.

From another investor whose initials are BK, "The money I invested through Terraform was not spare income.  It was the sum of nearly two decades of disciplined savings, sacrifice, and hope.  I mistakenly believed that this platform

PCBRKWOs

was transparent and safe.  I ultimately bore the full responsibility when everything collapsed because I managed our finances and made the final decision to invest.  The guilt I carried is indescribable.  I felt as though I had failed not only myself but every member of our family.  The fallout tore through my home like a storm.  My children were deeply affected.  I had to withdraw them from all tutoring and extra curricular activities, which caused them confusion and sadness.  They could not understand why their lives had suddenly changed.  I had to abandon my longstanding dream of pursuing grad school.  It destabilized my marriage.  The crime strained my relationship with my children, damaged my extended family's trust, and shook my physical and mental health to the core."

These letters remind us that beyond the $40 billion loss you caused, behind it were real people whose lives were often badly hurt.  So many accounts on these letters read individually are heartbreaking.  Viewed in the aggregate, the amount of suffering your fraud cost is stunning.  Reading these letters is like taking a bracing epistolary tour of the human wreckage you caused, and the thing is, all of this, Mr. Kwon, was predictable to you.

You had a sense of who your investors in general were.  You knew that they included ordinary people, retail investors with hopes and dreams anyone could identify with—college education for the kids, a starter home, cancer care.  You knew

PCBRKWOs

what they had to lose by holding on to their USTs based on your false premise that they would algorithmically stabilize, and yet, for your reasons you told them to hold on.  "Steady lads," you said.  And the victims we heard from today said much the same, and I want to thank all five speakers for the self-possession and courage it took to come forward and share your pain.  I wish you all the very best, and I'm very sorry for what you endured.

Look, to state the obvious, the people who invested in USTs were taking risks.  They were investing in cryptocurrency. They weren't buying U.S. Treasuries or putting their money in FDIC insured bank accounts.  This was caveat emptor.  Anyone who invested in USTs had to be prepared to lose their money.  I have the letters on that fact in perspective.

But one risk that they weren't taking was the risk of being a fraud victim.  When you touted their investments as safe and stable, they had the right to believe you were telling the truth.  They certainly didn't take on the risk or assume the risk of being lied to by Terra's venerated founder and leader, and repeatedly at that, and about matters centrally affecting the stability of what they were purchasing.

There is another dimension to your fraud that makes it so—and I'm using the word advisedly—despicable.  It is the extent to which you took advantage of your investor's trust.  A striking feature of many letters that the defense submitted in

PCBRKWOs

support of you was that so many of them were from investors who today still refuse to believe that you did anything wrong. Even after you pled guilty and owned up to an epic fraud, the investors remain so taken in by your vision and your daring, and your inspiring business model, and your charisma that they will not accept that you lied to them.

These letters read like they come from a fan club. Some hold you accountable, but a striking number of those letters exonerate you.  They chalk up losses to outside things. Even people who lost six figures or more of their life savings write that they believe that you have been falsely accused. These letters graphically illustrate what you knew, the almost mystical hold that you had over these investors.

No wonder they fell for your lies about the USTs.  To read some of these letters is like reading the words of cult followers about a fallen will leader whom they still worship. The contrast is striking between the letters in support of you and the victims' letters.  Many of the letters in support read like letters of cult followers for whom the Kool Aid hasn't yet worn off.  The letters of victims, in contrast, read like what you would expect a person to say when they woke up to realize in horror that they had been gulled out of their retirement or college or mortgage savings by an unscrupulous executive.

Had Terraform been a regulated public company, investors would have had protections, required disclosures

PCBRKWOs

under the securities laws and quarterly reports from the CPAs and compliance officers and lawyers.  Terra's investors instead had you.  They were counting on the integrity and honor of one charismatic leader—you.  You had to appreciate that.  You had to appreciate the extent to which these people were counting on you to be honorable.  Your offense is all the more serious because you abused the extreme trust that investors in Terraform placed in you.

If there are any investors here in this courtroom today who still believe that Do Kwon didn't defraud them, if there's anybody here who doesn't believe that you, Mr. Kwon, are the source of their losses, I want to read aloud to you two quotes.  The first is this:  "Do made false statements exaggerating Terraform's capabilities and misleading investors about the stability of its products."  The government didn't write that.  Defense counsel wrote that.  Mr. Kwon's lawyers wrote that in their sentencing letter on his behalf.  And the second is from Mr. Kwon's letter to me.  "I alone am responsible for everyone's pain.  I got swept up in my own overconfidence.  I made many mistakes.  I made misrepresentations that came from a brashness that is now a source of deep regret."

And your letter, Mr. Kwon—and I give you great credit for owning up to that—goes on to admit that you entered into a secret arrangement with Jump that you call "essentially a

PCBRKWOs

don't-ask-don't-tell partnership...to help defend UST's peg."
But you were telling the public in real time the opposite.
That is called fraud.

For clarity's sake, let me say this to your investors
and to former employees, some of whom I understand are here.
The government has not claimed that Terraform had no valid
business purpose, and my comments about Mr. Kwon's fraud should
not be taken that way.  There are cases where a defendant's
company was nothing other than a sham.  Bernard Madoff
Investment Securities or Theranos, the company run by Elizabeth
Holmes.  Not so here.  Terraform was a legitimate company.  It
had an inventive concept.

Mr. Kwon, I credit that you had a vision in founding
Terra; that you were sincere in doing so; that you were
idealistic; and that Terra had the potential to create
transformative technology.  I credit that you had in mind to
build, as defense counsel said, as Mr. Patton said, a better
mousetrap.  This was not a house of cards.  It was not a Ponzi
scheme.  Mr. Patton is 100 percent right about that.  Yours was
a potentially game changing concept had it been developed to
fruition.

Your company had a committed, high-energy, talented,
idealistic workforce.  They believed fervently and with
goodwill in you and in your company's mission.  It's impossible
to read the letters I received from many of Terraform's former

PCBRKWOs

employees and conclude otherwise.  But not for the first time, this was a startup business venture that was ultimately led astray by a founder's hubris.  You used that word "hubris," rightly so, in your sentencing letter.  The word fits.  The indictment of you is not an indictment of your company.  It's not an indictment of its employees.  They are victims too.

There's one more point to cover before I wrap up my extended discussion of just punishment.  It's your coverup afterwards and your attempt to escape accountability.  The coverup and escape took several forms.  There were the bogus accounting papers.  There was the flight to Serbia.  There was the flight to Montenegro.  There was your attempt to go to Dubai, which not coincidentally does not have an extradition treaty to the U.S. or to South Korea.  You were caught with two fake passports which landed you in jail in Montenegro for four months.  And by the way, the sentencing guidelines go easy on you for that crime because they don't count foreign convictions.  If that had counted towards your criminal history, you would be even more off the sentencing guidelines charts.

There was your transfer of money after South Korean authorities publicly announced criminal charges against you.  Paragraph 57(c) of the PSR reports how in the week after that, in September 2022, you diverted some $57 million from a Terraform Swiss bank account to a professional services account

PCBRKWOs

for your apparent benefit.  I note as well, as I did with my colloquy with Mr. Patton, that you have not submitted a financial statement to the probation department.  That leaves your finances opaque.

The government reports after the secret propping up the peg in mid-2021, later that year in December, you bought a $40 million Singapore penthouse or a share in it.  You have not paid the $7 million owed to the SEC, and because you have chosen not to make your finances transparent, I cannot conclude that you are unable to do so.  Now, eventually you accepted responsibility, and we will get to that and it matters.  But the record shows that you did so only after a series of failed attempts to escape accountability anywhere that resulted in your extradition here, and only after it was clear that you had no realistic path forward other than a guilty plea.

So that's my assessment of the just punishment factors.  If anybody in this room is asking yourself the question of how any reasonable person on this earth could possibly find a sentence anywhere remotely close to five years justified in light of that assessment, you're asking yourself the right question.  Such a sentence would be, in my professional judgment, so implausible that if imposed, it would require appellate reversal for being substantively reasonable.

Other 3553(a) reinforce the interest in a substantial sentence.  One of them is general deterrence.  It refers to the

PCBRKWOs

need for the sentence here to deter other people engaging in similar crimes. That factor weighs heavily here. This is a high-profile case involving a gigantic investor fraud. People are watching this case, as they watch high profile Wall Street or business frauds, and they will remember it.

There will be future Do Kwons. There will be future entrepreneurs. There will be people with inventive ideas, maybe in the crypto or tech space, maybe in other businesses. Some of the businesses run by those people will hit snags. Those people may be tempted to dissemble. They may be tempted not to come clean with investors. They may want to pretty up the facts for the public. They may want the public not to see that they have feet of clay. They may not want to respond truthfully to critics who had a point, just like you didn't. This case will be there as a graphic reminder of what happens when a person makes the wrong choice and breaks bad. This case will be there as a remainder that breaking bad is apt to lead to apprehension, prosecution, and prison. Those people will remember what happened to you.

Some of them may be deterred from making the mistakes you did. The nature of general deterrence is that we can't know how many people are deterred from crossing red lines by earlier prosecutions and sentences. But it stands to reason that when a Sam Bankman-Fried whose fraud brought down FTX goes to prison, or when the executives whose frauds brought down

PCBRKWOs

Enron goes to prison, or when a Bernie Ebbers who caused the fraud at WorldCom or other high-flying executives who lied to the public do long prison terms, some other executive will think twice before following their lead.  It stands to reason that some of them will say it just wasn't worth it.  People, as I said, are following this case, and so it's important that the sentence today get a message to the next Do Kwon.  The message has to be, if you choose the path of fraud, you could lose your liberty for a long time as you will.

A final factor favoring a substantial prison sentence here is specific deterrence and that refers to the need to deter you, Mr. Kwon, from committing future crimes.  You have said to me that you have already learned your lesson. Including the time in Montenegro awaiting extradition, you've been in custody for more than two years, and the time has been hard.  I hope that that has gotten the message to you that crime doesn't pay, but I cannot be confident of that.

By your own account, while you and Terraform were under investigation for fraud, you traveled to Serbia to try to restart Terraform there.  There's much in the record that says that you have been bitten by the crypto big and have not been inoculated against it.  I am not confident that if you were at liberty any time soon, you would not get right back into the crypto field and again perhaps push the limits of legality.  If any sentence has the potential to get the message across to you

PCBRKWOs

never to fly anywhere near the flame again, it would have to be a long one. And to the extent it may be impossible to deter you from crossing legal lines in the future, the longer you are in prison, the longer you will be incapacitated from doing so. So there it is.

So far I've considered factors that by their nature often tend to favor a substantial sentence and they all do in your case particularly the interest in just punishment. But there are other factors, important ones, that favor you in the sentencing equation, and I want to review them with you now, also at length. First off, you accepted responsibility. You did so by pleading guilty and admitting your crime. That makes a difference to me as it does under sentencing guidelines. Were it not for your guilty plea, please know that the sentence I impose today would have been materially higher.

Beyond the fact of your guilty plea there is its timing. All things considered, given the volume of discovery and the complexity of this case, you pled early. You pled before what surely would have been extensive and complex pretrial motions practice. Your early plea saved the government and the Court substantial resources.

I also appreciate the letter you submitted, which is Exhibit A to the defense sentencing submission. It is thoughtful. It is beautifully written. You review the history of events in detail, and a couple parts of your letter stood

PCBRKWOs

out to me.

You squarely acknowledged, as you did today, the harm you caused to others. You write, "I can only imagine how worse the crash was for the many UST holders who had no inkling that a crash was even possible. Not a day goes by when I don't think about the damage I've caused to their lives." That is certainly the right thing to say. You also write that you regret squandering the opportunity to enable Terraform to realize its mission, which you continue to regard as important.

Most of all, you regret that your choices have cost your young daughter time with you and compromised her cherished earlier years. You write that you have composed the letter with an eye towards her reading it one day and seeing that her father took responsibility for mistakes. I admire that too. That is the way a good parent thinks. I also admired your remarks here today. You paid respect to the victims whose accounts you rightly called harrowing. You took full blame for yourself, and I thought it was right that you thanked the people who built Terra, who worked with you, and needlessly suffered for your misdeeds. Although those points, I thought, were well taken. You also give credit for the assistance you have given to the Terraform administrator, and I credit that the assistance was real and not shambolic.

There is a suggestion from the defense that beyond pleading guilty early, your acceptance of responsibility in

PCBRKWOs

this prosecution was materially more laudable than what I commonly see in cases involving early guilty pleas. That's wrong. Yours is not one of those rare cases where a defendant makes amends to an extraordinary or an exceptional degree. I have seen that from time to time. I've had defendants who self-report or self-surrender, and defendants who voluntarily disgorge everything they have. The full record makes that not so here. Remember that you engaged in passport fraud to avoid getting prosecuted anywhere. You still haven't paid the SEC the $7 million, and you chose not to give the probation department a financial statement. That left the Court unable to determine the extent to which you continue somewhere to retain gains that could be used to repay victims.

And your acceptance responsibility, although very real and very laudable, also has to be measured against the scale of the crime. Again, the guidelines, although very flawed, offer some perspective. When I said that the offense level put you at the every outer edge of the guidelines table, that was after giving you full credit for acceptance of responsibility. Without that three-level credit, your offense level, again, would be off the chart and on a different page.

Moving on from the acceptance of responsibility and turning to another important factor, there's the 17 months and eight days that you spent in custody in Montenegro awaiting extradition. You deserve full credit for it as against the

PCBRKWOs

sentence in this case.  And in its letter yesterday, the government represented that the Bureau of Prisons would give you credit for every day of that time.

I was glad to read that.  To make sure that happens, I will include in the judgment a directive to the Bureau of Prisons to do so.  I will also include a statement that in calculating the just sentence, I proceeded on the premise that the BOP would give you such credit.  In the event that BOP does not give you such credit, defense counsel please notify the Court so that I can take action to make things right.

Separately, as to your time in pre-extradition custody, by all accounts including yours, the conditions in which you were held were inhumane.  They were well below the standards that we expect for federal inmates.  In previous cases, my colleagues and I have given defendants in harsh conditions of pre-extradition custody, such as a defendant in Colombia, credit of more than a day for each day in pretrial custody.

My colleagues and I have done the same in cases where inmates were held in unacceptably bad conditions here in the United States prior to their sentencing, including all over the country during COVID, and here during a stretch when conditions at the MDC were particularly abominable.  I will do so here. In deciding on the just sentence, I will treat the 17-plus months in onerous pre-extradition custody as the equivalent of

PCBRKWOs

substantially more time in ordinary conditions of custody.

Relatedly, I'm also mindful that custody in the United States will be harder for you than for some federal inmates. That is because your wife and infant daughter live abroad, and visits to you will be less frequent and harder to arrange. That is a valid point.  It bears on the just sentence, and I will take it into account.  That said, as perspective, you are far from alone in being in that situation.  Many federal inmates are from abroad.  Those include defendants like you who chose to commit transnational offenses, white collar and non-white collar, that endangered, targeted, or injured U.S. persons, as you did.  For many such defendants, custody in the U.S. is all the harder because they do not speak English, do not have college degrees, do not have any money, and do not have any friends in the United States who might visit them. None of those are problems for you.

In addition, the government has agreed to a provision I have not previously seen.  It has agreed not to oppose, and I should say the U.S. Attorney's Office, not the government, an application by you to serve the back half of your sentence in this case abroad.  That provision, at least for the back half of your sentence, stands to mitigate the harshness of your serving a sentence far from home.

I'm also mindful, as the defense has pointed out, that because you are subject to a final order of removal, you are

PCBRKWOs

ineligible for earned time credits under the First Step Act, which otherwise could have enabled you to reduce the amount of prison time you would serve relevant to an otherwise comparable defendant who does not have a final order of removal, you would stand to serve more time in prison.  I agree that that fact is relevant to the just sentence, and I have considered it.

Now, the defense separately argues that the fact that you are being prosecuted in South Korea and potentially, or in the defense's view very likely, will face additional prison time there is also a mitigating factor favoring a lower sentence here.  I am not persuaded by that.  As counsel are well aware, from time to time, two different units of government contemporaneously prosecute a defendant.  Sometimes it's the federal government and a state, sometimes it's the federal government and a foreign nation.  In those situations the first court to impose sentence cannot guess at what the second court will do and thereby reverse engineer its sentence accordingly.

Instead, the central task of the first court is to impose the just sentence in the case before it, as I am in the process of doing right now.  It is up to the second court, in the event the case there even reaches sentencing, to determine how much, if any, incremental punishment is needed.  If that court concludes that the sentence imposed here was too light, that court will have the latitude as a matter of sovereignty to

PCBRKWOs

impose a higher sentence.  That's the nature and the risk you take of carrying out a worldwide fraud.  Multiple sovereigns have a legitimate interest in bringing you to justice, and there is a risk that you took that you would face prosecution in multiple countries.  Given your worldwide-victim basis, you are arguably fortunate there are only two countries that have charged you based on your actions at Terra.

To your counsel's concern South Korea will not credit the time you spent in U.S. custody in calculating the just sentence, I hope that that does not happen.  To the extent the substance of the crime charged is the same in the two countries, you should, as a matter of basic justice, be credited in the second country for the time you served in the first.  But I am unpersuaded by the contention that the South Korean justice system is so hidebound, so primitive, and so inflexible that you are destined not to get such credit.  And government counsel, Ms. Mortazavi, credibly proffered that OIA has represented that the opposite is so.

It's anybody's guess what will happen years from now when you are returned to South Korea.  The charges there may or may not be pursued.  You may or may not be convicted on charges there.  But even assuming you are convicted, the offenses of conviction may or may not cover conduct beyond that for which you are being sentenced today, and the sentence that will be imposed cannot be predicted.  I'm leaving a crystal clear

PCBRKWOs

record as to the conduct for which I am sentencing you, which is to say for committing a $40 billion worldwide fraud.  It will be for the judge in South Korea should a sentencing of you there come to pass to determine whether further punishment is needed for you for the same conduct or for conduct that exceeds the bounds of that for which you are being sentenced today. The sentence I impose today does not presuppose what the outcomes of the proceedings in South Korea will be.

I want to turn now to what I regard as the most important mitigating factor for you.  It's one that Section 3553(a) expressly directs a court to consider the defendant's history and characteristics, and I'm referring at this point to your history other than in connection with your crimes, which I have covered at some length.  The letters that I received about who you are, Mr. Kwon, were really eye opening.  They showed me a different side of you than reflected in your offense conduct. There were so many letters.  I've read them all closely.  Time again permits me as with the victim letters to quote from only a subset and I have sorted those letters into several categories.

Many of the letters were investors or others who didn't know you personally or much but admired you from afar. They describe how inspired they were by your brilliance and your vision and your sense of mission.  One moment.

So Jade Jacobs, writing on behalf of himself and

PCBRKWOs

several friends who followed Terra and made small investments in it, that they lost, writes nonetheless, "Yes, we suffered losses when the project collapsed. We lost money and with it some hopes, but Do Kwon inspired us over many years. In public appearances, he could sometimes be direct, even challenging, and perhaps at times he even came across as too confident or distant. But within personal community interactions, we experienced him as helpful, witty, intelligent, and sincere. We witnessed how he encouraged people, motivated young founders, and created a sense of possibility where before there was only caution.

"We saw Terra as a bold experiment much like the first human efforts to fly across the English channel. Sometimes pioneers fail, and yet their efforts open doors to futures that might never exist without their courage." And he asks that I give you the opportunity to continue contributing your talents to society.

Ryan Nakao, who encountered you in a group phone call format Twitter Spaces, says that even though he lost $100,000, "in my mind Do is a visionary who meant well and got crucified trying to do something revolutionary." And he describes those conversations. He said he was glad to address our questions and share his knowledge. "Despite people accusing him of being arrogant and malicious. That's not the Do we knew. He was humble, encouraging, and generous with his resources. He would

PCBRKWOs

often personally pledge time and money to help new projects."

The letters this particularly caught my eye were people who know you personally.  Your coworkers at Terra describe with striking consistency your kindness, attentiveness, and your patience.  As busy as you were running Terra, they say, you took time to look after them and to mentor them.

For example, Woojin Lim describes your first meeting on the second floor of Bluestone Tower where he kept a modest office. "Do pulled out a whiteboard and with quick sketches mapped out my marketplace idea in Terra's broader vision. Despite my young age and lack of experience, he engaged with my idea seriously, offered candid feedback, and encouraged me to use the office as a place to test and learn.  In the weeks that followed, he introduced me to fellow ecosystem protocol builders, helped refine my approach, and provided all the base resources to build and launch."  And he describes your writing him stellar letters of recommendation, maintaining a calm demeanor, mapping out paths for other people, and describes you as being kind to people around you, and how you thought academically and extensively and cared deeply about the builders and investors.

Joowon Ryon writes that you two met in his final year of high school.  Encouraged by your confidence, he made the bold decision to forgo college and join a start-up.  "Without

PCBRKWOs

his support and trust, it would have been difficult for me," he says, "to build a meaningful career.  Because of Do, I found the confidence to take risks and eventually start my own company."  He saw firsthand what he calls your rare ability to pair an ambitious vision with disciplined execution.  As a leader he writes you were open and principled.  You voiced opinions candidly, grounding them in a clear philosophy.  Towards the end he writes, "Do has been the most influential mentor and role model in my life.  Because of his guidance and example, I was able to build my own company."  And he says that despite losing a great deal of his personal wealth to Terra.

Taemin Park writes that you met when he was 18, and you gave him one of the greatest gifts he has ever received, a recommendation letter to Stanford.  "It is not only beautifully written but also reflected how deeply he believed in me."  Afterwards, his relationship with you became a meaningful part of his life.  "We met a few times each year regardless of how busy he was or what challenges he faced.  Whether in a season of success or enduring setbacks, he always reached out.  He invited me to meals, asked about my life, and encouraged me to stay focused on my path."  He goes on, "These gestures may sound simple, but to me, they carried profound significance.  Do was not obligated to maintain this relationship, yet he did consistently and warmly."

Safwan Siddiqui writes that he has known you for the

PCBRKWOs

better part of 13 years.  You met through a close friend.  You welcomed him as a friend without hesitation, and while you were in military service, you wrote him a touching letter that to this day he remembers.  "Even while serving under such difficult and isolating conditions, he carried others in his heart.  That small gesture spoke volumes about the depth of our bond, and I realized how rare and enduring his friendship truly is."

And finally in this category of letters, Taemin Park, to whom you offered a job but he said no, says, "Beyond his professional life, the person I know is a kind and grounded human being, who is a loving and dedicated family man.  He is a fierce protector of his family's privacy and has always prioritized their well-being.  The personal side of him which is often unseen by the public reveals a compassionate and caring individual who is deeply devoted to people he loves."

And then there were people who knew you going away back, college friends and roommates from Stanford, for example.  Daniel Speckhard describes how you got to know each other well, spending long hours in the library.  "There I discovered the real Do—attentive, social, and generous.  He helped me with math problems, critiqued my essays, encouraged me to develop a stronger voice and more confidence.  He introduced me to new people who became a community that carried me through homesickness and doubt."  He describes your relentless work

PCBRKWOs

ethic, how you weren't a good singer, but you were an inspiring one.  He describes how you really carried him through a painful period during his college years.  He describes your love for his daughter.  He says, "Without him, I might have dropped out of Stanford.  I seriously considered it.  He gave me the courage to persist."

And then, of course, there is your family.  Your father-in-law, Duk Haeng Lee, writes that you were raised in a middle-class Korean family that valued honor and family responsibilities.  He studied tirelessly to achieve success and worked diligently to provide honorably for his wife and child.  One may also see his pride and trust in his work in the way he named his daughter Luna and his family's dog Terra after his cryptocurrency projects.  He would never have done so if he believed his business was fraudulent or unlawful.  And he describes the anguish of your separation from his daughter and granddaughter.  He says, "Through this painful experience, Do Kwon has surely learned a profound lesson in life.  He is still at an age when many young people are just starting their first careers.  I respectfully ask that he be given a chance to atone."

And finally there is the letter from your wife, Daeun Lee, which is a beautiful letter, and I hope counsel or Mr. Kwon, whoever communicates with her next, you will please thank her for the attentiveness and love that she showed in the

PCBRKWOs

letter.  It really got my attention.  She describes your nature, integrity, and the qualities that have defined you. "He never fussed or faltered.  He never let setbacks bruise him.  Instead, he treated them like small, amusing puzzles waiting to be solved.  With nothing but a weathered leather backpack holding a laptop, he carried himself as if sheer guts and conviction were enough to take on the world. Hyperfunctional as he was, he would spend hours sealed to a desk coding, writing, conquering, and when he wasn't working, he devoted every free minute to me making me feel like the most important person in his world."

His problem-solving ability naturally made him, she writes, "a magnet for friends seeking help.  For someone who believed time was the most valuable currency and kept exacting standards for how he used his own, he was extraordinarily generous when it came to helping out friends.  It often felt as though he had a reserve for patience set aside just for them. I remember asking him once, half exasperated, why do you take on so much for your friends, and why does it always become your responsibility to help."  She describes how you are fiercely loyal, and then she describes the events of the crash.  And then describes your shared goal of raising your daughter with honesty, dignity, and a sense of purpose.  She believes in you.

Mr. Kwon, there are so many more parts of that letter and so many other letters thematically similar.  The letters

PCBRKWOs

I've quoted, and so many others, are impressive testimonials to you. They remind us, as they should, that the same person who has made a huge mistake, or in your case who has carried off an epic fraud, can also be capable of great kindness and good. They remind us that people are complicated. On a day that a person is sentenced, it is right that they be viewed in light of the totality of their life experience, the good as well as the bad. I will do so today. Please know that these letters weighed very much in your favor.

In the end, after giving the matter a great deal attention, my overall assessment of the 3553(a) factors, I am sorry to say, is that they require a prison sentence above the sentence that the government seeks, and specifically, my assessment is that they require a sentence of no less than 15-years imprisonment. Such a sentence takes into account all of the mitigating factors I have covered. That includes the unusual rigor of your time in custody past and future.

Your offenses Mr. Kwon are simply that serious, and a 15-year sentence, in my judgment, is compatible with the various comparator cases the parties have cited, all factors considered. There's no case that is factually analogous to yours or even close, and of course, this Court is not bound by my colleagues' assessments of the just sentences in the very different cases assigned to them. But all factors considered, my judgment is a sentence of the one I will impose would fairly

PCBRKWOs

situate this case among the cases to which it can be fairly compared.  The William Sadleir case of mine to which the defense cites is not one of them.  That case bears no resemblance to this.

I have carefully considered whether notwithstanding that the 3553(a) require a higher sentence, I should nonetheless defer to the government's promise in the plea agreement to not seek a sentence above 12-years imprisonment.  That provision does not bind the Court, as you acknowledged during your guilty plea agreement proceeding, but it certainly merits the Court's close attention.  It is relatively rare that the United States Attorney agrees to a cap on a sentencing recommendation it will make to a Court.  It is all the more rare, in my experience, that the United States Attorney's Office agrees to a cap that is way below both the guidelines recommendation, which but for the statutory maximum would be life, and the statutory maximum, which is 25 years.

And the plea agreement here is a closely negotiated document that was entered into by professionals on both sides for whom the Court has the greatest esteem.  There is undeniably a systemic value in a court's giving a degree of deference to an agreement negotiated under such circumstances. There is a value in having counsel in cases before this Court know that the Court will respect their plea agreements and will within reason give effect to their recommendations.  A Court's

PCBRKWOs

known respect for plea agreements in turn facilitates plea discussions among counsel in future cases.  That is a good thing.

Had the Court's assessment of the 3553(a) factors been close to the recommendation to which the government committed in the plea agreement, I would have been comfortable for those reasons reducing the sentence to that which the government recommended.  That, however, was not the case here.  Try as I might, I simply cannot find a 12-year sentence here, or close to it, reasonable.  In particular, for all the reasons I set out at length, such a sentence would not be equal to the gravity of the offense here.  It would not be a just punishment.

The 15-year sentence that I will impose represents, to say the least, a significant downward variance from the guidelines recommendation.  I find such a variance warranted in light of all the facts I have covered, but 15 years is the lowest sentence I can impose that would reasonably respect the 3553(a) factors taken as a whole.

So with all that, I'm now going to formally state the sentence I intend to impose.  The attorneys will have a final opportunity to make legal obligations before the sentence is legally imposed.  Mr. Kwon, would you please rise.

After assessing the pertinent facts of this case and the factors under Section 3553(a), including the sentencing

PCBRKWOs

guidelines, it is the judgment of the Court that you are to serve a sentence of 15-years imprisonment, 180 months in the custody of the Bureau of Prisons.  There will be no ensuing term of supervised release.  The judgment will state that Mr. Kwon is to be given credit by the Bureau of Prisons for time served since December 31, 2024, when he arrived in the United States, following his extradition to the United States.

It will also state that in addition, he is to be given credit for 17 months and eight days, during which he was in pre-extradition custody, prior to his arrival in the United States.  It will state that in determining Mr. Kwon's sentence, the Court has assumed that the Bureau of Prisons would credit Mr. Kwon for his time in pre-extradition custody.  As to the particular counts, I impose a sentence of five years, 60 months, on Count One, which is the maximum sentence available, and a sentence of 15 years, 180 months, on Count Four, the terms to run concurrently.

As to a fine, I'm not going to impose a fine here.  To the extent you, Mr. Kwon, have money, it is better directed to recompense the victims in this case.

I'm not going to impose restitution for the reasons counsel have recommended.  I will, upon being furnished it, execute an order that explains why restitution is impracticable.  I do expect and encourage that the parties will work towards the recompense of victims through the other means

PCBRKWOs

we have described, specifically remission and the use of the bankruptcy plan.

I am hereby adopting as permanent, as final, the order of forfeiture that I entered in preliminary form at the time of the plea.  I'm also imposing, because I'm required to do so, a mandatory special assessment of $100 per count, for a total of $200, which shall be due immediately.

Does either counsel know of any legal reason why this sentence shall not be imposed as stated?

MS. MORTAZAVI:  No, your Honor.

MR. PATTON:  No, your Honor.

THE COURT:  All right.  The sentence as stated is imposed.

Government, are there open counts?

MS. MORTAZAVI:  There are, your Honor, and the government moves to dismiss Counts Two, Three, and Five through Nine.

THE COURT:  Granted.

Mr. Kwon, I'm about to advise you of your appeal rights.  To the extent you haven't given up your right to appeal your conviction and your sentence through your plea of guilty and the plea agreement you entered into with the government in connection with that plea, you have the right to appeal your conviction and your sentence.  If you are unable to pay for the cost of an appeal, you may apply for leave to

PCBRKWOs

appeal in forma pauperis.  The notice of appeal must be filed within 14 days of the judgment of conviction.

Mr. Patton, what sentencing recommendations would you like me to make to the Bureau of Prisons?

MR. PATTON:  Could I have a moment?

THE COURT:  Of course.

MR. PATTON:  Your Honor, we could ask that the Court recommend designation to Fort Dix.

THE COURT:  I'll be happy to make that recommendation. Mr. Patton, are there any recommendations you would like me to make otherwise?  Programming or anything with respect to the transfer abroad?

MR. PATTON:  If I may, two things, your Honor.  One, your Honor has already said it, but if you could include in the judgment that you expect that the Korean court will consider the U.S. sentence in imposing an overall just sentence.

THE COURT:  I'd be happy to do that.

MR. PATTON:  Secondly, if your Honor would include that, obviously this is not binding, but that the Court approves of a prisoner transfer to South Korea upon Mr. Kwon's application.

THE COURT:  I think what I would prefer to do is caveat that I support the United States Attorney's Office to the extent it supports a prison application.  I think they've indicated they will support such an application at the halfway

PCBRKWOs

point, and I'm happy to support that.

MR. PATTON:  That's fine.

THE COURT:  Very good.

Anything further from the defense?

MR. PATTON:  No, your Honor.

THE COURT:  Please be seated.  Look before we adjourn, I want to say a few things to various people.  To begin with, to the supporters and coworkers of Mr. Kwon, I want to thank those of you who are here to support him during what has to have been one of the darkest and hardest days of his life.  I'm sure it will be a source of support for him as he endures the period of his prison sentence to know that he has such supporters in his camp.

To the victims who are here, who participated by phone, or who may read this transcript, or hear of the sentencing, please know that you have my sympathy, and my hope that the process for recompense through the bankruptcy court or through remission results in getting a measure of justice to you.  In any event, I wish you all well.

I want to thank counsel.  This was a hard one, and this was as complicated and challenging a sentence as I have had in quite some time.  My law clerks were wowed by you and rightly so.  So am I.  Everyone in this courtroom has seen first-rate lawyering here, and those who read the papers saw the same.

PCBRKWOs

Finally, to you, Mr. Kwon, the nature of a sentencing is that I have to deliver a lot of hard messages to you. I now want to say something else, which is reading the letters about you from the people who know you best, I get it. I understand when you have inspired so many people. You are exceptionally articulate. You are inspiring. You are a terrific writer. You have got imagination, and you have got, more important than any of those things, kindness. Those things leapt off the page for me.

You made an epically big mistake here, and you are paying for it. But I have not lost sight of the fact that that is only a corner of your journey, and that there is so much of you to admire. You are still—trust me—a very young man and you will be when this saga ends. You will still have a lot of time ahead of you with all the gifts that have propelled you forward in the past. I want to encourage you to not give up hope. You have a great deal to offer our world, whether in the fields in which you have specialized in some other direction in which you may choose to take your gifts. But you have a great deal to offer, and if you channel that without crossing any lines, the world will be a better place for it. In any event, I want to wish you the very best.

THE DEFENDANT: Thank you, your Honor.

THE COURT: Thank you. We stand adjourned.

(Adjourned)